**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| CANEISHA MILLS, ET AL. | ) |
| | ) |
| Plaintiffs, | ) |
| v. | )   Civil Action No.: 08-1061 (RJL) |
| | ) |
| DISTRICT OF COLUMBIA | ) |
| 441 4th Street, N.W. | ) |
| Washington DC 20001 | ) |
| | ) |
| Defendant | ) |

_____ )

### PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Plaintiffs hereby respectfully move the Court for a preliminary injunction, as described below, to enjoin the further implementation of "Neighborhood Safety Zone" (NSZ) roadway seizure checkpoints, the primary purpose of which is general crime control, and to expunge all data collected in connection with the unconstitutional NSZ checkpoint program.

This motion is filed because the District of Columbia Metropolitan Police Department has instituted a roadblock and seizure program authorized on June 4, 2008 by MPD Special Police Order SO-08-06, "Neighborhood Safety Zones." This program has been used to operate checkpoints which serve to cordon off areas in the District of Columbia, at which motorists are stopped and questioned regarding their identification, activities and associations, which information they are forced to provide in order to proceed to their destination by vehicle.

Under clearly established law roadway checkpoints the primary purpose of which is general crime control are unconstitutional when used to stop drivers in the absence of individualized suspicion. City of Indianapolis v. Edmond, 531 U.S. 32 (2000). The Neighborhood Safety Zone checkpoint program has general crime control as its primary purpose.

Plaintiffs, acting on their own behalf and on behalf of a proposed class of D.C. residents possessing valid motor vehicle operator licenses, seek to enjoin the continued implementation of the NSZ checkpoints and, more generally, the implementation of roadway checkpoints that stop drivers in the absence of individualized suspicion (excepting roadblocks implemented under recognized exigent circumstances, such as to halt a fleeing felon or thwart an imminent terrorist attack).

Plaintiffs MILLS, SLOAN and LEAKS, acting on their own behalf and on behalf of a proposed class of individuals who were stopped at NSZ checkpoints, seek the expungement of all data and records collected through this system of unconstitutional and suspicionless checkpoints.

## STANDARDS FOR PRELIMINARY INJUNCTION

Preliminary injunctions are available where necessary to protect the rights of plaintiffs before a court issues final judgment on the merits.  Fed. R. Civ. Pro. 65.

In this Circuit,

> "a litigant must show 1) a substantial likelihood of success on the merits, 2) that it would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction.  The district court balances the litigant's showings in these four areas in deciding whether to grant an injunction."

Mova Pharmaceutical Corp. v. Shalala, 140 F.3d 1060 (D.C. Cir. 1998) (citations and internal quotations omitted).

As set forth in the Complaint, Plaintiffs are highly likely to succeed on the merits of their constitutional claims. It is unconstitutional to operate a roadway checkpoint the primary purpose of which is general crime control where such checkpoints are used to stop motorists in the absence of individualized suspicion. City of Indianapolis v. Edmond, 531 U.S. 32 (2000). The

2

NSZ suspicionless checkpoint program has general crime control as its primary, if not exclusive, purpose.

Plaintiffs will be irreparably harmed absent a preliminary injunction:  See Delaware & Hudson Ry. Co. v. United Transp. Union, 450 F.2d 603, 619-20 (D.C. Cir. 1971) (in cases involving a claim of interference with protected freedoms or other constitutional rights, the finding of irreparable injury depends on an appraisal of the probable validity of the legal premise underlying the claim of the right in jeopardy of impairment); See also, Mitchell v. Cuomo, 748 F.2d 804, 806 (2d Cir. 1984) (citing 11 Wright & Miller, Federal Practice and Procedure, § 2948, at 440 (1973) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.")).  Plaintiffs have not merely alleged constitutional injury, but have demonstrated that they will suffer violations of their Fourth Amendment right to be free from unwarranted and suspicionless seizure through the operation of roadway checkpoints.  As demonstrated in the accompanying memorandum in support of this motion, constitutional law is clearly established that roadway checkpoints where motorists are required by police to stop are unconstitutional where operated for the primary purpose of crime control, unless the police have conducted the stop based on individualized suspicion of criminal offense. See City of Indianapolis v. Edmond, 531 U.S. 32 (2000). Accordingly, unless defendant is enjoined from operating roadblocks for the primary purpose of crime control, plaintiffs will suffer irreparable harm.

The District's program of collecting personal and privileged data from those it stops at the checkpoints for entry into a database system that can be used for any law enforcement purpose also causes irreparable harm. Law abiding residents are having their identities and activities and associations contained in a law enforcement database which may be accessed and

further disseminated. The entry of such information on law abiding residents into a database that can be used for any law enforcement purpose can cause dissemination and access by law enforcement agencies that is irretrievable and uncollectable. Even with the remedy of expungement there will be irreparable harm where such data has already been accessed, replicated and/or further disseminated by law enforcement.

There is no countervailing interest that should prevent issuance of a preliminary injunction. While the government has an interest in general crime control, this does not warrant widespread violation of plaintiffs' civil rights. The Supreme Court specifically held general crime control checkpoints unconstitutional despite acknowledging strong interests of the government. City of Indianapolis v. Edmond, 531 U.S. 32 at 42 (2000).

The public interest is served by granting the relief requested. The public would benefit from an injunction enjoining the operation of these unconstitutional checkpoints and data collection program to which a large segment of the public is subject and at risk. Furthermore, the public certainly has an interest in the safeguarding of its constitutional rights.

Additional bases for the relief requested herein are set forth in the accompanying Memorandum of Law and Statement of Points and Authorities.

Pursuant to Local Rule 7, counsel for plaintiffs contacted the Office of the Attorney General for the District of Columbia to request consent to this motion. A message was left for Section Chief Kim Mathews Johnson on June 20, 2008. At the time of filing of this motion, counsel has not heard back from the Office of Attorney General.

June 20, 2008                                    Respectfully submitted,

 

 

                                               __/s/_____
                                               Carl Messineo [450033]
                                               Mara Verheyden-Hilliard [450031]
                                               PARTNERSHIP FOR CIVIL JUSTICE
                                               617 Florida Avenue, NW
                                               Washington, D.C. 20001
                                               (202) 232-1180
                                               (202) 350-9557 fax

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of June, 2008, copies of Plaintiff's Motion for A Preliminary Injunction and Memorandum in Support of Plaintiff's Motion for A Preliminary Injunction were e-filed and hand delivered along with copies of the Summons and Complaint in this case to the following:

Adrian M. Fenty, Mayor
1350 Pennsylvania Avenue, NW
Washington, DC 20004

Peter Nickles, Interim D.C. Attorney General
441 4th Street, NW
Washington, DC 20001

                                               __/s/_____
                                               Carl Messineo

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

CANEISHA MILLS, ET AL.                               )
                                                     )
              Plaintiffs,                            )
v.                                                   )          Civil Action No.: 08-1061 (RJL)
                                                     )
DISTRICT OF COLUMBIA                                 )
441 4th Street, N.W.                                 )
Washington DC 20001                                  )
                                                     )
              Defendant                              )
_____    )

**MEMORANDUM IN SUPPORT OF MOTION**
**FOR PRELIMINARY INJUNCTION**

### I. Introduction

Police checkpoints used to stop and inspect drivers without suspicion of any crime.
Armed police officers posted outside of neighborhoods to pull over all vehicles and question
those who seek to enter as to their purpose in driving upon the city streets, to interrogate citizens
to disclose the names, phone numbers and contact information of their friends, family and
associates (information which will first be "verified" to the officer's satisfaction and then be
permanently catalogued and cross-referenced in a law enforcement data base). Checkpoint
officers questioning residents about their associations, meetings, intentions, where they are
traveling to, the purpose of their travel; demanding drivers disclose the nature of their political
activities and name their political associates if their stated intention is political; and allowing the
privilege of vehicular entry or movement within the designated area based on police
determination that the purposes of travel provided by residents seems sufficiently "legitimate."
Large posters announce to those entering the checkpoint that "failure to comply with such a
request may result in arrest for 'Failure to Obey.'"

None of the above is a projection of a dark but hypothetical future.

It is all set out and authorized by the District of Columbia Metropolitan Police Department (MPD) Special Police Order SO-08-06, "Neighborhood Safety Zones," (NSZs) issued on June 4, 2008. While the use of roadblock seizure checkpoints to surround a neighborhood is a new policy, the MPD has maintained a long-standing practice of using roadway seizure checkpoints, also known as roadblocks, for the purposes of general crime control and also data collection on law abiding citizens. See, e.g., Allan Lengel, *The Washington Post*, "Safety Stops Draw Doubts: D.C. Police Gather Nonviolator's Data," May 2, 2005 at B1 (data collected on law abiding citizens secured through suspicionless "safety" checkpoints entered into master law enforcement database).

It is fundamental to the Fourth Amendment to the Bill of Rights that, absent strictly limited special circumstances not present herein, police may not stop and seize an individual, no matter how brief such seizure may be, in the absence of individualized suspicion of wrongdoing. The requirement of individual suspicion is a bedrock principle of Fourth Amendment jurisprudence. It is a critical bulwark against abusive and arbitrary exercise of the limited authority allowed to police.

The stopping of a car at the NSZ roadblocks established by the District of Columbia is a seizure under the Fourth Amendment. "It is well established that a vehicle stop at a highway checkpoint effectuates a seizure within the meaning of the Fourth Amendment." City of Indianapolis v. Edmond, 531 U.S. 32, 40 (2000). The Supreme Court has stressed that the exceptions to the general prohibition on suspicionless roadway seizures are strictly limited and that going beyond those strict limitations especially when the purpose is to effect general crime control is unconstitutional.

In <u>City of Indianapolis v. Edmond</u>, the Supreme Court established a clear standard: A roadway seizure checkpoint is unconstitutional if the primary purpose of the checkpoint program is for "general crime control purposes." <u>Edmond</u> at 47. The purpose analysis is undertaken at the programmatic level. <u>Id.</u> at 47 – 48.

According to MPD programmatic documents, including the Special Order establishing the checkpoint program, the purpose of the challenged "Neighborhood Safety Zone" checkpoints is general crime control.

The checkpoint program is plainly unconstitutional as a matter of law. The intelligence gathering component, whereby the MPD uses the unlawful checkpoints to collect data on the identities and activities of law abiding residents and visitors, is equally unconstitutional.

The protections of the Fourth Amendment were not stumbled upon by the Framers arbitrarily. It is a bulwark establishing minimal, but fundamental and essential, limitations on the encroachment of the state into private lives and movements. The Fourth Amendment was not enacted with a disregard for the compelling needs of government, it was established because in the name of such pressing asserted needs the government can and will inevitably seek to intrude upon and restrict individual freedoms. It will take little to morph the so-called Neighborhood Safety Zone checkpoint program from planning documents to trial implementations in Northeast Washington, DC, to the creation of ever-larger zones where the citizens are subject to a pass and identity system, their movements recorded and approved by police power.

A grave situation does indeed exist today in the District of Columbia when it comes to street crime and personal security. Although the situation is far less acute than it was in the 1980's and early 1990's, it is real and the people want action, a remedy that matters.

The population of the District requires a solution and response to the very real problems arising from street crime and violence, which are neither inevitable nor a necessary component of summertime as some have suggested. People want their children to be able to walk the streets in their neighborhoods in a safe and secure environment. The District's military-style roadblock system was deployed, in part, to give the appearance that the government is addressing this deeply felt need. But it is neither constitutional, nor effective. There is an urgent need to tackle the problems of violence, street crime, unemployment and education. This roadblock does not address any of them.[1]

Plaintiffs have filed the instant lawsuit on behalf of the class of all District of Columbia residents who are licensed motor vehicle operators to enjoin the District of Columbia from executing Neighborhood Safety Zone checkpoints and, more generally, to enjoin the District of Columbia from executing roadway seizure checkpoints for purposes of general crime control purposes.

The instant lawsuit seeks, on behalf of the class of all persons seized at the Neighborhood Safety Zone checkpoints, to expunge and prohibit from dissemination all records relating to the identities of persons or vehicle operators/owners who were, or whose vehicles were, stopped at such unconstitutional checkpoints.

Plaintiffs present a constitutional challenge to the NSZ checkpoint program and policy as well as to the practice of using checkpoint roadblocks for general crime control purposes in the absence of individualized suspicion. See generally, Plaintiffs' Verified Complaint.

---

[1] The Trinidad checkpoint was suspended after a night in which eight people were shot at six other locations throughout the District, See, Allison Klein and Clarence Williams, "Trinidad Driver Checks Halted, 8 People Shot Across District," *Washington Post*, June 13, 2008.

II.    **Background on the Neighborhood Safety Zones Program and the MPD's Use of Suspicionless Roadway Seizure Checkpoints for General Crime Control Purposes**

      A.    **The Primary Programmatic Purpose of the Challenged Roadway Seizure Checkpoint Program is General Crime Control**

The programmatic purpose of the "Neighborhood Safety Zone" checkpoint program is general crime control, as is conclusively established by the Special Order authorizing the program, the MPD training plan for the checkpoint program, the MPD brochure for citizens entitled "Neighborhood Safety Zones: For Your Safety," as well as Mayor Fenty and Chief Lanier's June 4, 2008 news release announcing the checkpoint system. See Edmond, 531 U.S. at 41 (relying on initiating Order of the Chief of Police and other descriptive police documents to establish programmatic purpose).

The programmatic purpose is admitted and asserted by the MPD itself to be general crime control. The opening sentence of the Special Order authorizing the NSZs identifies the purpose to be crime control. "The establishment of Neighborhood Safety Zones is **an effective law enforcement tool for addressing violent crime**. Vehicles are common instrumentalities of crime, particularly armed violent crime. . . ." Ex. 1, Special Order at 1 (emphasis added); Ex. 2, Lesson Plan at 3 (same).

The general crime control purpose is restated in all MPD documents describing the programmatic purpose of the checkpoint program. The MPD Special Order defines Neighborhood Safety Zones to be "delineated geographic areas designated by the Chief of Police in response to documented crimes of violence **the purpose of which is to** provide high police visibility, **prevent and deter crime**, safeguard officers and community members, and create safer District of Columbia neighborhoods." Ex. 1, Special Order at 1 (emphasis added); Ex. 2, Lesson Plan at 3 (checkpoints to "**prevent and deter crime**") (emphasis added); Id. at 4

(checkpoints to "**prevent and deter crime**") (emphasis added); Id. at 3 ("officers must ensure they follow the [Special Order] to keep these zones available for use as a **tool to prevent and deter crime**") (emphasis added); Id. at 7 ("An NSZ location shall be selected **for the purpose of addressing a neighborhood violent crime problem**.") (emphasis added); Ex. 3, MPD brochure for citizens ("the purpose of which is to provide high police visibility, **prevent and deter crime, and create safer District of Columbia neighborhoods**") (emphasis added); Ex. 4, Fenty and Lanier news release (a "**targeted initiative[] aimed at reducing criminal activity** and increasing quality of life in at-risk communities.") (emphasis added); Id. ("The program will authorize Metropolitan Police Department to set up public safety checks to help safeguard community members and create safer neighborhoods in the District by increasing police presence **aimed at deterring crime**.") (emphasis added); Id. (According to Police Chief Cathy Lanier, "The Neighborhood Safety Zones is just **another tool MPD will employ to stop crime before it happens**. . . .") (emphasis added).

"An NSZ **may be established solely in response to documented crimes of violence** occurring in a designated location." Ex. 1, Special Order at 2, 3 (emphasis added); Ex. 2, Lesson Plan at 5 (same); Ex. 4, Fenty and Lanier news release (same); Ex. 2, Lesson Plan at 7 ("Evidence of **crime problem** is a necessity") (emphasis added). The nature of severity of the triggering "crime problem" is broad and unrestricted. See Ex. 1, Special Order at 2 (defining the underlying program as "e.g., recently reported criminal incident(s) including homicides, shootings, robberies, and other offenses as approved by the Chief of Police.").

A related stated purpose of the checkpoints is to exclude from entry any vehicle except those where the motor vehicle operator presents and is able to prove to an officer's satisfaction "a legitimate reason" for entry into the neighborhood. Ex. 1, Special Order at 2 (defining

"Neighborhood Safety Zone Checkpoint" to be "A location at the perimeter of the NSZ where vehicles are stopped **for the purpose of determining whether the operator has a legitimate reason for entering the NSZ.**") (emphasis added); Ex 2, Lesson Plan at 4 (same); Ex. 1, Special Order at 4 (police to allow vehicle to enter only if police believe "the operator of the stopped vehicle has a <u>legitimate</u> reason for entering the NSZ") (emphasis in original).

The list of acceptable "legitimate reasons" is not coextensive with the scope of all lawful purposes. The six "legitimate" reasons are: "a. The person resides in the NSZ; b. The person is employed in the NSZ or is on a commercial delivery; c. The person attends school or a day-care facility, or is taking a child to, or picking up a child from, a school or day-care facility in the NSZ; d. The person is a relative of a person who resides in the NSZ; e. The person is seeking medical attention, is elderly, or is disabled; and/or f. The person is attempting to attend a verified organized civil, community or religious event within the NSZ." Ex. 1, Special Order at 4. Any reasons outside of these six, including "to visit a friend" or 'to go grocery shopping" or any other within a range of ordinary lawful activities is strictly prohibited except where there exists "exigent circumstances" and "[a]n official the rank of Sergeant or above assigned to the NSZ approved the entry." <u>Id</u>.

Stated intentions are not accepted at face value but officers are to "[r]equire proof of the reason for entry." <u>Id.</u> at 5.

To this end the police engage in an extraordinary additional element: the invasive questioning of persons about their associations, destinations and other privileged information.

**B.    The Neighborhood Safety Zone Checkpoint Program**

The MPD "Neighborhood Safety Zone" program goes even farther than the prior use of roadway checkpoints. The NSZ program establishes exclusion zones ("Neighborhood Safety

Zones") around or within D.C. neighborhoods and establishes an armed presence at checkpoints at perimeter entrances into the neighborhood. See Ex. 1, Special Order at 2 (checkpoints located "at the perimeter of" the neighborhood zone).

There are no programmatic limitations on the size of the exclusion zones, they are limited only by the resources of the police and their ability to cordon off neighborhoods. See Ex. 2, Lesson Plan at 4 ("Number of checkpoints will be determined by resources, size of zone, etc."). The MPD has sufficient resources to cordon off massive neighborhood areas of the District, as reflected by the MPD's cordoning of large swaths of the District in the context of International Monetary Fund / World Bank meetings and protests.

Upon approach into an NSZ neighborhood, all vehicles will be stopped. By closing other entry options, utilizing one way streets, and by redirecting traffic from other roadways to the checkpoint, the police funnel traffic to the checkpoint including vehicles the drivers of which hold no intention to enter the "safety zone." This creates a vortex or drain-like effect whereby vehicles moving outside of the zone are swept into the checkpoint. See, Allison Klein, Elissa Silverman, "Police Close Streets to Steer Drivers to Checkpoint," *Washington Post*, June 10, 2008.

Persons who wish to drive into the zone must, as a condition of potential passage, disclose their identity and provide their driver's license information, as well as car registration (which reveals their friends or family members were they to have borrowed the vehicle), for entry into MPD data records. The police also record vehicle tag information. In addition, as a condition of potential passage, persons must provide the government an explanation as to their purpose and destination, provide telephone, contact and any other information related to their friends, family, or associates deemed necessary to "verify" the "legitimacy" of their purpose for

entering the neighborhood. <u>See</u> Ex. 1, Special Order at 4 (A checkpoint officer is to "Inquire whether the operator of the stopped vehicle has a <u>legitimate</u> reason for entering.") (emphasis in original); <u>Id.</u> at 5 (The checkpoint officer is to "Request operator identification when attempting to determine the legitimacy of the reason for entering.").

The absence of a police approved "legitimate reason" for entry into the neighborhood is considered a sufficient nexus to "criminal incidents including homicides, shootings, robberies, and other [unspecified general criminal] offenses" that exclusion of the vehicle is asserted by police to be justified. <u>See</u> Ex. 2, Lesson Plan at 5; <u>see also</u> Ex. 1, Special Order at 2.

The officer is not to accept the stated reason at face value, but is to "[r]equire proof of the reason." <u>See</u> Ex. 1, Special Order at 5.

The officer is to then question the individual further in order to elicit "information sufficient for the [officer] to verify the accuracy of the reason." <u>See Id.</u> at 5.

As part of the stop and verification process, the officer may contact by phone or visit the address of any person or organization related to the NSZ visit to "verify" the stated intention. <u>See, Id.</u> ("the operator must provide information sufficient for the member to verify the accuracy of the reason. This may include, but is not limited to, a telephone number of the address to which the person seeks entry (which the member may use to verify that the resident/occupant expects the *person(s)*) and/or an invitation to a verified organized civil, community, or religious event located within the NSZ.") (emphasis added). The reference here to "persons" in the plural reflects that the scope of the verification process extends beyond even the motor vehicle operator to include the friends, family or associates and purposes of passengers.

In other words, the stop and "verification" process is so extensive and intrusive that it ordinarily may go beyond the scope of simple and swift questions to the driver and encompass an

unannounced visit or telephone call by the police to friends, family or associates of the driver and of the passengers.

For those vehicles that are denied entry, the police are required to place into MPD records on a PD 76 the identity of the operator, the vehicle description, vehicle tag number and the reason for the denial.

For vehicles that are allowed entry or where the operator elects to leave the checkpoint without providing information, the police are required to record on a PD 76 the vehicle tag number and, where applicable, the reason for entry. Id. at 6. These referenced items of information are just what is minimally required.

Each PD Form 76, the Stop or Contact Report, contains standard fields for recordation of the name, home address, phone number, gender, race, date of birth, height and weight, eye color, hair color, complexion, driver's license number and other identifying characteristics. It also has a place to record whether the individual was a passenger in a vehicle. See Id. at 11.

      **C.    MPD Has a Long-Standing Practice of Roadway Checkpoints for Purposes of Crime Control, Including Most Recently As a Component of the Neighborhood Safety Zone Program**

The District of Columbia Metropolitan Police Department has an established practice of using roadway checkpoints for the purposes of general crime prevention. Defendant's practice has been repeatedly rejected by the Courts as unconstitutional. See, e.g., United States v. Hudson, Criminal Action No. 07-00082 (ESH), June 5, 2007 Memorandum Opinion at 11 (excluding evidence seized at unconstitutional checkpoint executed by an MPD "Street Crime / Power Shift Unit," observing that "evidence points to crime control as the roadblock's primary purpose and finding no evidence that checkpoint effectively advanced its claimed purpose of stopping speeding); Galberth v. United States, 590 A.2d 990 (D.C. 1991) (declaring

unconstitutional a Montello Avenue checkpoint which was placed in the Trinidad neighborhood for the purpose of deterring violent crime, including violent crime and drug traffic, on the basis that this was an unconstitutional purpose on which to make suspicionless seizures).

According to police statements to the *Washington Post*, since the year 2002 the MPD has also used such checkpoints for intelligence gathering and data collection of information related to law-abiding citizens. Allan Lengel, *The Washington Post*, "Safety Stops Draw Doubts: D.C. Police Gather Nonviolator's Data," May 2, 2005 at B1. The information collected on those seized is "fed into the database, which is linked to a computer that includes arrest records and mug shots of criminals." Id.; See also Ex. 5, Yellow House Associates, LLC Project Summary, available at www.yellowhouseassociates.net (MPD's Columbo Intelligence data system combines over twenty databases and enables free text or "Google-like" searching of information).

### III. ANALYSIS

#### A.     The NSZ Roadway Checkpoints Effect Fourth Amendment Seizures

It is well established that a Fourth Amendment seizure occurs when a vehicle is stopped at a checkpoint. Michigan State v. Sitz, 496 U.S. 444, 450 (1990) ("[A] Fourth Amendment 'seizure' occurs when a vehicle is stopped at a checkpoint."); City of Indianapolis v. Edmond, 531 U.S. 32, 40 (2000) ("It is well established that a vehicle stop at a highway checkpoint effectuates a seizure within the meaning of the Fourth Amendment."); United States v. Martinez-Fuerte, 428 U.S. 543, 556 (1976) ("checkpoint stops are 'seizures' within the meaning of the Fourth Amendment"); United States v. Bowman, 496 F.3d 685 (D.C. Cir. 2007) (applying Fourth Amendment seizure analysis to MPD license-and-registration roadway checkpoint); United States v. Davis, 270 F.3d 977, 979 (D.C. Cir. 2001) (Fourth Amendment seizure effected

by MPD checkpoint that stopped vehicle as part of "Summer Mobile Force" anti-crime initiative); United States v. Montgomery, 561 F.2d 875, 878 (D.C. Cir. 1977) ("The stop of a moving vehicle - - even if the period of detention is brief - - involves a 'seizure' within the meaning of the fourth amendment."); United States v. Hudson, 07-CR-00082 (ESH), June 5, 2007 Memorandum Opinion at 7 ("It is well settled that stopping a vehicle at a roadblock constitutes a Fourth Amendment 'seizure.'), citing Edmond 496 U.S. at 450.

   "The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975), citing Davis v. Mississippi, 394 U.S. 721 (1969) & Terry v. Ohio, 391 U.S. 1, 16 – 19 (1968). A checkpoint stop does intrude, even if only in a limited way, on motorists' right to 'free passage without interruption' and arguably on their right to personal security." " United States v. Martinez-Fuerte, 428 U.S. 543, 557 - 558 (1976), citing, Carroll v. United States, 267 U.S. 132, 154 (1925).

   The *sine qua non* of a roadway seizure is the stopping of a vehicle.

   It is immaterial for the purpose of determining whether a seizure has occurred whether, after the vehicle stop, the detention may be brief[2] or the motorist may not be arrested and may be free to travel elsewhere as he or she pleases. While such circumstances may be relevant to a determination of whether such seizure was "reasonable," they cannot be used to change the fact that checkpoint stops constitute "seizures."

---

[2]  The intrusiveness of a stop or roadway seizure is reached in the constitutional analysis only if the stop is for a permissible purpose, in this case, for a purpose other than general crime control. A vehicle stop or roadway seizure is unconstitutional - - no matter how brief or unintrusive - - if the stop is made as a component of a law enforcement program the primary purpose of which is general crime control.

MPD materials establish that at NSZ checkpoints, all vehicles "are stopped" by police. Ex. 1, Special Order at 1 ("A location at the perimeter of the NSZ where **vehicles are stopped** . . .") (emphasis added).

Motorists are warned that the failure to stop or to provide identification subjects that motorist to potential arrest:

> "**NOTICE This area has been declared a NEIGHBORHOOD SAFETY ZONE BY ORDER OF THE CHIEF OF POLICE. VEHICLES ENTERING THIS AREA ARE SUBJECT TO STOP. OPERATORS MUST PROVIDE IDENTIFICATION. . . .**Failure to comply with such a request may result in arrest for 'Failure to Obey' per Title 18 DCMR §2000.2."

Ex. 6, Official Neighborhood Safety Zone poster (emphasis in original).

The MPD Special Order authorizing the checkpoints requires, as is required for all seizures that do not result in arrest, that a PD Form 76 (Stop or Contact Report) be completed for each seizure. See Ex. 1, Special Order at 6.

**B.      Roadway Checkpoints - - Including the NSZ Checkpoints - - Are Unconstitutional Where the Primary Purpose of the Checkpoint Program is General Crime Control**

As discussed above, the primary purpose of the NSZ Checkpoint Program is crime control.

The U.S. Supreme Court addressed the issue of programmatic purpose squarely in the seminal case of City of Indianapolis v. Edmond, 531 U.S. 32, 41 (2000) (emphasis added). "We have *never* approved a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing."

The D.C. Circuit has applied the Edmond case and insodoing has articulated the applicable legal standards to be the same as stated above.

> "The Supreme Court has derived a principle from the Fourth Amendment: a search or seizure of a person must be based on individualized suspicion of

wrongdoing. E.g., Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); Delaware v. Prouse, 440 U.S. 648, 654 – 55, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); but see Brown v. Texas, 443 U.S. 47, 51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). As exceptions to this principle, the Court has upheld the constitutionality of vehicle checkpoints near the border to intercept illegal aliens (United States v. Martinez-Fuerte, 428 U.S. 543, 556, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976)), and roadblocks aimed at apprehending drunk drivers (Michigan Dep't of State Police v. Sitz, 496 U.S. 444, 450, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990)). The Court has indicated that roadside truck weigh-stations and roadblocks to check drivers' licenses and vehicle registrations would also qualify as exceptions to the general principle. Delaware v. Prouse, 440 U.S. at 663 & n. 26, 99 S.Ct. 1391; Edmond, 531 U.S. at 39, 121 S.Ct. 447. *Concerned that its exceptions would swallow the principle of individualized suspicion, 531 U.S. at 46-47, 121 S.Ct. 447, the Court in* Edmond *laid down a line: 'When law enforcement authorities pursue primarily general crime control purposes at checkpoints . . . stops can only be justified by some quantum of individualized suspicion.'* Id. *At 47, 121 S.Ct. 447. Even if the police check licenses at the roadblock, their stopping of vehicles would violate the Fourth Amendment when the 'primary purpose of the checkpoint program' is the discovery and interdiction of illegal narcotics.'* Id. *At 46, 34, 121 S.Ct. 447. . . . Throughout the text the Court states again and again that when the 'primary purpose' of a roadblock is general crime control it is unconstitutional.* Id. *At 38, 41, 42, 44, 46, 47, 48, 121 S.Ct.447."*

United States v. Davis, 270 F.3d 977, 979 (D.C. Cir. 2001) (emphasis added).

The Supreme Court warned against roadblock seizures for general crime control as being deleterious to American life and constitutional protections.

"If we were to rest the case at this high level of generality, there would be little check on the ability of the authorities to construct roadblocks for almost any conceivable law enforcement purpose. Without drawing the line at roadblocks designed primarily to serve the general interest in crime control, the Fourth Amendment would do little to prevent such intrusions from becoming a routine part of American life."

City of Indianapolis v. Edmond, 531 U.S. 32, 42 (2000).

Stopping a vehicle at a checkpoint constitutes a seizure, no matter how brief the stop may be. See Id. at 40.

The exceptions to the requirement of individual and particularized suspicion are strictly limited to "special circumstances," and for purposes of roadway checkpoints include being at or near international border crossings in light of the unique and imperative need to preserve the

14

integrity of national borders, or strictly limited roadway stops that preserve the immediate safety of roadway use, for example, through a sobriety checkpoint or a license/registration/inspection verification checkpoint. See Michigan Dept. of State Police v. Sitz, 496 U.S. 444 (1990) (sobriety checkpoint where all vehicles are stopped for a few seconds for signs of intoxication); See also Delaware v. Prouse, 440 U.S. 648, 663 (1979) (suggesting it is constitutional to establish vehicular checkpoints for purposes of roadway safety to confirm operator licensure, vehicular registration and inspection); See also United States v. Bowman, 496 F.3d 685 (D.C. Cir. 2007) (even a license-and-registration checkpoint may be unconstitutional if operated for primary purpose of general crime control); United States v. Davis, 270 F.3d 977 (D.C. Cir. 2000) (same); cf. United States v. McFayden, 865 F.2d 1306 (D.C. Cir. 1989) (pre-Edmond case authorizing license and registration checkpoint).

The Supreme Court has been clear on the matter of checkpoint seizures. These limited and exceptional "special circumstances" do not and cannot encompass general crime control or else the exceptions would swallow the rule and render the Fourth Amendment an empty measure. See Id. at 37 (2000) (prohibiting suspicionless seizures at roadway checkpoints the primary purpose of which is "to serve the general interest in crime control"); Chandler v. Miller, 520 U.S. 305, 314 (1997) (defining "special needs" to be "concerns other than crime detection"); Skinner v. Railway Labor Executives Association, 489 U.S. 602, 619 (1989) (exceptions warranted based on "special needs, beyond the normal need for law enforcement").

When presented with a challenge to the constitutionality of a checkpoint, the Court is to first determine the primary purpose of the checkpoint program and determine whether it is permissible. If there is a permissible primary purpose, then the Court is to proceed with two further inquiries. The second inquiry is whether the checkpoint system is an effective means of

furthering the identified constitutionally legitimate purpose. Third, the Court must evaluate whether the checkpoint is "minimally intrusive."  U.S. v. Bowman, 496 F.3d 685, 692 (D.C. Cir. 2007) (citing United States v. McFayden, 865 F.2d 1306, 1311-12 (D.C. Cir. 1989) (citing in turn Delaware v. Prouse, 440 U.S. 648, 659, 662 (1979); United States v. Martinez-Fuerte, 428 U.S. 543, 558-59 (1976); Brown v. Texas, 443 U.S. 47, 51 (1979)).

For the NSZ checkpoints and, more generally, for roadway checkpoints the primary purpose of which is determined to be general crime control, the analysis is complete with the first factor. Such checkpoints are the very type of checkpoints that are unconstitutional, as their primary purpose of suspicionless seizures for the purpose of general crime control is impermissible.

>        **C.    The NSZ Checkpoint Program Is Distinguishable From the Sobriety Checkpoint Program Allowed Under Sitz**

The NSZ checkpoints are not similar or comparable to the sobriety checkpoint deemed permissible by the U.S. Supreme Court Michigan Dept. of State Police v. Sitz, 496 U.S. 444 (1990), which had as its primary purpose the immediate protection of roadway safety. Edmond, 531 U.S. at 39.

The Sitz sobriety checkpoint was deemed constitutional because the checkpoint was "designed to eliminate" the type of "*immediate, vehicle-bound* threat to life and limb" posed by drunk driving. Edmond, 531 U.S. at 43 (emphasis added); Id. at 39 (Sitz sobriety checks were "clearly aimed at reducing the *immediate hazard* posed by the presence of drunk drivers on the highways and there was an obvious connection between the imperative of highway safety and the law enforcement practice at issue.") (emphasis added).

There is a constitutionally significant distinction that is drawn by the Supreme Court between checkpoints designed to eliminate an "immediate, vehicle-bound threat to life and limb"

16

from roadway checkpoints that focus on reducing a specific crime threat that is perceived to be facilitated by vehicle operation.

In <u>Sitz,</u> checkpoint stops averaged twenty-five seconds and the police did not check identity papers (which can be used for general crime control purposes to run data through general crime or law enforcement databases), and specifically did not review the driver's license and car registration unless the officer detected signs of intoxication and directed the vehicle for further testing. <u>Sitz</u>, 496 U.S., at 447.

This is in sharp contrast to the questioning and verification process in the instant roadblock, where police require disclosure of the acquaintances, friends or family that the vehicle operator wishes to visit as well as proof or verification which may be satisfied by having the police place a call or contact that person.

Unlike the NSZ checkpoint program, both the programmatic purpose of the actual functioning of the <u>Sitz</u> sobriety checkpoints are narrowly tailored to the immediate protection of roadway safety and specifically to the detection and removal of vehicles being driven by persons under the influence of alcohol.

> **D.      The NSZ Suspicionless Checkpoints Cannot Be Justified as a Deterrent to Crime**

One basis publicly advanced by the MPD for the NSZ checkpoints is the contention that it is necessary to utilize suspicionless roadway checkpoints in response to a documented and specific law enforcement need evidenced by crime statistics. The NSZ checkpoints are justified by police - - as they were also in <u>Edmond</u> - - as an urgent response to specific "recently reported criminal incident(s) including homicides, shootings, robberies, and other offenses as approved by the Chief of Police." Ex. 2, Lesson Plan at 5.

This is plainly a justification based on the need to deter crime. This is exactly where the constitutional requirements of reasonable suspicion are at their apex. If police could use the existence of crime to justify suspension of constitutional protections, there would be no Constitution left to speak of.

In <u>Edmond</u>, the government argued that the primary purpose of the checkpoints was to interdict and deter the specific threat of vehicles being used to facilitate violent crime, specifically drug trafficking. <u>Edmond</u>, 531 U.S. at 41. The government submitted a police affidavit attesting that the location of the checkpoints was determined in advance based on evidence of prior criminal activity and crime statistics and traffic data, <u>Id.</u> at 35, which indicated a specific and compelling need to combat drug trafficking in that location.

Still, the Supreme Court rejected the reasoning that presentation of a specific area's need somehow moved the purpose of the program outside of the parameters of general crime control. The fact that there was a strong and compelling interest in prevention of such violent crime within the area did not alter the constitutional requirement of individualized suspicion. <u>Id.</u> at 42 (acknowledging the "severe and intractable nature of the drug problem"); <u>Id.</u> ("There is no doubt that traffic in illegal narcotics creates social harms of the first magnitude."), <u>citing</u>, <u>Treasury Employees v. Von Raab</u>, 489 U.S. 656, 668 (1989); <u>See also</u> <u>Von Raab</u>, 489 U.S. at 660 (1989) (identifying that drug trafficking "may be effected by violence or its threat.").

A specific area's problems with violent street crime within the District are no less urgent of an interest. Such specific needs do not here provide a basis to dispense with the constitutional requirement of individualized suspicion any more than they did in <u>Edmond</u>.[3]

---

[3] Nor, as discussed below, is the District's roadblock program even an effective response to the very real problems that District residents face. However, as below, the effectiveness of the program need not be assessed where the programmatic nature renders the checkpoint system unconstitutional.

That a stated goal of the program is deterrence or interdiction of vehicles to be used as implements of a crime, as distinct from a stated goal of arrest, does not remove the purpose of the checkpoints from the scope of "general crime control."

The Eleventh Circuit soundly rejected the strategy of such a justification for suspicionless searches and seizures of attendees at a protest which, each year, resulted in violation of federal law when protestors marched and trespassed upon a military base as a recurring act of unlawful civil disobedience.

> "It is quite possible that both protestors and passersby would be safer if the City were permitted to engage in mass, warrantless, suspicionless searches. Indeed, it is quite possible that our nation would be safer if police were permitted to stop and search anyone they wanted, at any time, for no reason at all. Cf. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (requiring that police demonstrate individualized suspicion that a suspect is armed before frisking him). Nevertheless, the Fourth Amendment embodies a value judgment by the Framers that prevents us from gradually trading ever-increasing amounts of freedom and privacy for additional security. It establishes searches based on evidence — rather than potentially effective, broad, prophylactic dragnets — as the constitutional norm."

Bourgeois v. Peters, 387 F.3d 1303, 1311 - 1312 (11th Cir. 2004).

Likewise, in Edmond, the Supreme Court - - while acknowledging the importance of the interdiction or detection of criminal conduct - - refused to allow that to justify the constitutional violations inherent in that checkpoint system. Edmond, 531 U.S. at 43 (Acknowledging that "The detection and punishment of almost any criminal offense serves broadly the safety of the community, and our streets would no doubt be safer but for the scourge of illegal drugs" and declaring the suspicionless checkpoints to be unconstitutional).

### E.    The NSZ Suspicionless Seizure Checkpoints Cannot Be Justified on the Claim That Motor Vehicles Are Facilitative of Violent Crime

The District has also publicly argued that the NSZ checkpoints are justified because motor vehicle operation is facilitative of violent crime. The Supreme Court entertained and

rejected a similar government argument in <u>Edmond</u>, that the <u>Edmond</u> checkpoints were justified by the fact that vehicles are facilitative of drug trafficking and are potential instruments of violent crime because they are used to conceal and transport contraband.

In rejecting this argument, the Court explained that "The problem with this argument is that the same logic prevails any time a vehicle is employed to conceal contraband or other evidence of crime. This type of connection to the roadway is very different from the close connection to roadway safety that was present in <u>Sitz</u> and <u>Prouse</u>." <u>Edmond</u>, 531 U.S. at 43. The argument that vehicles are facilitative of violent crime is no different than the interest in general crime control, a purpose for which individualized suspicion is constitutionally required. To provide otherwise would undermine the Fourth Amendment.

## F.    The NSZ Suspicionless Seizure Checkpoints Cannot Be Justified as License-and-Registration Checkpoints

Applying the immediate roadway safety framework of <u>Sitz</u>, the D.C. Circuit has upheld license-and-registration checkpoints, roadblocks in which all vehicles are stopped to confirm operator licensure and vehicle registration and inspection. <u>See</u> <u>also</u> <u>Delaware v. Prouse</u>, 440 U.S. 648, 661 (1979) (suggesting that roadway checkpoints would be constitutional if established for the purposes of ensuring immediate roadway safety by confirming operator licensure, vehicle registration and inspection); <u>United States v. McFayden</u>, 865 F.2d 1306 (D.C. Cir. 1989) (pre-<u>Edmond</u> case permitting registration-and-licensure checkpoint).

The NSZ checkpoints are <u>not</u> justified as licensure-and-registration checkpoints. Nor do they function as licensure-and-registration checkpoints for purposes of securing immediate roadway safety.

The request of identification at the NSZ checkpoint is asserted to be ancillary to, and for informing, the determination of the legitimacy of the reason provided for entry. <u>See</u> Ex. 1,

Special Order at 5 ("Request operator identification when attempting to determine the legitimacy of the reason for entering an NSZ."); Ex. 2, Lesson Plan at 9 (same).

MPD policy materials indicate that drivers may elect to depart the checkpoint without providing such information to police, with the consequence being that the drivers cannot enter the zone by vehicle. Id. at 12 (allowing operator to "elect[] to leave the checkpoint without providing information"); Ex. 3, citizens' brochure ("Vehicle operators entering an NSZ will need to provide personal identification (i.e., driver's license) and information sufficient for determining the accuracy of the reason for entering the area."). The significance of this allowance, under policy, to elect to not provide such information reinforces that the programmatic purpose of the NSZ checkpoints is not to implement licensure-and-registration checkpoints for the purposes of roadway safety.

Even were such present, a requirement that all drivers produce license and registration at the checkpoint cannot "save" or legitimize a checkpoint the primary purpose of which is to control crime. See gen'ly Edmond, 531 U.S. 32 (declaring checkpoint unconstitutional where primary purpose was crime control, even though police required production of license and registration); See also Meeks v. State, 692 S.W.2d 504, 508 (Tex.Crim.App. 1985) ("The mere asking for a driver's license will not validate the stopping of an automobile if it is clear that the driver's license check was not the reason for detention."), cited in Galberth v. U.S., 590 A.2d 990, 998 (D.C. 1991) (declaring Trinidad neighborhood checkpoint unconstitutional where primary purpose was general deterrence of drug transactions).

In the pre-Edmond case of United States v. McFayden, 865 F.2d 1306 (D.C. Cir. 1989), the D.C. Circuit upheld the constitutionality of a license-and-registration roadblock. "If a driver's license and registration were in order, the car would be permitted to continue within a matter of

seconds." Only if the documents were not in order would a computer check be run on the individual. McFayden, 865 F.2d, at 1308. Although the roadblock at issue was put in place as an element of an anti-narcotics initiative, Operation Cleansweep, the U.S. District Court found that the facts as related above established that the roadblock was operated for the purpose of traffic enforcement. The McFayden Court stressed, citing the Supreme Court case of Delaware v. Prouse, that the constitutionality of the checkpoint turned in part on the fact that "they must detain drivers no longer than is reasonably necessary to accomplish the purpose of checking a license and registration, unless other facts come to light creating a reasonable suspicion of criminal activity." McFayden. 865 F.2d at 1312, citing Prouse, 440 U.S. at 662.

The D.C. Circuit has since expressly held that the reasoning and analysis of McFayden has been refined or modified by the superceding Edmond case which established the necessary inquiry into programmatic purpose underlying the roadblock. See United States v. Davis, 270 F.3d 977, 981 (D.C. Cir. 2000).

The D.C. Circuit has entertained two post-Edmond cases related to such roadblocks, United States v. Davis, 270 F.3d 977 (D.C. Cir. 2000) and United States v. Bowman, 496 F.3d 685 (D.C. Cir. 2007).

In both Davis and Bowman, the MPD operated checkpoints at which they demanded license and registration from all vehicles. In both cases the checkpoints were a part of a larger crime prevention program. In each of these cases the D.C. Circuit held that even if the checkpoints functioned to uniformly require production of license and registration from all

vehicles, such suspicionless routine roadway seizures would be unconstitutional were they

implemented for the primary purpose of general crime control.[4]

### G.    The Fatal Flaw in the NSZ Program is That it Imposes Suspicionless Roadway Seizures for the Purpose of Crime Control; The Pre-<u>Edmond</u> Second Circuit Case of <u>Maxwell v. City of New York</u> Is Inapplicable

All analyses lead back to the same simple and fatal obstacle to the District's NSZ plan:

the NSZ roadway seizure checkpoints are for crime control, which is precisely where the need

for individually particularized suspicion or cause is unavoidable.

Given the District's previous failures in establishing constitutionally sound roadblocks, it

is unclear how the District can assert that the NSZ roadblock and neighborhood exclusion system

- - which goes even farther afield than prior efforts by surrounding targeted neighborhoods and

by subjecting drivers and residents to routine invasive interrogation about activities and

associations - - can be constitutional.

The District of Columbia and its Office of the Attorney General has, however, articulated

the "basis" on which it seeks to circumvent the plain terms and clear holding of the <u>Edmond</u> case

which was decided in 2000.

Mayor Adrian Fenty and Chief of Police Cathy Lanier have published a brochure titled

"Neighborhood Safety Zones," that poses the question, "Are such zones Constitutional?" and

answer the question as follows: "Yes. The U.S. Courts have found that such zones are

Constitutional when limited in scope, and when conducted for a legitimate law enforcement

---

[4]    In <u>Davis</u>, the D.C. Circuit observed that the challenged checkpoint was part of the MPD's Summer Mobile Force initiative, the stated objective of which was "to restore the public's confidence in the Metropolitan Police Department through the reduction and prevention of crime and violence by utilizing short-term, pro-active, high visibility enforcement techniques." <u>Davis</u>, 270 F.3d at 981. In <u>Bowman</u>, the checkpoint was part of a larger program. The testifying officer was a part of the "Seventh District High Impact Tactical Team," which had the acknowledged responsibility or purpose of "combating crime in the Seventh District [,] . . . [p]rimarily the retrieval of narcotic[s] and guns from the streets." <u>Bowman</u>, 496 F.3d 685, 693-94 (D.C. Cir. 2007).

purpose."[5] This remarkably legally deficient and inaccurate explanation provided to the residents of the District, and approved by the Mayor's Attorney General, Peter Nickles, is then immediately followed by a quote from the pre-Edmond case of Maxwell v. City of New York, 102 F.3d 664 (2d Cir. 1996). The NSZ checkpoint program shares many overlapping characteristics with the checkpoint zone set up in Maxwell. However, the Maxwell checkpoint could not stand under Edmond. Its asserted purpose was for generalized crime control, that of deterring drive-by shootings that were perceived to be connected with the drug trade. The Second Circuit evaluated the constitutionality of the Maxwell checkpoint using a scheme squarely rejected by the Supreme Court's holding in Edmond four years later. As such the Maxwell opinion was rendered to a truncated and relatively short life-span.

The Maxwell case is not controlling. It was issued by a Court outside of this jurisdiction that is subordinate to the U.S. Supreme Court and its ruling in Edmond, was issued prior to Edmond, and is in direct contravention to the Edmond holding. The fact that the District feels unencumbered by controlling Supreme Court case law evidences that it has established its sweeping checkpoint program using a model in complete disregard for its obligations under the Fourth Amendment to the Constitution.

The District's utter failure to meet, and apparent contempt for, the well-established guidelines for constitutional checkpoints, renders any evaluation of the second and third prong of the analysis unnecessary. As the checkpoints were established for general crime control purposes, and as such violate the Fourth Amendment, there is no additional inquiry to be had. Even were there to be, the District would fail.

With respect to the second factor, effectiveness to achieve a permissible purpose, *there is no permissible purpose present*. Further, the District will be unable to establish that the NSZ

---

[5] This is the same language that is used in the MPD SO – 08 – 06, June 4, 2008.

checkpoints are effective at lowering crime in the District of Columbia overall (as opposed to squeezing shootings out of one area and into another) or, within the confines of the targeted zone,[6] more effective than an enhanced police presence which deters crime without imposing unconstitutional suspicionless seizures and roadblocks.

The population of the District requires a solution and response to the very real problems arising from street crime and violence. People want their children to be able to walk the streets in their neighborhoods in a safe and secure environment. The District's roadblock system was deployed, in part, to give the appearance that the government is addressing this deep felt need. But it is neither effective, nor constitutional.

No doubt crime is temporarily and locally depressed when the police direct massive resources from the remainder of the District or a particular police district into a highly targeted neighborhood, but it is impossible to establish that the suspicionless seizure, questioning and data collection system is responsible as distinguished from the massive police presence.

A unanimous panel of the D.C. Court of Appeals wrote with respect to such unconstitutional checkpoints, as used (ultimately to arrest over 50,000 persons) in the anti-violence and anti-drug initiative Operation Cleansweep:

> "The purported deterrence rationale for the Galberth roadblock [located at Montello Avenue and Queen Street, N.E. in Trinidad]. . . was addressed to problems of general law enforcement, namely deterring drug traffic and violence and preventing 'violence, drugs and guns,' not to problems predictably associated with persons who are stopped at the roadblock. Such a justification is antithetical

---

[6] During the existence, and after the close, of its recent Trinidad neighborhood roadblock, the District proclaimed success because it stated that there had been no shootings or violent crime reported in the NSZ it established. Keith L. Alexander and V. Dion Haynes, *in Face of Protests, Police Call Area Checkpoints A Success*, Washington Post, June 8, 2008 at C06 (Assistant Police Chief Diane Groomes expressed her belief that the program had satisfied one of its main goals, stating "We did not hear gunfire."); Brian Westley, *DC Police Chief Defends Checkpoints Before Council*, The Associated Press Monday, June 16, 2008 (Police Chief Lanier testified that roadblock was a success, noting that there were no shootings while the checkpoints were in place).

The District's approach to the terrible series of mostly unrelated shootings the weekend of May 29 – June 2, 2008 was to announce the establishment of the NSZ program and its first checkpoint in Trinidad.

to the Fourth Amendment. See Delaware v. Prouse, supra, 440 U.S. at 659 n. 18, 99 S.Ct. at 1399 n.18 ('the general interest in crime control' is insufficient to justify suspicionless stops).

Moreover, there is no empirical evidence that the roadblock technique itself effectively promoted the government's interest in deterring drug crimes. Indeed, common sense (see Sitz, supra, 110 S.Ct. at 2487), as well as the police use of 'saturation' patrols, suggests that any disruption resulted from the highly visible police presence during the roadblock, and that any law enforcement technique involving a substantial police presence would have had a similar effect."

Galberth v. United States, 590 A.2d 990, 999 (D.C. 1991).

With respect to the third factor, the District's checkpoint and questioning system cannot even approach a burden of being "minimally intrusive." The District's unprecedented level of intrusiveness does not pass constitutional muster. Requiring law-abiding people to provide an explanation of where they are going to law enforcement to be followed with proof and "verification" of "legitimacy" including the demand for invitations, flyers, phone numbers, contacts, addresses and associates names is extraordinary. Requiring people to open up their address books, turn over names and phone numbers, and further for those associates to then be called by the police out of the blue is far from "minimally intrusive." Having the police then place an unannounced call or visit to friends or family or associates to "verify" the stated intentions to the satisfaction of the police goes far beyond any measure that could be considered "minimally intrusive." It is extraordinary to suggest that, for residents within a neighborhood zone who plan to have a relative visit by car, the "price" they must be willing to pay is the likelihood of a police visit or telephone call.

### H.    Police Questioning Mandating Disclosure of Attendance at Political or Other Constitutionally Protected Events Also Violates the First Amendment.

Persons who prefer or need (for physical, health or practical reasons including delivery of materials) to travel by car to engage in political First Amendment protected activity within an

area surrounded by the police, are required to identify to the police information that is soundly

protected and constitutionally privileged.

The very manifestation of the program itself provokes neighborhood and political

meetings within the NSZ in response and opposition to the checkpoint imposition. Persons

driving to such meetings should be allowed to attend without having to have the fact of their

intention and attendance recorded in police records, particularly where there may be a fear of

police harassment stemming from such oppositional political activities.

The case law is clear. "Where, however, 'the primary purpose' of a roadblock is general

crime control' or the 'interdiction of illegal narcotics' - - as in Edmond – 'it is unconstitutional.'"

U.S. v. Bowman, 496 F.3d 685, 692 (D.C. Cir. ).

"Concerned that its exceptions would swallow the principle of individualized suspicion,

the Court in Edmond laid down a line: 'When law enforcement authorities pursue primarily

general crime control purposes at checkpoints . . . stops can only be justified by some quantum of

individualized suspicion.'" United States v. Davis, 270 F.3d 977, 979 (D.C. Cir. 2001).

"Throughout the text the [Edmond] Court states again and again that when the 'primary purpose'

of a roadblock is general crime control, it is unconstitutional." Id., citing, Edmond at 38, 41, 42,

44, 46, 47, 48.

The same principles apply here.

## IV. All Data on Law Abiding Citizens Secured Through the Unconstitutional Roadway Seizures Should be Expunged

The intelligence data that has been collected on citizens through the unconstitutional NSZ

checkpoint system is fruit of the poisonous tree, ill gotten data collection secured solely by a

mass violation of civil rights. The collected data revealed personal associations, movements, and

stated intentions for activity.

Each PD Form 76, the Stop or Contact Report, requires recordation of the name, home address, phone number, gender, race, date of birth, height and weight, eye color, hair color, complexion, driver's license number and other identifying characteristics. It also has a place to record whether the individual was a passenger in a vehicle. This information was all secured through civil rights violations and abuse of police authority and therefore should be disgorged, expunged and recovered/deleted from any data or record keeping systems into which it has been entered.

It is well established that courts possess within their equitable powers, as well as pursuant to the U.S. Constitution where appropriate to remedy constitutional violations, the authority to order expungement of records. U.S. v. Johnson, 714 F. Supp. 522, 523-24 (S.D.Fla. 1989) ("Expungement lies within the equitable discretion of the district court"), citing, United States v. Schnitzer, 567 F.2d 536, 539 (2d Cir. 1977) (same); Diamond v. United States, 649 F.2d 496 (7th Cir. 1981); Patton v. La Prade, 524 F.2d 862 (3rd Cir. 1975) (expungement of administrative law enforcement records maintained by the FBI); Sullivan v. Murphy, 487 F.2d 938, 963-64 ("The principle is well established that a court may order the expungement of records, including arrest records, when that remedy is necessary and appropriate in order to preserve basic legal rights" including "as an appropriate remedy in the wake of police action in violation of constitutional rights."); Sullivan v. Murphy, 380 F. Supp. 867, 868 (D.D.C. 1974) (in the context of mass false arrests, ordering defendants to convey to plaintiffs' counsel "all records, including recordings, reports, memoranda, index cards, notations and writings of any kind" related to false arrests).

## V. Conclusion

The relief sought by the instant lawsuit is focused on eradication of the persistent circumstance of unlawful police misconduct that is manifest in suspicionless seizures and roadblocks that broadly subject law abiding citizens, residents and visitors to routine police intervention, to demands under threat of arrest for disclosures of a personal and protected nature, to data collection on movement and activity and association - - all conducted by police without *any* individualized suspicion or basis whatsoever. Whether police goals are agreeable or disagreeable, effective or ineffective, is not the issue presented by this motion. The tactics are plainly unconstitutional.


June 20, 2008                                        Respectfully submitted,


                                                     __/s/_____
                                                     Carl Messineo [450033]
                                                     Mara Verheyden-Hilliard [450031]
                                                     PARTNERSHIP FOR CIVIL JUSTICE
                                                     617 Florida Avenue, NW
                                                     Washington, D.C. 20001
                                                     (202) 232-1180
                                                     (202) 350-9557 fax

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of June, 2008, copies of Plaintiff's Motion for A Preliminary Injunction and Memorandum in Support of Plaintiff's Motion for A Preliminary Injunction were e-filed and hand delivered along with copies of the Summons and Complaint in this case to the following:

Adrian M. Fenty, Mayor
1350 Pennsylvania Avenue, NW
Washington, DC 20004

Peter Nickles, Interim D.C. Attorney General
441 4th Street, NW
Washington, DC 20001


__/s/_____
Carl Messineo

# SPECIAL ORDER



## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **Subject** | | |
| **Neighborhood Safety Zones** | | |
| Topic  Series  Number | | |
| **SO - 08 - 06** | | |
| **Effective Date** | | |
| **June 4, 2008** | | |
| Related to: | | |
| General Order 304.10 (Police-Citizen Contacts, Stops and Frisks), Effective July 1, 1973 | | |
| GO-OPS-301.03 (Vehicular Pursuits), Effective February 25, 2003 | | |

I.   Background.................................... Page 1
II.  Policy........................................... Page 1
III. Definitions................................... Page 1

IV. Regulations.................................... Page 2
V.  Procedural Guidelines....................... Page 3

## I.    BACKGROUND

The establishment of Neighborhood Safety Zones is an effective law enforcement tool for addressing violent crime. Vehicles are common instrumentalities of crime, particularly armed violent crime.  It is in the interest of law enforcement to prohibit vehicles with no legitimate purpose to enter neighborhoods that have been victimized by spikes in violent crime. The U.S. Courts have found that such zones are constitutional when limited in scope, and when conducted for a legitimate law enforcement purpose.

This Special Order provides guidance for establishing Neighborhood Safety Zones, consistent with constitutional requirements that provide high police visibility, prevent and deter crime, safeguard officers and community members, and create safer District of Columbia neighborhoods.

## II.   POLICY

It is the policy of the Metropolitan Police Department to lawfully establish Neighborhood Safety Zones to promote the health, safety, and welfare of the District of Columbia residents and visitors.

## III.  DEFINITIONS

When used in this directive, the following terms shall have the meaning designated:

1.    Member – Sworn employee of the Metropolitan Police Department (MPD).

2.    Neighborhood Safety Zone (NSZ) – Delineated geographic area designated by the Chief of Police in response to documented crimes of violence the purpose of which is to provide high police visibility, prevent and deter crime, safeguard officers and community members, and create safer District of Columbia neighborhoods.

3.   Neighborhood Safety Zone Checkpoint – A location at the perimeter of the NSZ where vehicles are stopped for the purpose of determining whether the operator has a legitimate reason for entering the NSZ.

4.   Neighborhood Safety Zone Manager – Member the rank of Lieutenant or above who manages the individual Neighborhood Safety Zone operation.

5.   Neighborhood Safety Zone (NSZ) Manager's Report (PD Form 907-A) (Attachment A) – Report completed by the NSZ Manager that documents why, when, where, and how an NSZ was conducted.

## IV.   REGULATIONS

A.   An NSZ may be established solely in response to documented crimes of violence occurring in a designated location.

1.   The NSZ shall be established for a specific and legitimate law enforcement purpose, (e.g., recently reported criminal incident(s) including homicides, shootings, robberies, and other offenses as approved by the Chief of Police).

2.   The NSZ shall be targeted to promote community safety interests while minimizing interference with normal community activities.

3.   Consistent with Part V.F below, each NSZ checkpoint shall be conducted systematically so as to minimize or eliminate police officer discretion in stopping vehicles from entering the NSZ.

4.   The NSZ shall be established for no more than five (5) days, unless the Chief of Police approves an extension of no more than five (5) additional days.

B.   The recommendation to establish an NSZ, and the selection of the location for the NSZ, shall be made by an official the rank of Commander and above.

C.   Each NSZ shall be approved, in advance, by the Chief of Police or designee, provided that the designee shall not hold a rank lower than Assistant Chief of Police.

D.   Only those members who have successfully completed all NSZ-related training required by the Chief of Police may participate in the implementation of an NSZ.  NSZ-related training shall include specific limitations on members' exercise of discretion in determining whether a vehicle will be permitted to enter the NSZ.

E.   Each member assigned to an NSZ shall wear an MPD-approved visibility vest and be provided other required equipment (e.g., cones, light tower).

F.  For the purpose of implementing an NSZ, members shall not stop vehicles that are exiting the NSZ.

G.  For the purpose of implementing an NSZ, members shall not stop pedestrians entering or exiting the NSZ.

H.  Generally, vehicles shall be not searched during an NSZ operation. However, if in the course of conducting an NSZ, a member develops reasonable suspicion or probable cause to believe that a crime is being committed, the member may detain the motorist to an extent reasonably necessary to investigate. Under such circumstances, a motorist may consent to a search, or, if incident to arrest, a search of the interior passenger area of the vehicle (including containers) may be performed.

V.  **PROCEDURAL GUIDELINES**

A.  An NSZ location shall be selected with the primary purpose of addressing a neighborhood violent crime problem. Evidence to support the existence of a neighborhood violent crime problem may include:

1.  Pertinent violent crime data;

2.  Information contained in citizen and community reports and complaints relevant to documented violent crimes; and

3.  Information gathered from criminal intelligence sources relevant to documented violent crimes.

B.  Documentation of the evidence prepared based on Part V.A above, and an explanation of how the evidence supports the purpose of the NSZ as described in Part IV.A above, shall be preserved and attached to the PD Form 907-A [Neighborhood Safety Zone (NSZ) Manager's Report] associated with the NSZ.

C.  In selecting an NSZ location, the following criteria shall be considered:

1.  The NSZ shall not unnecessarily interfere with routine community activities;

2.  There shall be sufficient space for deploying members assigned to the NSZ;

3.  There shall be sufficient space on the roadway for deploying one (1) or more marked MPD vehicles such that the vehicle(s) are clearly visible;

4.  There shall be sufficient space for deploying equipment to alert vehicle operators approaching the NSZ;

     5.      NSZ operations shall cause minimum delays to normal traffic patterns; and

     6.      The area shall permit a sufficient number of checkpoints for establishing an adequate perimeter.

D.    Each NSZ checkpoint shall be staffed by a minimum of five (5) officers and one (1) official the rank of Sergeant or above.

E.    An official, of at least the rank of Lieutenant, shall be designated as the NSZ Manager and may increase, but not decrease, the NSZ staffing depending on factors such as location, level of criminal activity, and number of potential stops.

F.    Each member assigned to an NSZ shall:

     1.      Be equipped with a visibility vest, flashlight, cones, flares, Notice of Infraction (NOI) books, PD Form 61-D (Violation Notice) books, and PD Forms 76 (Stop or Contact Report);

     2.      Identify himself/herself, his/her assigned District or element, the reason for the NSZ, and the reason for the vehicle stop;

     3.      Inquire whether the operator of the stopped vehicle has a <u>legitimate</u> reason for entering the NSZ as follows:

          <u>NOTE</u>:  Absent exigent circumstances, legitimate reasons are:

         a.     The person resides in the NSZ;

         b.     The person is employed in the NSZ or is on a commercial delivery;

         c.     The person attends school or a day-care facility, or is taking a child to, or picking up a child from, a school or day-care facility in the NSZ;

         d.     The person is a relative of a person who resides in the NSZ;

         e.     The person is seeking medical attention, is elderly, or is disabled; and/or

         f.     The person is attempting to attend a verified organized civic, community or religious event within the NSZ; or

         g.     An official the rank of Sergeant or above assigned to the NSZ approves the entry.

4.  Request operator identification when attempting to determine the legitimacy of the reason for entering an NSZ.

5.  Require proof of the reason for entry; the operator must provide information sufficient for the member to verify the accuracy of the reason. This may include, but is not limited to, a telephone number of the address to which the person seeks entry (which the member may use to verify that the resident/occupant expects the person(s)) and/or an invitation to a verified organized civic, community, or religious event located within the NSZ.

    NOTE: Persons cannot be compelled to proffer a reason for entry into an NSZ; however, failing to provide a reason for entry is sufficient for denial of entry.

6.  Deny a stopped vehicle access to the NSZ when it is determined that the motor vehicle operator does not have a legitimate reason for entering the NSZ; and

7.  Arrest any motor vehicle operator who refuses to comply with lawful police direction with *Failure to Obey* (Title 18 DCMR § 2000.2).

G.  The NSZ Manager shall:

1.  Prior to establishing the NSZ, the NSZ Manager shall:

    a.  Verify that adequate natural lighting or street lighting is present;

    b.  Verify that adequate space is available for safe operations, deployment of personnel, traffic flow, and parking for the vehicles of arrested persons;

    c.  Notify the affected District's Watch Commander of the anticipated location, date, and time; and

    d.  Conduct roll call with all members assigned to the NSZ;

2.  Ensure all stop locations are clearly defined using barricades, lights, cones, and/or flares to reduce excessive traffic backup;

3.  Ensure a marked vehicle is positioned in the event a vehicular traffic stop is necessary;

4.  Ensure that members employ the stop method that requires that every vehicle attempting entry is stopped;

5.  Ensure, when practical, at least two (2) members approach each stopped vehicle;

6.  In the event that all assigned members become involved with multiple stops and/or traffic is affected, approve the temporary suspension of the NSZ checkpoint stops until the vehicular congestion is relieved;

7.  Ensure that each instance of a stopped vehicle is documented on a PD Form 76 (Stop or Contact Report) (Attachment B);

    a.  For vehicles that are denied entry, the PD Form 76 shall include the operator information, vehicle description, vehicle tag number, and reason for denial.

    b.  For vehicles that are permitted entry, and in cases where the operator elects to leave the checkpoint without providing information, the PD Form 76 shall include the vehicle tag number, and where appropriate, the reason for entry.

8.  Ensure that the documentation required by Part V.B above is attached to the PD Form 907-A; and

9.  Transmit the original PD Form 907-A and all accompanying documentation to the Watch Commander prior to the end of the tour of duty in which the NSZ was concluded.

H.  The Police District Watch Commander shall:

    1.  Record the NSZ notification on the Watch Commander's Report and notify, in turn, the Command Information Center (CIC);

    2.  Review, sign, and date the PD Form 907-A; and

    3.  Ensure that a copy of the signed and dated PD Form 907-A is forwarded to the CIC and the Police District Administrative Office.

I.  The Police District Commander shall:

    1.  When requesting the establishment of an NSZ in his/her District, meet the requirements of Part V. A and V.C above;

    2.  Ensure that only members who have successfully completed all required training participate in the NSZ;

    3.  Prepare a memorandum to the Chief of Police, through the chain of command, that includes:

        a.  Proposed date(s) and times that an area should be declared a NSZ;

        b.  Evidence used in making the selection of the location, date(s), and times;

    c.    Justification for the determination consistent with Part V.A and Part V.C above;

    d.    Plan specifying the resources to be used to mark the area as an NSZ and the deployment of personnel and resources to the NSZ; and

    e.    Detailed map outlining the boundaries of the proposed NSZ;

4.    Upon the approval of the Chief of Police for establishing an NSZ and prior to the establishment of the NSZ:

    a.    Ensure the procurement and distribution of a sufficient quantity of notices containing information regarding the NSZ to residences and businesses;

    b.    Ensure the procurement of a sufficient quantity of posters entitled, "Warning, This Area Has Been Declared A Neighborhood Safety Zone", from the Reproduction Section, Police Business Services Division, Corporate Support Bureau;

    c.    Ensure the NSZ posters are properly completed; located, at a minimum, around the borders of the NSZ; and secured to available objects (e.g., lamp posts) or placed on wooden stakes;

        NOTE:  Any member who observes an individual injuring, breaking, or destroying any NSZ poster may charge the individual with a misdemeanor *Destruction of Property* (D.C. Official Code § 22-303).

5.    Ensure that at least one (1) member assigned to the affected Patrol Service Area(s) included within the NSZ is assigned to each checkpoint;

6.    Upon the expiration of the NSZ time period, direct members of his/her command to promptly remove all signs and other identifying documents and equipment from the boundaries and areas within the former NSZ;

7.    Following the expiration of the NSZ time period, submit a report to the Chief of Police, through the chain of command, within ten (10) business days, with the following information:

    a.    Location of the NSZ, including the exact boundaries;

    b.    Personnel and other resources allocated to the NSZ;

    c.    Time(s) and date(s) of:

(1)    Distribution of notices to the residences and businesses located within the NSZ;

(2)    Period that the NSZ was implemented;

(3)    Marking of the boundaries with posters; and

(4)    Removal of all posters from the former NSZ;

d.    Number of locations at which posters were placed;

e.    Number and type of crime index offenses that occurred in the NSZ during the NSZ time period;

f.    Total number of vehicles stopped, vehicles denied access, and any arrests related to the NSZ;

g.    Number and type of complaint(s) received as a result of NSZ activities;

h.    Any significant event or unusual incident that occurred in the NSZ during the NSZ time period, and

i.    After-action evaluation of the NSZ operation;

8.    When the NSZ abuts the boundary of another Police District, notify the Commanding Officer of the affected district;

9.    Establish and maintain a Police District file as follows:

a.    A separate folder shall be established for each NSZ;

b.    The folder, at a minimum, shall include:

(1)    Copy of the recommendation memorandum submitted to the Chief of Police with the signature of approval of the Chief;

(2)    All documents supporting the recommendation for the establishment of the NSZ;

(3)    Record of when, how, and by whom the NSZ notices and posters were distributed and posted;

(4)    Enforcement documentation and crime statistics for the NSZ time period;

(5)    Information about any unusual or significant incident; and

          (6)     A copy of the final report to the Chief of Police.

J.    The Director, Corporate Support Bureau, shall be responsible for the preparation of the NSZ warning posters.

K.    The Assistant Chief, Patrol Services and School Security Bureau, shall forward to the Chief of Police each request for the establishment of an NSZ he/she has approved.

L.    The General Counsel shall:

    1.    Review all requests for the establishment of an NSZ for legal sufficiency; and

    2.    Advise the Chief of Police, in writing, whether the request for an NSZ meets legal requirements.

M.    The Chief of Police shall:

    1.    Approve or disapprove each request for the establishment of an NSZ.

## VI.  CROSS REFERENCES

A.    D.C. Official Code § 22-303 (Malicious Burning, Destruction, or Injury of Another's Property)

B.    Title 18 (Vehicles and Traffic) DCMR § 2000.2

## VII.  ATTACHMENTS

Attachment A: PD Form 907-A (Neighborhood Safety Zone Manager's Report;

Attachment B: PD Form 76 (Stop or Contact Report) (Revised 04/19/05)

Cathy L. Lanier
Chief of Police

CLL:JAE:HB:PAS:JGW

PD Form 907-A (051108)


**Metropolitan Police Department**
**Washington, D.C.**
**Neighborhood Safety Zone (NSZ) Manager's Report**


| Date: [DD/MM/YY] | District: | NSZ Lieutenant: [Print: Last, First, Middle Initial] |
|---|---|---|

**Checkpoint Locations:** [Intersection(s) and/or Address(es)]

**Purpose:**

| Time Began: [Hour, Minute] | Time Ended: [Hour, Minute] |
|---|---|
| Time Paused: [Hour, Minute] | Time Resumed: [Hour, Minute] |

**District Watch Commander Notified:** [Rank, Last Name, First Name, Badge Number, Date/Time Notified]

**Stop Procedure:** [For Example: All Vehicles; Every Third Vehicle]

| Total # Vehicles Passed Through NSZ: | Total # Vehicles Stopped From Entering NSZ: | Total # Vehicles Failing to Stop at NSZ: |
|---|---|---|
| Total # of NOIs Issued: | Total # of PD 76s Completed: | Total # of PD 61-Ds Issued: |

**ARRESTS**

| Arrest Number | CCN | Name of Arrestee | Charge(s) | Disposition |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**NSZ Lieutenant's Full Signature:** [First Name, Middle Initial, Last Name] | Date of Signature:

**Reviewed by Watch Commander:** [Print Rank, First Name, Middle Initial, Last Name, Badge Number]

**Watch Commander's Full Signature:** [First Name, Middle Initial, Last Name] | Date of Signature:

SO-08-06 (Neighborhood Safety Zones)
Attachment A
PD Form 907-A NSZ Supervisor's Report
Rev. 06/04

**PD Form 76 Stop or Contact Report (Revised 04/19/05)**

Card # (yymmdd-xxxx): _____

| Date (mm/dd/yy) & military time (hh:mm) | | |
|---|---|---|
| ___ / ___ / ___    ___:___ | ◌ Vehicle:    ◌ Spot check   ◌ Stop<br>◌ Pedestrian:   ◌ Contact    ◌ Stop   CCN# (yy-nnnnnn): _____<br>◌ Bicycle:     ◌ Contact    ◌ Stop | |

| Location | | District and PSA |
|---|---|---|
| | | |

**"Duration of Stop_____ (minutes)"**

**Operator/Pedestrian Information**

| Last name | First name | Middle name | Nickname |
|---|---|---|---|
| ◌ Passenger in vehicle | | | |

| Home address (street number and name, city, state, zip) | Phone number |
|---|---|
| | ( ) |

| Gender | Race/Ethnicity | | DOB (mm/dd/yy) |
|---|---|---|---|
| ◌ Male<br>◌ Female | ◌ American Indian/Alaskan Native<br>◌ Asian<br>◌ Arab American | ◌ Black/African American<br>◌ Hispanic/Latino<br>◌ White<br>◌ Other_____ | ___ / ___ / ___ |

| Height | Weight | Eye color | Hair color/style |
|---|---|---|---|
| | | | |

| Complexion | Facial hair, scars, tattoos, clothing, etc. | | |
|---|---|---|---|

| Driver's license/permit number and state |
|---|
| |

---

**PD Form 76 Stop or Contact Report (Revised 04/19/05)**

Card # (yymmdd-xxxx): _____

**VEHICLE INFORMATION**

| Vehicle type | Make | Model | | Year |
|---|---|---|---|---|
| | | | | |

| Color (top/bottom) | Tag/Bike registration number | State | VIN |
|---|---|---|---|
| | | | |

| Owner's last name | Owner's first name | Owner's address (St., No.#, Name, City, State, Zip) |
|---|---|---|
| | | |

| Dents/Other Identifiers: |
|---|
| |

**JUSTIFICATION & OUTCOME**

| Primary reason for contact/stop (Choose one) | Disposition of the contact/stop | (Choose all that apply) |
|---|---|---|
| ◌ Moving violation—NOI: _____<br>◌ Equipment violation<br>◌ Registration violation<br>◌ Call for service (suspect/vehicle description)<br>◌ Pre-existing knowledge<br>◌ Special detail/checkpoints<br>◌ Suspicious activity<br>◌ Other_____ | ◌ No action<br>◌ Verbal warning (traffic)<br>◌ Other warning issued<br>◌ Fine issued<br>◌ Operator arrested<br>◌ Passenger(s) arrested<br>   # of arrests: ____ | ◌ Vehicle impounded<br>◌ Report taken<br>◌ Drugs seized<br>◌ Weapons seized<br>◌ Search conducted<br>  Consent to search?<br>   Yes ◌ No ◌<br>◌ Other: ____ |

| Additional remarks |
|---|
| |

| Reporting Member (Print Name) | Element/CAD# | Signature |
|---|---|---|
| | | |

| Reviewing Official (Print Name) | Element/CAD# | Signature |
|---|---|---|
| | | |

Attachment B
SO-08-06
06/03/08

 

# Metropolitan Police Department

## Metropolitan Police Academy
**4665 Blue Plains Drive, Washington, D.C., 20032**

---

**Lesson Plan Title:** Neighborhood Safety Zones

**Lesson Plan Number:** N/A

**Prepared by:** John Foust                    **Date:** June 5, 2008

☒ **New plan**          ☐ **Revision**

---

**Time Frame:** Two Hours

---

## PARAMETERS

**Audience:** Recruits Officers or Sworn Officers

**Number:** Approx. Maximum of 100 students per session

**Space:** Large Classroom or auditorium

---

## PERFORMANCE OBJECTIVES

At the conclusions of this training session, the student shall be able to:

1. Identify purpose of Neighborhood Safety Zones
2. Define Neighborhood Safety Zone
3. Define Neighborhood Safety Zone checkpoint
4. Define Neighborhood Safety Zone Manager's Report
5. State maximum number of days a NSZ can be established
6. Identify the person who may authorize establishment of a NSZ
7. List equipment that is necessary for a NSZ
8. Identify person responsible for completing Manager's Report
9. Explain the importance of respecting community activities
10. List legitimate reasons that one may enter a NSZ

11. Demonstrate proper procedures while at checkpoints
12. Identify minimum number of members required for a NSZ

## ASSESSMENT TECHNIQUE

1.  Instructor led classroom discussion
2.  Classroom question and answer
3.  Practical application/demonstration

## INSTRUCTOR MATERIALS

☐ Overheads        ☐ Slides            ☐ Posters          ☒ References

☐ Videotapes  Title: _____

☐ Documents  Title: _____

## EQUIPMENT/SUPPLIES NEEDED

☐ Flipchart & Stands                    ☐ PowerPoint Presentation

☐ Flipchart Markers                      ☐ Video camera

☐ Masking Tape                            ☐ Televisions

☒ Marker Board                            ☐ Video-show

☐ Overhead Projector                    ☐ Computers

☐ Projector Screen                        ☐ Videotape Player

## TRAINING PARTICIPANT HANDOUTS

<u>Number Required</u>        <u>Title(s)</u>

One for each student-  Special Order Neighborhood Safety Zones
One for each student-  Neighborhood Safety Zones (NSZ) Manager's Report
One for each student-  Neighborhood Safety Zone Pocket Card
One for each student-  PD Form 76 Stop and Contact Report

| REFERENCES |
| --- |
| Special Order SO-08-06: Neighborhood Safety Zones<br>General Order 304.10: Police Citizen Contacts, Stops and Frisks<br>General Order 301.03: Vehicular Pursuits |

| GENERAL COMMENTS |
| --- |
| Although not necessary, it may be helpful to have legal counsel available to answer questions that may arise during the few presentations of this course. |

| LESSON PLAN PRESENTATION GUIDE | TRAINER NOTES |
| --- | --- |
| **Introduction**<br>    Class length and objectives | Introduces yourself and any guests that may be present. Discuss length of course and objectives. |
| **Registration**<br>    Register students | Ensure sign-in sheets delivered to Academic Services at MPA |
| **I.    <u>BACKGROUND</u>**<br><br>The establishment of Neighborhood Safety Zones is an effective law enforcement tool for addressing violent crime.  <u>Vehicles</u> are common instrumentalities of crime, particularly armed violent crime.  It is in the interest of law enforcement to prohibit <u>vehicles</u> with no legitimate purpose to enter neighborhoods that have been victimized by spikes in violent crime.  The U.S. Courts have found that the zones are constitutional when limited in scope, and when conducted for a legitimate law enforcement purpose.<br><br>This Special Order provides guidance for establishing Neighborhood Safety Zones, consistent with constitutional requirements, that provide high police visibility, prevent and deter crime, safeguard officers and community members, and create safer District of Columbia neighborhoods. | Focus in on vehicles<br><br>Neighborhood Safety Zones are lawful, officers must ensure that they follow the SO to keep these zones available for use as a tool to prevent and deter crime. |

II.    **POLICY**

It is the policy of the Metropolitan Police Department to lawfully establish Neighborhood Safety Zones to promote the health, safety, and welfare of the District of Columbia residents and visitors.

III.    **DEFINITIONS**

When used in this directive, the following terms shall have the meaning designated:

1.    Member – Sworn employee of the Metropolitan Police Department (MPD).

2.    Neighborhood Safety Zone (NSZ) – Delineated geographic area designated by the Chief of Police in response documented crimes of violence the purpose of which is to provide high police visibility, prevent and deter crime, safeguard officers and community members, and create safer District of Columbia neighborhoods.

3.    Neighborhood Safety Zone Checkpoint – A location at the perimeter of the NSZ where vehicles are stopped for the purpose of determining whether the operator has a legitimate reason for entering the NSZ.

4.    Neighborhood Safety Zone Manager – Member the rank of Lieutenant or above who manages the individual Neighborhood Safety Zone operation.

5.    Neighborhood Safety Zone (NSZ) Manager's Report (PD

Draw an example of a NSZ on the board. Two zones are illustrated here:



Checkpoints:  Draw examples of checkpoints.  Number of checkpoints will be determined by resources, size of zone, etc.  Setup of checkpoints will be discussed shortly.



The Manager's Report is a required document to be discussed in detail when procedures are discussed.

| | |
|---|---|
| Form 907-A) – Report completed by the NSZ Manger that documents why, when, where, and how an NSZ was conducted. | |
| **IV.  REGULATIONS** | |
| A.  An NSZ may be established solely in response to crimes of violence occurring in a designated location. | Established for a specific law enforcement purpose- not for general law enforcement or fishing expeditions |
| 1.  The NSZ shall be established for a specific and legitimate law enforcement purpose, (e.g., recently reported criminal incident(s) including homicides, shootings, robberies, and other offenses as approved by the Chief of Police). | Important to minimize interference to the community |
| 2.  The NSZ shall be targeted to promote community safety interests while minimizing interference with normal community activities. | Important to understand goal and purpose of each checkpoint. |
| 3.  Consistent with part V.F, below, each NSZ checkpoint shall be conducted systematically so as to minimize or eliminate police officer discretion in stopping vehicles from entering the NSZ. | 10 days maximum: No more than 5 days at first, COP may authorize additional days |
| 4.  The NSZ shall be established for no more than five (5) days, unless the Chief of Police approves an extension of no more than five (5) additional days. | Commander or above makes recommendation |
| B.  The recommendation to establish an NSZ, and the selection of the location for an NSZ, shall be made by an official | COP or designee must approve NSZ |

| | | |
|---|---|---|
| | the rank of Commander and above. | |
| C. | Each NSZ shall be approved, in advance, by the Chief of Police or designee, provided that the designee shall not hold a rank lower than Assistant Chief of Police. | |
| D. | Only those members who have successfully completed all NSZ-related training required by the Chief of Police may participate in the implementation of an NSZ. NSZ-related training shall include specific limitations on members' exercise of discretion in determining whether a vehicle will be permitted to enter the NSZ. | Officers cannot participate in NSZ unless trained |
| E. | Each member assigned to an NSZ shall wear an MPD-approved visibility vest and be provided other required equipment (e.g., cones, light tower). | NSZ officers must wear approved visibility vest. Use other equipment as necessary |
| F. | For the purpose of implementing an NSZ, members shall not stop vehicles that are exiting the NSZ. | Do not stop vehicles exiting |
| G. | For the purpose of implementing an NSZ, members shall not stop pedestrians. | Do not stop pedestrians |
| H. | Generally, vehicles shall be not searched during an NSZ operation. However, if in the course of conducting an NSZ, a member develops reasonable suspicion or probable cause to believe that a crime is being committed, the member may detain the motorist to an extent reasonably necessary to investigate. Under such circumstances, a motorist may consent to search, or, if incident to arrest, a search of the interior passenger area of the vehicle (including containers) may be performed. | |
| **V.** | **PROCEDURAL GUIDELINES** | |

| | |
|---|---|
| A.    An NSZ location shall be selected for the purpose of addressing a neighborhood violent crime problem. Evidence to support the existence of a neighborhood violent crime problem may include: | |
|       1.    Pertinent violent crime data; | Evidence of crime problem is a necessity |
|       2.    Information contained in citizen and community reports and complaints relevant to documented violent crimes; and | |
|       3.    Information gathered from criminal intelligence sources relevant to documented violent crimes. | May come from many sources |
| B.    Documentation of the evidence prepared based on Part V.A above, and an explanation of how the evidence supports the purpose of the NSZ, as described in Part IV.A above, shall be preserved and attached to the PD Form 907-A [Neighborhood Safety Zone (NSZ) Manager's Report] associated with the NSZ. | Evidentiary documentation is attached to PD Form 907-A (manager's report) |
| C.    In selecting an NSZ location, the following criteria shall be considered: | |
|       1.    The NSZ shall not unnecessarily interfere with routine community activities; | Respect community activities, minimize interference |
|       2.    There shall be sufficient space for deploying members assigned to the NSZ; | Have sufficient space |
|       3.    There shall be sufficient space on the roadway for deploying one (1) or more marked MPD vehicles such that the vehicle(s) are clearly visible; | MPD vehicle(s) must be on roadway, clearly visible |

| | | |
|---|---|---|
| 4. | There shall be sufficient space for deploying equipment to alert vehicle operators approaching the NSZ; | Use cones or other equipment to alert approaching vehicles |
| 5. | NSZ operations shall cause minimum delays to normal traffic patterns; and | Discussion point- have class provide examples of appropriate and inappropriate areas |
| 6. | The area shall permit a sufficient number of checkpoints for establishing an adequate perimeter. | |
| D. | Each NSZ checkpoint shall be staffed by a minimum of five (5) officers and one (1) official the rank of Sergeant or above. | Checkpoints: Minimum 5 officers, 1 sergeant |
| E. | An official, of at least the rank of Lieutenant, shall be designated as the NSZ Manager and may increase, but not decrease, the NSZ staffing depending on factors such as location, level of criminal activity, and number of stops. | NSZ Manager= Lieutenant or above

Consideration should be given to assessing need for additional perimeter patrol support to address safety of extra pedestrian traffic that may result from denial of vehicle entry to the NSZ |
| F. | Each member assigned to an NSZ shall: | |
| 1. | Be equipped with a visibility vest, flashlight, cones, flares, Notice of Infraction (NOI) books, PD Form 61-D (Violation Notice) books, and PD Forms 76 (Stop or Contact Report); | Be properly equipped |
| 2. | Identify himself/herself, his/her assigned District or element, the reason for the NSZ, and the reason for the stop; | Identify yourself & explain the purpose of the stop. This is important to convey the reason for the use of the NSZ. |
| 3. | Inquire whether the operator of the stopped vehicle has a <u>legitimate</u> reason for entering the NSZ as follows: | |

| | |
|---|---|
| Note: Legitimate reasons are: | Make inquiries |
| a.  The person resides in the NSZ; | |
| b.  The person is employed in the NSZ or is on a commercial delivery; | Ask the class: What do you think are legitimate reasons for entering NSZ? |
| c.  The person attends school, or is taking a child to or picking a child up from a school or day-care facility in the NSZ; | |
| d.  The person is a relative of a person who resides in the NSZ; | Discuss the reasons |
| e.  The person is seeking medical attention, is elderly, or is disabled; | Discuss exigent, explain that an official should decide |
| f.  The person is attempting to attend a verified organized civic, community or religious event within the NSZ; or | The discretion to permit entry into an NSZ under "exigent circumstances" as that term is used in section V F. 3. of the Special Order should be limited to decision making, when time and circumstances permit, by the MPD official of the rank of Sergeant or above, assigned to the NSZ (as stated in section V F.3.g.) |
| g.  An official the rank of sergeant or above assigned to the NSZ approves the entry under exigent circumstances. | |
| 4.  Request operator identification when attempting to determine the legitimacy of the reason for entering an NSZ. | |
| 5.  Require proof of the reason for entry; the operator must provide information sufficient for the member to verify the accuracy of the reason.  This may include, but is not limited to, a telephone number of the address to which | |

<table>
<tr>
<td>

the person seeks entry (which the member may use to verify that the resident/occupant expects the person(s)) and/or an invitation to a verified organized civic, community, or religious event located within the NSZ.

<u>Note:</u> Persons cannot be compelled to proffer a reason for entry into an NSA; however, failing to provide a reason for entry is sufficient for denial of entry.

</td>
<td>

For vehicles barred from entry, officers should be instructed to inform the drivers that they can park the vehicle and walk into the secured area, or that they are free to otherwise drive away.

When legitimate reason does not exist, <u>deny</u> access to the vehicle

</td>
</tr>
</table>

6.  Deny a stopped vehicle access to the NSZ when it is determined that the motor vehicle operator does not have a legitimate reason for entering the NSZ; and

7.  Arrest any vehicle operator who refuses to comply with lawful police direction with *Failure to Obey* (Title 18 DCMR § 2000.2).

G.  The NSZ Manager shall:

1.  Prior to establishing the NSZ, the NSZ Manager shall:

    a.  Verify that adequate natural lighting or street lighting is present;

    b.  Verify that adequate space is available for safe operations, deployment of personnel, traffic flow, and parking for the vehicles of arrested persons;

    c.  Notify the affected District's Watch Commander of the

Operator can turn around or park

Officers should be instructed to provide an egress point for vehicles that are either turned away or do not wish to approach the check-point.

Officers should be instructed that refusal to answer any or all questions should not be viewed as a basis for suspicion, and such drivers should be allowed to depart without being further detained.

Make arrest if there is no compliance

Manager (lieutenant or above) duties:

Documentation

Inspection

| | | |
|---|---|---|
| | anticipated location, date, and time; | Notify District Watch Commander |
| | d.    Conduct roll call with all members assigned to the NSZ; | Conduct roll call with members |
| 2. | Ensure all stop locations are clearly defined using barricades, lights, cones, and/or flares to reduce excessive traffic backup; | Check perimeters |
| 3. | Ensure a marked vehicle is positioned in the event a vehicular traffic stop is necessary; | Marked vehicles |
| 4. | Ensure that members employ the stop method that requires that every vehicle attempting entry is stopped; | Use 2 members when possible |
| 5. | Ensure, when practical, at least two (2) members approach each stopped vehicle; | |
| 6. | In the event that all assigned members become involved with multiple stops and/or traffic is affected, approve the temporary suspension of the NSZ checkpoint stops until the vehicular congestion is relieved; | Temporarily suspend NSZ when necessary |
| 7. | Ensure that each instance of a stopped vehicle is documented on a PD Form 76 (Stop or Contact report) | Convey documentation |
| | a.  For vehicles that are denied entry, the PD Form 76 shall include the operator information, vehicle description, vehicle tag number and reason for denial. | |

| | | |
|---|---|---|
| | b. For vehicles that are permitted entry and in cases where the operator elects to leave the checkpoint without providing information, the PD Form 76 shall include the vehicle tag number, and where appropriate, the reason for entry. | |
| | 8. Ensure that the documentation required by Part VB above is attached to the PD Form 907-A; and | |
| | 9. Transmit the original PD Form 907-A and all accompanying documentation to the Watch Commander prior to the end of the tour of duty in which the NSZ was conducted. | |
| H. | The Police District Watch Commander shall: | Watch Commander Duties: |
| | 1. Record the NSZ notification on the Watch Commander's Report and notify, in turn, the Command Information Center (CIC); | Record and notify CIC |
| | 2. Review, sign, and date the PD Form 907; and | Review, sign, date PD Form 907 |
| | 3. Ensure that a copy of the signed and dated PD Form 907 is forwarded to the CIC and the Police District Administrative Office. | Forward 907 |
| I. | The Police District Commander shall: | District Commander Duties: |
| | 1. When requesting the establishment of an NSZ in his/her District, meet the requirements of Part V.A. and V.C. above; | Review criteria for establishment of NSZ |

| | | |
|---|---|---|
| 2. | Ensure that only members who have successfully completed all required training participate in the NSZ; | Ensure training |
| 3. | Prepare a memorandum to the Chief of Police, through the chain of command, that includes: | Write memorandum to COP |
| | a.  Proposed date(s) and times that an area should be declared an NSZ; | |
| | b.  Evidence used in making the selection of the location, date(s), and times; | |
| | c.  Justification for the determination consistent with Part V.A and V.C above; | |
| | d.  Plan specifying the resources to be used to mark the area as an NSZ and the deployment of personnel and resources to the NSZ; and | |
| | e.  Detailed map outlining the boundaries of the proposed NSZ; | |
| 4. | Upon the approval of the Chief of Police for establishing an NSZ and prior to the establishment of the NSZ: | |
| | a.  Ensure the procurement and distribution of a sufficient quantity of notices containing information regarding the NSZ to residences and businesses; | Notify Residents |

| | | |
|---|---|---|
| b. | Ensure the procurement of a sufficient quantity of posters entitled, "Warning, This Area Has Been Declared A Neighborhood Safety Zone", from the Reproduction Section, Police Business Services Division, Corporate Support Bureau; | Procure posters |
| c. | Ensure the NSZ posters are properly completed; located, at a minimum, around the borders of the NSZ; and secured to available objects (e.g., lamp posts) or placed on wooden stakes; | Ensure proper placement of posters |
| | NOTE: Any member who observes an individual injuring, breaking, or destroying any NSZ poster may charge the individual with a misdemeanor *Destruction of Property* (D.C. Official Code § 22-303). | Destruction of posters is illegal |
| 5. | Ensure that at least one (1) member assigned to the affected Patrol Service Area(s) included within the NSZ is assigned to each checkpoint; | NSZ members must include at least 1 member from PSA |
| 6. | Upon the expiration of the NSZ time period, direct members of his/her command to promptly remove all signs and other identifying documents and equipment from the boundaries and areas within the former NSZ; | Ensure removal of posters and equipment when finished |

| | | |
|---|---|---|
| 7. | Following the expiration of the NSZ time period, submit a report to the Chief of Police, through the chain of command, within ten (10) business days, with the following information: | Submit Report to COP within 10 days |
| | a.  Location of the NSZ, including the exact boundaries; | |
| | b.  Personnel and other resources allocated to the NSZ; | |
| | c.  Time(s) and date(s) of: | |
| | (1)  Distribution of notices to the residences and businesses located within the NSZ; | |
| | (2)  Period that the NSZ was implemented; | |
| | (3)  Marking of the boundaries with posters; and | |
| | (4)  Removal of all posters from the former NSZ; | |
| | d.  Number of locations at which posters were placed; | |
| | e.  Number and type of crime index offenses that occurred in the NSZ during the NSZ time period; | |
| | f.  Total number of vehicles stopped, vehicles denied | |

| | | |
|---|---|---|
| | access, and any arrest related to the NSZ; | |
| | g. Number and type of complaint(s) received as a result of NSZ activities; | |
| | h. Any significant event or unusual incident that occurred in the NSZ during the NSZ time period, and | |
| | i. After-action evaluation of the NSZ operation; | |
| 8. | When the NSZ abuts the boundary of another Police District, notify the Commanding Officer of the affected district; | Notify other districts if necessary |
| 9. | Establish and maintain a District file as follows: | Establish District file |
| | a. A separate folder shall be established each NSZ; | |
| | b. The folder, at a minimum, shall include: | |
| | (1) Copy of the recommendation memorandum submitted to the Chief of Police with the signature of approval of the Chief; | |
| | (2) All documents supporting the recommendation for the establishment of the NSZ; | |
| | (3) Record of when, | |

|  |  |  |
|---|---|---|
|  | how, and by whom the NSZ notices and posters were distributed and posted; |  |
|  | (4) Enforcement documentation and crime statistics for the NSZ time period; |  |
|  | (5) Information about any unusual or significant incident; and |  |
|  | (6) A copy of the final report to the Chief of Police. |  |
| J. | The Director, Corporate Support Bureau shall be responsible for the preparation of the NSZ warning posters. | Corporate Support prepares posters |
| K. | The Assistant Chief, Patrol Services and School Security Bureau, shall forward to the Chief of Police each request for the establishment of an NSZ he/she has approved. | Assistant Chief of Patrol Service forwards requests to COP for NSZ |
| L. | The General Counsel shall: | General Counsel Reviews |
|  | 1. Review all requests for the establishment of an NSZ for legal sufficiency; and |  |
|  | 2. Advise the Chief of Police, in writing, whether the request for an NSZ meets legal requirements. | General Counsel advises COP |
| M. | The Chief of Police shall: | Chief of Police Duties: |
|  | 1. Approve or disapprove each request for the establishment of | Approve or Disapprove |

| | |
|---|---|
| an NSZ. | requests |
| **VI.  CROSS REFERENCES** | |
| A.    D.C. Official Code § 22-303 (Malicious Burning, Destruction, or Injury of Another's Property) | Two references are related to this SO.  Officers should read these prior to working in a NSZ. |
| B.    Title 18 (Vehicles and Traffic) DCMR § 2000.2 | |
| **VII.  ATTACHMENTS** | |
| Attachment A:  Neighborhood Safety Zone (NSZ) Manager's Report | |
| Attachement B. NSZ Pocket Cards | Distribute a copy of the Manger's Report, so that officers may see what documentation is necessary for a NSZ. |
| | Distribute pocket cards, so that officers have a quick reference when working in a NSZ. |
| **VIII.  REVIEW, DISCUSSION, APPLICATION** | |
| 1.    Review contents of above material | Distribute copy of PD Form 76 |
| 2.    Select officers from the class to participate in application exercises | |
| 3.    Bring officers to the front of the class | |
| 4.    Draw a NSZ on the board and establish checkpoints | Time allotted for this class is two hours.  Take part of the remaining time to review and then perform classroom applications. |
| 5.    Present officers with various situations of citizen encounters | |
| 6.    Request that officers address checkpoint encounters in appropriate manner | |
| 7.    Repeat with other officers as time permits | |

| | |
|---|---|
| **IX.    SUMMARY/ EVALUATION** | |
| 1.    Ask students if they have any questions. | Fifteen minutes should be allotted for the closing and final questions. |
| 2.    Address any concerns/questions | |
| 3.    Dismiss class | |

PD Form 907-A (050208)

 

### Metropolitan Police Department
### Washington, D.C.
### Neighborhood Safety Zone (NSZ)Manager's Report

| Date:  [DD/MM/YY] | District: | NSZ Lieutenant: [Print:  Last, First, Middle Initial] |
|---|---|---|

**Checkpoint Locations:  [Intersection(s) and/or Address(es)]**

**Purpose:**

| Time Began: [Hour, Minute] | Time Ended: [Hour, Minute] |
|---|---|
| Time Paused: [Hour, Minute] | Time Resumed: [Hour, Minute] |

**District Watch Commander Notified: [Rank, Last Name, First Name, Badge Number, Date /Time Notified]**

**Stop Procedure: [For Example: All Vehicles; Every Third  Vehicle]**

| Total #  Vehicles Passed Through NSZ: | Total # Vehicles Stopped From Entering NSZ: | Total #  Vehicles Failing to Stop at NSZ: |
|---|---|---|
| Total # of NOIs Issued: | Total # of PD 76s Completed: | Total # of PD 61-Ds Issued: |

### ARRESTS

| Arrest Number | CCN | Name of Arrestee | Charge(s) | Disposition |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| NSZ Lieutenant 's Full Signature: [First Name, Middle Initial, Last Name] | Date of Signature: |
|---|---|

**Reviewed by Watch Commander:  [Print Rank, First Name, Middle Initial, Last  Name, Badge Number]**

| Watch Commander's Full Signature: [First Name, Middle Initial, Last Name] | Date of Signature: |
|---|---|

NSZ Pocket Cards

Legitimate reasons to enter the NSZ are:

The person:
- resides in the NSZ;
- is employed in the NSZ or is on a commercial delivery;
- attends school or a day-care facility, or is taking a child to or picking a child up from a school or day-care facility in the NSZ;
- is a relative of a person who resides in the NSZ.
- is seeking medical attention, is elderly, or is disabled; and/or
- is attempting to attend a verified organized civic, community or religious event within the NSZ; or

An official the rank of sergeant or above assigned to the NSZ approves the entry under exigent circumstances,

---

Legitimate reasons to enter the NSZ are:

The person:
- resides in the NSZ;
- is employed in the NSZ or is on a commercial delivery;
- attends school or a day-care facility, or is taking a child to or picking a child up from a school or day-care facility in the NSZ;
- is a relative of a person who resides in the NSZ.
- is seeking medical attention, is elderly, or is disabled; and/or
- is attempting to attend a verified organized civic, community or religious event within the NSZ; or

An official the rank of sergeant or above assigned to the NSZ approves the entry under exigent circumstances,.

---

Legitimate reasons to enter the NSZ are:

The person:
- resides in the NSZ;
- is employed in the NSZ or is on a commercial delivery;
- attends school or a day-care facility, or is taking a child to or picking a child up from a school or day-care facility in the NSZ;
- is a relative of a person who resides in the NSZ.
- is seeking medical attention, is elderly, or is disabled; and/or
- is attempting to attend a verified organized civic, community or religious event within the NSZ; or

An official the rank of sergeant or above assigned to the NSZ approves the entry under exigent circumstances,.

---



Legitimate reasons to enter the NSZ are:

The person:
- resides in the NSZ;
- is employed in the NSZ or is on a commercial delivery;
- attends school or a day-care facility, or is taking a child to or picking a child up from a school or day-care facility in the NSZ;
- is a relative of a person who resides in the NSZ.
- is seeking medical attention, is elderly, or is disabled; and/or
- is attempting to attend a verified organized civic, community or religious event within the NSZ; or

An official the rank of sergeant or above assigned to the NSZ approves the entry under exigent circumstances,.

---

Legitimate reasons to enter the NSZ are:

The person:
- resides in the NSZ;
- is employed in the NSZ or is on a commercial delivery;
- attends school or a day-care facility, or is taking a child to or picking a child up from a school or day-care facility in the NSZ;
- is a relative of a person who resides in the NSZ.
- is seeking medical attention, is elderly, or is disabled; and/or
- is attempting to attend a verified organized civic, community or religious event within the NSZ; or

An official the rank of sergeant or above assigned to the NSZ approves the entry under exigent circumstances,.

---

Legitimate reasons to enter the NSZ are:

The person:
- resides in the NSZ;
- is employed in the NSZ or is on a commercial delivery;
- attends school or a day-care facility, or is taking a child to or picking a child up from a school or day-care facility in the NSZ;
- is a relative of a person who resides in the NSZ.
- is seeking medical attention, is elderly, or is disabled; and/or
- is attempting to attend a verified organized civic, community or religious event within the NSZ; or

An official the rank of sergeant or above assigned to the NSZ approves the entry under exigent circumstances,.



# NEIGHBORHOOD SAFETY ZONE

# WHAT YOU NEED TO KNOW

## Legitimate reasons for entering an NSZ

» You reside in the NSZ.
» You are employed in the NSZ or are making a commercial delivery.
» You attends school or a day-care facility in the NSZ.
» You are taking a child to, picking a child up from, a school or day-care facility in the NSZ.
» You are a relative of a person who resides in the NSZ.
» You are seeking medical attention, or are elderly or disabled.
» You are attending a verified organized civic, community, or religious event within the NSZ.

## Knowing when a DFZ is occurring

Signs like that below will be posted in a community where an NSZ has been declared.

### NOTICE
This area has been declared a
**NEIGHBORHOOD SAFETY ZONE**
BY ORDER OF THE CHIEF OF POLICE

**VEHICLES ENTERING THIS AREA ARE SUBJECT TO STOP, OPERATORS MUST PROVIDE IDENTIFICATION.**

To learn more about this program,
see **www.mpdc.dc.gov/nsz**

---

# Resources

## 24-Hour Violent Crime Tip Line
Crime Tip Line .................. (888) 919-CRIME
Text Message Tip Line .................. 50-411

Have information for police?
CALL (888) 919-CRIME
TEXT TO 50-411



## Emergency
Emergency: .................. 911

## Mayor's Call Center
City Services .................. 311

# Get Involved!

No one individual or agency working alone can prevent crime. It takes police and citizens working in partnership. The District of Columbia's community policing strategy provides many ways for police and communities to work together to prevent crime and build safer neighborhoods. These include regular PSA (Police Service Area) meetings in your community, problem-solving groups, citizen patrols and more. To learn more about community policing activities in your neighborhood, call your local police district:

1st District Station Desk:    698-0555    TTY: 863-4032
2nd District Station Desk:    715-7300    TTY: 364-3961
3rd District Station Desk:    673-6815    TTY: 518-0008
4th District Station Desk:    715-7400    TTY: 722-1791
5th District Station Desk:    698-0150    TTY: 727-5437
6th District Station Desk:    698-0880    TTY: 398-5397
7th District Station Desk:    698-1500    TTY: 889-3574





GOVERNMENT OF THE DISTRICT OF COLUMBIA
Metropolitan Police Department
300 Indiana Avenue, NW
Washington, DC 20001

June 2008

---



# NEIGHBORHOOD SAFETY ZONE

## FOR YOUR SAFETY

# Neighborhood Safety Zones

*Understanding How the NSZ Program Can Improve Safety in Your Community*



Adrian M. Fenty
*Mayor*

Cathy L. Lanier
*Chief of Police*

# Creating safer neighborhoods helps everyone.

One of the most challenging issues facing law enforcement — particularly in violent crimes — is the fact that many crimes occur using a motorized vehicle. With criminals equipped with an easy getaway, police are often put at a disadvantage to try to stop or solve crimes.



NEIGHBORHOOD SAFETY ZONE

### What is a Neighborhood Safety Zone?

A delineated geographic area designated by the Chief of Police in response to documented crimes of violence — the purpose of which is to provide high police visibility, prevent and deter crime, and create safer District of Columbia neighborhoods — by prohibiting vehicles with no legitimate business to enter the area.

### Are such zones Constitutional?

Yes. The U.S. Courts have found that such zones are Constitutional when limited in scope, and when conducted for a legitimate law enforcement purpose. A citation from a New York city case follows:

*Maxwell v. City of New York* (and Circuit)

In 1992, in response to four drive-by shootings, the New York City Police Department implemented a temporary vehicular checkpoint in an eight squareblock where most of the drive-by shootings had taken place. Officers stopped every vehicle (not pedestrians) seeking to enter the area in order to ascertain the driver's connection to the neighborhood. Area residents, commercial vehicles, those dropping off small children or visiting the local church were permitted to enter the area. The court balanced (1) the gravity of the public concerns served by the checkpoint, (2) the degree to which the checkpoint effectively addressed (3) the severity of the interference with individual liberty and held that the establishment of a vehicle checkpoint did not violate the 4th Amendment. The instructions given for the checkpoint were sufficiently detailed to be Constitutional.

### What is the purpose of a Neighborhood Safety Zone (NSZ)?

NSZs are designed to decrease crime in areas that are experiencing an increase in violent crime. Vehicles are often used in committing serious crimes, particularly armed violent crime. In April and May 2008, the city saw 33 incidents of shootings or homicides in which a vehicle was involved.

### What factors will be considered in selecting an area for as an NSZ?

The Chief of Police will consider several important factors before declaring a Neighborhood Safety Zone in a community. These include:

» A review of pertinent recent crime data.

» Information contained in citizen and community reports and complaints related to documented violent crimes in the area.

» Information gathered from criminal intelligence sources relevant to documented violent crimes in the area.

» The NSZ will not interfere with routine community activities and will cause minimum delays to normal traffic patterns.

### Who will approve the establishment of an NSZ?

The Chief of Police, or a designated Assistant Chief of Police, based upon a recommendation from a Police Department official at least the rank of Commander and a legal sufficiency review by the Police Department's General Counsel.

### How will the NSZ operate?

The Neighborhood Safety Zones will be carried out by a team of specially-trained members of the MPD, as follows:

» Posters will be placed in the area in advance to announce the establishment of the NSZ.

» The NSZ will be established for no more than 5 days, unless the Chief of Police approves an extension of no more than 5 days.

» During this authorization period, the NSZ will be in place 24 hours a day.

» The established NSZ will be managed by an official at least the rank of Lieutenant or above. Teams of officers will staff Safety Checkpoints set up along the perimeter of the area in order to stop every vehicle seeking entry to the area.

» Only those motor vehicle operators who provide a legitimate reason will be permitted entry. (See inside panel for examples.)

» Operators who cannot or do not wish to provide a legitimate reason will be denied access.

» Operators who do not comply with the directions of

a law enforcement officer may be arrested for "Failure to Obey" per Title 18 DCMR Section 2000.2.

### Does this mean that friends wishing to visit someone residing in an NSZ will be denied entry?

No. Friends may enter the neighborhood on foot.

### What information will motor vehicle operators need to provide?

Vehicle operators entering an NSZ will need to provide personal identification (i.e., driver's license) and information sufficient for determining the accuracy of the reason for entering the area. For example, operators can provide the telephone number of the address to which the person seeks entry or an invitation to a verified organized community or religious event being held within the NSZ.

### Will operators be compelled to present a reason for entry?

No. However, if the operator does not present a legitimate reason, the vehicle will be denied entry. The operator may park the vehicle elsewhere and enter the NSZ on foot.

### Will each vehicle that attempts to enter the NSZ be subject to search?

No. A vehicle entering the NSZ may be subject to search, but only in instances in which there is probable cause to conduct a search.

### What information will be maintained on the stopped vehicles?

» For vehicles that are denied entry, the operator information, vehicle description, vehicle tag number, and reason for denial.

» For vehicles permitted entry, and in cases where the operator elects to leave the checkpoint without offering a reason for entry, the vehicle tag number and, where appropriate, the reason for entry.

### How will the NSZ affect pedestrians?

For the purposes of the NSZ, pedestrians will be permitted to enter and exit an NSZ without being stopped. Vehicles exiting the NSZ also will not be stopped.

### Will Department members be trained in advance on how to implement an NSZ?

Yes. The Department's Training Academy will train all officers in advance concerning all procedures and standards as well as related U.S. constitutional law and case law.

### Will this operation take officers from other areas of the community?

No. The NSZ will be staffed by members of special mission units, who will be supported by PSA members who are familiar with the neighborhood and community.

| District of Columbia | MAYOR FENTY | DC GUIDE | RESIDENTS | BUSINESS | VISITORS | GOVERNMENT | FOR KIDS |

Releases / Advisories / Schedule / FAQs / Photo Gallery

**MAYOR'S OFFICE**

Press Contacts

News Releases

News Advisories

Schedule

FAQs

Photo Gallery

**2008 News Listing**
Jan Feb Mar Apr
May Jun Jul Aug
Sep Oct Nov Dec

**2007 News Listing**
Jan Feb Mar Apr
May Jun Jul Aug
Sep Oct Nov Dec

## News Release for Immediate Release
June 4, 2008

### Mayor, Chief: Expanded Public Safety Initiatives Aimed at Reducing Neighborhood Crime

Today, Mayor Adrian M. Fenty and Metropolitan Police Chief Cathy Lanier announced the expansion of the Focused Improvement Area (FIA) initiative into four new neighborhoods and the creation of the Neighborhood Safety Zones (NSZ) initiative. Both programs are targeted initiatives aimed at reducing criminal activity and increasing quality of life in at-risk communities.

"The residents of the District of Columbia depend on their government to keep the city where they live, work and play safe," said Fenty. "These initiatives allow us to deploy tools we already have available in a targeted way to have the greatest impact."

Expanding Focused Improvement Areas
The Focused Improvement Areas were established as a pilot program in November 2007 to combine an increased law enforcement presence with support from human service agencies and community-based organizations to address deeper societal issues facing at-risk communities. The program will be expanded into four new neighborhoods (maps attached), which will bring the total number of FIAs to seven. FIAs involve several District agencies in cooperation with non-governmental community-based organizations to address the root causes of crime by increasing employment services, engaging youth in meaningful activities, promoting individual health, well being and family strengthening, and improving neighborhood appearance.

In addition to intensified efforts to improve neighborhood appearance, human services resources are focused on at-risk individuals, their families and households. Individuals and households selected for direct outreach and intervention are identified through public safety information and outreach led by non-governmental volunteers including faith-based groups and government agencies and school outreach, with an emphasis on root-cause analysis. Crime statistics have shown overall reductions in crime in the pilot FIAs, particularly in the categories of assaults and automobile theft.

The new FIAs are located in the Third, Fourth, Fifth and Seventh police districts. Lead District agencies for FIAs include the Department of Employment Services, Department of Human Services, Department of Parks and Recreation, Department of Health and Department of Consumer and Regulatory Affairs.

Neighborhood Safety Zones
The Neighborhood Safety Zone initiative has been developed to help increase security for those who live in high-crime areas around the city and to help residents reclaim their communities. The program will authorize the Metropolitan Police Department to set up public safety checks to help safeguard community members and create safer neighborhoods in the District by increasing police presence aimed at deterring crime.

The safety zones will be established only upon request by a District Commander where there is evidence to support the existence of neighborhood violent crime, such as intelligence, violent crime data, police reports and feedback and concerns from the affected community.

Potential Neighborhood Safety Zones must be approved by the Chief of Police, and will be in effect for a maximum of 10 days. Public safety checks will be established along the main thoroughfares of the established neighborhoods. Anyone driving into a designated area may be asked to show valid identification with a home address in that neighborhood, or to provide an explanation for entering the NSZ, such as attending church, a doctor's appointment or visiting friends or relatives. Pedestrians will not be subject to the public safety checks.

"The Neighborhood Safety Zones is just another tool MPD will employ to stop crime before it happens. The Neighborhood Safety Zone initiative will help residents terrorized by violent crime to take back their neighborhoods," said Chief Lanier.

Initiatives such as the Neighborhood Safety Zones have been accepted by federal courts as a legitimate law enforcement practice in keeping with the Constitution's Fourth Amendment. The constitutionality of the NSZ initiative has been reviewed by the D.C. Office of the Attorney General.

The NSZ will be launched next week in the Trinidad area.

# Yellow House Associates, LLC

# Project Summary





**Columbo Criminal Intelligence Tool**

Columbo is the Metropolitan Police Department's premier crime research and mapping tool. Columbo automatically gathers data from 23 different legacy data sources, including the mainframe arrest tracking system, Microsoft SQL Server and Oracle databases, and end-user Access files and Word documents.

Yellow House Associates personnel were wholly responsible for the design, development, and operations of Columbo. Major roles included system architect, lead programmer, programming team members, database administrator, requirements analyst, user interface designer, data warehouse architect, help desk support, curriculum developer, and user trainer.

Columbo is built on a best-of-breed mix of open-source software and commercial products. The data movement component consists of custom Java code that uses **Java Database Connectivity** (JDBC), **Open Database Connectivity** (ODBC), **geo-coding software**, and **text parsing algorithms** to interface with a wide array of data sources. Yellow House proprietary **code generation tools** produce database schemas, **Java persistence objects**, and **Java Server Pages** (JSPs) based on a **central data dictionary**. The Tomcat Java servlet engine hosts the Java objects and JSPs, which provide user functionality using **DHTML** and **advanced JavaScript**. The open-source **Lucene text indexer** allows Google-style searching of all the documents in the system, with **stemming** and **phonetic** matching options. Columbo uses **ESRI's** respected **ArcIMS** and **MapObjects GIS** products to serve up maps with a user-friendly but powerful browser-based interface.

Columbo has over 1,500 users and performs an average of 200 searches an hour. In addition to MPD, Columbo is also used by the District US Attorney's Office, the DC Court Services and Offender Supervision Agency, the FBI, and the Secret Service.

Reference:

Mr Walter Collier
Deputy CIO
Metropolitan Police Department
(202)727-8667
wcollier@mpdc.org

**Web Link:** http://mpdc.dc.gov/news/stmts/2002/07/071002e.shtm
"Perhaps the biggest technological innovation has been the creation of the Columbo system. Columbo is a 'Google-like' search engine that allows investigators and other personnel to search, retrieve and link information from various criminal databases. This information can be invaluable in developing leads, identifying suspects and linking crimes." -- Metropolitan Police Chief Charles Ramsey, July 10, 2002.

*Yellow House Associates, LLC · (202) 434-4548 · www.yellowhouseassociates.net*

 Government of the District of Columbia 

# NOTICE

## This area has been declared a

# NEIGHBORHOOD
# SAFETY ZONE

### BY ORDER OF THE CHIEF OF POLICE

## VEHICLES ENTERING THIS AREA
## ARE SUBJECT TO STOP. OPERATORS
## MUST PROVIDE IDENTIFICATION.

Vehicles entering this area will be stopped to determine whether the vehicle's operator has a legitimate reason for entering the Neighborhood Safety Zone. Identification will be requested of the driver of the vehicle. Failure to comply with such a request may result in arrest for "Failure to Obey" per Title 18 DCMR §2000.2.

**BOUNDARIES**
Boundaries of Defined Neighborhood Safety Zone:

**EFFECTIVE DATES**
Start Date:          Time:                End Date:            Time:

**QUESTIONS?**
Contact the Patrol Services and School Security Bureau at **(202) 576-6600**
or visit **www.mpdc.dc.gov/nsz**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

CANEISHA MILLS, ET AL.                    )
                                          )
            Plaintiffs,                   )
v.                                        )        Civil Action No.: 08-1061 (RJL)
                                          )
DISTRICT OF COLUMBIA                      )
441 4th Street, N.W.                      )
Washington DC 20001                       )
                                          )
            Defendant                     )
_____  )

## ORDER

Upon consideration of plaintiffs' Motion for Preliminary Injunction, it is this _____ day

of _____, 2008, hereby

ORDERED that plaintiffs' motion is GRANTED; and it is further

ORDERED that defendant is hereby enjoined from further implementation of

"Neighborhood Safety Zone" roadway seizure checkpoints; and it is further

ORDERED that defendant shall expunge all data collected in connection with the

unconstitutional checkpoint program.


_____
RICHARD J. LEON
United States District Judge

1