**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| **CANEISHA MILLS,** *et al.*, | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civ. Action No. 08-1061 (RJL)** |
| | : | |
| **DISTRICT OF COLUMBIA,** | : | |
| | : | |
| **Defendant.** | : | |

_____:

**OPPOSITION OF DEFENDANT DISTRICT OF COLUMBIA TO PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**

Defendant, District of Columbia ("District"), by and through undersigned counsel, respectfully submits this memorandum of points and authorities and accompanying exhibits in opposition to Plaintiffs' Motion for Preliminary Injunction ("PI Mot.").

Plaintiffs seek a preliminary injunction prohibiting the District from operating Neighborhood Safety Zone checkpoints ("NSZCP") pursuant to Metropolitan Police Department ("MPD") Special Order SO-08-06 and affirmatively directing the expungement of any and all information collected and recorded in any law enforcement data base as a result of the operation of the NSZCP's. Complt, Prayer for Relief. Plaintiffs contend that the NSZCP's, such as recently used in the Trinidad neighborhood of Washington, DC, are unconstitutional under the Fourth Amendment because their primary purpose is "general law enforcement." Whether based on a facial challenge to the NSZCP program, or an "as applied" challenge, the PI Mot. should be denied for several reasons.

First, Plaintiffs lack standing to pursue such a remedy. They are unable to establish the necessary likelihood that they would suffer a recurrence of their alleged injuries if no preliminary injunction were to issue.

Next, plaintiffs fail to satisfy the four-pronged test that they must satisfy for a preliminary injunction. Were this Court to hold, based upon consideration of a full record, that the Program were unconstitutional, an injunction would be appropriate. However, the 4-pronged preliminary injunction test recognizes that the Court is required to make a ruling on a record that must be developed quickly, without discovery, and is likely to be incomplete. Accordingly, issuance of a preliminary injunction may not rest solely upon the Court's preliminary analysis of the validity of a challenged activity based on such a predictably incomplete record, but upon Plaintiffs' satisfaction of all four prongs.

The PI Mot. should be denied because Plaintiffs have not demonstrated that they would suffer irreparable injury in the absence of an injunction. Their failure on this prong is sufficient grounds for denial of the preliminary injunction.

In addition, Plaintiffs do not enjoy the requisite likelihood of success on the merits to justify the affirmative preliminary injunction that they seek. Plaintiffs characterize the Program as having a primary purpose of "general law enforcement" or "crime control." These characterizations are too imprecise to support their challenge under *Illinois v Lidster*, 540 U.S. 419 (2004) and are mischaracterizations as demonstrated by the programmatic evidence. On this basis, alone, PI Mot. should be denied.

Nor have Plaintiffs shown that issuance of a preliminary injunction would not result in injury to the District. Finally, they have not shown that a preliminary injunction is consistent

with the public interest. *See Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317–18 (D.C. Cir. 1998).

Plaintiffs have not and cannot make that showing here. Accordingly, the PI Mot. should be denied.[1]

# I.     STATEMENT OF FACTS BEARING ON THIS MOTION

## A.     The Neighborhood Safety Zone Initiative Program

MPD's Neighborhood Safety Zones ("NSZ") Initiative was established through MPD Special Order-08-06 ("SO0806"), effective June 5, 2008 (see copy of SO0806 annexed as Exh. 1). This Special Order provides for the establishment of NSZ's pursuant to the standards set forth therein, in accordance with U.S. Supreme Court precedent.  (*See* Exh. 1 (SP0806), at 1, 12). NSZ's are to be established to enhance the security of discrete geographical areas within the District based on evidence reflecting the existence of an acute neighborhood violent crime problem, such as pertinent violent crime data; information contained in citizen and community reports and complaints relevant to documented violent crimes; and information gathered from criminal intelligence sources relevant to documented violent crimes.  (Exh. 1, at 3 (Part IV.A (regulations)).  SO0806. sets forth, in general terms, a statement of policy and background information supporting the Special Order's promulgation.  (Exh. 1, at 1).

SO0806 sets forth programmatic procedural requirements that must be satisfied prior to the designation and implementation of an NSZ and its checkpoints.  (Exh. 1, at 3-11("V.

---

[1]     Although Plaintiffs fail to make the showing necessary for a preliminary injunction, the District respectfully proposes that the Court enter an Order that would (1) permit the attorneys defending this matter to retain copies of the MPD Form PD-76's completed for any of the named Plaintiffs, and (2) provide for all other MPD Form PD-76's generated through the Trinidad NSZ operations to be filed under seal with the Court, with no copies to be provided or retained by any party or person pending further Order of this Court, as Chief Lanier proposes through the declaration, verified June 27, 2008, at ¶ 12.  Such a proposed order is submitted herewith.

Procedural Guidelines")).  Pursuant to these programmatic procedural requirements, an NSZ may only be established with the prior approval of the Chief of Police (or her designee of the rank not lower that Assistant Chief) based on the recommendation of an official of the rank Commander or above.  (Exh. 1, at 3, IV.B, C (Regulations),  at 11, V.U (Procedural Guidelines)). The Special Order clearly states the criteria that a District Commander must satisfy in requesting establishment of an NSZ and by which the Chief of Police or her designee is to determine whether a Commander's Request should be approved.  Exhs. 1, 2 at 2 (IV. Regulations A-C; Procedural Guidelines A, C, I. 1).  The Commander's Recommendation sets forth the geographic area comprising the NSZ.

Moreover SO0806 requires that Commanders' Requests be reviewed by the MPD General Counsel for legal sufficiency and that the General Counsel report his legal sufficiency approval or disapproval of the Recommendation to the Chief.  (Exhs. 1, 2, at 11, V.T (V. Procedural Guidelines).  The Special Order, further, establishes requirements governing the implementation and operation of all NSZ's and checkpoints.  (Exh. 1, at 3, IV. D-H (Regulations D-G); V.D-M (Procedural Guidelines).  These requirements provide for consistency and serve to preclude the exercise of unwarranted discretion in the authorization, establishment and operation of NSZ's and CPEZ's.  (Declaration of Cathy L. Lanier, verified June 26, 2008 ("Lanier Decl."), a copy of which is annexed as Exh. 3, ¶ 6; Exhs. 1, 2. at 3 IV.A.3 (Regulations) ("[E]ach NSZ Entry Point shall be conducted systematically so as to minimize or eliminate police officer discretion in stopping vehicles from entering the NSZ.")).

Special Order 08-06 requires that all MPD personnel participating in the operation of an NSZ have successfully completed NSZ-related training.  (Exh. 1, at 3, IV.D (Regulations)). The training regarding Special Order-08-06 provided to MPD personnel as a prerequisite of an

4

officer's or official's participation in an NPZ reinforces the mandated consistency of NSZ operations and minimalization of officer discretion in an NSZ's operation. (*See* Special Order-08-06, Lesson Plan, annexed as Exh.3, at 5; Exh. 1, at 3 IV.A.3 (Regulations); Exh. 2 (Lanier Decl) at ¶¶ 6-7).

The MPD Special Order 08-06 governing the implementation and operation for the NSZ specifically dictates that officers staffing the checkpoint are simply to inquire whether the operator of a stopped vehicle has a legitimate reason for entering the NPZ along with such additional information as would enable the officers to reasonably verify the accuracy of the driver's stated reason. The inquiry was to be and was limited to confirmation of the driver's residence in the NSZ or identification of an invitation to a civic or community event within the NSZ or of a contact phone number for the destination address. The Special Order states the following list of legitimate entry reasons:

Legitimate reasons are:

a.      The person resides in the NSZ;

b.      The person is employed in the NSZ or is on a commercial delivery;

c.      The person attends school or a day-care facility, or is taking a child to, or picking up a child from, a school or day-care facility in the NSZ;

d.      The person is a relative of a person who resides in the NSZ;

e.      The person is seeking medical attention, is elderly, or is disabled;  and/or

f.      The person is attempting to attend a verified organized civic, community or religious event within the NSZ; or

g.      An official the rank of Sergeant or above assigned to the NSZ approves the entry for reasons other than those listed above when there are exigent circumstances.

(Exhs. 1, at 5, V.l (Procedural Guidelines)).  At no time were officers to travel to the location that an operator identified as her destination under the NSZ Initiative.  Exh. 2 (Lanier Decl). ¶ 8).

The NSZ Recommendation and resultant authorization were based, in part, on information gathered by MPD investigations reflecting that motor vehicles had been used in the commission of the spate of violent crimes recently committed in Trinidad.  (Declaration of Lamar Greene, verified June 27, 2008, a copy of which is annexed as Exh. 4 ("Greene Decl.") at ¶ 4); Request for Establishment of Neighborhood Safety Zone, dated June 6, 2008, a copy of which is annexed as Exh. 5 ("NSZ Rec."); Exh. 2, (Lanier Decl.) ¶4). These investigations do not indicate that cars were stolen from Trinidad in the context of the recent homicides and other violent crimes in Trinidad.  (Exh. 4, Greene Decl ¶ 4).  Accordingly, the attackers have driven into Trinidad, committed the murders and other violent felonies, and made their escape in the vehicles that they drove into Trinidad. (*Id.*)

The legitimate and specific law enforcement concern served by the Trinidad checkpoints was the reduction of violent crime in a particular geographic area that has come to be plagued by crimes of violence.  (Exh. 2, Lanier Decl. ¶ 9).  This was not to be accomplished by using the checkpoints to press interrogations intended or likely to yield self-incriminating statements by vehicles operators or actions providing probable cause for arrest – characteristics of presumptively unconstitutional checkpoints conducted for "general law enforcement purposes." *See Illinois v. Lidster*, 540 U.S. 419, (424 (2004).  Rather, the NSZ and its component checkpoints were intended and operated, in conjunction with communications to the public, to discourage persons, who otherwise might attempt to drive into Trinidad to commit acts of violence, from doing so.  (Exh. 2 (Lanier Decl.) ¶¶ 9-11).  Moreover, Commander Greene's NSZ

Recommendation expressly stated that "the proposed NSZ implementation is not intended or anticipated to result in inquiries regarding criminal activities, much less searches of vehicles or their drivers or occupants, or arrests.  (Exh. 5, at 2).

As reflected by Commander Green's NSZ Recommendation, the Trinidad neighborhood in which the NSZ was established had been the site of dozens of assaults with deadly weapons that involved a firearm over the preceding 12 months, resulting in six homicides, and 20 persons having suffered gunshot wounds.  (Exh. 4 ("Greene Decl.") ¶ 5; Exh. 5, NSZ Rec at 2).  Moreover, the neighborhood had been the scene of an extraordinary triple homicide on May 31, 2008.  (Exh. 4 (Greene Decl.) ¶ 5).  The checkpoints and the NSZ, overall, served that concern of extraordinary, repeated violent crime in a specific geographic area in a manner that was designed to avoid, and succeeded in avoiding, eliciting self-incriminatory information from the persons entering the checkpoints.  (Exh. 2 (Lanier Decl) ¶ 2; Exh. 1).

**B.** **Checkpoint Data**

Pursuant to Special Order 08-06, MPD operated NSZ checkpoints on 11 occasions within the period June 7, through June 12, 2008.  (*See* After Action Report for the Neighborhood Safe Zone, dated June 12, 2008 ("NSZ Report"), a copy of which is annexed as Exh. 6).

MPD compiled statistics for the purpose of evaluating the effect the NSZ implementation had on reported crime in the Trinidad neighborhood. (See Declarations of Burley Sanders, Judith Anderson, and Ronald J. Wright, Jr. (collectively "NSZ Zone Mgrs' Decls.") annexed as Exhs. 7 ¶ 11; 8 ¶ 10; and 9 ¶ 10, respectively).,  During the period that the NSZ was in place, the Trinidad neighborhood reported a total of four crimes.  Exh. 4 (Greene Decl.) ¶ 12; Exh. 6 (NSZ Report) at 9-10).  Additionally, none of the suspect(s) for the crimes committed during the NSZ period used a vehicle during the commission of the criminal act.  The average total number of

crimes reported during the nine (9) previous five (5) 24-hour periods was 4.6 crimes.  The four crimes reported during the NSZ active days reflect a 13% reduction off average.  Importantly, no shootings were reported while the NSZ was in operation.  (Exh. 4 (Greene Decl.) ¶ 12; Exh. 6 NSZ Report at 9-10).

Rather than being "nets" to capture evidence of ordinary criminal wrongdoing by the operator or occupants of the vehicles, the checkpoints, assisted by advance warning through publicity and media reporting, as well as clear signage approaching the checkpoints, served as a "fence" to keep violent criminals out of Trinidad.  (Exh. 2 (Lanier Decl) ¶ 10).

C.    **Checkpoint Operation**

MPD operated 11 NSZ checkpoints during the five days of NSZ operation.  (Exh. 6 (NSZ Report).  MPD stopped every motor vehicle and questioned every operator that came to the checkpoint while the NSZ was in place.  (Exhs. 7, ¶ 6; 8, ¶ 6; 9, ¶ 6).  Nine hundred fifty-one (951) vehicles entered the checkpoints.  Nine hundred three (903) were allowed through the checkpoints and 48 vehicles (5.3%) were turned away for failing or refusing to provide a legitimate purpose for entering.  (Exh. 6, (NSZ Report) at 2).  One operator was arrested for driving while in possession of an open container of alcohol.  (Exh. 7 (Decl. of .Burley Sanders) ¶ 12.  That driver was transporting four children in the car at the time, none of whom was in a child seat or wearing a seatbelt.  (Exh. 7 (Decl. of Lt. Burley Sanders) ¶ 12.

Where an individual approached the checkpoint and refused or was unable to advise police of a legitimate entry reason, the motorist was turned around and away from the checkpoint in a minute or less, on average, unless the operator wished to engage the officer in discussion. (Exhs. 7, ¶9; 8, ¶ 8; 9, ¶ 8).  Motorists who provided legitimate entry reasons and who were not delayed for another reason, passed through more quickly. (Exhs.7, ¶ 8; 8, ¶ 7; 9, ¶ 7).  Police

contact consisted simply of a request for limited information, after which the driver was allowed through the checkpoint or directed to turn around and advised that he could park in the area and enter the NSZ on foot.  (Exhs. 7, ¶ 9; 8, ¶ 8; 9, ¶ 8).

The planned establishment, location and functions of the NSZ and its checkpoints were publicized by the MPD and by news media in advance of their implementation.  (Exh. 2 (Lanier Decl.) ¶ 11).  Area residents were provided brochures explaining the operation of the NSZ. (Exh. 4 (Greene Decl.) ¶ 7; *see* Exh. 12 (MPD NSZ Brochure).  The MPD sought to accomplish two objectives through such information dissemination. (Exh. 2 (Lanier Decl.) ¶ 11).  MPD sought to alert the public, generally, to the planned use of the checkpoints so that drivers would not be made anxious by the checkpoint process if they encountered it.  (Exh. 2 (Lanier Decl.) ¶ 11).  Publication of the planned checkpoint operation was also intended to discourage persons who might otherwise consider driving into Trinidad to commit acts of violence from attempting to do so.  (Exh. 2 (Lanier Decl.) ¶ 11).  These dual objectives were further served by clear signage approaching the checkpoint and the lights of the police cars at the checkpoint, which gave drivers adequate opportunity to avoid the checkpoint entirely without any police contact. (Exh. 2 (Lanier Decl) ¶ 11; Exhs. 7, ¶ 13; 8, ¶ 12; 9, ¶ 12).

Public support for the program is reflected by the Compilation of signatures of Trinidad residents collected by Trinidad Advisory Neighborhood Commissioner Kay Henderson, a copy of which is attached to Exh. 10, the Declaration of Kay Henderson verified June 27, 2008).

## **ARGUMENT**

## **II.    Plaintiffs Lack Standing To Obtain the Injunction They Seek**

At the outset, the Court must ascertain whether plaintiffs enjoy standing to pursue their application for and to be awarded the injunction they seek.  Plaintiffs fail to establish standing to

obtain injunctive relief because they cannot "establish the basic requisites of the issuance of equitable relief in these circumstances – the likelihood of substantial and immediate irreparable injury, and the inadequacy of remedies at law." *See City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974). A plaintiff's standing to obtain injunctive relief depends upon her having suffered an unlawful injury coupled with a sufficient likelihood of the *recurrence* of the same injurious conduct to the same plaintiffs. *See Lyons*, 461 U.S. at 110; *Rizzo v. Goode*, 423 U.S. 362, 373 (1976); *O'Shea*, 414 U.S. at 496-97.

Moreover, to have standing, a plaintiff must plead and prove *specifics*. "To meet the injury-in-fact requirement, the plaintiffs must demonstrate a concrete, actual, or imminent injury." *Autozone Dev. Corp.*, 2007 WL 987558 at *4 (citing *Byrd v. EPA*, 174 F.3d 239, 243 (D.C. Cir. 1999)). *See also Advanced Mgmt. Tech., Inc. v. FAA*, 211 F.3d 633, 636 (D.C. Cir. 2000) ("[s]tanding cannot be 'inferred argumentatively' but rather 'must affirmatively appear in the record'") (quoting *Spencer v. Kemma*, 523 U.S. 1, 10–11 (1998)).

MPD Special Order-08-06 provides that "[a] n NSZ location shall be selected with the primary purpose of addressing a neighborhood violent crime problem," which may be evidenced by "(1) pertinent violent crime data; (2) information contained in citizen and community reports and complaints relevant to documented violent crimes; and (3) Information gathered from criminal intelligence sources relevant to documented violent crimes." (Exh. 1, SP0806 at 3). None of the Plaintiffs alleges that he or she anticipates having occasion to travel into such an area in the future and having the inability or unwillingness to provide a legitimate entry reason if he or she encounters a checkpoint in operation when he or she seeks to enter the NSZ. *See* Complt *generally*. On this record, Plaintiffs fail to establish the required showing of a sufficient likelihood of the *recurrence* of the same, alleged, injurious conduct to the same plaintiffs to

establish standing to pursue preliminary injunctive relief.  *See Lyons*, 461 U.S. at 110; *Rizzo*, 423 U.S. at 373 (1976); *O'Shea*, 414 U.S. at 496-97.

Here, based on these requirements, the PI Mot. should be denied.

### III.    Plaintiffs Fail To Meet Any of the Elements Necessary for Preliminary Injunctive Relief

Interim injunctive relief "is an extraordinary remedy that should be granted only when the party seeking relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (interim injunctive relief is "an extraordinary and drastic remedy")).

Plaintiffs fail to meet their difficult burden. In order to obtain preliminary injunctive relief, Plaintiffs must satisfy *each* prong of the following four-part test, by demonstrating that: (1) they enjoy a substantial likelihood of success on the merits; (2) they will suffer irreparable injury in the absence of an injunction; (3) an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction.  *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317–18 (D.C. Cir. 1998).

While a strong showing on one of the four factors may make up for a weaker showing on another, *Serono Labs.*, 158 F.3d at 1318, a particularly weak showing on one factor may be more than the other factors can compensate for. *Taylor v. RTC*, 56 F.3d 1497, 1506 (D.C. Cir. 1995), *amended on other grounds on reh'g.*, 66 F.3d 1226 (D.C. Cir. 1995).

Plaintiffs have failed to make a satisfactory showing on *any* of the four factors. Hence, their request for preliminary injunctive relief should be denied.

### IV.    Plaintiffs Have Failed As a Matter of Law to Establish Irreparable Harm

Plaintiffs have failed to make any showing of imminent, irreparable harm and therefore, their demand for preliminary injunctive relief must fail.

At a minimum, a plaintiff seeking emergency injunctive relief must make a threshold showing of irreparable injury. *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995) ("we require the moving party to demonstrate at least 'some injury . . . .'").

Plaintiff makes no competent showing of *any* imminent, *irreparable* injury. Consequently, the Court may deny its request for preliminary injunctive relief without considering any other factors. *See Chaplaincy of Full Gospel Churches v. England*, 455 F.3d 290, 297 (D.C. Cir. 2006) ("A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief.") (citing *Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1210–11 (D.C. Cir. 1989)).

*Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985), sets forth the guiding principles for determining whether irreparable harm exists: (1) the injury must be both *certain* and *great*, not something merely feared as likely to occur at some indefinite time; (2) the injury must be of such imminence that there is a "clear and present" need for relief to prevent it; and (3) economic loss is insufficient to constitute irreparable harm unless the plaintiff's very existence is threatened. *See also Sampson v. Murray*, 415 U.S. 61, 88–90 (1974).

The future threatened harms alleged by plaintiff are entirely speculative. Plaintiffs have not filed or served any declarations in support of their PI Mot. *See* LCVR 65. Moreover, Plaintiffs' verified complaint is insufficient as a matter of law to support the grant of preliminary injunctive relief. *See, e.g.*, *Nat'l Assn. of Psychiatric Health Sys. v. Shalala*, 120 F.Supp.2d 33,

44 & n.9 (D.D.C. 2000) (preliminary injunction denied where plaintiffs "offer[ed] no concrete, reliable evidence to support their contentions of irreparable harm.").[2]

The complaint alleges that Ms. Mills was stopped at an NSZ checkpoint and refused entry by car when she did not wish to provide personal information regarding her identity and activities.  Complt, Parties ¶ 1.  As this record does not reflect her intended destination, it is not clear that Ms. Mills suffered more than a detour, which would not constitute an irreparable injury.  If her destination was within the NSZ, this record does not reflect that she was denied entry on foot.  Ms. Leaks has not availed herself of her opportunity to put evidence in the record of what, if any, concrete, irreparable harm she may have suffered.

The complaint alleges that Mr. Robinson, when stopped at one checkpoint and refused to deliver his driver's license to a police officer,  was told he could not proceed to his house without

---

[2]    In fact, the Complaint is not even competently verified.  Only one of the four plaintiffs purports to verify it.  *See* Compt. Verification executed only by Sarah Sloan.  Plaintiffs offer no indication that Ms. Sloan is competent, under Fed. R. Evid. 602, which provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.", to verify the allegations relating to the other three plaintiffs or to the actions of the District.  The verification suggests that she is not competent to testify regarding the allegations relating to the other Plaintiffs. The verification is made "to the best of [Ms. Sloan's} belief" without any indication of the basis of that belief or the extent to which she verifies based on personal knowledge.

In addition, the first six pages of the Complt present an impassioned argument complete with citation to legal authority.  In this regard, it fails to comply with the pleading requirements of Fed. R. Civ. P. 8.  Those portions of this section of the complaint which would give the District notice of Plaintiffs' claims are repeated in subsequent portions.  Their elimination from the introductory section would improve the Complt's clarity without detracting from substance and would permit plaintiffs to plead responsively.  *Cf.*  Fed. R. Civ. P. 12(f) (stating "court may strike from a pleading . . any redundant, immaterial, impertinent, or scandalous matter"). .Insofar as Plaintiffs would seek that the Complt be treated as a declaration for any purpose in this litigation, it should be held to the Fed. R. Civ. P. 56 standard, "which requires that affidavits 'be made on personal knowledge, ... set forth such facts as would be admissible in evidence, and ... show affirmatively that the affiant is competent to testify to the matters stated therein'").  *See Bortell v. Eli Lilly and Co.*, 406 F.Supp.2d 1, 8 (D.D.C. 2005).for declarations: In short, this Court should treat as verified only those portions of the Complt that actually comply with all the applicable federal Rules.

providing identity information.  Complt, Parties ¶ 2.  This record does not reflect whether he was permitted to drive to his house based on production of other identification or whether he walked to his house.  Like with Ms. Mills, the complaint fails to provide evidence of what, if any, concrete, irreparable harm Mr. Robinson may have suffered.[3]

The complaint alleges that Ms. Leaks, when stopped at a checkpoint, provided identification information upon request, but was denied entry to the NSZ when she declined to provide information about "political activity and her intended community organizing."  Complt , Parties ¶ 3.  The complaint alleges that, as a result, she was prohibited from driving into the NSZ even though she stated that she needed to bring her political materials into the NSZ by car.  It cannot be determined from this record what, if any, was the nature and extent of her injuries.  Accordingly, although Ms. Leaks enjoyed complete control over the record she presents in favor of her motion for a preliminary injunction, she has failed to establish that she suffered irreparable injury or is likely to suffer recurrent irreparable injury.

Further, Ms. Mills, Mr. Robinson, and Ms. Leaks have not chosen to support their claims with declarations or even by verifying the Complt.  For this reason, the PI Mot. should be denied as to each of them.

The complaint alleges that Ms. Sloan was stopped at an NSZ checkpoint on her way to "a political meeting in the area" – presumably, but not expressly stated, as being within the NSZ.  Complt , Parties ¶ 4.  Ms. Sloan provided her license as identification, but declined to provide a checkpoint officer information, unspecified in the Complt about the meeting.  The MPD Form PD-76 completed regarding her checkpoint encounter restates that she "refused to state

---

[3]    Police may reasonably call upon a driver to produce his license and registration in the context of a suspicionless "license-and-registration" checkpoint held to be constitutionally permissible by the D.C. Circuit.  See *Bowman*, 496 F. 3d at 692.

destination address in Trinidad area.  [Officer' was told it was ["} none of my business. ["]  (See

copy of MPD PD-76, attached as Exh. 13).  Ms. Sloan was not permitted to drive through the

checkpoint.  Like the other Plaintiffs, Ms. Sloan has chosen not to provide evidence of a specific,

concrete, irreparable injury, subject to recurrence to support her preliminary injunction request.

Accordingly, the PI Mot. should be denied because the Plaintiffs have failed demonstrate that

they suffered irreparable harm.

To the extent Plaintiffs rely on their claim that their constitutional rights have been

violated, they have similarly failed to meet their burden. *See, e.g., Wagner v. Taylor*, 836 F.2d

566, 577 n. 76 (D.C.Cir.1987) ("[I]n cases involving a claim by movant of interference with

protected freedoms or other constitutional rights, . . . the finding of irreparable injury cannot

meaningfully be rested on a mere contention of a litigant."); *Veitch v. Danzig*, 135 F.Supp.2d 32,

37 (D.D.C. 2001) (violation of constitutional rights is not itself an irreparable harm) (citing *Elrod

v. Burns*, 427 U.S. 347, 373 (1976)); *Ashland Oil, Inc. v. FTC*, 409 F.Supp. 297, 307 (D.D.C.

1976) ("[T]he required showing of irreparable injury is not eliminated simply by virtue of a

claim alleging violation of statutory or constitutional rights."), *aff'd*, 548 F.2d 977

(D.C.Cir.1976).

Rather, the D.C Circuit has clarified that even in the context of an asserted First

Amendment violation "movants must show that their 'First Amendment interests are either

threatened or in fact being impaired at the time relief is sought.'" *Chaplaincy of Full Gospel

Churches v. England*, 454 F.3d 290, 302 (D.C. Cir. 2006) (quoting *National Treasury Employees

Union v. United States,* 927 F.2d 1253, 1254-55 (D.C.Cir.1991), (quoting *Wagner v. Taylor,* 836

F.2d 566, 577 n. 76 (D.C.Cir.1987), in turn quoting *Elrod v. Burns,* 427 U.S. 347,.373 (1976)

(plurality opinion))) (brackets omitted).  Mills and Robinson have not alleged a First Amendment

violation.  Even assuming that Leaks or Sloan can be understood to have alleged a violation of

their freedom of expression, they have alleged a past infringement, but not an ongoing or

imminent infringement.  Accordingly, Plaintiffs cannot satisfy their irreparable harm,

requirement, and on this basis alone the PI Mot. should be denied.

## V.    Plaintiffs Lack On This Basis Alone a Substantial Likelihood of Success on the Merits Because the NSZCP Was a Constitutionally Permissible Suspicionless Checkpoint the Primary Purpose of Which Was Not "General Law Enforcement Activity"

The Court's analysis of the constitutionality of the NSZ commences from the premise

that "a vehicle stop at a highway checkpoint effectuates a seizure within the meaning of the

Fourth Amendment." *City of Indianapolis v. Edmond*, 531 U.S. 32, 40 (2000) (citation omitted).

The parties concur that in being stopped at the NSZCP, Plaintiffs, among others, were "seized"

for purposes of the Fourth Amendment.  The parties further concur that the persons, including

Plaintiffs, who were stopped by MPD officers at the checkpoint, were not stopped based on the

officers' probable cause to believe that these drivers or their passengers had committed an

offense. Nevertheless, Plaintiffs' NSZ seizures were constitutionally valid because, like the

checkpoint held to be constitutionally valid by the U.S. Supreme Court in *Illinois v. Lidster*, 540

U.S. 419, (424 (2004), the NSZ checkpoints did not subject persons to "stops justified only by

the generalized and ever-present possibility that interrogation and inspection may reveal that any

given motorist has committed some crime."  Further, the NSZ checkpoints were reasonable

under the balance of interests tests of *Brown v. Texas*, 443 U.S. 47, 51 (1979); *United States v.*

*Davis*, 270 F.3d 977 (D.C. Cir. 2002); and *United States v. Bowman*, 496 F.3d 685 (D.C. Cir.

2007).

A.    **Fourth Amendment Reasonableness of a Seizure As Determined By Its Primary Purpose And The Balance Of Interests Under** *Brown v. Texas* **and** *Bowman v. United States,United States v. Davis,* **And** *United States v. Bowman*

United States Supreme Court precedent has defined three classes of motor vehicle checkpoints for purposes of Fourth Amendment analysis. One class consists of checkpoints that are used to uncover evidence of ordinary criminal wrongdoing in the absence of individualized suspicion of those stopped.  Where this is the "primary purpose" of a suspicionless checkpoint, the checkpoint is presumptively unconstitutional unless it serves one of a number of "special needs."  *See Edmond*, 531 U.S. at 42-43; *Illinois v. Lidster,* 540 U.S. 419, 424 (2004).  Plaintiffs contend that the NSZCP falls into the presumptively unconstitutional class.

 A second class consists of checkpoints, "designed to serve special needs, beyond the normal need for law enforcement." *Edmond*, 531 U.S. at 37 (citations omitted) (internal quotes omitted). Such suspicionless checkpoints may be deemed constitutionally reasonable where they are properly tailored to address a specific public safety or security issue in a reasonably non-intrusive manner. *Id.* at 37-39 (discussing validity of sobriety checkpoints established in *Michigan Dep't of State Police v. Sitz,* 496 U.S. 444 (1990), and checkpoints for intercepting illegal immigrants (*United States v. Martinez-Fuentes,* 428 U.S. 543 (1976)).  The District does not assert that the NSZCP's fall into this category.

Other suspicionless checkpoints fall between these two ostensible ends of the analytical spectrum. *See Illinois v. Lidster*, 540 U.S. 419 (2004); *see also* United States v, Faulkner, 450 F.3d 466 (9th Cir. 2006).  In assessing the validity of such a checkpoint, whose "primary purpose is other than to uncover evidence of ordinary criminal wrongdoing in the absence of individualized suspicion of those stopped," the Court "must judge its reasonableness, hence, its constitutionality on the basis of its individual circumstances." *Lidster*, 540 U.S. at 426.  The NSZ

checkpoints were not drug interdiction checkpoints, which are "general law enforcement" checkpoints. Nor are they sobriety or other "special needs" "checkpoints. Nor were they routine "license-and-registration" checkpoints, held by the D.C. Circuit to pass constitutional muster. The NSZ checkpoints served the primary purpose, much like the security measures used by the U.S. Marshall Service to protect this Courthouse and its occupants, to discourage persons from entering the NSZ to commit crimes. *Edmond's* reference to "general interest in crime control' does *not* refer to every 'law enforcement' objective." *Lidster*, 540 U.S. at 424. (citing *Edmond* 531 U.S. at 44, n.1) (emphasis added).

**B.    *Edmond*, *Lidster*, And The Primary Purpose**

**1.    *Edmond v. City of Indianapolis***

In *Edmond*, the U.S. Supreme Court introduced a "primary purpose test" to the pre-existing Brown *v. Texas* analysis. *Edmond*, 531 U.S. at 53 (Relinquish, C.J., dissenting) ("The Court, unwilling to adopt the straightforward analysis that these precedents dictate, adds a new non-law-enforcement primary purpose test lifted from a distinct area of Fourth Amendment jurisprudence relating to the *searches* of homes and businesses.") (emphasis in original). *Edmond* arose from the city of Indianapolis' use suspicionless roadblocks in August 1998 to interdict unlawful drugs. In conducting six such roadblocks between August and November, 1998, the city stopped 1,161 vehicles and arrested 104 motorists. Thus, 9 percent of the stops resulted in arrests. *Id*., at 34-35. Fifty-five of the arrests were for drug-related crimes, and the other 49 arrests were for offenses unrelated to drugs.

That program was conducted pursuant to written directives issued by the chief of police. The Indianapolis police stopped a predetermined number of vehicles at each checkpoint, and staffed each with approximately 30 police officers. According to the protocol, at least one

officer would approach the vehicle, tell the driver that s/he was being stopped briefly at a drug checkpoint, and ask the driver to produce a license and registration. The officer was also to check for signs of driver impairment and perform a plain-view inspection of the vehicle from the outside. A drug-sniffing dog walked around the outside of every stopped vehicle. *Id.*, at 35.

The police directives instructed officers to only conduct a further search by consent or based on particularized suspicion. The officers were required to conduct each stop in the same manner until particularized suspicion developed, and they had no discretion to stop any vehicle out of sequence. The checkpoints were operated to ensure that the total duration of each stop, absent reasonable suspicion or probable cause, would be five minutes or less. *Id.*, at 35.

The checkpoint locations were chosen weeks in advance based on factors such as area crime statistics and traffic flow. They were generally operated during daylight hours and identified with lighted signs reading, "NARCOTICS CHECKPOINT ___ MILE AHEAD, NARCOTICS K-9 IN USE, BE PREPARED TO STOP." Once a group of cars was stopped at the checkpoint, other traffic was allowed to proceed uninterrupted until all the stopped cars had been processed or diverted for further processing. The average stop for a vehicle not subject to further processing lasted two to three minutes or less. *Id.*, at 35-36.

Against this factual record, the U.S. Supreme Court enunciated the "primary purpose" test. *Edmond*, 451 U.S. at 53 (Rehnquist, CJ, dissenting). The Court explained that although it had held suspicionless checkpoints to be reasonable under the Fourth Amendment in a number of contexts it "ha[d] never approved a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing." *Id*. at 454. The Court held that "[b]ecause the primary purpose of the Indianapolis checkpoint program [wa]s ultimately indistinguishable from the general interest in crime control, the checkpoints violate[d] the Fourth Amendment." *Id.* at

459.

### 2. *Illinois v. Lidster*

*Illinois v. Lidster,* 540 U.S. 419, 426 (2004), ignored by Plaintiffs in their analysis of the validity of the NSZCP, explained the primary purpose set forth in *Edmond.* In *Lidster*, the Court stated that the language it had used in discussing the application of the primary purpose test in *Edmond,* like the result of applying that test, were fact-specific. *Lidster*, 540 U.S. at 424 ("*Edmond*'s language, as well as its context, makes clear that the constitutionality of this latter, information-seeking kind of stop [in *Lidster*] was not then before the Court").

*Lidster* arose from the deployment of a highway checkpoint by police one week after an unknown hit-and-run motorist traveling eastbound on a highway in Lombard, Illinois, struck and killed a 70-year-old bicyclist. The police established the checkpoint at about the same time of night and at about the same place as the accident to gather more information about the accident from the motoring public. Police partially blocked the eastbound lanes of the highway with patrol cars with flashing lights. This forced traffic to slow down, leading to lines of up to 15 cars in each lane. As each vehicle reached the checkpoint, an officer stopped it for 10 to 15 seconds, and asked the occupants whether they had seen anything happen there the previous weekend. The officer handed each driver a flyer in this process. These flyers stated, "'ALERT ... FATAL HIT & RUN ACCIDENT'" and asked for "'ASSISTANCE IN IDENTIFYING THE VEHICLE AND DRIVER INVOLVED IN THIS ACCIDENT WHICH KILLED A 70 YEAR OLD BICYCLIST.'" *Lidster*, 540 U.S. at 422.

As Robert Lidster drove a minivan toward the checkpoint, the vehicle swerved and nearly hit an officer. The officer smelled alcohol on Lidster's breath. That officer directed Lidster to a side street where a second officer performed a sobriety test and then arrested Lidster. Lidster was

tried and convicted of driving under the influence of alcohol. Lidster challenged this conviction, asserting that much of the evidence against him had been gathered through an unconstitutional checkpoint stop. *Id.*

The Illinois Supreme Court held that the U.S. Supreme Court's *Edmond* decision "required it to find the stop unconstitutional." *Lidster*, 540 U.S. at 423. In reversing the judgment of the Illinois Supreme Court, the U.S. Supreme Court explained with care the material differences between the two checkpoints that caused the *Edmond* checkpoint to unconstitutional and the *Lidster* checkpoint to be valid. *Id.* at 423-24. The Court also took care to explain that the meaning of language used in *Edmond*, including the phrase "general interest in crime control," was informed by the facts of the case in which the language had been used. *Lidster*, 540 U.S. at 424.

Regarding the material distinctions between the two checkpoints, the Court stated:

> The checkpoint stop here differs significantly from that in *Edmond*. The stop's primary law enforcement purpose was *not* to determine whether a vehicle's occupants were committing a crime . . . . The police expected the information elicited to help them apprehend, not the vehicle's occupants, but other individuals.

*Lidster*, 540 U.S. at 423 (emphasis in original).

### 3.    Explaining Primary Purpose

The *Lidster* Court next explained the constraints on applying of *Edmond's* language beyond the specific facts of *Edmond*. The Court recognized that "*Edmond* refers to the subject matter of its holding as 'stops justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that *any given motorist has committed some crime.*'" *Lidster,* 540 U.S. at 424 (quoting *Edmond*, 531 U.S. at 44) (emphasis added in *Lidster*). The Court "concede[d] that *Edmond* describes the law enforcement objective there in question as a general interest in crime control, *but it specifies that the phrase* "general interest in crime

control" *does not refer to every* law enforcement objective." *Lidster,* 540 U.S. at 424 (citing *Edmond,* 531 U.S. at 44, n.1) (emphasis added). Further, explaining how the Court could utilize the primary purpose test to reach its contrasting results in *Edmond* and *Lidster*, the Court stated, ""[w]e must read this and related general language in *Edmond* as we often read general language in judicial opinions--as referring in context to circumstances similar to the circumstances then before the Court and *not* referring to quite different circumstances that the Court was *not then* considering." *Lidster,* 540 U.S. at 424 (emphases added).

Then the Court discussed several more factors informing its determination that the *Lidster* checkpoint was reasonable. 540 U.S. at 424. Speaking in broader terms than simply distinguishing *Edmond*, the Court explained that *"Edmond* aside," the *Fourth Amendment* would not cause the Court to apply a "rule of automatic unconstitutionality to brief, information-seeking highway stops . . . ." *Id,* (emphasis added). That such stops generally lack individualized suspicion, "cannot by itself determine the constitutional outcome." *Id.* Further, for purposes of analyzing constitutional reasonableness, the Fourth Amendment does not provide a motorist in his vehicle the same degree of protection from governmental inquiry or intrusion that the Fourth Amendment provides him in his home. *Id.* (citations omitted). Thus, in *Lidster*, the Court made clear that even though the *Edmond* decision had served to introduce the primary purpose test, *Edmond* had not created a different standard of constitutional reasonableness than that which had been in place before *Edmond* had been decided. 540 U.S. at 424; *cf. also, Edmond*, 531 U.S. at 53 (Rehnquist, CJ, dissenting). That standard was the Fourth Amendment as the Supreme Court had applied it in *New York v. Class,* 475 U.S. 106, 112-113 (1986) and in *United States v. Martinez-Fuerte,* 428 U.S. 543, 561 (1976) (suspicionless Border Patrol checkpoint seizures to combat illegal immigration valid under Fourth Amendment). Lidster, 540 U.S. at 424.

"Moreover, unlike *Edmond*, the context here (seeking information from the public) is one in which, by definition, the concept of individualized suspicion has little role to play. *Lidster*, 540 U.S. at 425. Speaking of the *Lidster* checkpoint, the Court stated "[l]ike certain other forms of police activity, say, crowd control or public safety, an information-seeking stop is not the kind of event that involves suspicion, or lack of suspicion, of the relevant individual." *Lidster*, 540 U.S. at 425. (The same is true of the NSZ checkpoint.) Thus, in explaining the primary purpose test, *Lidster* clarified that a court should thoroughly consider the specifics of the checkpoint as implemented, and its effects, consistent with historical Fourth Amendment analysis.

The Court discussed all of these factors in its "primary purpose" analysis before turning to its *Brown v. Texas* balancing analysis. In contrast to the *Lidster* checkpoint, the *Edmond* checkpoint existed to enable police to conduct stops/seizures for the purpose of detecting evidence of ordinary criminal wrongdoing by the vehicle's occupants, themselves, in the absence of individualized suspicion. *Lidster*, 540 U.S. at 424, *Edmond,* 531 U.S. at 40.

Further, the Court cautioned against overly broad application of *Edmond*'s presumptive invalidation of checkpoints. "Finally, we do not believe that an *Edmond*-type rule is needed to prevent an unreasonable proliferation of police checkpoints. Practical considerations--namely, limited police resources and community hostility to related traffic tieups--seem likely to inhibit any such proliferation." *Lidster*, 431 U.S. 419, 426 (2004).

**D.      Determining Checkpoint Reasonableness**

The D.C. Circuit has reviewed the validity of MPD checkpoints twice since *Edmond* was decided. *See United States v. Davis*, 270 F.3d 977 (D.C. Cir. 2002) and *United States v. Bowman*, 496 F.3d 685 (D.C. Cir. 2007). In both cases, the Circuit remanded the matter to the trial court to provide additional findings, rather than determining the reasonableness of the

checkpoint in question.  Both cases arose from rulings on suppression motions in criminal prosecutions of drivers who were found by police to be in possession of illegal drugs and/or a firearm when the drivers were stopped at checkpoints.  In each case, the criminal defendant attacked the checkpoint seizure and search as unsupported by probable cause.  In each case the prosecution defended the seizure and search as having been incidental to the operation of a traffic safety or license-and-registration checkpoint.  Here, the District asserts that the NSZCP's interdictions neither are "general law enforcement" checkpoints nor license-and-registration checkpoints.

### 1.   *U.S. v. Davis*

 In U*nited States v. Davis*, the D.C. Circuit discussed a process by which the Court is to determine the primary purpose of a police checkpoint.  270 F.3d 977 (D.C. Cir. 2002).  The purpose of a police checkpoint for Fourth Amendment reasonableness is a question of fact. *Davis*, 270 F.3d at 980 (citing *Edmond*. 531 U.S. at 40-41; *Ferguson v. City of Charleston,* 532 U.S. 67, 84, (2001); *Galberth v. United States,* 590 A.2d 990, 1000 n. 12 (D.C.1991)).  The government bears the burden of establishing the checkpoint's purpose.  *Id.* at 982 (citing *see United States v. Matlock,* 415 U.S. 164, 177 n. 14, (1974)).

In *Davis*, the trial court had denied a motion by Davis to suppress evidence obtained from his car at a checkpoint established by MPD officers.  When Davis drove up to the checkpoint in 1999, he pulled over as directed. The officers determined that the car he was driving had a forged inspection sticker; in addition, he produced a temporary registration that had been altered. He was arrested for these and other traffic violations.  The police discovered crack cocaine on Davis' person and drug paraphernalia in the car.  270 F.3d at 979.

Davis sought to suppress the evidence of drug dealing, contending that the roadblock violated the Fourth Amendment. The U.S. Supreme Court decided *Edmond* after Davis had noted his appeal. Accordingly, the trial court lacked *Edmond's* guidance in deciding the suppression motion. "The issue in Davis's appeal is whether the roadblock complied with the Supreme Court's interpretation of the Fourth Amendment to the Constitution in *City of Indianapolis v. Edmond,* 531 U.S. 32, (2000), decided after Davis had noted his appeal, and with *United States v. McFayden,* 865 F.2d 1306 (D.C.Cir.1989), on which the district court relied in denying the motion to suppress." 270 F.3d at 978.

Following its discussion of Supreme Court precedent dealing with the general requirement that seizures must be supported by individualized suspicion and of Supreme Court checkpoint precedent recognizing exceptions to the general rule, the D.C. Circuit turned to its analysis of primary purpose made necessary by *Edmond*. The Supreme Court's primary purpose test rendered the fact that the checkpoint may have satisfied the *McFayden* requirements inconsequential, as *McFayden* "treated the overall program under which the roadblock had been established as 'immaterial.'" *Davis*, 270 F.3d at 981 (quoting *McFayden,* 865 F.2d at 1312). *Davis* stated that in attempting to assess whether a proffered reason for the establishment of a checkpoint reflects its primary purpose, the Court may guided by evidence at the programmatic level. *Id.* "*Edmond* held that 'programmatic purposes may be relevant to the validity of Fourth Amendment intrusions undertaken pursuant to a general scheme without individualized suspicion.'" *Davis*, 270 F.3d at 981 (quoting *Edmond*, 531 U.S. at 45-46). *See also Edmond,* 531 U.S. at 46 ("our cases dealing with intrusions that occur pursuant to a general scheme absent individualized suspicion have often required an inquiry into the purpose at the programmatic level."). Evidence of programmatic purpose for a checkpoint would be reflected by the

checkpoint's having been established pursuant to a program, Districtwide or even neighborhood initiative. *United States v. Hudson*, 2007 WL 1656282 (D.D.C.) at *6 (citing *Davis*, 270 F.3d at 981, as reflecting a roadblock established pursuant to such initiative). In this case, evidence of the programmatic purpose is reflected in MPD's Special Order, Lesson Plan, and After Action Report, as well as declarations.

Finally, the *Davis* Court stressed that "[s]everal words of caution are in order" with regard to identifying a checkpoint's primary purpose. 270 F.3d at 982. The Court noted that the Supreme Court had recognized that a particular checkpoint might be established for several purposes. *Id.* Arguably, therefore, a checkpoint might not be set up, or at least not set up in one location as opposed to another, if the checkpoint could not serve a number of purposes in a specific location.

> One must be careful not to fall into the trap of thinking that any "but for" cause of a roadblock represents its primary purpose within *Edmond*'s meaning. Whenever something is done for several reasons, it might not have been done in the absence of any one of those reasons. If there had not been drug dealing in the neighborhood, the *McFayden* roadblock would not have been placed there, yet its primary purpose dealt with vehicular safety. The assumption underlying the search for the "primary purpose" is that several purposes might have moved the police to set up a particular roadblock.

*Davis*, 270 F.3d at 982.

### 2.    *U.S. v. Bowman*

The D.C. Circuit again discussed the showing necessary by the prosecution to establish the validity of a checkpoint in *United States v. Bowman*, 496 F.3d 685 (D.C. Cir. 2007). Bowman was arrested at an MPD license-and-registration roadblock. 496 F.3d at 686. As an officer approached Bowman's stopped car, he noticed what he thought to be a cup of beer in Bowman's lap. *Id.* at 687. The officer ordered Bowman out of the car and attempted to frisk him. Bowman twice impeded the frisk and ultimately Bowman and the officer struggled. During

the struggle, a pistol inside Bowman's waistband came into view.  He was restrained and searched further.  The search resulted in the seizure of 20 bags of crack cocaine taken from Bowman's person.  He was eventually indicted on weapon and drug charges and convicted by conditional plea of possession of a firearm by a convicted felon.  *Id.* at 689.

The Court observed that *Edmond* had recognized limited circumstances in which "the usual rule" - that suspicionless searches and seizures are invalid – does not apply.  *Id.* at 691.  Specifically, the Court mentioned Border Patrol and sobriety checkpoints as examples.  *Id.* (citing *United States v. Martinez-Fuerte*, 428 U.S. 543, 566-57 (1976);  *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 445 (1990)).  The Court observed that it had twice before held that a license-and-registration roadblock would pass constitutional muster where its principal purpose was to "regulate vehicular traffic by allowing police to check driver'[s] licenses and vehicle registrations." *Id.,* (citing *Davis,* 270 F.3d at 980 (quoting *United States v. McFayden,* 865 F.2d 1306, 1312 (D.C.Cir.1989)). The Court restated that where, however, "the primary purpose of a roadblock is general crime control or the interdiction of illegal narcotics - as in *Edmond* - it is unconstitutional."  *Bowman*, 496 F.3d at 692 (citations omitted) (internal quotes omitted).

The Court then stated its three-factor test for license-and-registration checkpoints constitutionality.

> First, the principal purpose of such checkpoints must be vehicular regulation.
> Second, "the checkpoints must serve to promote that purpose in a 'sufficiently
> productive' fashion." Third, "the checkpoints must be minimally intrusive: (1)
> they must be clearly visible; (2) they must be part of some systematic procedure
> that strictly limits the discretionary authority of police officers; and (3) they must
> detain drivers no longer than is reasonably necessary to accomplish the purpose of
> checking a license and registration, unless other facts come to light creating a
> reasonable suspicion of criminal activity."

*Id*. at 692 (citations omitted).[4]

As in *Davis*, because the trial court's decision reflected "insufficient findings and evidence from which to assess the constitutionality of the roadblock," the D.C. Circuit remanded the matter for further proceedings. *Id.* at 695.

Specifically, the Circuit held the record to be insufficient because "there was no evidence and the court [had] made no findings about the programmatic purpose behind the series of roadblocks of which this one was only a part." *Id.* at 69. Also, the trial court had made no finding that either the roadblock at issue or the overall program furthered its primary purpose. *Id.* at 694. The Circuit acknowledged that the trial court had made findings regarding the whether the roadblock was "minimally intrusive." However, because the matter was being remanded, and *McFayden* had considered evidence regarding both "the siting of a roadblock and the plan pursuant to which it was conducted," it would be beneficial for the trial court to make findings" on that, too. *Id.*

The test applied in *Bowman* is appropriately tailored to the fact-specific analysis that

---

[4]  The *Edmond* Court identified *Martinez-Fuerte* and *Sits* as "special needs" cases. The Checkpoint in *Lidster* was not a "special needs" type, but was valid because checkpoints may be conducted for police purposes other than license-and registration verification, but still, "[l]ike certain other forms of police activity [such as] crowd control or public safety," not implicate the concerns presented by *Edmond. Lidster,* 540 U.S. at 425.

The *Bowman* Court limited its discussion to "special needs" checkpoints; drug interdiction and "general crime control" checkpoints, which was the nature of the *Edmond* checkpoints; and license-and-registration checkpoints, which is how the government characterized the *Bowman* checkpoint. This is consistent with *Lidster*. 540 U.S. at 424 ("We must read this and related general language in *Edmond* as we often read general language in judicial opinions--as referring in context to circumstances similar to the circumstances then before the Court and *not* referring to quite different circumstances that the Court was *not then* considering.") (emphasis added). The *Bowman* Court did not discuss checkpoints having non-general law enforcement primary purposes besides license-and-registration checkpoints – such as the *Lidster* checkpoint. Nor did the *Bowman* Court cite *Lidster* at all. Because the Circuit Court was only required to determine whether the *Bowman* checkpoint was, in fact, a license-and-registration roadblock or actually a drug interdiction or general crime control checkpoint, it was unnecessary for the Court to cast its discussion in more specific terms or to mention *Lidster*.

*Lidster* requires. However, the first prong of the *Bowman* test has no application her, under *Lidster*. Further, *Bowman* addressed a type of checkpoint, for which "the gravity of the public concerns served by the seizure" had been precedentially established. The *Bowman* test is not suited to this case because it does not address the gravity of the public concerns served by the NSZ checkpoints, as required by *Lidster*, 540 U.S. at 426-27, and *Brown*, 443 U.S. at 51.

Where a checkpoint withstands constitutional scrutiny under the primary purpose test, the Court is to apply the three-prong test for assessing checkpoint reasonableness in *Brown v. Texas,* 443 U.S. 47, 51 (1979). *See Lidster*, 540 U.S. at 426-27. The Court is to determine the reasonableness of particular checkpoint by balancing "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Lidster*, 540 U.S. at 426-27 (quoting *Brown v. Texas, supra,* and citing *Sitz*, supra, and *Martinez-Fuerte, supro.*

### 3.    *U.S. v. Faulkner*

In *United States v. Faulkner*, 450 F.3d 466 (9th Cir. 2006), the Ninth Circuit had occasion to address a checkpoint falling between drug interdiction and license-and-registration stops. Chief Ranger Ed Ruth set up a checkpoint 165 feet inside the U.S. Bureau of Land Management ("BLM") Paradise Recreation Area. It was comprised of orange traffic cones, a stop sign, an official ranger vehicle with a light bar and a siren, and was staffed by a park ranger, unusually, Ruth, who was armed.

Ruth stopped every vehicle for approximately 20 seconds to inform the occupants of newly promulgated regulations governing the use and enjoyment of Paradise and to provide them with a litter bag. A list of the regulations governing activity at Paradise was printed on the litter bag. Among other things, the BLM regulations prohibited campfires and the possession of

alcoholic beverages, and required all litter to be placed in a container. The BLM spent $2,500 to purchase 5,000 preprinted litter bags in advance of this activity.

The Ranger created the checkpoint to "'provide information to visitors to the recreation area of the regulations governing its use.'" He did so partly because of complaints about intoxicated motorists, increased litter, illegal fires, consumption of drugs and alcohol by minors, and gang activity.

Occasionally Ruth asked park visitors stopped at the checkpoint whether they possessed alcohol. If they answered affirmatively, Ruth would allow then to leave the park or to leave the alcohol with him and recover it when they departed the park, rather than arrest them. *Id.* at 468. He had issued citations for alcohol possession once or twice and had sometimes asked persons to inspect the contents of coolers to see whether they contained alcohol.

On June 1, 2003, Faulkner stopped his vehicle at the checkpoint, and Ruth saw that he had an open container of beer. Ruth ordered Faulkner to pull off the road and to produce his driver's license. Faulkner responded that he had no license, and a subsequent check showed that Faulkner's license had been suspended for more than six months. A "'cursory visual search'" by Ruth of the vehicle's interior revealed more open alcohol containers, marijuana, and smoking paraphernalia. *Id.*

Ruth cited Faulkner for driving with a suspended license, and for driving in possession of an open container of alcohol. Faulkner moved to suppress the evidence. Following an evidentiary hearing, the trial court ruled that the stop resulting in the discovery of the evidence was constitutional because the primary purpose of the checkpoint was to "provide information to visitors to the recreation area of the regulations governing its use...." Faulkner entered into a conditional plea agreement allowing him to appeal the denial of his motion to suppress.

The Ninth Circuit found that the trial court's determination of the checkpoint's primary purpose was supported by BLM's purchase and distribution of thousands of litter bags, on which BLM had preprinted regulations concerning campfires for fire safety, refuse disposal for litter control, and camping restrictions in a day use recreation area.  These provided "clear evidence" of "a premeditated regulatory purpose other than advancing the general interest in crime control."  *Faulkner*, 450 F.3d at 470.  That these regulations addressed campfire safety, refuse disposal for litter control, and camping restrictions provided evidence of a planned regulatory purpose rather than an intent to advance a general interest in crime control.  *Faulkner*, at 470. The Ninth Circuit observed that The *Lidster* Court had noted that the police in that case had distributed a flier, as Ruth had distributed information from his vehicle stop.  *Id.* The Ninth Circuit observed that The *Lidster* Court had noted that the police in that case had distributed a flier, as Ruth had distributed information from his vehicle stop.  *Id.*   Additionally, Ruth testified in the suppression hearing that an important concern during the summer season was the promotion of fire safety.  *Id.*

Faulkner argued that the checkpoint's primary purpose "was to detect evidence of ordinary wrongdoing" because it was established partly in response to complaints of criminal activity and because Ruth occasionally asked to inspect visitors' coolers.  This contention was inadequate to invalidate the checkpoint under *Edmond.  Id.* at 471.  *Edmond*'s presumption of unconstitutionality only applied where at stop's primary purpose was to advance the general interest in crime control.  *Id.*  Although crime control may have been one of the checkpoint's purposes, it was not the *primary* purpose," as reflected, in part, by the purchase of the 5,000 litter bags preprinted with regulations.  *Id.*

In addition, "the phrase 'general interest in law enforcement does not refer to every 'law enforcement' objective." *Id.* (citing *Lidster*, 540 U.S. at424, citing *Edmond*, 531 U.S. 44 & n.1). *Edmond* did not govern because "curtailment of littering, illegal fires, and driving while intoxicated serves a purpose beyond the general interest in crime control." *Id.* The Ninth Circuit explained that the primary reason for prohibiting alcohol was to reduce a serious litter problem in the park, where 70% of the litter was beer bottles. *Id.* The primary function was to distribute the litter bags, provide information to visitors regarding new rules, promote fire safety, and curtail drinking and driving. *Id.* These factors served checkpoint's primary purpose of protecting the use and enjoyment of the recreation area, rather than to advance the general interest in crime control. Upon this analysis, the evidence was not to be suppressed based on *Edmond. Id.* at 471.

Further, the Court observed that the public concern to be served by the seizure could be characterized in alternative ways. It could be seen as serving a need for a welcoming site to park visitors. However, it could also be viewed as "more specifically as the need to prevent litter, promote fire safety, reduce incidents of driving under the influence, eliminate property destruction and gang activity, and protect the environment." *Id.* at 472. The Court noted that the Supreme Court had measured the gravity of the concerns addressed by a highway sobriety checkpoint, which lasted only 75 minutes, in terms of the gravity of the public concerns of with the nationwide effects of drunk driving in *Michigan Department of State Police v. Sitz,* 496 U.S. 44 (1999), Applying that reasoning, the Ninth Circuit stated that the gravity of the local concerns should be assessed on the basis of these same problems in federal parklands nationwide. *Id.*

Finally, the Ninth Circuit observed that Ruth had stopped all vehicles, "so there was no concern that a seizure might engender concern or fright on the part of visitors." *Id.* at 474. Thus, the Court found the intrusiveness of the Faulkner stop "nearly identical to that in other cases, and

upheld its constitutionality.  *Id.*

The same analysis applies here. The primary purpose of the NSZ checkpoints was not a general interest in crime control, as would have been reflected by efforts to exploit the "ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime." *Lidster,* 540 U.S. at 424; *Edmond*, 531 U.S. at 44.  It was an effort to afford security to a neighborhood, like a fence provides security to a homeowner's yard or the elaborate mechanisms on the first floor of the United States Courthouse provide security here. None of these has a primary purpose of gathering evidence of criminal wrongdoing through measures to encourage self-incrimination.  Each allows people with misconduct in mind to recognize the obstacle to his purpose and to turn around undisturbed.

### E.  The Trinidad NSZCP's Had A Valid, Non-General Law Enforcement Primary Purpose

The stops and inquiries at the NSZ checkpoint were not intended to gather evidence through driver's self-incrimination.  *See Lidster,* 540 U.S. at 424; *Edmond*, 531 U.S. at 44. Unlike the *Edmonds* checkpoint, the Trinidad NSZCPs were not implemented to and did not facilitate an inquiry aimed as an "ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime." *Lidster,* 540 U.S. at 424; *Edmond*, 531 U.S. at 44.  Rather, as provided for by the governing MPD Special Order, questioning was limited, designed to avoid self-incrimination, and not subject to the officer's discretion. (Exh. 1 (SO0806 at 4-5 (V. Procedural Guidelines, F. 4-5); see also Declaration of Willie A. Smith verified June 27, 2008, a copy of which is annexed as Exh. 11, ¶ 5(discussing officers' use of standard script for questioning)).

In further explaining why a checkpoint of the nature of the *Lidster* roadblock would not be viewed prejudicially, the Supreme Court noted that in such a checkpoint the "police are not

likely to ask questions designed to elicit self- incriminatory information." *Lidster*, 540 U.S. at 425. The same is true of the Trinidad NSZCP. The MPD Special Order 08-06 governing the implementation and operation of the NSZCP specifically dictates that officers staffing the checkpoint are simply to inquire whether the operator of a stopped vehicle has a legitimate reason for entering the NPZ along with such additional information as would enable the officers to reasonably verify the accuracy of the driver's stated reason.  (*See* Exh. 1, SP0806).  The Special Order states the following list of legitimate entry reasons:

> a.  The person resides in the NSZ;
>
> b.  The person is employed in the NSZ or is on a commercial delivery;
>
> c.  The person attends school or a day-care facility, or is taking a child to, or picking up a child from, a school or day-care facility in the NSZ;
>
> f.  The person is a relative of a person who resides in the NSZ;
>
> g.  The person is seeking medical attention, is elderly, or is disabled;  and/or
>
> f.  The person is attempting to attend a verified organized civic, community or religious event within the NSZ; or
>
> g.  An official the rank of Sergeant or above assigned to the NSZ approves the entry for reasons other than those listed above when there are exigent circumstances.

(Exh. 1, at 5, V.l (Procedural Guidelines)).

The inquiries were to be and were limited to identification of an invitation to a civic or community event within the NSZ or of a contact phone number for the destination address.

In *Lidster,* the non-general law enforcement primary purpose was to gather information concerning a specific fatal hit-and-run accident. *Id.* at 422. The non-general law enforcement purpose of the NSZ checkpoint was to provide security to residents within a specific area in much the same way the various screening measures employed at the entrances to the U.S.

Courthouse for the District of Columbia keep this building and those within it secure. The NSZ authorization was based, in part, on information gathered by MPD investigations that motor vehicles had been used in the commission of the spate of violent crimes recently committed in Trinidad. (Exh. 4 (Greene Decl) at ¶ 4; Exh. 5 (NSZ Rec.) at 1-2). These investigations did not indicate that cars were stolen from Trinidad in the context of the recent homicides and other violent crimes there. Accordingly, the attackers had driven into Trinidad, committed the murders and other violent felonies, and made their escapes in the vehicles that they drove into Trinidad. (Exh. 4 (Greene Decl) at ¶ 4).  The primary purpose of the NSZ, its checkpoints, its brochure, its signage, and its attendant publicity was simply to discourage persons inclined toward committing acts of violence from attempting to enter Trinidad, by "fencing them out" physically and through communications.  (Exh. 2 (lanier Decl) ¶ 2). The primary purpose was not to gather evidence against drivers entering the checkpoint or to arrest them.

Absent the ability to conceal a weapon in a car, move up quickly on an intended victim, and escape quickly to a great distance from the crime, persons were reasonably anticipated to be much less likely to attempt a violent crime in the NSZ than they would be, but for the checkpoints. This provision of security was a legitimate public safety police activity, which, like crowd control or seeking information about a hit-and-run traffic accident, passes muster under the *Edmond*-based primary purpose analysis.  *See Lidster*, 540 U.S. at 422-425.  Such inquiries, not intended or suited to elicit self-incriminating responses, are permissible under the Fourth Amendment.[5]

---

[5]    As the *Lidster* Court noted, the law ordinarily permits police to seek the voluntary cooperation of members of the public in the investigation of a crime. "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by

**F.      The Trinidad NSZ Was Sufficiently Productive**

The *Davis* Court observed "that a checkpoint, in addition to having a legitimate primary purpose, must also promote the state interest in a sufficiently productive fashion." *Id.* (quoting *United States v. McFayden,* 865 F.2d 1306, 1311-12 (D.C.Cir.1989) (in turn, quoting *Delaware v. Prouse,* 440 U.S. at 660, 99 S.Ct. 1391)); *see also Bowman*, 496 F.3d at 692.  The government can demonstrate the requisite productivity without statistical evidence.  *Davis* at 982-83.  As the *Davis* Court explained, "in one of the consolidated criminal cases in *Martinez-Fuerte* the [U.S. Supreme] Court refused to suppress the evidence and affirmed the conviction despite the absence of *any* statistics revealing the number of cars stopped at the border or the number of illegal aliens arrested.  *Id.* at 982-83 (citing *Martinez-Fuerte,* 428 U.S. at 554, 567.) (emphasis added).

"To make the legality of a seizure pursuant to a particular roadblock wholly dependent on statistics gathered *after* the roadblock ended would, in any event, run into the time-honored doctrine that a search or seizure cannot be justified by its success." *Davis*, 270 F.3d at 983 (citing *Byars v. United States,* 273 U.S. 28, 29 (1927)-or as it is usually put, by what it turns up, *e.g.*, *United States v. Di Re,* 332 U.S. 581, 595(1948); *Wong Sun v. United States,* 371 U.S. 471, 484 (1963).  Such a requirement would further "ignore that the deterrent purpose of the exclusionary rule cannot be fulfilled unless the police can determine ahead of time whether their operation of a proposed checkpoint will be constitutional." *Davis*, 270 F.3d at 983.

The Supreme Court recognized that "[w]hile it appears that fewer illegal aliens are apprehended [at the checkpoint in question]" than at other checkpoints, "*it may be assumed* that fewer pass by undetected, as every motorist is questioned." *Davis*, 270 F.2d at 983 (quoting *Martinez-Fuerte*, at 554 (emphasis added).  In this case, this Court may reasonably infer that the

---

putting questions to him if the person is willing to listen." *Florida v. Royer,* 460 U.S. 491, 497 (1983).

Trinidad NSZ was sufficiently productive based on a combination of factors reflected in the NSZ Report. (Exh. 6). .

During the days on which the checkpoints were in operation, the Trinidad neighborhood reported a total of four crimes with none of the reported crimes occurring during the hours that the checkpoints were active. Additionally, none of the suspect(s) for the crimes committed during the NSZ period used a vehicle during the commission of the criminal act. The average total number of crimes reported during the nine (9) previous five (5) day time ranges was 4.66 crimes. The four crimes reported during the NSZ active days constitute a 13% reduction off average. Further, no shootings were reported while the NSZ was in operation. (Exh. 4 (Greene Decl.) ¶ 12; Exh. 6 (NSZ Report) at 9-10).

In addition, 951 vehicles entered the 11 NSZ checkpoints. Nine hundred three (903) of these were allowed through the checkpoints and 48 vehicles (5.3%) were turned away for failing or refusing to provide a legitimate purpose for entering. (Exh. 6, (NSZ Report) at 2).

**G.    *Brown v. Texas* Reasonableness**

Because the Trinidad NSZ is not presumptively unreasonable under the *Edmond-Lidster* analysis, this Court is to determine its constitutionality by balancing "the gravity of the public concerns served by the [NSZ checkpoint] seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Brown v. Texas,* 443 U.S. 47, 51. *Lidster*, 540 U.S. at 480.

**H.    The Trinidad NSZCPs Were Justified By a Grave Public Concern**

The Trinidad NSZCPs were justified by a need on the part of the District to protect persons from acts of violence perpetrated in the Trinidad neighborhood by persons entering the area in motor vehicles to commit homicides and other violent acts and then escaping in motor

vehicles.  (*See* Exh. 5 ( NSZ Rec.); Exh. 4 (Greene Decl.) ¶ 4); *.see also Lidster*, 540 U.S. at 427.

In *Lidster*, the Supreme Court found that '[t]he relevant public concern was grave,' as police

were investigating a specific incident and seeking to "find the perpetrator of a specific and

known crime, not of unknown crimes of a general sort" as the *Edmond* roadblock had been

established to do.  *Id.*  The Trinidad checkpoint was established to serve a public concern at least

as grave as the *Lidster* concern.  The Trinidad checkpoint was established against the

background of numerous known homicides and other violent attacks, including an extraordinary

triple homicide.  It was established to provide security to the neighborhood by discouraging

persons from attempting to drive into Trinidad, commit violent crimes and escape.  Eliminating

the opportunity to escape by motor vehicle understandably discourages the violent attack.[6]

Accordingly, the NSZ checkpoint was reasonable in serving a grave public concern.  *Brown*, 443

U.S 51; *Lidster*, 540 U.S. 427.

     In *Faulkner*, the Ninth Circuit held that a Park Ranger's  "information-providing station"

served a grave public concern by informing park visitors of federal park regulations to the end of

reducing litter and alcohol consumption in the park.  The District respectfully submits that the

Trinidad checkpoints served a much graver public concern.

---

[6]    Many reported cases arise in the context of a motion to suppress evidence seized at a
checkpoint.  In these cases, defendants in criminal matters argue that the roadblock or checkpoint
at issue had been established as a net to capture unidentified persons for previously unknown
crimes, *see Lidster*, 540 U.S. at 427, or, as the *Edmonds* Court stated, to pursue the "ever-present
possibility that interrogation and inspection may reveal that any given motorist has committed
some crime. "*Edmond*, 531 U.S. at 44.  None of the plaintiffs was arrested and the Trinidad NSZ
was not a net to capture persons for unknown crimes of a general sort.  *Lidster*, 540 U.S. at  247.
It was a component of a multi-faceted security barrier to keep violent criminals out of Trinidad,
akin to the security measures taken to maintain the safety of a courthouse or an airport terminal.
Like such buildings, the record establishes Trinidad as a particular target requiring such security
measures.

I.     **The Trinidad NSZ Stop Advanced This Grave Public Concern to a Significant Degree**

The *Lidster* Court held that "[t]he stop [in that case] advanced this grave public concern to a significant degree." 540 U.S. at 427. The stops were appropriately tailored to fit important investigatory needs, as they occurred close in time to the incident, were conducted at about the same time and near the location at which the accident occurred, to increase the likelihood that some of the drivers they stopped "might have been in the vicinity of the crime at the time it occurred." *Id.*

The checkpoints were activated at a variety of times of day to make their operations unpredictable by persons who would otherwise seek to drive into the neighborhood to do violence. Supplemental barriers of alleys required persons seeking to enter Trinidad by motor vehicle during these times to do so through the checkpoint, thus making the NSZ "checkpoint stops appropriately tailored to fit important [and specific] criminal [deterrence] needs." *Cf. Lidster*, 540 at 427. The checkpoint admitted motorists articulating legitimate reasons for entry and excluded motorists failing to offer a legitimate reason, if any reason for entry. (Exh.7, ¶ 7)**.** No violent criminal acts were reported while the checkpoint was operational, reflecting as least as definitively as the *Lidster* record, that the NSZ advanced to a significant degree the grave public concern that it addressed. *Cf.* 540 U.S. at 427. Accordingly, the NSZ checkpoint stops were reasonable in advancing this grave public concern to a significant degree. *Brown*, 443 U.S 51; *Lidster*, 540 U.S. 427.

J.     **The NSZ Checkpoints Were Implemented and Operated Pursuant To a Systematic Procedure That Strictly Limited the Discretionary Authority of Police Officers**

"A central concern in the balancing of these competing considerations in a variety of situations had been to assure that an individual's reasonable expectation of privacy is not subject

to arbitrary invasions solely at the unfettered discretion of officers in the field." *Brown*, 443 U.S. at 51 (citing *Delaware v. Prouse*, 440 U.S. 648, 654-655, (1979); *United States v. Brignoni-Ponce, supra*, 422 U.S., at 882). The Trinidad NSZCP's were conducted in accordance with Special Order-08-06 and MPD's training of the officers staffing the NSZ. Thus, the program was implemented and conducted in accordance with explicit, neutral limitations on the exercise of discretion by officers staffing the NSZ checkpoint. (*See* Exh. 1, *generally*).

The NSZ Initiative provides for the determination of whether to establish an NSZ to be made by the Chief of Police or her designee of the rank Assistant Chief or higher, at the recommendation of a Commander of higher ranking official, subject to the legal sufficiency review of the MPD General Counsel. Pursuant to the Special Order, the Chief also determines the location and duration of the NSZ. The Special Order sets forth the protocol pursuant to which each checkpoint is to operate. Each checkpoint is to be controlled by a Zone Manager of the rank of Lieutenant or higher. The Special Order expressly provides that officers have minimal discretion. In addition, Plaintiffs have not alleged that officers deviated from the requirements or restrictions of the Special Order. Accordingly, the NSZ checkpoints satisfy this prong of the *Lidster-Brown-Bowman* analysis.

### K.    Most Importantly, the Stops Interfered Only Minimally With Liberty of the Sort the Fourth Amendment Seeks To Protect

In holding the *Lister* highway stops to have been reasonable, the Supreme Court stated:

Most importantly, the stops interfered only minimally with liberty of the sort the Fourth Amendment seeks to protect. Viewed objectively, each stop required only a brief wait in line--a very few minutes at most. Contact with the police lasted only a few seconds. Cf. *Martinez-Fuerte, supra,* at 547 (upholding stops of three-to-five minutes); *Sitz, supra,* at 448 (upholding delays of 25 seconds).

540 U.S. at 427-28. *Bowman* reinforces this requirement. 496 F.3d at 692.

The NSZ Initiative, embodied in the Special Order stringently restrict the discretion of officers, as discussed immediately above and *supra*, at 4-5.

As provided for by the programmatic requirements of the NSZ Initiative, the checkpoints were well publicized in advance and readily visible to drivers approaching them. Advance media publication of the location and function of the checkpoint, plus signage approaching the checkpoint and the lights of the police cars at the checkpoint gave drivers adequate opportunity to avoid the checkpoint entirely without any police contact. (Exh. 7 (Sanders Decl.) ¶ 13). As in *Lidster*, the police stopped all vehicles that entered the checkpoint systematically. 540 U.S. at 428. As in Lidster, "[v]iewed subjectively, the contact provided little reason for anxiety or alarm." 540 U.S. at 428.

In addition, the program as designed and executed caused drivers to be subjected to very limited, and brief interactions with the police. Police contact consisted simply of a request for limited information, after which the driver was allowed through the checkpoint or directed to turn around and advised that he could park in the area and enter the NSZ on foot. (Exhs. 7, ¶9; 8, ¶ 8; 9, ¶ 8). Where an individual approached the checkpoint and refused or was unable to advise police of a legitimate entry reason, the motorist was turned around and away from the checkpoint in a minute or less, on average. (Exh. 7, ¶ 7). Motorists who provided legitimate entry reasons passed through more quickly. (Exh. 7, ¶ 8). This is consistent with the degree of inconvenience created by the *Lidster* stops, which the Court held to be reasonable. 540 U.S. at 428. Moreover, in this city, with its routine traffic congestion and its stoppages and rerouting of traffic for motorcades and public events, the inconvenience caused by the NSZCPs was not unreasonable.

Finally, one does not enjoy the same level of constitutional protection of his or her privacy as she drives along public thoroughfares as she/he does in his or her home. *Lidster*, 540 U.S. at 424. "[t]he Fourth Amendment does not treat a motorist's car as his castle. *See*, *e.g., New York v. Class,* 475 U.S. 106, 112-113 (1986); *United States v. Martinez-Fuerte,* 428 U.S. 543, 561 (1976)." *Lidster*, 540 U.S. at 424. Thus, the NSZ checkpoints were reasonable in interfering only minimally with liberty of the sort the Fourth Amendment seeks to protect this factor. *Brown*, 443 U.S. at 51; *Lidster*, 540 U.S. at 427-28.

The foregoing demonstrates that the operation NSZ checkpoints did not violate Plaintiffs' constitutional rights. Accordingly, they are unable to establish a substantial likelihood of success on the merits, and the PI Mot. Should be denied.

## VI.    The Balance of Equities Favors Denying Injunctive Relief

The balance of harms to result from issuance of an injunction weighs against Plaintiffs. The U.S. Supreme Court has recognized that the "concern for the safety and indeed the lives of its citizens" is a "primary concern of every government." *United States* v. *Salerno*, 481 U. S. 739, 755 (1987). Preclusion of checkpoints as part of a program intended (and apparently effective) to provide security and safety from deadly violence to a neighborhood unduly limits the District's ability to keep its residents safe in response to an acute, localized spike in violence. Thus, Plaintiffs requested injunction would significantly harm the District.

In contrast, Plaintiffs fail to allege with specificity or explain how denial of a preliminary injunction will injure them. On this record, the balance of equities weighs heavily against issuing a preliminary injunction.

## VII.    The Public Interest Favors the District

The public interest would be served by denial of the Plaintiffs' request for a preliminary injunction.  A petition received from Trinidad residents, a copy of which is annexed as Exh. 10, reflects significant support for the NSZ Initiative and its checkpoint component from persons most directly affected.

Plaintiffs contend that the public interest is served the safeguarding of constitutional rights.  This, of course, is true.  However, the analysis of the constitutional validity of the NSZ checkpoints is fact-specific. *See, e.g., Lidster*, 540 U.S. at 424: *Davi*s, 270 F.3d at 980.  The District submits that that the NSZ Initiative, including its use of checkpoints, is constitutionally reasonable and valid, as demonstrated by the record before the Court.  Accordingly, denying the preliminary injunction is entirely in keeping with the safeguarding of constitutional rights.  The District's valid exercise of its police powers to protect the "safety and indeed the lives of its citizens" within the requirements of the Fourth Amendment is very much consistent with the safeguarding of constitutional rights.

To the extent that, at this preliminary injunction stage of the litigation, facts necessary to dispositively determine the constitutionality of the NSZ checkpoints have yet to be fully ascertained, it is in no small part due to Plaintiffs' failure to have set forth a more complete and clear set of allegations regarding their own checkpoint interactions.  While a record sufficient for the determination of the constitutional questions posed by the Complt is prepared, the public interest is served by the denial of a preliminary injunction.

## VIII.   Conclusion

Plaintiffs have challenged the constitutionality of the District's NSZ checkpoints.  In doing so they have presented a question regarding the application of the Fourth Amendment to

government action without having called to the Court's attention the most recent and
illuminating U.S. Supreme Court decision on the issues presented: *Illinois v Lidster*, 540 U.S.
419 (2004). Plaintiffs have presented this fact-specific question to the Court without providing
any declarations to inform the record. The complaint they have submitted to inform this Court's
analysis offers only a one-paragraph spotty and ambiguous account of each Plaintiff's
interactions with the NSZ's checkpoints from which no concrete irreparable harm can be
identified. This complaint is "verified" by only Plaintiff, and then only to the "best of her
knowledge," which is unspecified regarding the allegations of the other three Plaintiffs. This
record fails to indicate that any Plaintiff has suffered an irreparable harm, much less one that is
ongoing or which is subject to an imminent recurrence. Accordingly, they lack standing to
pursue preliminary injunctive relief. Even if the Court were to find that Plaintiffs do not lack
standing, they fail to establish the most pivotal of the elements for preliminary injunctive relief –
irreparable harm. Further, applying all pertinent precedent to the record reflects that the District
productively conducted the checkpoints for a constitutionally valid purpose, in a reasonable
manner. For this reason, Plaintiffs lack the substantial likelihood of success on the merits
required for the issuance of a preliminary injunction. Moreover, the issuance of the requested
injunction would cause much greater harm to the District than denial of the injunction will cause
Plaintiffs. Finally, an injunction would deny the residents of the District the lawful benefits of
the NSZ checkpoints, for which reason an injunction is contrary to the public interest. For all
these reasons, the PI Mot. should be denied.

DATE: June 27, 2008                    Respectfully submitted,

                                       PETER J. NICKLES
                                       Interim Attorney General for the District of Columbia

                                       GEORGE C. VALENTINE

Deputy Attorney General, Civil Litigation Division

/s/ Ellen A. Efros
ELLEN A. EFROS, D.C. Bar No. 250746
Chief, Equity Section I
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Telephone: (202) 442-9886
Facsimile: (202) 727-0431

 /s/ Thomas L. Koger
THOMAS L. KOGER, D.C. Bar No. 427921
Senior Assistant Attorney General
Equity I Section
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Telephone: (202) 724-6610
Facsimile: (202) 727-3625
thomas.koger@dc.gov

Counsel for Defendant District of Columbia

# Defendant's Exhibit 1

# SPECIAL ORDER



**METROPOLITAN POLICE**

**DISTRICT OF COLUMBIA**

| | |
|---|---|
| **Subject** | **Neighborhood Safety Zones** |
| **Topic  Series  Number** | **SO - 08 - 06** |
| **Effective Date** | **June 4, 2008** |
| **Related to:** | General Order 304.10 (Police-Citizen Contacts, Stops and Frisks), Effective July 1, 1973<br>GO-OPS-301.03 (Vehicular Pursuits), Effective February 25, 2003 |

I.   Background…….…..………………….…  Page  1
II.  Policy……………..……...……………….  Page  1
III. Definitions..……….….….……….............  Page  1
IV.  Regulations………...…………………….  Page  2
V.   Procedural Guidelines………..…….……  Page  3

## I.     BACKGROUND

The establishment of Neighborhood Safety Zones is an effective law enforcement tool for addressing violent crime. Vehicles are common instrumentalities of crime, particularly armed violent crime.  It is in the interest of law enforcement to prohibit vehicles with no legitimate purpose to enter neighborhoods that have been victimized by spikes in violent crime. The U.S. Courts have found that such zones are constitutional when limited in scope, and when conducted for a legitimate law enforcement purpose.

This Special Order provides guidance for establishing Neighborhood Safety Zones, consistent with constitutional requirements that provide high police visibility, prevent and deter crime, safeguard officers and community members, and create safer District of Columbia neighborhoods.

## II.    POLICY

It is the policy of the Metropolitan Police Department to lawfully establish Neighborhood Safety Zones to promote the health, safety, and welfare of the District of Columbia residents and visitors.

## III.   DEFINITIONS

When used in this directive, the following terms shall have the meaning designated:

1.     Member – Sworn employee of the Metropolitan Police Department (MPD).

2.     Neighborhood Safety Zone (NSZ) – Delineated geographic area designated by the Chief of Police in response to documented crimes of violence the purpose of which is to provide high police visibility, prevent and deter crime, safeguard officers and community members, and create safer District of Columbia neighborhoods.

3.    Neighborhood Safety Zone Checkpoint – A location at the perimeter of the NSZ where vehicles are stopped for the purpose of determining whether the operator has a legitimate reason for entering the NSZ.

4.    Neighborhood Safety Zone Manager – Member the rank of Lieutenant or above who manages the individual Neighborhood Safety Zone operation.

5.    Neighborhood Safety Zone (NSZ) Manager's Report (PD Form 907-A) (Attachment A) – Report completed by the NSZ Manager that documents why, when, where, and how an NSZ was conducted.

## IV.    REGULATIONS

A.    An NSZ may be established solely in response to documented crimes of violence occurring in a designated location.

1.    The NSZ shall be established for a specific and legitimate law enforcement purpose, (e.g., recently reported criminal incident(s) including homicides, shootings, robberies, and other offenses as approved by the Chief of Police).

2.    The NSZ shall be targeted to promote community safety interests while minimizing interference with normal community activities.

3.    Consistent with Part V.F below, each NSZ checkpoint shall be conducted systematically so as to minimize or eliminate police officer discretion in stopping vehicles from entering the NSZ.

4.    The NSZ shall be established for no more than five (5) days, unless the Chief of Police approves an extension of no more than five (5) additional days.

B.    The recommendation to establish an NSZ, and the selection of the location for the NSZ, shall be made by an official the rank of Commander and above.

C.    Each NSZ shall be approved, in advance, by the Chief of Police or designee, provided that the designee shall not hold a rank lower than Assistant Chief of Police.

D.    Only those members who have successfully completed all NSZ-related training required by the Chief of Police may participate in the implementation of an NSZ. NSZ-related training shall include specific limitations on members' exercise of discretion in determining whether a vehicle will be permitted to enter the NSZ.

E.    Each member assigned to an NSZ shall wear an MPD-approved visibility vest and be provided other required equipment (e.g., cones, light tower).

F.     For the purpose of implementing an NSZ, members shall not stop vehicles that are exiting the NSZ.

G.     For the purpose of implementing an NSZ, members shall not stop pedestrians entering or exiting the NSZ.

H.     Generally, vehicles shall be not searched during an NSZ operation.  However, if in the course of conducting an NSZ, a member develops reasonable suspicion or probable cause to believe that a crime is being committed, the member may detain the motorist to an extent reasonably necessary to investigate.  Under such circumstances, a motorist may consent to a search, or, if incident to arrest, a search of the interior passenger area of the vehicle (including containers) may be performed.

V.    **PROCEDURAL GUIDELINES**

A.     An NSZ location shall be selected with the primary purpose of addressing a neighborhood violent crime problem.  Evidence to support the existence of a neighborhood violent crime problem may include:

1.     Pertinent violent crime data;

2.     Information contained in citizen and community reports and complaints relevant to documented violent crimes; and

3.     Information gathered from criminal intelligence sources relevant to documented violent crimes.

B.     Documentation of the evidence prepared based on Part V.A above, and an explanation of how the evidence supports the purpose of the NSZ as described in Part  IV.A above, shall be preserved and attached to the PD Form 907-A [Neighborhood Safety Zone (NSZ) Manager's Report] associated with the NSZ.

C.     In selecting an NSZ location, the following criteria shall be considered:

1.     The NSZ shall not unnecessarily interfere with routine community activities;

2.     There shall be sufficient space for deploying members assigned to the NSZ;

3.     There shall be sufficient space on the roadway for deploying one (1) or more marked MPD vehicles such that the vehicle(s) are clearly visible;

4.     There shall be sufficient space for deploying equipment to alert vehicle operators approaching the NSZ;

5.    NSZ operations shall cause minimum delays to normal traffic patterns; and

6.    The area shall permit a sufficient number of checkpoints for establishing an adequate perimeter.

D.    Each NSZ checkpoint shall be staffed by a minimum of five (5) officers and one (1) official the rank of Sergeant or above.

E.    An official, of at least the rank of Lieutenant, shall be designated as the NSZ Manager and may increase, but not decrease, the NSZ staffing depending on factors such as location, level of criminal activity, and number of potential stops.

F.    Each member assigned to an NSZ shall:

1.    Be equipped with a visibility vest, flashlight, cones, flares, Notice of Infraction (NOI) books, PD Form 61-D (Violation Notice) books, and PD Forms 76 (Stop or Contact Report);

2.    Identify himself/herself, his/her assigned District or element, the reason for the NSZ, and the reason for the vehicle stop;

3.    Inquire whether the operator of the stopped vehicle has a <u>legitimate</u> reason for entering the NSZ as follows:

NOTE:  Absent exigent circumstances, legitimate reasons are:

a.    The person resides in the NSZ;

b.    The person is employed in the NSZ or is on a commercial delivery;

c.    The person attends school or a day-care facility, or is taking a child to, or picking up a child from, a school or day-care facility in the NSZ;

d.    The person is a relative of a person who resides in the NSZ;

e.    The person is seeking medical attention, is elderly, or is disabled; and/or

f.    The person is attempting to attend a verified organized civic, community or religious event within the NSZ; or

g.    An official the rank of Sergeant or above assigned to the NSZ approves the entry.

4.  Request operator identification when attempting to determine the legitimacy of the reason for entering an NSZ.

5.  Require proof of the reason for entry; the operator must provide information sufficient for the member to verify the accuracy of the reason. This may include, but is not limited to, a telephone number of the address to which the person seeks entry (which the member may use to verify that the resident/occupant expects the person(s) and/or an invitation to a verified organized civic, community, or religious event located within the NSZ.

    NOTE: Persons cannot be compelled to proffer a reason for entry into an NSZ; however, failing to provide a reason for entry is sufficient for denial of entry.

6.  Deny a stopped vehicle access to the NSZ when it is determined that the motor vehicle operator does not have a legitimate reason for entering the NSZ; and

7.  Arrest any motor vehicle operator who refuses to comply with lawful police direction with *Failure to Obey* (Title 18 DCMR § 2000.2).

G.  The NSZ Manager shall:

1.  Prior to establishing the NSZ, the NSZ Manager shall:

    a.  Verify that adequate natural lighting or street lighting is present;

    b.  Verify that adequate space is available for safe operations, deployment of personnel, traffic flow, and parking for the vehicles of arrested persons;

    c.  Notify the affected District's Watch Commander of the anticipated location, date, and time; and

    d.  Conduct roll call with all members assigned to the NSZ;

2.  Ensure all stop locations are clearly defined using barricades, lights, cones, and/or flares to reduce excessive traffic backup;

3.  Ensure a marked vehicle is positioned in the event a vehicular traffic stop is necessary;

4.  Ensure that members employ the stop method that requires that every vehicle attempting entry is stopped;

5.  Ensure, when practical, at least two (2) members approach each stopped vehicle;

6. In the event that all assigned members become involved with multiple stops and/or traffic is affected, approve the temporary suspension of the NSZ checkpoint stops until the vehicular congestion is relieved;

7. Ensure that each instance of a stopped vehicle is documented on a PD Form 76 (Stop or Contact Report) (Attachment B);

   a. For vehicles that are denied entry, the PD Form 76 shall include the operator information, vehicle description, vehicle tag number, and reason for denial.

   b. For vehicles that are permitted entry, and in cases where the operator elects to leave the checkpoint without providing information, the PD Form 76 shall include the vehicle tag number, and where appropriate, the reason for entry.

8. Ensure that the documentation required by Part V.B above is attached to the PD Form 907-A; and

9. Transmit the original PD Form 907-A and all accompanying documentation to the Watch Commander prior to the end of the tour of duty in which the NSZ was concluded.

H. The Police District Watch Commander shall:

1. Record the NSZ notification on the Watch Commander's Report and notify, in turn, the Command Information Center (CIC);

2. Review, sign, and date the PD Form 907-A; and

3. Ensure that a copy of the signed and dated PD Form 907-A is forwarded to the CIC and the Police District Administrative Office.

I. The Police District Commander shall:

1. When requesting the establishment of an NSZ in his/her District, meet the requirements of Part V. A and V.C above;

2. Ensure that only members who have successfully completed all required training participate in the NSZ;

3. Prepare a memorandum to the Chief of Police, through the chain of command, that includes:

   a. Proposed date(s) and times that an area should be declared a NSZ;

   b. Evidence used in making the selection of the location, date(s), and times;

    c.    Justification for the determination consistent with Part V.A and Part V.C above;

    d.    Plan specifying the resources to be used to mark the area as an NSZ  and the deployment of personnel and resources to the NSZ; and

    e.    Detailed map outlining the boundaries of the proposed NSZ;

4.    Upon the approval of the Chief of Police for establishing an NSZ and prior to the establishment of the NSZ:

    a.    Ensure the procurement and distribution of a sufficient quantity of notices containing information regarding the NSZ to residences and businesses;

    b.    Ensure the procurement of a sufficient quantity of posters entitled, "Warning, This Area Has Been Declared A Neighborhood Safety Zone", from the Reproduction Section, Police Business Services Division, Corporate Support Bureau;

    c.    Ensure the NSZ posters are properly completed; located, at a minimum, around the borders of the NSZ; and secured to available objects (e.g., lamp posts) or placed on wooden stakes;

        NOTE:  Any member who observes an individual injuring, breaking, or destroying any NSZ poster may charge the individual with a misdemeanor *Destruction of Property* (D.C. Official Code § 22-303).

5.    Ensure that at least one (1) member assigned to the affected Patrol Service Area(s) included within the NSZ is assigned to each checkpoint;

6.    Upon the expiration of the NSZ time period, direct members of his/her command to promptly remove all signs and other identifying documents and equipment from the boundaries and areas within the former NSZ;

7.    Following the expiration of the NSZ time period, submit a report to the Chief of Police, through the chain of command, within ten (10) business days, with the following information:

    a.    Location of the NSZ, including the exact boundaries;

    b.    Personnel and other resources allocated to the NSZ;

    c.    Time(s) and date(s) of:

    (1)    Distribution of notices to the residences and businesses located within the NSZ;

    (2)    Period that the NSZ was implemented;

    (3)    Marking of the boundaries with posters; and

    (4)    Removal of all posters from the former NSZ;

d.    Number of locations at which posters were placed;

e.    Number and type of crime index offenses that occurred in the NSZ during the NSZ time period;

f.    Total number of vehicles stopped, vehicles denied access, and any arrests related to the NSZ;

g.    Number and type of complaint(s) received as a result of NSZ activities;

h.    Any significant event or unusual incident that occurred in the NSZ during the NSZ time period, and

i.    After-action evaluation of the NSZ operation;

8.    When the NSZ abuts the boundary of another Police District, notify the Commanding Officer of the affected district;

9.    Establish and maintain a Police District file as follows:

a.    A separate folder shall be established for each NSZ;

b.    The folder, at a minimum, shall include:

    (1)    Copy of the recommendation memorandum submitted to the Chief of Police with the signature of approval of the Chief;

    (2)    All documents supporting the recommendation for the establishment of the NSZ;

    (3)    Record of when, how, and by whom the NSZ notices and posters were distributed and posted;

    (4)    Enforcement documentation and crime statistics for the NSZ time period;

    (5)    Information about any unusual or significant incident; and

                (6)     A copy of the final report to the Chief of Police.

J.     The Director, Corporate Support Bureau, shall be responsible for the preparation of the NSZ warning posters.

K.     The Assistant Chief, Patrol Services and School Security Bureau, shall forward to the Chief of Police each request for the establishment of an NSZ he/she has approved.

L.     The General Counsel shall:

      1.     Review all requests for the establishment of an NSZ for legal sufficiency; and

      2.     Advise the Chief of Police, in writing, whether the request for an NSZ meets legal requirements.

M.    The Chief of Police shall:

      1.     Approve or disapprove each request for the establishment of an NSZ.

## VI.    CROSS REFERENCES

A.     D.C. Official Code § 22-303 (Malicious Burning, Destruction, or Injury of Another's Property)

B.     Title 18 (Vehicles and Traffic) DCMR § 2000.2

## VII.    ATTACHMENTS

Attachment A: PD Form 907-A (Neighborhood Safety Zone Manager's Report;

Attachment B: PD Form 76 (Stop or Contact Report) (Revised 04/19/05)

*Cathy L. Lanier*

Cathy L. Lanier
Chief of Police

CLL:JAE:HB:PAS:JGW

PD Form 907-A (051108)

 

**Metropolitan Police Department**
**Washington, D.C.**
**Neighborhood Safety Zone (NSZ) Manager's Report**

| Date: [DD/MM/YY] | District: | NSZ Lieutenant: [Print: Last, First, Middle Initial] |
|---|---|---|

Checkpoint Locations:  [Intersection(s) and/or Address(es)]

Purpose:

| Time Began: [Hour, Minute] | Time Ended: [Hour, Minute] |
|---|---|
| Time Paused: [Hour, Minute] | Time Resumed: [Hour, Minute] |

District Watch Commander Notified: [Rank, Last Name, First Name, Badge Number, Date/Time Notified]

Stop Procedure: [For Example: All Vehicles; Every Third  Vehicle]

| Total #  Vehicles Passed Through NSZ: | Total # Vehicles Stopped From Entering NSZ: | Total #  Vehicles Failing to Stop at NSZ: |
|---|---|---|
| Total # of NOIs Issued: | Total # of PD 76s Completed: | Total # of PD 61-Ds Issued: |

**ARRESTS**

| Arrest Number | CCN | Name of Arrestee | Charge(s) | Disposition |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| NSZ Lieutenant's Full Signature: [First Name, Middle Initial, Last Name] | Date of Signature: |
|---|---|

Reviewed by Watch Commander:  [Print Rank, First Name, Middle Initial, Last  Name, Badge Number]

| Watch Commander's Full Signature: [First Name, Middle Initial, Last Name] | Date of Signature: |
|---|---|

SO-08-06 (Neighborhood Safety Zones)
Attachment A
PD Form 907-A NSZ Supervisor's Report
Rev. 06/04

**PD Form 76 Stop or Contact Report (Revised 04/19/05)**

Card # (yymmdd-xxxx): _____

| Date (mm/dd/yy) & military time (hh:mm) | | |
|---|---|---|
| ____/____/____    ____:____ | Vehicle: | Spot check  Stop |
| | Pedestrian: | Contact  Stop   CCN# (yy-nnnnnn): _____ |
| | Bicycle: | Contact  Stop |
| **Location** | | |
| | | **District and PSA** |

**\*\*Duration of Stop_____ (minutes)\*\***

**Operator/Pedestrian Information**

| Last name | First name | Middle name | Nickname |
|---|---|---|---|
| ☐ Passenger in vehicle | | | |
| **Home address (street number and name, city, state, zip)** | | | **Phone number** ( ) |
| **Gender** ☐ Male ☐ Female | **Race/Ethnicity** ☐ American Indian/Alaskan Native ☐ Asian ☐ Arab American | ☐ Black/African American ☐ Hispanic/Latino ☐ White ☐ Other | **DOB (mm/dd/yy)** ____/____/____ |
| **Height** | **Weight** | **Eye color** | **Hair color/style** |
| **Complexion** | Facial hair, scars, tattoos, clothing, etc. | | |
| **Driver's license/permit number and state** | | | |

**PD Form 76 Stop or Contact Report (Revised 04/19/05)**

Card # (yymmdd-xxxx): _____

**VEHICLE INFORMATION**

| Vehicle type | Make | Model | | Year |
|---|---|---|---|---|
| Color (top/bottom) | Tag/Bike registration number | State | VIN | |
| Owner's last name | Owner's first name | Owner's address (St., No.# Name, City, State, Zip) | | |
| Dents/Other Identifiers: | | | | |

**JUSTIFICATION & OUTCOME**

| Primary reason for contact/stop (Choose one) | Disposition of the contact/stop | (Choose all that apply) |
|---|---|---|
| ☐ Moving violation—NOI: _____ ☐ Equipment violation ☐ Registration violation ☐ Call for service (suspect/vehicle description) ☐ Pre-existing knowledge ☐ Special detail/checkpoints ☐ Suspicious activity ☐ Other_____ | ☐ No action ☐ Verbal warning (traffic) ☐ Other warning issued ☐ Fine issued ☐ Operator arrested ☐ Passenger(s) arrested    # of arrests: _____ | ☐ Vehicle impounded ☐ Report taken ☐ Drugs seized ☐ Weapons seized ☐ Search conducted   Consent to search?    Yes ☐  No ☐ ☐ Other: |
| **Additional remarks** | | |

| Reporting Member (Print Name) | Element/CAD# | Signature |
|---|---|---|
| **Reviewing Official (Print Name)** | Element/CAD# | Signature |

Attachment B
SO-08-06
06/03/08

# Defendant's Exhibit 2

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CANEISHA MILLS, *et al.*, | : |
| Plaintiff, | : |
| v. | :    **Civ. Action No. 08-1061 (RJL)** |
| DISTRICT OF COLUMBIA, | : |
| Defendant. | : |

## DECLARATION OF CATHY L. LANIER

I, Cathy L. Lanier, under penalty of perjury, declare as follows:

1.    I am an adult over the age of 21 years.

2.    I make this declaration based on my personal knowledge of the matters discussed in it.

3.    I am the Chief of Police of the Metropolitan Police Department ("MPD" or "Department").

4.    On June 7, 2008, I authorized the establishment of a Neighborhood Safety Zone ("NSZ") in the Trinidad neighborhood of Washington, DC, pursuant to MPD Special Order-08-06, effective June 4, 2008. The authorization issued in response to a Request for Establishment of Neighborhood Safety Zone submitted by MPD Fifth District Commander Lamar Greene. That NSZ Recommendation and resultant authorization were based, in part, on information gathered by MPD investigations reflecting that motor vehicles had been used in the commission of the spate of violent crimes recently committed in Trinidad.

5.    NSZ's are to be established to enhance the security of discrete geographical areas within the District based on evidence reflecting the existence of neighborhood violent crime, such as pertinent violent crime data; information contained in citizen and community reports and complaints relevant to documented violent crimes; and information gathered from criminal intelligence sources relevant to documented violent crimes.

6.    MPD Special Order-08-06, effective June 4, 2008, establishes and sets forth requirements governing the establishment, implementation, and operation of NSZ's and NSZ checkpoints ("NSZCP's"). These requirements provide for consistency and serve to preclude the exercise of unwarranted discretion in the authorization, establishment, and operation of NSZCP's.

7.    MPD Special Order-08-06 and the training required by this Special Order require consistency of NSZ operations and minimize officer discretion in an NSZ's operation. According to the Special Order and the training thereon, each NSZ checkpoint is to be conducted systematically so as to minimize or eliminate police officer discretion in stopping vehicles from entering the NSZ.

8.    The Special Orders state the following list of legitimate NSZ entry reasons:

a.    The person resides in the NSZ;

b.    The person is employed in the NSZ or is on a commercial delivery;

c.    The person attends school or a day-care facility, or is taking a child to, or picking up a child from, a school or day-care facility in the NSZ;

d.    The person is a relative of a person who resides in the NSZ;

2

e.    The person is seeking medical attention, is elderly, or is disabled;

and/or

f.    The person is attempting to attend a verified organized civic, community or religious event within the NSZ; or

g.    An official the rank of Sergeant or above assigned to the NSZ approves the entry for reasons other than those listed above when there are exigent circumstances.

<u>At no time</u> were officers to travel to the location that an operator identified as his or her destination under the NSZ Initiative.

9.    The legitimate law enforcement concern served by the Trinidad checkpoints was the reduction of violent crime in that particular geographic area that had come to be plagued by crimes of violence. The checkpoints and the NSZ, overall, served that concern in a manner that was designed to avoid, and, I am informed, succeeded in avoiding eliciting self-incriminatory information from the persons entering the checkpoints.

10.    Rather than being "nets" to capture evidence of ordinary criminal wrongdoing by the operator or occupants of the vehicles, the checkpoints, assisted by advance warning through publicity and media reporting, as well as by signage, served as a "fence" to keep violent criminals out of Trinidad.

11.    The planned establishment and location of the NSZ and its checkpoints and their function was publicized by the MPD and by news media in advance of its implementation. The MPD sought to accomplish two objectives through such information dissemination. The MPD sought to alert the public, generally, to the planned use of the checkpoints so that drivers would not be made anxious by the checkpoint process if they encountered it. Publication of the planned checkpoint operation was also

3

intended to discourage persons who might otherwise consider driving into Trinidad to commit acts of violence. These dual objectives were further served by clear signage approaching the checkpoint and the lights of the police cars at the checkpoint, which gave drivers adequate opportunity to avoid the checkpoint entirely without any police contact.

12.    I understand that Plaintiffs in this matter seek an Order from this Court directing the District of Columbia to expunge all data gathered in the Trinidad NSZ operations. I have authorized the expungement of all such data that is electronically maintained by the MPD. No data from the Trinidad NSZ operations, to my knowledge, is stored elsewhere. Because Plaintiffs have commenced a putative class action, I respectfully submit that expungement or destruction of the data altogether is contrary to the interests of justice. Accordingly, I have requested trial counsel in this matter to prepare a Proposed Order to be submitted with the District of Columbia's filings in opposition to Plaintiffs' Motion For Preliminary Injunction that would (1) permit the attorneys defending this matter to retain copies of the MPD Form PD-76's completed for any of the named Plaintiffs, and (2) provide for all other MPD Form PD-76's generated through the Trinidad NSZ operations to be filed under seal with the Court, with no copies to be provided or retained by any party or person.

I declare under the penalty of perjury that the foregoing is true and accurate

Executed on: June 27, 2008          _____
                                     CATHY L. LANIER

4

# Defendant's Exhibit 3

 

# Metropolitan Police Department

### Metropolitan Police Academy
**4665 Blue Plains Drive, Washington, D.C., 20032**

**Lesson Plan Title:** Neighborhood Safety Zones

**Lesson Plan Number:** N/A

**Prepared by:** John Foust          **Date:** June 5, 2008

☒ **New plan**          ☐ **Revision**

**Time Frame:** Two Hours

## PARAMETERS

**Audience:** Recruits Officers or Sworn Officers

**Number:** Approx. Maximum of 100 students per session

**Space:** Large Classroom or auditorium

## PERFORMANCE OBJECTIVES

At the conclusions of this training session, the student shall be able to:

1. Identify purpose of Neighborhood Safety Zones
2. Define Neighborhood Safety Zone
3. Define Neighborhood Safety Zone checkpoint
4. Define Neighborhood Safety Zone Manager's Report
5. State maximum number of days a NSZ can be established
6. Identify the person who may authorize establishment of a NSZ
7. List equipment that is necessary for a NSZ
8. Identify person responsible for completing Manager's Report
9. Explain the importance of respecting community activities
10. List legitimate reasons that one may enter a NSZ

11. Demonstrate proper procedures while at checkpoints
12. Identify minimum number of members required for a NSZ

## ASSESSMENT TECHNIQUE

1. Instructor led classroom discussion
2. Classroom question and answer
3. Practical application/demonstration

## INSTRUCTOR MATERIALS

☐Overheads        ☐Slides              ☐Posters          ☒References

☐Videotapes  Title:_____

☐Documents  Title:_____

## EQUIPMENT/SUPPLIES NEEDED

☐Flipchart & Stands                    ☐PowerPoint Presentation

☐Flipchart Markers                     ☐Video camera

☐Masking Tape                          ☐Televisions

☒Marker Board                          ☐Video-show

☐Overhead Projector                    ☐Computers

☐Projector Screen                      ☐Videotape Player

## TRAINING PARTICIPANT HANDOUTS

Number Required        Title(s)

One for each student-  Special Order Neighborhood Safety Zones
One for each student-  Neighborhood Safety Zones (NSZ) Manager's Report
One for each student-  Neighborhood Safety Zone Pocket Card
One for each student-  PD Form 76 Stop and Contact Report

## REFERENCES

Special Order SO-08-06: Neighborhood Safety Zones
General Order 304.10: Police Citizen Contacts, Stops and Frisks
General Order 301.03: Vehicular Pursuits

## GENERAL COMMENTS

Although not necessary, it may be helpful to have legal counsel available to answer questions that may arise during the few presentations of this course.

| LESSON PLAN PRESENTATION GUIDE | TRAINER NOTES |
|---|---|
| **Introduction**<br>    Class length and objectives | Introduces yourself and any guests that may be present. Discuss length of course and objectives. |
| **Registration**<br>    Register students | Ensure sign-in sheets delivered to Academic Services at MPA |
| **I.    BACKGROUND**<br><br>The establishment of Neighborhood Safety Zones is an effective law enforcement tool for addressing violent crime. <u>Vehicles</u> are common instrumentalities of crime, particularly armed violent crime.  It is in the interest of law enforcement to prohibit <u>vehicles</u> with no legitimate purpose to enter neighborhoods that have been victimized by spikes in violent crime.  The U.S. Courts have found that the zones are constitutional when limited in scope, and when conducted for a legitimate law enforcement purpose.<br><br>This Special Order provides guidance for establishing Neighborhood Safety Zones, consistent with constitutional requirements, that provide high police visibility, prevent and deter crime, safeguard officers and community members, and create safer District of Columbia neighborhoods. | Focus in on vehicles<br><br>Neighborhood Safety Zones are lawful, officers must ensure that they follow the SO to keep these zones available for use as a tool to prevent and deter crime. |

II.     **POLICY**

It is the policy of the Metropolitan Police Department to lawfully establish Neighborhood Safety Zones to promote the health, safety, and welfare of the District of Columbia residents and visitors.

III.    **DEFINITIONS**

When used in this directive, the following terms shall have the meaning designated:

1.      Member – Sworn employee of the Metropolitan Police Department (MPD).

2.      Neighborhood Safety Zone (NSZ) – Delineated geographic area designated by the Chief of Police in response documented crimes of violence the purpose of which is to provide high police visibility, prevent and deter crime, safeguard officers and community members, and create safer District of Columbia neighborhoods.

3.      Neighborhood Safety Zone Checkpoint – A location at the perimeter of the NSZ where vehicles are stopped for the purpose of determining whether the operator has a legitimate reason for entering the NSZ.

4.      Neighborhood Safety Zone Manager – Member the rank of Lieutenant or above who manages the individual Neighborhood Safety Zone operation.

5.      Neighborhood Safety Zone (NSZ) Manager's Report (PD

Draw an example of a NSZ on the board. Two zones are illustrated here:



Checkpoints: Draw examples of checkpoints. Number of checkpoints will be determined by resources, size of zone, etc. Setup of checkpoints will be discussed shortly.



The Manager's Report is a required document to be discussed in detail when procedures are discussed.

| | |
|---|---|
| Form 907-A) – Report completed by the NSZ Manger that documents why, when, where, and how an NSZ was conducted. | |
| **IV.**    **REGULATIONS** | |
| A.    An NSZ may be established solely in response to crimes of violence occurring in a designated location. | Established for a specific law enforcement purpose- not for general law enforcement or fishing expeditions |
| 1.    The NSZ shall be established for a specific and legitimate law enforcement purpose, (e.g., recently reported criminal incident(s) including homicides, shootings, robberies, and other offenses as approved by the Chief of Police). | Important to minimize interference to the community |
| 2.    The NSZ shall be targeted to promote community safety interests while minimizing interference with normal community activities. | Important to understand goal and purpose of each checkpoint. |
| 3.    Consistent with part V.F, below, each NSZ checkpoint shall be conducted systematically so as to minimize or eliminate police officer discretion in stopping vehicles from entering the NSZ. | 10 days maximum: No more than 5 days at first, COP may authorize additional days |
| 4.    The NSZ shall be established for no more than five (5) days, unless the Chief of Police approves an extension of no more than five (5) additional days. | Commander or above makes recommendation |
| B.    The recommendation to establish an NSZ, and the selection of the location for an NSZ, shall be made by an official | COP or designee must approve NSZ |

| | | |
|---|---|---|
| | the rank of Commander and above. | |
| C. | Each NSZ shall be approved, in advance, by the Chief of Police or designee, provided that the designee shall not hold a rank lower than Assistant Chief of Police. | |
| D. | Only those members who have successfully completed all NSZ-related training required by the Chief of Police may participate in the implementation of an NSZ. NSZ-related training shall include specific limitations on members' exercise of discretion in determining whether a vehicle will be permitted to enter the NSZ. | Officers cannot participate in NSZ unless trained |
| E. | Each member assigned to an NSZ shall wear an MPD-approved visibility vest and be provided other required equipment (e.g., cones, light tower). | NSZ officers must wear approved visibility vest. Use other equipment as necessary |
| F. | For the purpose of implementing an NSZ, members shall not stop vehicles that are exiting the NSZ. | Do not stop vehicles exiting |
| G. | For the purpose of implementing an NSZ, members shall not stop pedestrians. | Do not stop pedestrians |
| H. | Generally, vehicles shall be not searched during an NSZ operation. However, if in the course of conducting an NSZ, a member develops reasonable suspicion or probable cause to believe that a crime is being committed, the member may detain the motorist to an extent reasonably necessary to investigate. Under such circumstances, a motorist may consent to search, or, if incident to arrest, a search of the interior passenger area of the vehicle (including containers) may be performed. | |
| V. | **PROCEDURAL GUIDELINES** | |

A.  An NSZ location shall be selected for the purpose of addressing a neighborhood violent crime problem. Evidence to support the existence of a neighborhood violent crime problem may include:

1.  Pertinent violent crime data;

2.  Information contained in citizen and community reports and complaints relevant to documented violent crimes; and

3.  Information gathered from criminal intelligence sources relevant to documented violent crimes.

Evidence of crime problem is a necessity

May come from many sources

B.  Documentation of the evidence prepared based on Part V.A above, and an explanation of how the evidence supports the purpose of the NSZ, as described in Part IV.A above, shall be preserved and attached to the PD Form 907-A [Neighborhood Safety Zone (NSZ) Manager's Report] associated with the NSZ.

Evidentiary documentation is attached to PD Form 907-A (manager's report)

C.  In selecting an NSZ location, the following criteria shall be considered:

1.  The NSZ shall not unnecessarily interfere with routine community activities;

2.  There shall be sufficient space for deploying members assigned to the NSZ;

3.  There shall be sufficient space on the roadway for deploying one (1) or more marked MPD vehicles such that the vehicle(s) are clearly visible;

Respect community activities, minimize interference

Have sufficient space

MPD vehicle(s) must be on roadway, clearly visible

| | | |
|---|---|---|
| 4. | There shall be sufficient space for deploying equipment to alert vehicle operators approaching the NSZ; | Use cones or other equipment to alert approaching vehicles |
| 5. | NSZ operations shall cause minimum delays to normal traffic patterns; and | |
| 6. | The area shall permit a sufficient number of checkpoints for establishing an adequate perimeter. | Discussion point- have class provide examples of appropriate and inappropriate areas |
| D. | Each NSZ checkpoint shall be staffed by a minimum of five (5) officers and one (1) official the rank of Sergeant or above. | Checkpoints: Minimum 5 officers, 1 sergeant |
| E. | An official, of at least the rank of Lieutenant, shall be designated as the NSZ Manager and may increase, but not decrease, the NSZ staffing depending on factors such as location, level of criminal activity, and number of stops. | NSZ Manager= Lieutenant or above |
| F. | Each member assigned to an NSZ shall: | Consideration should be given to assessing need for additional perimeter patrol support to address safety of extra pedestrian traffic that may result from denial of vehicle entry to the NSZ |
| 1. | Be equipped with a visibility vest, flashlight, cones, flares, Notice of Infraction (NOI) books, PD Form 61-D (Violation Notice) books, and PD Forms 76 (Stop or Contact Report); | Be properly equipped |
| 2. | Identify himself/herself, his/her assigned District or element, the reason for the NSZ, and the reason for the stop; | Identify yourself & explain the purpose of the stop. This is important to convey the reason for the use of the NSZ. |
| 3. | Inquire whether the operator of the stopped vehicle has a legitimate reason for entering the NSZ as follows: | |

| | |
|---|---|
| Note: Legitimate reasons are: | Make inquiries |
| a. The person resides in the NSZ; | |
| b. The person is employed in the NSZ or is on a commercial delivery; | Ask the class: What do you think are legitimate reasons for entering NSZ? |
| c. The person attends school, or is taking a child to or picking a child up from a school or day-care facility in the NSZ; | |
| d. The person is a relative of a person who resides in the NSZ; | Discuss the reasons |
| e. The person is seeking medical attention, is elderly, or is disabled; | Discuss exigent, explain that an official should decide |
| f. The person is attempting to attend a verified organized civic, community or religious event within the NSZ; or | The discretion to permit entry into an NSZ under "exigent circumstances" as that term is used in section V F. 3. of the Special Order should be limited to decision making, when time and circumstances permit, by the MPD official of the rank of Sergeant or above, assigned to the NSZ (as stated in section V F.3.g.) |
| g. An official the rank of sergeant or above assigned to the NSZ approves the entry under exigent circumstances. | |
| 4. Request operator identification when attempting to determine the legitimacy of the reason for entering an NSZ. | |
| 5. Require proof of the reason for entry; the operator must provide information sufficient for the member to verify the accuracy of the reason. This may include, but is not limited to, a telephone number of the address to which | |

the person seeks entry (which the member may use to verify that the resident/occupant expects the person(s)) and/or an invitation to a verified organized civic, community, or religious event located within the NSZ.

<u>Note:</u> Persons cannot be compelled to proffer a reason for entry into an NSA; however, failing to provide a reason for entry is sufficient for denial of entry.

For vehicles barred from entry, officers should be instructed to inform the drivers that they can park the vehicle and walk into the secured area, or that they are free to otherwise drive away.

When legitimate reason does not exist, <u>deny</u> access to the vehicle

6. Deny a stopped vehicle access to the NSZ when it is determined that the motor vehicle operator does not have a legitimate reason for entering the NSZ; and

Operator can turn around or park

7. Arrest any vehicle operator who refuses to comply with lawful police direction with *Failure to Obey* (Title 18 DCMR § 2000.2).

Officers should be instructed to provide an egress point for vehicles that are either turned away or do not wish to approach the check-point.

G. The NSZ Manager shall:

1. Prior to establishing the NSZ, the NSZ Manager shall:

Officers should be instructed that refusal to answer any or all questions should not be viewed as a basis for suspicion, and such drivers should be allowed to depart without being further detained.

a. Verify that adequate natural lighting or street lighting is present;

b. Verify that adequate space is available for safe operations, deployment of personnel, traffic flow, and parking for the vehicles of arrested persons;

Make arrest if there is no compliance

Manager (lieutenant or above) duties:

Documentation

c. Notify the affected District's Watch Commander of the

Inspection

|  |  |  |
|---|---|---|
|  | anticipated location, date, and time; | Notify District Watch Commander |
|  | d.   Conduct roll call with all members assigned to the NSZ; | Conduct roll call with members |
| 2. | Ensure all stop locations are clearly defined using barricades, lights, cones, and/or flares to reduce excessive traffic backup; | Check perimeters |
| 3. | Ensure a marked vehicle is positioned in the event a vehicular traffic stop is necessary; | Marked vehicles |
| 4. | Ensure that members employ the stop method that requires that every vehicle attempting entry is stopped; | Use 2 members when possible |
| 5. | Ensure, when practical, at least two (2) members approach each stopped vehicle; |  |
| 6. | In the event that all assigned members become involved with multiple stops and/or traffic is affected, approve the temporary suspension of the NSZ checkpoint stops until the vehicular congestion is relieved; | Temporarily suspend NSZ when necessary |
| 7. | Ensure that each instance of a stopped vehicle is documented on a PD Form 76 (Stop or Contact report) | Convey documentation |
|  | a.  For vehicles that are denied entry, the PD Form 76 shall include the operator information, vehicle description, vehicle tag number and reason for denial. |  |

|  |  |  |
|---|---|---|
| | b. For vehicles that are permitted entry and in cases where the operator elects to leave the checkpoint without providing information, the PD Form 76 shall include the vehicle tag number, and where appropriate, the reason for entry. | |
| 8. | Ensure that the documentation required by Part VB above is attached to the PD Form 907-A; and | |
| 9. | Transmit the original PD Form 907-A and all accompanying documentation to the Watch Commander prior to the end of the tour of duty in which the NSZ was conducted. | |
| H. | The Police District Watch Commander shall: | Watch Commander Duties: |
| 1. | Record the NSZ notification on the Watch Commander's Report and notify, in turn, the Command Information Center (CIC); | Record and notify CIC |
| 2. | Review, sign, and date the PD Form 907; and | Review, sign, date PD Form 907 |
| 3. | Ensure that a copy of the signed and dated PD Form 907 is forwarded to the CIC and the Police District Administrative Office. | Forward 907 |
| I. | The Police District Commander shall: | District Commander Duties: |
| 1. | When requesting the establishment of an NSZ in his/her District, meet the requirements of Part V.A. and V.C. above; | Review criteria for establishment of NSZ |

| | |
|---|---|
| 2. Ensure that only members who have successfully completed all required training participate in the NSZ; | Ensure training |
| 3. Prepare a memorandum to the Chief of Police, through the chain of command, that includes: | Write memorandum to COP |
|    a. Proposed date(s) and times that an area should be declared an NSZ; | |
|    b. Evidence used in making the selection of the location, date(s), and times; | |
|    c. Justification for the determination consistent with Part V.A and V.C above; | |
|    d. Plan specifying the resources to be used to mark the area as an NSZ and the deployment of personnel and resources to the NSZ; and | |
|    e. Detailed map outlining the boundaries of the proposed NSZ; | |
| 4. Upon the approval of the Chief of Police for establishing an NSZ and prior to the establishment of the NSZ: | |
|    a. Ensure the procurement and distribution of a sufficient quantity of notices containing information regarding the NSZ to residences and businesses; | Notify Residents |

| | | |
|---|---|---|
| b. | Ensure the procurement of a sufficient quantity of posters entitled, "Warning, This Area Has Been Declared A Neighborhood Safety Zone", from the Reproduction Section, Police Business Services Division, Corporate Support Bureau; | Procure posters |
| c. | Ensure the NSZ posters are properly completed; located, at a minimum, around the borders of the NSZ; and secured to available objects (e.g., lamp posts) or placed on wooden stakes; | Ensure proper placement of posters |
| | NOTE: Any member who observes an individual injuring, breaking, or destroying any NSZ poster may charge the individual with a misdemeanor *Destruction of Property* (D.C. Official Code § 22-303). | Destruction of posters is illegal |
| 5. | Ensure that at least one (1) member assigned to the affected Patrol Service Area(s) included within the NSZ is assigned to each checkpoint; | NSZ members must include at least 1 member from PSA |
| 6. | Upon the expiration of the NSZ time period, direct members of his/her command to promptly remove all signs and other identifying documents and equipment from the boundaries and areas within the former NSZ; | Ensure removal of posters and equipment when finished |

| | | |
|---|---|---|
| 7. | Following the expiration of the NSZ time period, submit a report to the Chief of Police, through the chain of command, within ten (10) business days, with the following information: | Submit Report to COP within 10 days |
| | a. Location of the NSZ, including the exact boundaries; | |
| | b. Personnel and other resources allocated to the NSZ; | |
| | c. Time(s) and date(s) of: | |
| | (1) Distribution of notices to the residences and businesses located within the NSZ; | |
| | (2) Period that the NSZ was implemented; | |
| | (3) Marking of the boundaries with posters; and | |
| | (4) Removal of all posters from the former NSZ; | |
| | d. Number of locations at which posters were placed; | |
| | e. Number and type of crime index offenses that occurred in the NSZ during the NSZ time period; | |
| | f. Total number of vehicles stopped, vehicles denied | |

|  |  |
|---|---|
| access, and any arrest related to the NSZ; | |
| g. Number and type of complaint(s) received as a result of NSZ activities; | |
| h. Any significant event or unusual incident that occurred in the NSZ during the NSZ time period, and | |
| i. After-action evaluation of the NSZ operation; | |
| 8. When the NSZ abuts the boundary of another Police District, notify the Commanding Officer of the affected district; | Notify other districts if necessary |
| 9. Establish and maintain a District file as follows: | Establish District file |
| a. A separate folder shall be established each NSZ; | |
| b. The folder, at a minimum, shall include: | |
| (1) Copy of the recommendation memorandum submitted to the Chief of Police with the signature of approval of the Chief; | |
| (2) All documents supporting the recommendation for the establishment of the NSZ; | |
| (3) Record of when, | |

|  | | how, and by whom the NSZ notices and posters were distributed and posted; |  |
|  | (4) | Enforcement documentation and crime statistics for the NSZ time period; |  |
|  | (5) | Information about any unusual or significant incident; and |  |
|  | (6) | A copy of the final report to the Chief of Police. |  |
| J. | | The Director, Corporate Support Bureau shall be responsible for the preparation of the NSZ warning posters. | Corporate Support prepares posters |
| K. | | The Assistant Chief, Patrol Services and School Security Bureau, shall forward to the Chief of Police each request for the establishment of an NSZ he/she has approved. | Assistant Chief of Patrol Service forwards requests to COP for NSZ |
| L. | | The General Counsel shall: | General Counsel Reviews |
|  | 1. | Review all requests for the establishment of an NSZ for legal sufficiency; and |  |
|  | 2. | Advise the Chief of Police, in writing, whether the request for an NSZ meets legal requirements. | General Counsel advises COP |
| M. | | The Chief of Police shall: | Chief of Police Duties: |
|  | 1. | Approve or disapprove each request for the establishment of | Approve or Disapprove |

| | | |
|---|---|---|
| an NSZ. | | requests |

**VI.    CROSS REFERENCES**

A.    D.C. Official Code § 22-303 (Malicious Burning, Destruction, or Injury of Another's Property)

B.    Title 18 (Vehicles and Traffic) DCMR § 2000.2

Two references are related to this SO.  Officers should read these prior to working in a NSZ.

**VII.    ATTACHMENTS**

Attachment A:  Neighborhood Safety Zone (NSZ) Manager's Report

Attachement B. NSZ Pocket Cards

Distribute a copy of the Manger's Report, so that officers may see what documentation is necessary for a NSZ.

Distribute pocket cards, so that officers have a quick reference when working in a NSZ.

**VIII.    REVIEW, DISCUSSION, APPLICATION**

1.    Review contents of above material

2.    Select officers from the class to participate in application exercises

3.    Bring officers to the front of the class

4.    Draw a NSZ on the board and establish checkpoints

5.    Present officers with various situations of citizen encounters

6.    Request that officers address checkpoint encounters in appropriate manner

7.    Repeat with other officers as time permits

Distribute copy of PD Form 76

Time allotted for this class is two hours.  Take part of the remaining time to review and then perform classroom applications.

| | |
|---|---|
| **IX.    SUMMARY/ EVALUATION**<br><br>    1.    Ask students if they have any<br>        questions.<br><br>    2.    Address any concerns/questions<br><br>    3.    Dismiss class | Fifteen minutes should be allotted for the closing and final questions. |

PD Form 907-A (050208)

 **Metropolitan Police Department**
**Washington, D.C.**
**Neighborhood Safety Zone (NSZ)Manager's Report** 

| Date:  [DD/MM/YY] | District: | NSZ Lieutenant: [Print:  Last, First, Middle Initial] |
|---|---|---|

**Checkpoint Locations:**  [Intersection(s) and/or Address(es)]

**Purpose:**

| Time Began: [Hour, Minute] | Time Ended: [Hour, Minute] |
|---|---|
| Time Paused: [Hour, Minute] | Time Resumed: [Hour, Minute] |

**District Watch Commander Notified:** [Rank, Last Name, First Name, Badge Number, Date /Time Notified]

**Stop Procedure:** [For Example: All Vehicles; Every Third  Vehicle]

| Total #  Vehicles Passed Through NSZ: | Total # Vehicles Stopped From Entering NSZ: | Total #  Vehicles Failing to Stop at NSZ: |
|---|---|---|
| Total # of NOIs Issued: | Total # of PD 76s Completed: | Total # of PD 61-Ds Issued: |

| ARRESTS | | | | |
|---|---|---|---|---|
| Arrest Number | CCN | Name of Arrestee | Charge(s) | Disposition |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

| NSZ Lieutenant 's Full Signature: [First Name, Middle Initial, Last Name] | Date of Signature: |
|---|---|

**Reviewed by Watch Commander:**  [Print Rank, First Name, Middle Initial, Last  Name, Badge Number]

| Watch Commander's Full Signature: [First Name, Middle Initial, Last Name] | Date of Signature: |
|---|---|

NSZ Pocket Cards

Legitimate reasons to enter
the NSZ are:

The person:
- resides in the NSZ;
- is employed in the NSZ or is on a commercial delivery;
- attends school or a day-care facility, or is taking a child to or picking a child up from a school or day-care facility in the NSZ;
- is a relative of a person who resides in the NSZ.
- is seeking medical attention, is elderly, or is disabled; and/or
- is attempting to attend a verified organized civic, community or religious event within the NSZ; or

An official the rank of sergeant or above assigned to the NSZ approves the entry under exigent circumstances,

---

Legitimate reasons to enter
the NSZ are:

The person:
- resides in the NSZ;
- is employed in the NSZ or is on a commercial delivery;
- attends school or a day-care facility, or is taking a child to or picking a child up from a school or day-care facility in the NSZ;
- is a relative of a person who resides in the NSZ.
- is seeking medical attention, is elderly, or is disabled; and/or
- is attempting to attend a verified organized civic, community or religious event within the NSZ; or

An official the rank of sergeant or above assigned to the NSZ approves the entry under exigent circumstances,.

---

Legitimate reasons to enter
the NSZ are:

The person:
- resides in the NSZ;
- is employed in the NSZ or is on a commercial delivery;
- attends school or a day-care facility, or is taking a child to or picking a child up from a school or day-care facility in the NSZ;
- is a relative of a person who resides in the NSZ.
- is seeking medical attention, is elderly, or is disabled; and/or
- is attempting to attend a verified organized civic, community or religious event within the NSZ; or

An official the rank of sergeant or above assigned to the NSZ approves the entry under exigent circumstances,.

---



Legitimate reasons to enter
the NSZ are:

The person:
- resides in the NSZ;
- is employed in the NSZ or is on a commercial delivery;
- attends school or a day-care facility, or is taking a child to or picking a child up from a school or day-care facility in the NSZ;
- is a relative of a person who resides in the NSZ.
- is seeking medical attention, is elderly, or is disabled; and/or
- is attempting to attend a verified organized civic, community or religious event within the NSZ; or

An official the rank of sergeant or above assigned to the NSZ approves the entry under exigent circumstances,.

---

Legitimate reasons to enter
the NSZ are:

The person:
- resides in the NSZ;
- is employed in the NSZ or is on a commercial delivery;
- attends school or a day-care facility, or is taking a child to or picking a child up from a school or day-care facility in the NSZ;
- is a relative of a person who resides in the NSZ.
- is seeking medical attention, is elderly, or is disabled; and/or
- is attempting to attend a verified organized civic, community or religious event within the NSZ; or

An official the rank of sergeant or above assigned to the NSZ approves the entry under exigent circumstances,.

---

Legitimate reasons to enter
the NSZ are:

The person:
- resides in the NSZ;
- is employed in the NSZ or is on a commercial delivery;
- attends school or a day-care facility, or is taking a child to or picking a child up from a school or day-care facility in the NSZ;
- is a relative of a person who resides in the NSZ.
- is seeking medical attention, is elderly, or is disabled; and/or
- is attempting to attend a verified organized civic, community or religious event within the NSZ; or

An official the rank of sergeant or above assigned to the NSZ approves the entry under exigent circumstances,.

# Defendant's Exhibit 4

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **CANEISHA MILLS,** *et al.,* | : | |
| **Plaintiff,** | : | |
| v. | : | **Civ. Action No. 08-1061 (RJL)** |
| **DISTRICT OF COLUMBIA,** | : | |
| **Defendant.** | : | |

## DECLARATION OF LAMAR GREENE

I, LAMAR GREENE, do declare, under penalty of perjury, as follows:

1.  I am an adult over the age of 21 years.

2.  I make this declaration based on my personal knowledge of the facts discussed in it.

3.  I am the Commander of the Fifth Police District of the Metropolitan Police Department ("MPD") as I was at the time of all events discussed in this declaration.

4.  The Trinidad neighborhood of Washington, DC is within the Fifth District. In response to a sharp increase in incidents of violent crime in Trinidad, I requested authorization to establish a Neighborhood Safety Zone ("NSZ") there. My Request was supported, in part, by information gathered by MPD investigations reflecting that motor vehicles had been used in the commission of several violent crimes committed in Trinidad. Those investigations did not indicate that cars were stolen from Trinidad in the context of the recent homicides and other violent crimes in Trinidad. It follows that on several occasions the attackers had driven into Trinidad, committed violent felonies, and made their escape in the vehicles that they drove into Trinidad.

5.    Exhibit 5 is a copy of the "Request for Establishment of Neighborhood Safety Zone," dated June 6, 2008, that I submitted to MPD Chief Cathy L. Lanier. As reflected by my Request, the Trinidad neighborhood area in which the NSZ was to be established had been the site of many assaults that involved a firearm over the preceding year, with dozens of assaults with deadly weapons, resulting in 20 persons having suffered gunshot wounds, and six homicides. Moreover, the neighborhood had been the scene of an extraordinary triple homicide on May 31, 2008.

6.    On June 6, 2008, Chief Lanier authorized the establishment of the NSZ that I had requested, in accordance with MPD Special Order 08-06.

7.    In advance of the establishment of the NSZ, area residents were provided brochures explaining the operation of the NSZ. Defendant's Exhibit 12 is a copy of the brochure.

8.    In operating the checkpoints according to Special Order 08-06, officers staffing the checkpoint were to allow drivers to turn away from the checkpoint rather than submitting to queries regarding their reasons for wishing to drive into the NSZ. Also, persons could enter the NSZ on foot, including persons who had been turned away from the checkpoint, without being engaged at all by the police. The clear objective of the NSZ was to non-intrusively discourage persons from attempting to drive into the NSZ to commit acts of violence.

9.    In accordance with Special Order 08-06, I received reports from each of the NSZ Zone Managers and prepared an After Action Report regarding the establishment and operation of the Trinidad NSZ ("NSZ Report"). Defendant's Exhibit 6 is a true copy of my After Action Report. The NSZ Report was generated near the time of the NSZ

2

operations reported in it, based on information from persons with firsthand knowledge of the events reflected in the report. It was prepared and maintained in the ordinary course of MPD operations.

10.    Defendant's Exhibit 13 is a true copy of the MPD Form PD-76 record regarding Ms. Sarah Sloan's attempt to enter Trinidad through an NSZ checkpoint. Under the NSZ Initiative such records were generated near the time of the NSZ operations reported by persons with firsthand knowledge of the events reflected in the report. It was prepared and maintained in the ordinary course of MPD operations. It reflects that Ms. Sloan was "[d]enied access, refused to state destination address in Trinidad area. [The preparing officer] was told it was none of [his] business."

11.    MPD operated NSZ checkpoints on 11 occasions within the period June 7, through June 12, 2008.

12.    During the period that the NSZ was in place, the Trinidad neighborhood reported a total of four crimes. Additionally, none of the suspect(s) for the crimes committed during the NSZ period used a vehicle during the commission of the criminal act. The average total number of crimes reported during the nine (9) previous five day (5) 24-hour periods was 4.6 crimes. The four crimes reported during the NSZ active days reflect a 13% reduction off average. Importantly, no shootings were reported while the NSZ was in operation.

13.    In advance of the establishment of the NSZ, area residents were provided brochures explaining the operation of the NSZ.

I declare under penalty of perjury that the foregoing is true and correct.

3

Executed on: ___6/27/08___    _____
                                        LAMAR GREENE

4

# Defendant's Exhibit 5

  

**District**

[Insert Address], Washington D.C., 20001   (202) [Insert Telephone Number]

June 6, 2008

## MEMORANDUM

**TO:**       Chief of Police

**THRU:**     Assistant Chief of Police
              Patrol Services and School Security Bureau

**FROM:**     Commander
              Fifth District

**SUBJECT:**  Request for Establishment of Neighborhood Safety Zone (NSZ)

I am herein requesting your approval for the establishment of a Neighborhood Safety Zone pursuant to Metropolitan Police Department Special Order-08-06, *Neighborhood Safety Zones* effective June 5, 2008. I am requesting that the area described below, located in PSA 504, be declared a Neighborhood Safety Zone from June 7, 2008 to June 11, 2008, during the following hours: starting 1900 hours on June 7th thru 1900 hours on June 11, 2008.

The safety zone will be in the 1400 block of Montello Avenue, Northeast, starting at Owen Place and ending at Oates Street.  The purpose of the zone is to provide high visibility, prevent and deter crime, safe guard officers and the community members and create safer neighborhoods in the District of Columbia.  The exact descriptions of the boundaries are as follows:

**Starting at the southeast corner of the zone at the intersection of the eastern curb line of Montello Ave NE and the southern curb line of Oates St NE, proceeding westward across Montello Ave NE to the intersection of the western curb line of Montello Ave NE and the southern curb line of Oates St NE, proceeding northward along the westward curb line of Montello Ave NE to the intersection of the curb line and the southern curb line of Owen Pl NE, proceeding eastward across Montello Ave NE to the intersection of the eastern curb line of Montello Ave NE and the southern curb line of Owen Pl NE, proceeding southward along the eastern curb line of Montello Ave NE to the starting point.**

The requested use of this proposed NSZ is intended to accomplish these objectives by discouraging entry into this heavily victimized area of individual's intent upon committing acts of violence.  Investigations of violent crimes committed in and around the proposed

NSZ reflect that in numerous instances, persons have driven into the area, committed violent crimes, and escaped in vehicles.

Special Order-08-06 provides for MPD to notify the public of the existence and whereabouts of an NSZ, so that drivers can avoid it altogether. Further, the Special Order requires the officers staffing the checkpoint to allow drivers to turn away from the checkpoint rather than submitting to queries regarding his/her reasons for wishing to drive into the NSZ. Further, persons may enter the NSZ on foot, including persons who have been turned away from the checkpoint, without being engaged at all by the police. This combination of factors is well-suited to non-intrusively discourage persons from attempting to drive into the NSZ to commit acts of violence. Thus, the proposed NSZ implementation is not intended or anticipated to result in inquiries regarding criminal activities, much less searches of vehicles or their drivers or occupants, or arrests.

Montello Avenue is a one way south bound street and considered a major thorough fare through the Trinidad community.

A checkpoint will be established at the northern end of Montello Avenue at the intersection of Owen Place. Vehicular traffic seeking to enter the NSZ will be briefly stopped in accordance with the NSZ protocol. All southbound traffic will be stopped on Montello Avenue prior to entering the NSZ. A patrol unit will provide perimeter security for all persons who elect to park and walk into the zone.

All safety zone check points will be manned by at least five officers and one official at the rank of sergeant or above. Each member will be trained in utilizing the NSZ protocol. All officials on the scene of the check points shall have the NSZ fact sheets on their person.

The Neighborhood Safety Zone is being established to provide high visibility, prevent and deter crime, safe guard officers and the community members and create safer neighborhoods within the Trinidad community. The request is based on the following considerations relative to the Trinidad community:

- 25 Total assaults that involved a firearm over the last year– 5 Homicides & 20 ADW guns
- Occurring between 2000 and 0359 hours;
- 186 calls for service within the NSZ

It should be noted that of the 20 assaults where firearms where involved 6 involved the suspect utilizing a vehicle.  Those particular cases are as follows:

- April 1, 2008        1344hrs        1242 Penn St NE
- October 11, 2007     2223hrs        Meigs Pl. & Trin. Ave NE
- July 18, 2007        2105hrs        1040 Blad. Road NE
- June 21, 2007        1600hrs        1200 Meigs Place NE
- June 13, 2007        1427hrs        1200 16th NE
- June 9, 2007         0835hrs        1220 Owen Place NE



The Trinidad area, located within **PSA 504** has experienced an overall 80% increase in homicides.  This NSZ checkpoint location was chosen because of the following factors:

- Added protection to the citizens residing within the NSZ.
- Montello Avenue is a main thoroughfare through Trinidad, thus affecting the ability for criminals to traverse through the area.
- There have been two homicides within one block of the NSZ

- Increased citizen contact will provide better opportunities to develop information to support the investigative process.
- Several shootings (6) within the Trinidad community were committed by persons utilizing vehicles in the commission of the crime.

I hereby certify that:

- The NSZ will not unnecessarily interfere with routine community activities;

- There will be sufficient space for deploying members assigned to the NSZ;

- There will be sufficient space on the roadway for deploying one (1) or more marked Metropolitan Police Department vehicles such that the vehicle(s) are clearly visible;

- There will be sufficient space for deploying equipment to alert vehicle operators approaching the NSZ;

- NSZ operations will cause minimum delays to normal traffic patterns; and

- The area will permit a sufficient number of checkpoints for establishing an adequate perimeter.

I will deploy a minimum of five (5) officers and one (1) member the rank of Sergeant or above at each Neighborhood Safety Zone checkpoint. The Neighborhood Safety Zone will be managed by a member the rank of Lieutenant or above. At least one (1) officer from the involved PSA will support each Checkpoint.

Attached is a map of the proposed Neighborhood Safety Zone and the supporting data and information.

Attachments

# Defendant's Exhibit 6



**Metropolitan Police Department**
*Patrol Services & School Security Bureau*
Fifth District

**1805 Bladensburg Road, NE, Washington D.C., 20002 (202) 698-0111 FAX (202) 724-8649**

## MEMORANDUM

**TO:**      Chief of Police

**THRU:**   Assistant Chief of Police
            Patrol Services & School Security Bureau

**FROM:**   Lamar Greene
            Commander

**DATE:**   June 12, 2008

**SUBJECT:**  After Action Report for the Neighborhood Safe Zone

Your attention is invited to the following information relative to the Fifth District's NSZ from 6/7/08 through 6/12/08. The statistics captured are from 6/7/08 through 6/12/08 @ 1700 hours.

The NSZ concluded on 6/12/08 with last checkpoint from 1500-1700. The boundaries for the NSZ are as follows:

**Safety Zone: Trinidad**

Bladensburg Road southbound to the intersection of Florida Avenue proceeding westward to the intersection of West Virginia Ave NE and north on West Virginia Ave to the intersection of Mt Olivet Road then east to Bladensburg Road NE.

**Check Point Boundaries:**

**Starting at the southeast corner of the zone at the intersection of the eastern curb line of Montello Ave NE and the southern curb line of Oates St NE, proceeding westward across Montello Ave NE to the intersection of the western curb line of Montello Ave NE and the southern curb line of Oates St NE, proceeding northward along the westward curb line of Montello Ave NE to the intersection of the curb line and the southern curb line of Owen Pl NE, proceeding eastward across Montello Ave NE to the intersection of the eastern curb line of Montello Ave NE and the southern curb line of**

2

**Owen Pl NE, proceeding southward along the eastern curb line of Montello Ave NE to the starting point.**

**NSZ Overview:**

1) The NSZ was implemented on Saturday, June 7, 2008 and concluded on Thursday, June 12, 2008;

2) There has been one (1) arrest directly in the NSZ on June 7, 2008;

3) There were nine hundred and three (903) vehicles that passed through the NSZ;

4) There were forty-eight (48) vehicles that were stopped from entering the NSZ;

5) There was one (1) vehicle that failed to stop;

6) There were seven hundred and twenty-four (724) PD 76's completed in the NSZ;

7) There were three (3) NOI's issued in the NSZ;

8) There were zero (0) PD 61D's issued in the NSZ;

9) Of the nine-hundred and fifty-one (951) vehicles entering the checkpoint, forty-eight (48), or 5.3%, were turned away for failing to provide a legitimate purpose for entering.

**NSZ Active Dates/Times:**

The following section contains summary information of active NSZ's by date, time, and location:

<u>June 7, 2008</u>

The checkpoint locations:

      A.    1400 B/O Montello Avenue NE
      B.    1100 B/O Owen Place NE

The checkpoint began at **1945** and ended at **2140 hours**.

3

C.   All vehicles were stopped except Metro buses.
D.   Twenty-four (24) vehicles passed through the NSZ.
E.   Twenty-six (26) vehicles were stopped from entering the NSZ.
F.   No vehicle failed to stop
G.   Two (2) NOI's were issued.
H.   Fifty (50) PD 76's were completed.
I.   No PD 61D's were issued.
J.   There was one arrest for POCA/DUI (Brown, Anthony, CCN # 077-850)

Personnel on checkpoint:

A.   Captain W. Smith
B.   Lieutenant B. Sanders
C.   Sergeant R. Ervin
D.   Officer K. Finn (McHugh)
E.   Officer A. Gamm
F.   Officer M. Lambeau
G.   Officer K. Smith
H.   Officer B. Bangura
I.   Officer D. Moore
J.   Officer M. Reddy
K.   Officer L. Tyler

**June 9, 2008**

The checkpoint locations:

A.   1400 B/O Montello Avenue NE

The checkpoint began at **1930** and ended at **2130 hours**.

B.   All vehicles were stopped.
C.   Eighty (80) vehicles passed through the NSZ.
D.   One (1) vehicle was stopped from entering the NSZ.
E.   No vehicle failed to stop.
F.   One (1) warning NOI was issued.
G.   Thirty-eight (38) PD 76's were completed.
H.   No PD 61D's were issued.
I.   There were no arrests.

4

Personnel on Checkpoint:

    A.    Lieutenant R. Wright
    B.    Sergeant B. Purnell
    C.    Sergeant A. Cipolari
    D.    Officer J. Love
    E.    Officer P. White
    F.    Officer D. Gillespie
    G.    Officer A. Weston
    H.    Officer M. Littlejohn
    I.    Officer B. Rubin
    J.    Officer D. Collins
    K.    Officer T. Gross

**June 10, 2008**

The checkpoint location:

    A.    1400 B/O Montello Avenue NE

The checkpoint began at **2230** and ended at **0030 hours**.

    B.    All vehicles were stopped.
    C.    Fifty (50) vehicles passed through the NSZ.
    D.    No vehicle was stopped from entering the NSZ.
    E.    No vehicle failed to stop.
    F.    No NOI's were issued.
    G.    Thirty-one (31) PD 76's were completed.
    H.    No PD 61D's were issued.
    I.    There were no arrests

5

**June 10, 2008**

The checkpoint location:

A.    1400 B/O Montello Avenue NE

The checkpoint began at **1100** and ended at **1300 hours**.

B.    All vehicles were stopped except Metro buses.
C.    Fifty-three (53) vehicles passed through the NSZ.
D.    No vehicle was stopped from entering the NSZ.
E.    No vehicle failed to stop.
F.    No NOI's were issued.
G.    Fifty-three (53) PD 76's were completed.
H.    No PD 61D's were issued.
I.    There was no arrest

Personnel on Checkpoint:

A.  Lieutenant J. Anderson
B.  Sergeant T. Thorne
C.  Officer M. Morawski
D.  Officer G. Johnson
E.  Officer R. Matos
F.  Officer C. James
G.  Officer J. Phillips

**June 10, 2008**

The checkpoint location:

A.    1400 B/O Montello Avenue NE

The checkpoint began at **1900** and ended at **2015 hours**.  The detail was discontinued early because of inclement weather.

B.  All vehicles were stopped except Metro buses.
C.  Forty-seven (47) vehicles passed through the NSZ.
D.   Five vehicles were stopped from entering the NSZ.
E.   One vehicle failed to stop.
F.   No NOI's were issued.
G.  Thirty-eight (38) PD 76's were completed.
H.   No PD 61D's were issued.
I.   There were no arrests

6

**June 11, 2008**

The checkpoint location:

    A.   1400 B/O Montello Avenue NE

The checkpoint began at **2230** and ended at **0100 hours**.

    B.  All vehicles were stopped except Metro buses.
    C.  Eighteen (18) vehicles passed through the NSZ.
    D.  No vehicle was stopped from entering the NSZ.
    E.  No vehicle failed to stop.
    F.  No NOI's were issued.
    G.  Five (5) PD 76's were completed.
    H.  No PD 61D's were issued.
    I.   There were no arrests

**June 11, 2008**

The checkpoint location:

    A.   1400 B/O Montello Avenue NE

The checkpoint began at **1500** and ended at **1900 hours**.

    B.  All vehicles were stopped except Metro buses.
    C.  Three hundred and sixty (360) vehicles passed through the NSZ.
    D.  Fifteen vehicles were stopped from entering the NSZ.
    E.  No vehicle failed to stop.
    F.  No NOI's were issued.
    G.  Three hundred and sixty (360) PD 76's were completed.
    H.  No PD 61D's were issued.
    I.   There were no arrests

Personnel on Checkpoint:

    a.  Lieutenant B. Sanders
    b.  Sergeant J. Lipscomb

7

    c.  MPO T. Finnegan
    d.  Officer X. Greene
    e.  Officer A. Simms
    f.  Officer D. Barnes
    g.  Officer J. Light
    h.  Officer K. McHugh
    i.  Officer M. Miller
    j.  Officer M. Montiero
    k.  Officer P.Samuels
    l.  Officer J. Colkley

**June 12, 2008**

The checkpoint location:

    A.   1400 B/O Montello Avenue NE

The checkpoint began at **2300** and ended at **0100 hours**.

    B.  All vehicles were stopped except Metro buses.
    C.  Seventy-two (72) vehicles passed through the NSZ.
    D.  No vehicle was stopped from entering the NSZ.
    E.  No vehicle failed to stop.
    F.  One NOI's was issued.
    G.  Seventy-two (72) PD 76's were completed.
    H.  No PD 61D's were issued.
    I.   There were no arrests

**June 12, 2008**

The checkpoint location:

    A.   1400 B/O Montello Avenue NE

The checkpoint began at **1100** and ended at **1300 hours**.

    B.  All vehicles were stopped except Metro buses.
    C.  Sixty-four (64) vehicles passed through the NSZ.
    D.  No vehicle was stopped from entering the NSZ.
    E.  No vehicle failed to stop.
    F.  No NOI's were issued.
    G.  Sixty-four (64) PD 76's were completed.

8

H. No PD 61D's were issued.
I. There were no arrests

Personnel on Checkpoint:

      A. Lieutenant D. Craig
      B. Sergeant T. Thorne
      C. Officer M. Morawski
      D. Officer G. Johnson
      E. Officer R. Clark
      F. Officer D. McCullough
      G. Officer J. Phillips
      H. Officer A. Paredes
      I. Officer M. Washington


**June 12, 2008**

The checkpoint location:

      A. 1400 B/O Montello Avenue NE

The checkpoint began at **1500** and ended at **1700 hours**.

B. All vehicles were stopped except Metro buses.
C. One hundred and thirty-five (135) vehicles passed through the NSZ.
D. Two vehicles were stopped from entering the NSZ.
E. No vehicle failed to stop.
F. No NOI's were issued.
G. One hundred and thirty-five (135) PD 76's were completed.
H. No PD 61D's were issued.
I. There were no arrests

Personnel on Checkpoint:

      A. Lieutenant B. Sanders
      B. Sergeant J. Lipscomb
      C. Officer M. Lambeau
      D. Officer D. Haile
      E. Officer K. Smith
      F. Officer J. Light
      G. Officer S. Recker
      H. Officer R. Grimes
      I. Officer M. Montiero

**Trinidad**

The Neighborhood Safety Zone (NSZ) was established to provide high visibility, prevent and deter crime, safe guard officers and community members, and create safer neighborhoods within the Trinidad community. The establishment of the NSZ is attempting to achieve these goals by restricting criminal usage of vehicles as instrumentalities of crime.  The request is based on the following considerations relative to the Trinidad community:

- 25 Total shootings involving a firearm over the previous year (6/7/2007 through 6/6/2008) – 5 Homicides & 20 ADW guns;
- Suspect(s) utilizing vehicles in approximately 25% of shooting assaults;
- A 13% increase in violent crime comparing this calendar year-to-date to 2007 calendar year-to-date;
- 114 Calls for Service for sounds of gunshots in Trinidad over the previous year;

In attempting to evaluate the effect the NSZ's had on reported crime in the Trinidad neighborhood, the following statistics were compiled.  The 5th District activated the NSZ's during various hours for five (5) 24 hour periods beginning on **6/7/2008 at 1945 hours** and ending on **6/12/2008 at 1700 hours**.  Crime counts for prior nine (9) five day periods, beginning and ending date/time ranges were queried with the results seen in the table below.  As seen, during the activation days, the Trinidad neighborhood reported a total of four (4) crimes.  None of the reported crimes occurred during the hours that the NSZ's were active.  Additionally, none of the suspect(s) for the crimes committed during the NSZ period used a vehicle during the commission of any criminal act.  The average total number of crimes reported during the nine (9) previous five (5) 24 hour periods was 4.6 crimes.  The four (4) crimes reported during the NSZ active days constitute a 13% reduction off average.

| | 4/5/2008 1945 hrs through 4/10/2008 1700 hrs | 4/12/2008 1945 hrs through 4/17/2008 1700 hrs | 4/19/2008 1945 hrs through 4/24/2008 1700 hrs | 4/26/2008 1945 hrs through 5/1/2008 1700 hrs | 5/3/2008 1945 hrs through 5/8/2008 1700 hrs | 5/10/2008 1945 hrs through 5/15/2008 1700 hrs | 5/17/2008 1945 hrs through 5/22/2008 1700 hrs | 5/24/2008 1945 hrs through 5/29/2008 1700 hrs | 5/31/2008 1945 hrs through 6/5/2008 1700 hrs | 6/7/2008 1945 hrs through 6/12/2008 1700 hrs |
|---|---|---|---|---|---|---|---|---|---|---|
| Homicide | | 2 | | | | | | | | |
| Robbery | | 2 | | | | | | 3 | 1 | 1 |
| ADW | 1 | 2 | 1 | 2 | 1 | | 1 | 1 | | |
| Sex Abuse | | | | | | | | | | |
| Violent | 1 | 6 | 1 | 2 | 1 | 0 | 1 | 4 | 1 | 2 |
| Burglary | 2 | 2 | 1 | | 1 | 1 | 2 | 3 | | |
| Theft | 1 | | | | | 1 | 2 | | 1 | 1 |
| Theft f/Auto | | 1 | | 1 | | 2 | | 1 | | 1 |
| Stolen Auto | | 1 | | | | | 1 | | | |
| Arson | | | | | | | | | | |
| Property | 3 | 4 | 1 | 1 | 1 | 4 | 5 | 4 | 1 | 2 |
| Total | 4 | 10 | 2 | 3 | 2 | 4 | 6 | 8 | 2 | 4 |

10

**Results Assessment:**

The implementation of the NSZ in Trinidad was determined a success based on the following factors:

- No Part 1 crimes occurred in Trinidad during the active NSZ hours;
- Trinidad, a historically high crime area, reported four (4) Part 1 offenses during the NSZ period – a 13% reduction off average;
- No vehicles were utilized by suspect(s) in the commission of Part 1 criminal acts;
- The area reported zero (0) shootings during the active period

# Defendant's Exhibit 7

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CANEISHA MILLS, *et al.*, | : |
| Plaintiff, | : |
| v. | : Civ. Action No. 08-1061 (RJL) |
| DISTRICT OF COLUMBIA, | : |
| Defendant. | : |

## DECLARATION OF BURLEY ANTHONY SANDERS

I, BURLEY ANTHONY SANDERS, do declare, under penalty of perjury, as follows:

1. I am an adult over the age of 21 years.

2. I make this declaration based on my personal knowledge of the facts discussed in it.

3. I am a Lieutenant of the Metropolitan Police Department ("MPD") as I was at the time of all events discussed in the declaration.

4. I participated in the Neighborhood Safety Zone ("NSZ") operations conducted in the Trinidad neighborhood of Washington, DC, over the period June 7-12, 2008. At the times that I was assigned to the Trinidad NSZ, I served as a Neighborhood Safety Zone Manager, in accordance with MPD Special Order SO-08-06. Prior to assuming my responsibilities as an NSZ Zone Manager, I had been trained in and had become familiar with Special Order SO-08-06.

5. I served as the Zone Manger for NSZ checkpoints conducted on June 7, 2008, from 8:00 P.M. to 9:15 P.M., June 10, 2008, 2008, from 3:00 P.M. to 5:00 P.M. and from 7:00 P.M. to 8:15 P.M., and June 11, 2008, from 3:00 P.M. to 5:00 P.M.

6.  In the operation of these checkpoints, MPD officers under my supervision stopped every motor vehicle and questioned every operator that came to the checkpoint while that checkpoint was in place.

7.  Where an operator approached the checkpoint and refused or was unable to advise the officers of a legitimate entry reason, the motorist was turned around and away from the checkpoint in a minute or less, on average, unless the operator wished to engage the officer in discussion.

8.  Motorists who provided legitimate entry reasons and who were not delayed for another reason passed through in a matter of seconds.

9.  Police contact with operators consisted simply of a request for limited information, after which the driver was allowed through the checkpoint or directed to turn around and advised that he could park in the area and enter the NSZ on foot.

10. In no instance did any officer follow or accompany a person admitted into the NSZ to his or her destination.  To my understanding the Special Order does not contemplate such police activity.  None of my officers suggested such police action and, if they had, I would not have permitted it.

11. I accurately reported the number of vehicles that entered my checkpoint, the number of vehicles admitted through my checkpoint, the number of vehicles turned away from my checkpoint, the number of Notices of Infraction issued at my checkpoint, and the number of arrests made at my checkpoint in each instance.

12. Only one arrest was made at a checkpoint under my supervision.  That operator was arrested for driving while in possession of an open container of alcohol.  That driver

was transporting four children in the car at the time, none of whom was in a child seat or wearing a seatbelt.

13.     Clear signage approaching the checkpoint and the lights of the police cars at the checkpoint gave drivers adequate opportunity to avoid the checkpoint entirely without any police contact.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _June 26, 2008_     _Burley Anthony Sanders_

**BURLEY ANTHONY SANDERS**

3

# Defendant's Exhibit 8

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CANEISHA MILLS, *et al.*,                    :

      **Plaintiff,**                         :

      **v.**                                 :    **Civ. Action No. 08-1061 (RJL)**

DISTRICT OF COLUMBIA,                        :

      **Defendant.**                         :

## DECLARATION OF JUDITH A ANDERSON

    I, **JUDITH A. ANDERSON**, do declare, under penalty of perjury, as follows:

1.    I am an adult over the age of 21 years.

2.    I make this declaration based on my personal knowledge of the facts discussed in it.

3.    I am an official of the Metropolitan Police Department ("MPD") as I was at the time of all events discussed in the declaration.

4.    I participated in the Neighborhood Safety Zone ("NSZ") operations conducted in the Trinidad neighborhood of Washington, DC, over the period June 7-12, 2008.  At the times that I was assigned to the Trinidad NSZ, I served as a Neighborhood Safety Zone Manager, in accordance with MPD Special Order SO-08-06.  Prior to assuming my responsibilities as an NSZ Zone Manager, I had been trained in and had become familiar with Special Order SO-08-06.

5.    I served as the Zone Manager for an NSZ checkpoint conducted on June 10, 2008.

6.    In the operation of this checkpoint, MPD officers under my supervision stopped every motor vehicle and questioned every operator that came to the checkpoint while that checkpoint was in place.

7.    Motorists who provided legitimate entry reasons and who were not delayed for
another reason passed through in a matter of seconds.

8.    Police contact with operators consisted simply of a request for limited information,
after which the driver was allowed through the checkpoint or directed to turn around
and advised that he could park in the area and enter the NSZ on foot.

9.    In no instance did any officer follow or accompany a person admitted into the NSZ to
his or her destination.  To my understanding the Special Order does not contemplate
such police activity.  None of my officers suggested such police action and, if they
had, I would not have permitted it.

10.    I accurately reported the number of vehicles that entered my checkpoint, the number
of vehicles admitted through my checkpoint, the number of vehicles turned away
from my checkpoint, the number of Notices of Infraction issued at my checkpoint,
and the number of arrests made at my checkpoint in each instance.

11.    No one was arrested at any checkpoint under my supervision.

12.    Clear signage approaching the checkpoint and the lights of the police cars at the
checkpoint gave drivers adequate opportunity to avoid the checkpoint entirely without
any police contact.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:    June 26, 2008                    _____
                                                           JUDITH A ANDERSON

2

# Defendant's Exhibit 9

2027248649          5D ADMIN                                              10:01:47 a.m.     27-06-2008          1 /2
JUN-27-2008 10:31 From:GENERAL COUNSEL          2027273306          16:512248649                    Page:1/2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CANEISHA MILLS, *et al.*, | : |
| **Plaintiff,** | : |
| v. | :    Civ. Action No. 08-1061 (RJL) |
| DISTRICT OF COLUMBIA, | : |
| **Defendant.** | : |

## DECLARATION OF RONALD J. WRIGHT, JR.

I, **RONALD J. WRIGHT, JR.**, do declare, under penalty of perjury, as follows:

1.    I am an adult over the age of 21 years.

2.    I make this declaration based on my personal knowledge of the facts discussed in it.

3.    I am a lieutenant of the Metropolitan Police Department ("MPD") as I was at the time of all events discussed in the declaration.

4.    I participated in the Neighborhood Safety Zone ("NSZ") operations conducted in the Trinidad neighborhood of Washington, DC, over the period June 7-12, 2008. At the times that I was assigned to the Trinidad NSZ, I served as a Neighborhood Safety Zone Manager, in accordance with MPD Special Order SO-08-06. Prior to assuming my responsibilities as an NSZ Zone Manager, I had been trained in and had become familiar with Special Order SO-08-06.

5.    I served as the Zone Manager for an NSZ checkpoint conducted on June 9, 2008 during the 3-11 tour of duty. I also served as the Zone Manager from approximately 11p.m. on June 9 to 2:00 a.m. on June 10, 2008.

2027248649        5D ADMIN                                      10:01:57 a.m.      27-06-2008      2 /2

6.    In the operation of this checkpoint, MPD officers under my supervision stopped every

motor vehicle and questioned every operator that came to the checkpoint while that

checkpoint was in place.

7.    Motorists who provided legitimate entry reasons and who were not delayed for

another reason passed through in a matter of seconds.

8.    Police contact with operators consisted simply of a request for limited information,

after which the driver was allowed through the checkpoint or directed to turn around

and advised that he could park in the area and enter the NSZ on foot.

9.    In no instance did any officer follow or accompany a person admitted into the NSZ to

his or her destination.  To my understanding the Special Order does not contemplate

such police activity.  None of my officers suggested such police action and, if they

had, I would not have permitted it.

10.    I accurately reported the number of vehicles that entered my checkpoint, the number

of vehicles admitted through my checkpoint, the number of vehicles turned away

from my checkpoint, the number of Notices of Infraction issued at my checkpoint,

and the number of arrests made at my checkpoint in each instance.

11.    No one was arrested at any checkpoint under my supervision.

12.    Clear signage approaching the checkpoint and the lights of the police cars at the

checkpoint gave drivers adequate opportunity to avoid the checkpoint entirely without

any police contact.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:    June 27, 2008

RONALD J. WRIGHT, JR.

2

# Defendant's Exhibit 10

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CANEISHA MILLS, *et al.*, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civ. Action No. 08-1061 (RJL) |
| | : | |
| DISTRICT OF COLUMBIA, | : | |
| | : | |
| Defendant. | : | |

## DECLARATION OF KATHY HENDERSON

I, KATHY HENDERSON, do declare, under penalty of perjury, as follows:

1.    I am an adult over the age of 21 years.

2.    I make this declaration based on my personal knowledge of the facts discussed in it.

3.    I am a resident of the District of Columbia and the immediate past Advisory Neighborhood Commissioner of the District of Columbia, representing Single Member District 5B10.

4.    I am the parent of the current Commissioner representing Single Member District 5B10, India A. Henderson.

5.    I drafted and circulated a petition with Commissioner Henderson, obtaining the names and addresses and signatures of approximately seventy-eight residents of the Trinidad area who support the Metropolitan Police Department's Neighborhood Safety Zone program.

6.    A copy of this compilation of names, addresses and signatures is attached to this declaration. Commissioner Henderson and I will continue to gather signatures for said petition.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:   __June 27, 2008__                    _____
                                                    KATHY HENDERSON

2

**GOVERNMENT OF THE DISTRICT OF COLUMBIA
ADVISORY NEIGHBORHHOD COMMISSION 5B
SINGLE MEMBER DISTRICT 5B10**



We the undersigned support Police Chief Cathy Lanier's plan to reduce violent crime in our neighborhood by establishing the Neighborhood Safety Zone program. We believe the plan is necessary to address the overwhelming level of violence in our community, underscoring two recent shootings in the 1200 block of 18th Street, NE.

Further, we do not believe the plan violates anyone's civil rights and we will gladly show our identification in an effort to identify those that do not live here and wish to commit crimes. We believe our civil rights are violated by the unacceptable level of violent crime in our community.

Finally, we support the "Hot Spot No Loitering Zone Amendment Act of 2008", Bill 17-0111, prohibiting two or more persons from congregating on any public space for the purpose of using, selling or purchasing illegal drugs within a designated "Hot Spot". A portion of ANC 5B10 is located in the Patrol Service Area 504 "Hot Spot".

| PRINTED NAME: | ADDRESS: | SIGNATURE: |
|---|---|---|
| N. Reid | ███████ | N. Reid |
| Kathy Henderson | ███████ | K Hend |
| CHALMERS ROD | ███████ | |
| Joel Robinson | ███████ | Joel Robinson |
| Darlene Tropp | ███████ | Juli L |
| John Hajduk | ███████ | John H |
| Jennifer Lynch | ███████ | Jennifer Lynch |
| Boshua Nurrgoddill | ███████ | Bold L |
| Bobby C. Johnson | ███████ | Bobby C. Johnson |
| T.C Mc Dowell    Thas Chas Mckaine G | LISA Henry ███████ | Lisa Henry |

| Printed Name: | Address: | Signature: |
|---|---|---|
| Sheila Brooks | | Sheila Brooks |
| Freddie McCoy | | Freddie McCoy |
| Johnie Epps | | Johnie Epps |
| Hattie O. Sampson | | Hatt O. Sampson |
| Willie Raynor | | Willie Raynor |
| Thurnell Outlaw | | Thurnell Outlaw |
| Dretta Outlaw | | Dretta Outlaw |
| Barthonia A Smith | | |
| McAnnie L Johnson | | M Joy |
| Michele Houston | | Michele O. Host |
| Ethel Reedy | | Ethel Reedy |
| Frances R. Brick | | retha Reedy |
| Christy DuPree | | C. DuРее |
| Margaret Gibson | | Margaret S. Gibson |
| Teresa Jemper | | TeJ. |
| Gilma Jimenez | | G Jimenez |
| HOWARD CORBIN | | Howard Corbin |
| John P. Taylor | | John P Taylor |
| James R Fields | | |
| CATHY D. Whitehead | | Cathy D. Whitehead |
| Gladis Morr | | S Mary |
| Mary Morgan | | R Morgan Mary |



**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**ADVISORY NEIGHBORHHOD COMMISSION 5B**
**SINGLE MEMBER DISTRICT 5B10**



We the undersigned support Police Chief Cathy Lanier's plan to reduce violent crime in our neighborhood by establishing the Neighborhood Safety Zone program. We believe the plan is necessary to address the overwhelming level of violence in our community, underscoring two recent shootings in the 1200 block of 18th Street, NE.

Further, we do not believe the plan violates anyone's civil rights and we will gladly show our identification in an effort to identify those that do not live here and wish to commit crimes. We believe our civil rights are violated by the unacceptable level of violent crime in our community.

Finally, we support the "Hot Spot No Loitering Zone Amendment Act of 2008", Bill 17-0111, prohibiting two or more persons from congregating on any public space for the purpose of using, selling or purchasing illegal drugs within a designated "Hot Spot". A portion of ANC 5B10 is located in the Patrol Service Area 504 "Hot Spot".

| PRINTED NAME: | ADDRESS: | SIGNATURE: |
|---|---|---|
| Tjuana Huddleston | ███████ | Tjuana Huddleston |
| EARL F. HOLSENDORFF | ███████ | Earl F. Holsendorff |
| Juanita Holsendorff | ███████ | Juanita Holsendorff |
| RUTH ATKINSON | ███████ | Ruth Atkinson |
| THOMAS BRYAN | ███████ | Thomas Bryan |
| FLORINE W. BRYAN | ███████ | Florine W. Bryan |
| Nellie Green | ███████ | Nellie Green |
| Olivia W Green | ███████ | Olivia W. Green |

| NAME | ADDRESS | SIGNATURE |
|------|---------|-----------|
| Marrow, Derrick L. | ██████████ | Derrick L. Marrow |
| Rhonda McNeil | ██████████ | Rhonda McNeil |
| Ethel D Brown | ██████████ | Ethel D Brown |
| Yvonne _ | ██████████ | _ |
| Nequita Atkinson | ██████████ | Qryta Atkinson |
| Nancy Moore | ██████████ | Nancy Moore |
| Shelly Monroe | ██████████ | Shelly Monroe |
| Carolyn Coleman | ██████████ | Carolyn Coleman |
| Loryn M Lancaster | ██████████ | Loryn M Lancaster |
| Ruby Lomas | ██████████ | Ruby Lomas |
| Moretha C Lancaster | ██████████ | Moretha C Lancaster |
| LaShawn Warren | ██████████ | LaShawn Warren |
| Alvin McCaskill | ██████████ | Alvin McCaskill |
| Janet Doyzett | ██████████ | Janet Hoyzett |
| Gregory Harris | ██████████ | Gregory Harris |
| MARY OSBORNE | ██████████ | Mary Osborne |
| Tracey King | ██████████ | |
| Daiyyah A. Abdullah | ██████████ | D. A. Abdullah |
| David Zephirial | ██████████ | David S. Zephirin |
| India A. Henderson | ██████████ | India A. Hend |
| | | |
| | | |

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**ADVISORY NEIGHBORHHOD COMMISSION 5B**
**SINGLE MEMBER DISTRICT 5B10**



We the undersigned support Police Chief Cathy Lanier's plan to reduce violent
crime in our neighborhood by establishing the Neighborhood Safety Zone program.
We believe the plan is necessary to address the overwhelming level of violence in our
community, underscoring two recent shootings in the 1200 block of 18th Street, NE.

Further, we do not believe the plan violates anyone's civil rights and we will gladly
show our identification in an effort to identify those that do not live here and wish to
commit crimes. We believe our civil rights are violated by the unacceptable level of
violent crime in our community.

Finally, we support  the "Hot Spot No Loitering Zone Amendment Act of 2008", Bill
17-0111, prohibiting two or more persons from congregating on any public space for
the purpose of using, selling or purchasing illegal drugs within a designated "Hot
Spot". A portion of ANC 5B10 is located in the Patrol Service Area 504 "Hot Spot".

| PRINTED NAME: | ADDRESS: | SIGNATURE: |
|---|---|---|
| Odessa Carter | ███████ | Odessa Carter |
| Pau S. Mues | ███████ | Patty S Mues |
| NORMA DiCostanzo | ███████ | Norma DiCostanzo |
| Benjamin J. Jackson | ███████ | |
| Davana Abele | ███████ | Davana Abele |
| Dorothy L. Lott | ███████ | Dorothy L. Lott |
| Barbara Bozemore | ███████ | Barbara Bozemore |
| | | |
| | | |
| | | |

| Name: | Address: | Signature: |
|---|---|---|
| Ralph Armstrong | ████ | Ralph Armstrong |
| Jean R. Grier | ████ | Jean L. Grier |
| Betty C. Spencer | ████ | Betty C. Spencer |
| Thelma Graeia | ████ | Thelma Graham |
| Julie Lawton | ████ | |
| Vernette Pompey | ████ | V Pompey |

# Defendant's Exhibit 11

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CANEISHA MILLS, *et al.*, | : |
| Plaintiff, | : |
| v. | : Civ. Action No. 08-1061 (RJL) |
| DISTRICT OF COLUMBIA, | : |
| Defendant. | : |

## DECLARATION OF CAPTAIN WILLIE A. SMITH

I, **WILLIE A. SMITH**, do declare, under penalty of perjury, as follows:

1.    I am an adult over the age of 21 years.

2.    I make this declaration based on my personal knowledge of the facts discussed in it.

3.    I am an official of the Metropolitan Police Department ("MPD") as I was at the time
of all events discussed in the declaration.

4.    I participated in the Neighborhood Safety Zone ("NSZ") operations conducted in the
Trinidad neighborhood of Washington, DC, over the period June 7-12, 2008.  At the
times that I was assigned to the Trinidad NSZ, I served as a Neighborhood Safety
Zone Manager, in accordance with MPD Special Order SO-08-06.  Prior to assuming
my responsibilities as an NSZ Zone Manager, I had been trained in and had become
familiar with Special Order SO-08-06.

5.    I served as the Zone Manger for NSZ checkpoint conducted on June 7, 2008, at 8:00
PM until 10: PM.  From June 9 thru June 12, 2008, I was the NSZ Manager and
observed the Patrol Services Team conducting an NSZ checkpoint that began at 10:00
PM and ended at 1:00 AM.

In the operation of these checkpoints, MPD officers under my supervision stopped every motor vehicle and questioned every operator that came to the checkpoint while that checkpoint was in place.  On every NSZ Checkpoint I worked I observed officers who were either reading from or had memorized the following prepared script explaining what they were doing.

Hello.  My name is Officer _____ and I am assigned to _____.  This area has been designated as a neighborhood safety zone.  The designation is in response to crimes of violence that have occurred in, and around this area in which the persons committing the violence drove into this area.  As a result, we are stopping every vehicle that seeks to enter the zone to determine whether there is a legitimate purpose for entering.  Those who have a legitimate purpose will be permitted to drive in to the zone.  Those who do not have a legitimate purpose or do not wish to provide a reason for entering the zone, will not be permitted to drive into the zone.  Those who are not permitted to drive into the zone but still wish to enter the zone may enter as a pedestrian.  Those who are not permitted to drive into the zone and do not wish to enter the zone are free to proceed elsewhere and will not be detained further absent evidence of a civil or criminal violation.

Will you please tell me why you wish to enter this area?

6.    Where an operator approached the checkpoint and refused or was unable to advise the officers of a legitimate entry reason, the motorist was turned away from the checkpoint in a minute or less, on average, unless the operator wished to engage the officer in discussion.

7.    Motorists who provided legitimate entry reasons and who were not delayed for another reason passed through in a matter of seconds.

8.    Police contact with operators consisted simply of a request for limited information, after which the driver was allowed through the checkpoint or directed to turn around and advised that he could park in the area and enter the NSZ on foot.

9.    In no instance did any officer follow or accompany a person admitted into the NSZ to his or her destination.  To my understanding the Special Order does not contemplate such police activity.  None of my officers suggested such police action and, if they had, I would not have permitted it.

10.   I accurately reported the number of vehicles that entered my checkpoint, the number of vehicles admitted through my checkpoint, the number of vehicles turned away

from my checkpoint, the number of Notices of Infraction issued at my checkpoint, and the number of arrests made at my checkpoint in each instance.

11.  To my knowledge the only arrest made at a checkpoint under my supervision involved a vehicle operator that was arrested for driving while in possession of an open container of alcohol.  That driver was transporting four children in the car at the time, none of whom was in a child seat or wearing a seatbelt.]

12.  Clear signage approaching the checkpoint and the lights of the police cars at the checkpoint gave drivers adequate opportunity to avoid the checkpoint entirely without any police contact.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: June 26, 2008    *Willie A. Smith*

**CAPTAIN WILLIE A. SMITH**

3

# Defendant's Exhibit 12

# Neighborhood Safety Zones



NEIGHBORHOOD **SAFETYZONE**

FOR YOUR SAFETY



*Understanding How the NSZ Program Can Improve Safety in Your Community*

Adrian M. Fenty
*Mayor*

Cathy L. Lanier
*Chief of Police*

---

## Resources

### 24-Hour Violent Crime Tip Line

Crime Tip Line .............. (888) 919-CRIME

Text Message Tip Line .................... 50411

**GIVE 5-0**
**TXT 4-1-1**

**Have information for police?**
**CALL (888) 919-CRIME**
**TEXT TO 50-411**

### Emergency

Emergency ......................................... 911

### Mayor's Call Center

City Services ................................... 311

## Get Involved!

No one individual or agency working alone can prevent crime. It takes police and citizens working in partnership. The District of Columbia's community policing strategy provides many ways for police and communities to work together to prevent crime and build safer neighborhoods. These include regular PSA (Police Service Area) meetings in your community, problem-solving groups, citizen patrols and more. To learn more about community policing activities in your neighborhood, call your local police district:

| District | Phone | TTY |
|---|---|---|
| 1st District Station Desk: | 698-0555 | TTY: 863-4032 |
| 2nd District Station Desk: | 715-7300 | TTY: 364-3961 |
| 3rd District Station Desk: | 673-6815 | TTY: 518-0008 |
| 4th District Station Desk: | 715-7400 | TTY: 722-1791 |
| 5th District Station Desk: | 698-0150 | TTY: 727-5437 |
| 6th District Station Desk: | 698-0880 | TTY: 398-5397 |
| 7th District Station Desk: | 698-1500 | TTY: 889-3574 |




★ ★ ★

GOVERNMENT OF THE DISTRICT OF COLUMBIA
Metropolitan Police Department
300 Indiana Avenue, NW
Washington, DC 20001

*June 2008*

---



NEIGHBORHOOD **SAFETY ZONE**

## WHAT YOU NEED TO KNOW

### Legitimate reasons for entering an NSZ

» You reside in the NSZ.

» You are employed in the NSZ or are making a commercial delivery.

» You attend a school or a day-care facility in the NSZ.

» You are taking a child to, or picking a child up from, a school or day-care facility in the NSZ.

» You are a relative of a person who resides in the NSZ.

» You are seeking medical attention, or are elderly or disabled.

» You are attending a verified organized civic, community, or religious event within the NSZ.

### Knowing when a DFZ is occurring

Signs like that below will be posted at least 24 hours in a community where an NSZ has been declared.



**NOTICE**
This area has been declared a
**NEIGHBORHOOD
SAFETY ZONE**
BY ORDER OF THE CHIEF OF POLICE
**VEHICLES ENTERING THIS AREA
ARE SUBJECT TO STOP OPERATORS
MUST PROVIDE IDENTIFICATION.**



**To learn more about this program,
see www.mpdc.dc.gov/nsz**

# Creating safer neighborhoods helps everyone.

One of the most challenging issues facing law enforcement — particularly in violent crimes — is the fact that many crimes occur using a motorized vehicle. With criminals equipped with an easy getaway, police are often put at a disadvantage to try to stop or solve crimes.



NEIGHBORHOOD
**SAFETY ZONE**

## What is a Neighborhood Safety Zone?

A Neighborhood Safety Zone is a delineated geographic area designated by the Chief of Police in response to documented crimes of violence — the purpose of which is to provide high police visibility, prevent and deter crime, and create safer District of Columbia neighborhoods — by prohibiting vehicles with no legitimate purpose to enter the area.

## Are such zones Constitutional?

Yes. The U.S. Courts have found that such zones are constitutional when limited in scope, and when conducted for a legitimate law enforcement purpose. A citation from a New York case follows:

*Maxwell v. City of New York* (and Circuit)

In 1992, in response to four drive-by shootings, the New York City Police Department implemented a temporary vehicular checkpoint in an eight square-block where most of the drive-by shootings had taken place. Officers stopped every vehicle (not pedestrians) seeking to enter the area in order to ascertain the driver's connection to the neighborhood. Area residents, commercial vehicles, those dropping off small children or visiting the local church were permitted to enter the area. The court balanced (1) the gravity of the public concerns served by the checkpoint; (2) the degree to which the checkpoint effectively addressed those concerns; and (3) the severity of the intrusion upon individual liberty and held that the establishment of a vehicle checkpoint did not violate the 4th Amendment. The instructions given for the checkpoint were sufficiently detailed to be constitutional.

## What is the purpose of a Neighborhood Safety Zone (NSZ)?

NSZs are designed to decrease crime in areas that are experiencing an increase in violent crime. Vehicles are often used in committing serious crimes, particularly armed violent crime. In April and May 2008, the city saw 33 incidents of shootings or homicides in which a vehicle was involved.

## What factors be considered in selecting an area for as an NSZ?

The Chief of Police will consider several important factors before declaring a Neighborhood Safety Zone in a community. These include:

» A review of pertinent recent crime data.

» Information contained in citizen and community reports and complaints related to documented violent crimes in the area.

» Information gathered from criminal intelligence sources relevant to documented violent crimes in the area.

» The NSZ will not interfere with routine community activities and will cause minimum delays to normal traffic patterns.

## Who will approve the establishment of an NSZ?

The Chief of Police, or a designated Assistant Chief of Police, based upon a recommendation from a Police Department official of at least the rank of Commander and a legal sufficiency review by the Police Department's General Counsel.

## How will the NSZ operate?

The Neighborhood Safety Zones will be carried out by a team of specially-trained members of the MPD, as follows:

» Posters will be placed in the area 24 hours in advance to announce the establishment of the NSZ.

» The NSZ will be established for no more than 5 days, unless the Chief of Police approves an extension of no more than 5 days.

» During this authorization period, the NSZ will be in place 24 hours a day.

» The established NSZ will be managed by an official of at least the rank of Lieutenant or above. Teams of officers will staff Safety Checkpoints set up along the perimeter of the area in order to stop every vehicle seeking entry to the area.

» Only those motor vehicle operators who provide a **legitimate** reason will be permitted entry. (See inside panel for examples.)

» Operators who cannot or do not wish to provide a legitimate reason will be denied access.

» Operators who do not comply with the directions of

a law enforcement officer may be arrested for "Failure to Obey" per Title 18 DCMR Section 2000.2.

## Does this mean that friends wishing to visit someone residing in an NSZ will be denied entry?

No. Friends may enter the neighborhood on foot.

## What information will motor vehicle operators need to provide?

Vehicle operators entering an NSZ will need to provide personal identification (i.e., driver's license) and information sufficient for determining the accuracy of the reason for entering the area. For example, operators can provide the telephone number of the address to which the person seeks entry or an invitation to a verified organized community or religious event being held within the NSZ.

## Will operators be compelled to present a reason for entry?

No. However, if the operator does not present a legitimate reason, the vehicle will be denied entry. The operator may park the vehicle elsewhere and enter the NSZ on foot.

## Will each vehicle that attempts to enter the NSZ be subject to search?

No. A vehicle entering the NSZ may be subject to search, but only in instances in which there is probable cause to conduct a search.

## What information will be maintained on the stopped vehicles?

» For vehicles that are denied entry, the operator information, vehicle description, vehicle tag number, and reason for denial.

» For vehicles permitted entry, and in cases where the operator elects to leave the checkpoint without offering a reason for entry, the vehicle tag number and, where appropriate, the reason for entry.

## How will the NSZ affect pedestrians?

For the purposes of the NSZ, pedestrians will be permitted to enter and exit an NSZ without being stopped. Vehicles exiting the NSZ also will not be stopped.

## Will Department members be trained in advance on how to implement an NSZ?

Yes. The Department's Training Academy will train all officers in advance concerning all procedures and standards as well as related U.S. constitutional law and case law.

## Will this operation take officers from other areas of the community?

No. The NSZ will be staffed by members of special mission units, who will be supported by PSA members who are familiar with the neighborhood and community.

# Defendant's Exhibit 13

| VEHICLE | ☐ SPOT CHECK<br>☐ STOP | PEDESTRIAN | ☐ CONTACT<br>☐ STOP | BICYCLE | ☐ CONTACT<br>☐ STOP | | | |
|---|---|---|---|---|---|---|---|---|

LOCATION 1400 Montello Ave NE | DIST 5 | RA | TIME 1834 | DATE 6/11/08

NAME - LAST, FIRST MIDDLE Sloan, Sarah | NICKNAME

ADDRESS | PHONE | RACE | SEX | DOB

| HT | WT | EYES | HAIR | COMP | FACIAL HAIR, SCARS, TATTOOS, CLOTHING, ETC. |
|---|---|---|---|---|---|

COLOR-TOP/BOTT Blue | YR | MAKE, BODY, SIZE BIKE Chev 4Dr | TAG NO./BIKE REG NO. CT 3347 | STATE DC

DENTS/OTHER IDENTIFIERS | OWNER'S NAME

OPERATOR'S PERMIT NO. AND STATE | OWNER'S ADDRESS

METROPOLITAN POLICE DEPARTMENT STOP OR CONTACT REPORT PD-76 REV. 5/03

JUSTIFICATION FOR STOP OR CONTACT

Denied access, Refused to State
Destination address's in trinidad area
was told it was none of my business

REMARKS    BICYCLES:   ☐ Legal Possession Established

☐ Legal Possession NOT Established

REPORTING OFC Samuels    UNIT 5    SECTION 504

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                              :
**CANEISHA MILLS,** *et al.,*                 :
                                              :
        **Plaintiff,**                        :
                                              :
        **v.**                                :  **Civ. Action No. 08-1061 (RJL)**
                                              :
**DISTRICT OF COLUMBIA,**                     :
                                              :
        **Defendant.**                        :
_____:

## ORDER

Upon consideration of the Plaintiffs' Motion For Preliminary Injunction, the

Memorandum of Points and Authorities in Support thereof and the Defendant District of

Columbia's opposition thereto, the entire record herein, and it appearing that the relief

should be denied, it is this _____ day of July 2008,

ORDERED, that Plaintiff's Motion is hereby DENIED.


                                    _____
                                    RICHARD J. LEON
                                    United States District Judge

Serve upon:

All Counsel of Record

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                    :
**CANEISHA MILLS,** *et al.,*                        :
                                                    :
        **Plaintiff,**                               :
                                                    :
        **v.**                                        :   **Civ. Action No. 08-1061 (RJL)**
                                                    :
**DISTRICT OF COLUMBIA,**                            :
                                                    :
        **Defendant.**                               :
_____:

## ORDER

Defendant District of Columbia having proposed, and there being no objection to, the entry of an Order herein pursuant to which it would be

ORDERED that the attorneys defending this matter would be permitted to retain copies of the MPD Form PD-76's completed for any of the named Plaintiffs, and further

ORDERED that all other MPD Form PD-76's generated through the Trinidad NSZ operations to be filed under seal with the Court, with no copies to be provided or retained by any party or person pending further order of this Court, it is this _____ day of July, 2008,

        SO ORDERED.


                                        _____
                                        RICHARD J. LEON
                                        United States District Judge

Serve upon:

All Counsel of Record