UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

——————————————————————————
                                            :
CANEISHA MILLS, *et al.*,                    :
                                            :
            Plaintiff,                       :
                                            :
      v.                                     :    Civ. Action No. 08-1061 (RJL)
                                            :
DISTRICT OF COLUMBIA,                        :
                                            :
            Defendant.                       :
——————————————————————————:

**SUPPLEMENTAL FILING OF DEFENDANT DISTRICT OF COLUMBIA TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Defendant District of Columbia ("District") respectfully submits this memorandum of

points and authorities in accordance with the Court's instructions to the parties to address

questions that arose at the July 9, 2008 oral arguments to this Court on Plaintiffs' Motion For

Preliminary Injunction ("PI Mot."). Four issues arose at the hearing that bear further discussion:

1) Whether there is a case that permits the Court to rely upon conjecture to show irreparable

harm; 2) the District's future plans for data collection and retention with regard to motorists

stopped at the check-points; 3) other check-point cases raised by Plaintiff; and 4) reported crime

statistics for the Trinidad neighborhood.

**I.        Irreparable Injury Absent Ongoing Or Imminent Action**

The Court asked Plaintiffs to produce a case supporting their contention that the existence

of the NSZ program, even in the absence of a planned future implementation of checkpoints,

constitutes irreparable harm. The District has been unable to locate any such precedent.  On the

contrary, other cases that discuss irreparable harm, albeit in a different context, support the

Court's concern with using "conjecture" to support the extraordinary relief of a preliminary

injunction.  For instance, to establish the "typicality" requirement for certifying a class, the harm

complained of must "be common to the class, and . . . the named plaintiffs [must] demonstrate a

personal interest or threat of injury that is real and immediate, not *conjectural* or hypothetical."

*Bame v. Dillard*, 2008 U.S. Dist. LEXIS 40805, at \*19 (D.D.C. May 22, 2008), *citing Bynum*,

214 F.R.D. at 34.  And, where irreparable injury based upon a rule change was alleged

concerning the destruction of foreign habitats for endangered species, the Supreme Court held

that the plaintiffs had failed to establish any "actual or imminent, not conjectural or hypothetical"

harm essential to confer standing on a court.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 563-

64 (1992)[1] ("Past exposure to illegal conduct does not in itself show a present case or

controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse

effects.'" *Lyons*, 461 U.S. at 102 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-95 (1974)).

It follows from these cases that the potential or "conjectural" injury to which Plaintiffs

point simply by virtue of the existence of the NSZ program, like the potential or conjectural

harm asserted by the *Lujan* plaintiffs, lacks the imminence necessary to constitute irreparable

harm to support a preliminary injunction.  *See Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674

(D.C. Cir. 1985) (irreparable harm exists only where  (1) the injury is both certain and great, not

something merely feared as likely to occur at some indefinite time; and  (2) of such imminence that

there is a "clear and present" need for relief to prevent it.).

## II.    MPD Data Gathering and Storage

The Metropolitan Police Department's ("MPD") Neighborhood Safety Zone ("NSZ")

Special Order, effective June 4, 2008 ("Old SPO"), provided information gathering by officers in

---

[1]  Indeed, in *Lujan*, where the plaintiffs submitted declarations reflecting that they "hoped" and "intended" to continue their work abroad,  they could state that any such trip was planned or scheduled. The Supreme Court noted that "such 'some day' intentions-without any description of concrete plans, or indeed even any specification of *when* the some day will be-do not support a finding of the 'actual or imminent' injury that our cases require."  504 U.S. at 564.

the operation of NSZs.  MPD Chief of Police Cathy L. Lanier reviewed this Special Order and

revised it to require less information gathering in the operation of NSZs, as reflected in the

Declaration of Cathy L. Lanier executed July 18, 2008 ("Lanier Decl.II").[2]  Further, Chief Lanier

revised the Special Order to expressly prohibit the entry of data gathered at NSZ checkpoints for

completion of MPD Forms 76 into any District of Columbia data processing system or electronic

data entry system.  (Lanier Decl.II, ¶ 6; NSZSPO.7.18.08, Part V (Procedural Guidelines) ¶ O

("The Police District Commander shall") at 9.b.5).

      Under the June 4, 2008 NSZ Special Order, police officers staffing checkpoints were

required to fill out an MPD Form PD-76 Stop or Contact Report each time a vehicle was stopped

at an NSZ checkpoint. (SPO Part V. (Procedural Guidelines) ¶ G.7).  If a vehicle were to be

denied entry, the PD-76 was to reflect the driver's identity, a description of the vehicle, the

vehicle tag number and the reason the vehicle was denied entry.  If the vehicle were to be

admitted or if the driver chose to leave the checkpoint without providing information, then the

officer only had to reflect the vehicle tag number and, where appropriate, the reason or entry on

the PD-76. (Lanier Decl.II, ¶ 5).

      The newly revised Special Order eliminates any requirement to provide information

concerning the reason for entry where persons are permitted through the checkpoint.  The

remaining information that would be recorded on PD-76's (should an NSZ checkpoint be

operated at some future date) would be that which was required under the Old SPO, because that

is the minimum information necessary to properly keep track of police contact with persons

affected by the NSZ checkpoints.  This data also provides a record to support the claims of

---

[2] A copy of which is annexed as Exh. 1, and the copy of MPD's Special Order-08-06, revised July 18, 2008 ("NSZSPO.7.18.08"), annexed to Lanier Decl.II as Exh. CLL-1.

persons who subsequently initiate legal action based on their contact with such checkpoints.[3]

(Lanier Decl.II, ¶ 5).

In addition to prohibiting the entry of data gathered at NSZ checkpoints for completion of

MPD Forms 76, the NSZSPO. 7.18.08 provides that all Forms PD-76 generated in the context of

NSZ checkpoints are to be provided to the Office of the Attorney General for the District of

Columbia ("OAG") Civil Litigation Division for filing under seal in this matter, subject to this

Court's approval.  NSZSPO. 7.18.08 further provides that the Forms PD-76 are to be maintained

in a confidential file within the Office of the MPD General Counsel in the event that this Court

does not approve the filing of the PD-76's under seal.  Moreover, NSZSPO.7.18.08 provides that

only such copies of Forms PD-76 as may be authorized by this Court shall be provided to

counsel for the District and persons identified in the forms.  (Lanier Decl.II, ¶ 6;

NSZSPO.7.18.08 Part V, ¶¶ N 12 -13, ¶ T ("The General Counsel shall") 3).

Finally, the instructions to officers regarding the requirements for proof of reasons for

entry through NSZ checkpoints contained in Part V. Procedural Guidelines, ¶ L.4, have been

revised to more clearly reflect limitations on queries and actions that may be used to obtain proof

of reasons for entry.   The revisions comprise the underlined text of ¶ L.4, which now reads as

follows:

> 4.     Require proof of the reason for entry, including, but not limited, to a
> telephone number of the address to which the person seeks entry (which
> the member may use to verify that the resident/occupant expects the
> person(s)) and/or an invitation to a verified organized civic, community, or
> religious event located within the NSZ. Members are reminded to limit the
> time spent verifying the accuracy of the reason given so as to not unduly
> delay efficient operation of the NSZ Entry Checkpoint.  Members are
> further reminded that these inquiries are not to be unreasonably intrusive

---

[3] NSZSPO.7.18.08 also refines the Procedural Guidelines stated in Part V of Special Order -08-06 to eliminate the prior component of the NSZ operations that had an officer, in a marked MPD vehicle with emergency lights activated, record vehicle tag numbers and descriptions of motor vehicles passing the NSZ checkpoint when it was non-operational.  (Lanier Decl.II, ¶ 7; NSZSPO.7.18.08 Part V. Procedural Guidelines, ¶ H).

> (i.e. Do not question persons about political or religious beliefs or about group memberships). Members are not to travel to the location that an operator identified as his or her destination.
>
> NOTES: (1) The operator must provide information reasonably sufficient for the member to verify the accuracy of the reason. (2) The operator cannot be compelled to proffer a reason for entry into an NSZ; however, failing to provide a reason for entry is sufficient for denial of entry.

(Lanier Decl.II, ¶ 8; NSZSPO.7.18.08 Part V. Procedural Guidelines, ¶ L.4).

While the District maintains that the NSZ Initiative challenged by Plaintiffs has at all times been valid on its face and as applied, these revisions constitute further bases for denying the PI Mot. The District's responsive and responsible actions argue persuasively against an injunction. *See Washington Free Community v. Wilson*, 157 U.S. App. D.C. 360, 484 F.2d 1078, 1082 (1973) (denying injunctive relief not upon jurisdictional mootness, but upon prudential considerations counseling "self-denying discretion").

## III. Plaintiffs' Opinions Regarding The Validity of the Checkpoints Analyzed in *United States v. Davis*; *United States v. Bowman*: and *Maxwell v. New York City*

In oral argument, Plaintiffs argued points which are not, in fact, supported by any authority regarding the constitutionality of checkpoints analyzed in three cases. These three cases are *United States v. Davis*, 270 F.3d 977 (D.C. Cir. 2002); *United States v. Bowman*, 496 F.3d 685 (D.C. Cir. 2007); and *Maxwell v. City of New York*, 102 F.3d 664 (2nd Cir. 1996), *cert denied sub nom. Maxwell v. Bratton*, 522 U.S. 813 (1997).

In both *Davis* and *Bowman*, the D.C. Circuit remanded the cases to the trial courts for additional findings required under *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000). Plaintiffs advised that in one of these cases the Office of the United States Attorney for the District of Columbia ("OUSA") dismissed their prosecution and in the other the OUSA reduced the charges following the remands. In so doing Plaintiffs, apparently wish to infer that the

dismissals reflected that the OUSA had determined the checkpoints to have been unconstitutional. But, as this Court is well aware, because "the exercise of prosecutorial discretion is at the very core of the executive function" it is virtually non-reviewable. *See, e.g., United States v. Armstrong,* 517 U.S. 456, 464-65 (1996). Thus, Plaintiffs/Movants ask the Court to (1) make an inference adverse to the District on an issue on which Plaintiffs have the burden, (2) regarding subject matter not subject to judicial review.

Plaintiffs further argued that the *Maxwell* decision is no longer good law and the checkpoint system reviewed and upheld therein would be deemed unconstitutional were it to be reviewed under the "primary purpose" test today. This simply is not true. In *Maxwell*, the Second Circuit reviewed and upheld the constitutionality of a checkpoint program operated by New York City implemented in response to a spike in violent crime within a limited geographic area. In the *Maxwell* program, as in the NSZ program, officers staffing the checkpoints stopped every vehicle seeking to enter the area in order to ascertain the driver's connection to the neighborhood. In *Maxwell*, as in the NSZ, drivers could avoid questioning by driving around the area or by parking their cars and entering the area on foot. In both programs, residents of the area and commercial vehicles were allowed through the checkpoints.

To be sure, the *Maxwell* decision provided a useful starting point in fashioning the check-point system at issue here, but the additional protections incorporated by MPD make the District's check-points constitutionally stronger still. Unlike in *Maxwell,* the District has given written instructions to its officers concerning check-point operation and provided these officers with special training. Moreover, permissible reasons for entry into the NSZ have been clearly stated in writing and officer discretion has, for the most part, been eliminated. Finally significant signage warning of the check-points is required whenever a check-point is in operation. When

read in conjunction with *Edmond* and *Lidster,* these additional constitutional safeguards leave no doubt about the permissibility of the NSZ program.[4]

## IV.    Plaintiffs' Crime Data Analysis

Plaintiffs also discussed and provided their interpretation of allegedly conflicting MPD crime statistics in challenging the justification for and/or productivity of the Trinidad NSZ. Unfortunately, the statistics table in Commander Greene's After Action Report failed to include the triple homicide that took place on May 31, 2008, which Commander Greene discussed in his declaration.

To the extent that Plaintiffs' analysis relies on the MPD's Fifth District Monthly Crime Statistics, this data does not carve out the Trinidad area, which is the focus of the litigation here. Rather, the Fifth District Monthly Crime Statistics for May 2008 reflect year-to-date comparisons for the entire Police District for the period January 1 – May 31 for 2007 and 2008. These comparative statistics do reflect a dramatic increase in the number of homicides from 2007 to 2008.

As reflected in Commander Greene's Request For Establishment Of Neighborhood Safety Zone, however, the reported crime activity that was the basis for the NSZ implementation was only that which had occurred in Trinidad.  Accordingly, a comparison of crime statistics for

---

[4] It should be noted that the Second Circuit applied the balancing test used in *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 448-49 (1990) (citing *Brown v. Texas*, 443 U.S. 47, 50-51 (1979)) in upholding the *Maxwell* checkpoints. 102 F.3d at 667.   Neither *Sitz* nor *Brown* was overruled by *Edmond* or *Lidster;* rather, the Supreme Court utilized the same balancing test in *Lidster* that the Second Circuit used to determine the "reasonableness" of the *Maxwell* checkpoints. 540 U.S. at 426-28.

the Fifth District overall from period to period,  was not the basis for the NSZ implementation

and cannot measure its productivity.

                            Respectfully submitted,

                            PETER J. NICKLES
                            Acting Attorney General for the District of Columbia

                            GEORGE C. VALENTINE
                            Deputy Attorney General
                            Civil Litigation Division

                            ELLEN EFROS [250746]
                            Assistant Deputy Attorney General
                            Chief, Equity Section I

                            _/s/_Thomas L. Koger_____
                            THOMAS L. KOGER [427921]
                            Senior Assistant Attorney General

                            _/s/ Chad Copeland_____
                            CHAD COPELAND[5]
                            Assistant Attorneys General
                            Civil Litigation Division
                            441 4th Street, NW
                            Suite 600 South
                            Washington, DC 20001

---

[5]        DC Bar Application pending.  Member of Texas Bar in good standing.  Authorized by the Office of the Attorney General for the District of Columbia to provide legal services pursuant to Rules of the United States District Court for the District of Columbia Local Rules 83.2(d) and 83.2(e).

Exh.1: Lanier Decl.II

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **CANEISHA MILLS,** *et al.*, | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **Civ. Action No. 08-1061 (RJL)** |
| | : | |
| **DISTRICT OF COLUMBIA,** | : | |
| | : | |
| **Defendant.** | : | |

## DECLARATION OF CATHY L. LANIER

I, Cathy L. Lanier, under penalty of perjury, declare as follows:

1.      I am an adult over the age of 21 years.

2.      I make this declaration based on my personal knowledge of the matters discussed in it.

3.      I am the Chief of Police of the Metropolitan Police Department ("MPD" or "Department").

4.      On June 7, 2008, I authorized the establishment of a Neighborhood Safety Zone ("NSZ") in the Trinidad neighborhood of Washington, DC, pursuant to MPD Special Order-08-06, effective June 4, 2008. Under this Special Order, police officers staffing checkpoints are required to fill out an MPD Form PD-76 Stop or Contact Report regarding each instance in which a vehicle is stopped at an NSZ checkpoint. This requirement was contained in Part V. (Procedural Guidelines) ¶ G.7. If the vehicle were denied entry, the PD-76 was to reflect the driver's identity, a description of the vehicle, the vehicle tag number and the reason the vehicle was denied entry. If the vehicle were admitted or if the driver chose to leave the checkpoint without providing information,

then the PD-76 only had to reflect the vehicle tag number, and where appropriate, the reason for entry.

5.    I have directed that the Special Order be revised effective July 18, 2008, to eliminate any requirement for information concerning the reason for entry in instances in which persons are permitted through the checkpoint. The remaining information to be recorded is that which was required under the June 4, 2008 Special Order-08-06, which is the minimum information necessary to keep track of police contact with persons affected by the NSZ checkpoints. This data also provides a record to support the claims of persons who subsequently initiate legal action based on their contact with such checkpoints.

6.    The revised Special Order also expressly provides that no data gathered at NSZ checkpoints for completion of MPD Forms 76 is to be entered into any District of Columbia data processing system or electronic data entry system. (*See* Special Order 08-06, revised July 18, 2008, a copy of which is annexed as Exh. CLL-1, at Part V (Procedural Guidelines) ¶ O ("The Police District Commander shall") at 9.b.5). On the contrary, the revised Special Order provides that all Forms PD-76 generated in the context of NSZ checkpoints are to be provided to the Office of the Attorney General for the District of Columbia ("OAG") Civil Litigation Division for filing under seal in this matter, subject to this Court's approval. If this Court does not approve such filing under seal, the Forms PD-76 are to be maintained in a confidential file within the Office of the General Counsel of the Metropolitan Police Department. Only such copies of Forms PD-76 as may be authorized by this Court shall be provided to counsel for the District and

persons identified in the forms. (CLL-1, Part V, ¶¶ N 12 -13, ¶ T ("The General Counsel shall") 3).

       7.     This revised Special Order also refines the Procedural Guidelines stated in Part V of Special Order -08-06 to eliminate the prior component of the NSZ operations that had an officer, in a marked MPD vehicle with emergency lights activated, record vehicle tag numbers and descriptions of motor vehicles passing the NSZ checkpoint when it was non-operational. (Part V. Procedural Guidelines, ¶ H).

       8.     In addition, I have caused the instructions to officers regarding the requirements for proof of reasons for entry through NSZ checkpoints contained in Part V. Procedural Guidelines, ¶ L.4 , to more clearly reflect limitations on queries and actions that be may used to obtain proof of reasons for entry.   The revisions comprise the underlined text of ¶ L.4, which now reads as follows:

> 4.     Require proof of the reason for entry, including, but not limited, to a telephone number of the address to which the person seeks entry (which the member may use to verify that the resident/occupant expects the person(s)) and/or an invitation to a verified organized civic, community, or religious event located within the NSZ. Members are reminded to limit the time spent verifying the accuracy of the reason given so as to not unduly delay efficient operation of the NSZ Entry Checkpoint. <u>Members are further reminded that these inquiries are not to be unreasonably intrusive (i.e. Do not question persons about political or religious beliefs or about group memberships).  Members are not to travel to the location that an operator identified as his or her destination.</u>
>
> NOTES: (1) The operator must provide information <u>reasonably</u> sufficient for the member to verify the accuracy of the reason. (2) The operator cannot be compelled to proffer a reason for entry into an NSZ; however, failing to provide a reason for entry is sufficient for denial of entry.

       9.     These revisions are additional privacy safeguards in keeping with those contained in the June 4, 2008 MPD Special Order -08-06.  These revisions serve the

primary purpose of the NSZ Initiative by reinforcing the restrictions upon NSZ activities,

as reflected in the Special Order's primary purpose statement:

> The primary purpose of an NSZ is not to make arrests or to detect evidence of ordinary criminal wrongdoing, but to increase protection from violent criminal acts, and promote the safety and security of persons within the NSZ by discouraging-- and thereby deterring--persons in motor vehicles from entering the NSZ intending to commit acts of violence.

10,    Further, I have directed that the MPD Lesson Plan used for training

be revised to reflect these revisions in Special Order-08-06,  Additionally, I have

directed that roll call training be conducted to inform members of the MPD of

these revisions to the Special Order, although no implementation of an NSZ is

under consideration.


I declare under the penalty of perjury that the foregoing is true and accurate

Executed on:  July 18, 2008

CATHY L. LANIER

# Exh. CLL: Revised Special Order

# SPECIAL ORDER



**DISTRICT OF COLUMBIA**

| | | | | |
|---|---|---|---|---|
| Subject **Neighborhood Safety Zones** | | | | |

Topic  Series  Number
**SO - 08 - 06**

Effective Date
**July 18, 2008**

Related to:
General Order 304.10 (Police-Citizen Contacts, Stops and Frisks), Effective July 1, 1973
GO-OPS-301.03 (Vehicular Pursuits), Effective February 25, 2003

| | | | | | | |
|---|---|---|---|---|---|---|
| I. | Background........................................ | Page | 1 | IV. | Regulations.......................................... | Page 2 |
| II. | Policy................................................ | Page | 1 | V. | Procedural Guidelines............................ | Page 3 |
| III. | Definitions.......................................... | Page | 1 | | | |

## I.    BACKGROUND

The establishment of Neighborhood Safety Zones is an effective law enforcement tool for addressing violent crime. Vehicles are common instrumentalities of crime, particularly armed violent crime.  It is in the interest of law enforcement to prohibit vehicles with no legitimate purpose to enter neighborhoods that have been victimized by spikes in violent crime. The Second Circuit Court of Appeals found that such zones are constitutional when limited in scope and when conducted for a legitimate law enforcement purpose.  Further, the United States Supreme Court has upheld the validity of checkpoints to serve significant law enforcement/public safety concerns other than general criminal law enforcement.

This Special Order provides guidance for establishing Neighborhood Safety Zones, consistent with constitutional requirements which: (1) Provide high police visibility, (2) Prevent and deter crime, (3) Safeguard officers and community members, and (4) Create safer District of Columbia neighborhoods.  The primary purpose of an NSZ is not to make arrests or to detect evidence of ordinary criminal wrongdoing, but to increase protection from violent criminal acts, and promote the safety and security of persons within the NSZ by discouraging--and thereby deterring--persons in motor vehicles from entering the NSZ intending to commit acts of violence.

## II.    POLICY

It is the policy of the Metropolitan Police Department to lawfully establish Neighborhood Safety Zones to promote the health, safety, and welfare of District of Columbia residents and visitors.

## III.    DEFINITIONS

When used in this directive, the following terms shall have the meaning designated:

1.    Member – Sworn employee of the Metropolitan Police Department (MPD).

2.    Neighborhood Safety Zone (NSZ) – Geographic area designated by the Chief of Police in response to documented crimes of violence the purpose of which is to provide high police visibility, prevent and deter crime, safeguard officers and community members, and create safer District of Columbia neighborhoods.

3.    Neighborhood Safety Zone Entry Checkpoint – A location at any point along the perimeter of or within the NSZ where vehicles are stopped for the purpose of determining whether the operator has a legitimate reason for entering the NSZ.

4.    Neighborhood Safety Zone Manager – Member the rank of Lieutenant or above who manages the individual Neighborhood Safety Zone operation.

5.    Neighborhood Safety Zone (NSZ) Manager's Report (PD Form 907-A) (Attachment A) – Report completed by the NSZ Manager for each operational period of the NSZ.

6.    Neighborhood Safety Zone Vehicle Report (PD Form 907-B) (Attachment B) – Report completed by (1) Members assigned to the NSZ Entry Checkpoints during any non-operational period, and (2) Members assigned to the NSZ neighborhood, apart from the Entry Checkpoint(s), during  NSZ operations.

## IV.    REGULATIONS

A.    An NSZ may be established solely in response to documented crimes of violence occurring within the designated neighborhood.

1.    The NSZ shall be established for a specific and legitimate law enforcement purpose (e.g., recently reported criminal incident(s) including homicides, shootings, robberies, and other offenses as approved by the Chief of Police).

2.    The NSZ shall be targeted to promote community safety interests while minimizing interference with normal community activities.

3.    Consistent with Part  V.L below, each NSZ Entry Checkpoint shall be conducted systematically so as to minimize or eliminate police officer discretion in stopping vehicles from entering the NSZ.

4.    The NSZ shall be established for no more than five (5) days unless the Chief of Police approves an extension of no more than five (5) additional days, and only during the time periods approved by an official the rank of Commander or above.

B.  The recommendation to establish an NSZ, and the identification of the location for the NSZ, shall be made by an official the rank of Commander and above.

C.  Each NSZ shall be approved, in advance, by the Chief of Police or designee, provided that the designee shall not hold a rank lower than Assistant Chief of Police.

D.  Only those members who have successfully completed all NSZ-related training required by the Chief of Police may participate in the implementation of an NSZ.  The NSZ-related training shall include the specific limitations on members' exercise of discretion in determining whether a vehicle will be permitted to enter the NSZ.

E.  Each member assigned to an NSZ shall wear an MPD-approved visibility vest and be provided other required equipment (e.g., cones, light tower).

F.  While an NSZ is in effect, members shall not stop vehicles that are exiting the NSZ.  However, traffic stops based on reasonable suspicion, probable cause, or in response to lookouts are authorized.

G   While an NSZ is in effect, members shall not stop pedestrians entering or exiting the NSZ.  However, pedestrian stops based on reasonable suspicion, probable cause, or in response to lookouts are authorized.

H.  Generally, vehicles shall be not searched during an NSZ operation.  However, if in the course of conducting an NSZ, a member develops reasonable suspicion or probable cause to believe that a crime is being committed, the member may detain the motorist to the extent reasonably necessary to investigate.  Under such circumstances, a motorist may consent to a search, or, if incident to arrest, a search of the interior passenger area of the vehicle (including containers) may be performed.

V.  **PROCEDURAL GUIDELINES**

A.  An NSZ location shall be selected with the primary purpose of addressing a neighborhood violent crime problem.  Evidence to support the existence of a neighborhood violent crime problem may include:

1.  Pertinent violent crime data;

2.  Information contained in citizen and community reports and complaints relevant to documented violent crimes; and

3.  Information gathered from criminal intelligence sources relevant to documented violent crimes.

B.  Documentation of the evidence prepared based on Part V.A above, and an explanation of how the evidence supports the purpose of the NSZ as

described in Part IV.A above, shall be preserved and attached to the NSZ After-Action Report associated with the NSZ.

C.    In selecting an NSZ location, the following criteria shall be considered:

1.    The NSZ shall not unnecessarily interfere with routine community activities;

2.    There shall be sufficient space for deploying members assigned to the NSZ;

3.    There shall be sufficient space on the roadway for deploying one (1) or more marked MPD vehicles such that the vehicle(s) are clearly visible;

4.    There shall be sufficient space for deploying equipment to alert vehicle operators approaching the NSZ; and

5.    NSZ operations shall cause minimum delays to normal traffic patterns.

D.    Each NSZ Entry Checkpoint shall be staffed by a minimum of five (5) officers and one (1) official the rank of Sergeant or above.

E.    Members shall be relieved as appropriate at all NSZ Entry Checkpoints only after replacement personnel are on site.

F.    A minimum of three (3) patrol vehicles and two (2) foot, bicycle or motor-scooter units shall be assigned to the NSZ 24 hours per day for the duration of the NSZ.

G.    Whenever an NSZ is declared, a member of the (1) Homicide and Sex Offense Branch; (2) affected Police District Investigations Branch; and (3) Intelligence Fusion Division shall be present within the NSZ.

H.    When an NSZ Entry Checkpoint is non-operational during the approved NSZ time period, a minimum of one (1) officer in a marked MPD vehicle, with emergency lights activated, shall be assigned to the Checkpoint.

I.    An official, of at least the rank of Lieutenant, shall be designated as the NSZ Manager and may increase, but not decrease, the NSZ staffing depending on factors such as location, level of criminal activity, and number of potential stops.

J.    The Field Commander shall visit and oversee operational NSZ Entry Checkpoints to the extent additional MPD responsibilities permit.

K.    Each member assigned to an NSZ shall be equipped with a visibility vest, flashlight, cones, flares, Notice of Infraction (NOI) books, PD Form 61-D (Violation Notice) books, and PD Forms 76 (Stop or Contact Report).

L.   Each member assigned to an NSZ Entry Checkpoint shall:

    1.   Identify himself/herself, his/her assigned District or element, the reason for the NSZ, and the reason for the vehicle stop;

    2.   Inquire whether the operator of the stopped vehicle has a <u>legitimate</u> reason for entering the NSZ as follows:

        Legitimate reasons are:

        a.   The person resides in the NSZ;

        b.   The person is employed in the NSZ or is on a commercial delivery;

        c.   The person attends school or a day-care facility, or is taking a child to, or picking up a child from, a school or day-care facility in the NSZ;

        d.   The person is a relative of a person who resides in the NSZ;

        e.   The person is seeking medical attention, is elderly, or is disabled;  and/or

        f.   The person is attempting to attend a verified organized civic, community or religious event within the NSZ; or

        g.   An official the rank of Sergeant or above assigned to the NSZ approves the entry for reasons other than those listed above when there are exigent circumstances.

    3.   Request operator identification only for persons who claim to be residents in the NSZ to verify their residency; and

    4.   Require proof of the reason for entry, including, but not limited, to a telephone number of the address to which the person seeks entry (which the member may use to verify that the resident/occupant expects the person(s)) and/or an invitation to a verified organized civic, community, or religious event located within the NSZ.  Members are reminded to limit the time spent verifying the accuracy of the reason given so as to not unduly delay efficient operation of the NSZ Entry Checkpoint.  Members are further reminded that these inquiries are not to be unreasonably intrusive (i.e., Do not question persons about political or religious beliefs or about group memberships).  Members are not to travel to the location that an operator identifies as his or her destination.

    NOTES: (1) The operator must provide information reasonably sufficient for the member to verify the accuracy of the reason. (2) The

operator cannot be compelled to proffer a reason for entry into an NSZ; however, failing to provide a reason for entry is sufficient for denial of entry.

5.  Deny a stopped vehicle access to the NSZ when it is determined that the motor vehicle operator does not have a legitimate reason for entering the NSZ; and

6.  Be permitted to arrest any motor vehicle operator who refuses to comply with lawful police direction with *Failure to Obey* (Title 18 DCMR § 2000.2).

M.  The NSZ Manager shall:

1.  Prior to establishing an NSZ Checkpoint:

    a.  Verify that adequate natural lighting or street lighting is present both around the NSZ perimeter and at the NSZ Entry Checkpoint;

    b.  Verify that adequate space is available for safe operations, deployment of personnel, traffic flow, and parking for the vehicles of arrested persons;

    c.  Notify the affected District's Watch Commander of the NSZ beginning and ending dates, location (neighborhood), Entry Checkpoint locations, and time periods of operation of the Checkpoints; and

    d.  Conduct roll call with all members assigned to the NSZ;

2.  Maintain a list of the names and rank of all members assigned to work in an NSZ while the NSZ Entry Checkpoint is operational;

3.  Ensure all stop locations are clearly defined using barricades, lights, cones, and/or flares to reduce excessive traffic backup;

4.  Ensure a marked vehicle is positioned in the event a vehicular traffic stop is necessary;

5.  Ensure that members employ the stop method that requires that every vehicle attempting entry is stopped;

6.  Ensure, when practical, at least two (2) members approach each stopped vehicle;

7.  Approve the temporary suspension of an NSZ Entry Checkpoint in the event that all assigned members become involved with multiple stops,

and/or traffic is unduly affected and approve the resumption of the Checkpoint as appropriate;

    a.    The period of time for a temporary suspension shall be recorded on the PD Form 907-A.

    b.    The District Watch Commander shall be notified at the beginning of each suspension and when normal activities are resumed.

8.    Ensure that each instance of a stopped vehicle is documented on a PD Form 76 (Stop or Contact Report) (Attachment C);

    a.    For vehicles that are denied entry, the PD Form 76 shall include the operator information, vehicle description, vehicle tag number, and reason for denial.

    b.    For vehicles that are permitted entry, and in cases where the operator elects to leave the Checkpoint without providing information, the PD Form 76 shall include the vehicle tag number, and where appropriate, the reason for entry.

9.    Transmit a completed PD Form 907-A, with the related PD Forms 907-B and all other pertinent documentation, to the District Watch Commander at the end of each tour of duty in which NSZ Entry Checkpoint(s) were operational.

N.    The Police District Watch Commander shall:

1.    Record the NSZ notification/information on the Watch Commander's Report and notify, in turn, the Command Information Center (CIC) of the NSZ beginning and ending dates, location (neighborhood), Entry Checkpoint locations, and time periods of operation of each Checkpoint;

2.    Notify the CIC of each temporary suspension of an NSZ Entry Checkpoint operation;

3.    Review, sign, and date each PD Form 907-A; and

4.    Ensure that a copy of each signed and dated PD Form 907-A is forwarded to the CIC and the Police District Administrative Office.

5.    Ensure that all summary statistics from each NSZ Entry Checkpoint are placed in the NSZ Central File and are also transmitted to the CIC and the Patrol Services and School Security Bureau before the end of the tour of duty.

O.    The Police District Commander shall:

    1.    When requesting the establishment of an NSZ in his/her District, meet the requirements of Part V.A and V.C above and ensure that the NSZ plan includes the following:

        a.    Procedures for disrupting routine traffic access so that the traffic is funneled to the NSZ Entry Checkpoint(s);

        b.    Deployment of tag reader(s);

        c.    Deployment of an arrest processing vehicle in close proximity to each NSZ Entry Checkpoint;

        d.    Request that  a member of the CIC conduct live monitoring of any CCTV (Closed-Circuit Television) camera located in the NSZ for the duration of the NSZ; and

        e.    Requirement that District members assigned to the NSZ, but not to an NSZ Entry Checkpoint, document, for each vehicle observed in the NSZ, the vehicle's tag number and vehicle description (make and model) (Attachment B).

    2.    Ensure that only members who have successfully completed all required training participate in the NSZ.

    3.    Prepare a memorandum to the Chief of Police, through the chain of command, that includes:

        a.    Proposed date(s) and times that an area should be declared a NSZ;

        b.    Evidence used in making the selection of the location, date(s), and times;

        c.    Justification for the determination consistent with Part V.A and Part V.C above;

        d.    Plan specifying the resources to be used to mark the area as an NSZ  and the deployment of personnel and resources to the NSZ; and

        e.    Detailed map outlining the boundaries of the proposed NSZ.

    4.    Upon the approval of the Chief of Police for establishing an NSZ and prior to the establishment of the NSZ:

      a.     Ensure the procurement and distribution of a sufficient quantity of notices containing information regarding the NSZ to residences and businesses;

      b.     Ensure the procurement of a sufficient quantity of posters entitled, "Warning, This Area Has Been Declared A Neighborhood Safety Zone", from the Reproduction Section, Police Business Services Division, Corporate Support Bureau; and

      c.     Ensure the NSZ posters are posted around the borders of the NSZ; and are secured to available objects (e.g., lamp posts) or placed on wooden stakes.

            NOTE:  Any member who observes an individual injuring, breaking, or destroying any NSZ poster may charge the individual with a misdemeanor *Destruction of Property* (D.C. Official Code § 22-303).

5.    Ensure that at least one (1) member assigned to the affected Patrol Service Area(s) included within the NSZ is assigned to each Entry Checkpoint and also the staffing required by Parts V.D, V.F, V.G, and V.H above.

6.    Upon the expiration of the NSZ time period, direct members of his/her command to promptly remove all signs and other identifying documents and equipment from the boundaries and areas within the former NSZ.

7.    Following the expiration of the NSZ time period, submit an NSZ After-Action Report to the Chief of Police, through the chain of command, within five (5) business days, with the following information:

      a.     Location of the NSZ, including the exact boundaries;

      b.     Personnel and other resources allocated to the NSZ;

      c.     Time(s) and date(s) of:

            (1)    Distribution of notices to the residences and businesses located within the NSZ;

            (2)    Period that the NSZ was implemented;

            (3)    Marking of the boundaries with posters; and

            (4)    Removal of all posters from the former NSZ;

      d.     Number of locations at which posters were placed;

      e.      Number and type of crime index offenses that occurred in the NSZ during the NSZ time period;

      f.      Total number of vehicles stopped, vehicles denied access, and any arrests related to the NSZ;

      g.      Number and type of complaint(s) received as a result of NSZ activities;

      h.      Any significant event or unusual incident that occurred in the NSZ during the NSZ time period, and

      i.      After-action evaluation of the NSZ operation.

8.      When the NSZ abuts the boundary of another Police District, notify the Commanding Officer of the affected district.

9.      Establish and maintain a Police District NSZ Central File as follows:

      a.      A separate folder shall be established for each NSZ;

      b.      The folder, at a minimum, shall include:

            (1)      Copy of the recommendation memorandum submitted to the Chief of Police with the signature of approval of the Chief;

            (2)      All documents supporting the recommendation for the establishment of the NSZ;

            (3)      Record of when, how, and by whom the NSZ notices and posters were distributed and posted;

            (4)      Enforcement documentation and crime statistics for the NSZ time period;

            (5)      Copies of the related PD Forms 907-A and PD Forms 907-B, but NOT PD Forms 76;

            (6)      Information about any unusual or significant incident; and

            (7)      A copy of the NSZ After-Action Report.

10.      Forward the original NSZ documents to the Assistant Chief, Patrol Services and School Security Bureau, who will maintain all NSZ records and statistics.

11.    Forward to the Assistant Chief, Investigative Services Bureau, a copy of the PD Forms 907-A and PD Forms 907-B related to the NSZ.

12.    Forward to the General Counsel within 72 hours of the completion of each NSZ checkpoint all PD Forms 76 on which any information has been entered relating to persons or vehicles entering and NSZ checkpoint.

13.    Ensure that no data gathered at NSZ checkpoints for completion of MPD Forms 76 is entered into any District of Columbia data processing system of electronic data entry system.

P.    The Commanding Officer/Director, Metropolitan Police Academy, shall ensure that the CIC is provided an up-to-date listing of all members trained on the NSZ procedures.

Q.    The CIC shall:

1.    Page the information provided concerning the NSZ under Parts N.1 and N.2 above to the command staff; and

2.    Release to MPD officials the name(s) of NSZ-trained member(s) when provided with the CIC-designated code for such information.

R.    The Director, Corporate Support Bureau, shall be responsible for the preparation of the NSZ warning posters.

S.    The Assistant Chief, Patrol Services and School Security Bureau, shall forward to the Chief of Police each request for the establishment of an NSZ he/she has approved.

T.    The General Counsel shall:

1.    Review all requests for the establishment of an NSZ for legal sufficiency;

2.    Advise the Chief of Police, in writing, whether the request for an NSZ meets legal requirements; and

3.    Receive all PD Forms 76 on which any information has been entered relating to persons or vehicles entering an NSZ checkpoint and either (a) within 3 business days of receipt, provide all such PD Forms 76 to the Office of the Attorney General for the District of Columbia ("OAG") Civil Litigation Division for filing under seal to the extent that such handling is in accordance with an order of a court of competent jurisdiction, or (b) maintain all such PD Forms 76 in a confidential file within the Office of the General Counsel of the Metropolitan Police Department, providing only such copies of PD Forms 76 as may be

authorized by a court of competent jurisdiction to counsel for the District and persons identified in the forms.

U.    The Chief of Police shall:

    1.    Approve or disapprove each request for the establishment of an NSZ.

## VI.    CROSS REFERENCES

A.    D.C. Official Code § 22-303 (Malicious Burning, Destruction, or Injury of Another's Property)

B.    Title 18 (Vehicles and Traffic) DCMR § 2000.2

C.    *Maxwell v. City of New York, et al.*, 102 F.3d 664 (1996)

D.    *Illinois v. Lidster*, 540 US 419 (2004)

E.    *Indianapolis v. Edmond,* 531 US 32 (2000)

## VII.    ATTACHMENTS

Attachment A: PD Form 907-A (Neighborhood Safety Zone Manager's Report

Attachment B: PD Form 907-B (Neighborhood Safety Zone Vehicle Report)

Attachment C: PD Form 76 (Stop or Contact Report) (Revised 04/19/05)

Cathy L. Lanier
Chief of Police

CLL:JAE:HB:PAS:JGW