UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CANEISHA MILLS, ET AL. )<br>)<br>Plaintiffs, )<br>v. )<br>)<br>DISTRICT OF COLUMBIA )<br>441 4th Street, N.W. )<br>Washington DC 20001 )<br>)<br>Defendant )<br>) | Civil Action No. 08-1061 (RJL) |

**PLAINTIFFS' SUPPLEMENTAL[1] FILING REGARDING ISSUES
RAISED OR ADDRESSED AT THE JULY 9, 2008 HEARING**

**I.    The Requirements Are Met for Issuance of Preliminary Injunction**

The Court inquired substantially at the motions hearing regarding the appropriateness of a preliminary injunction where the MPD checkpoint program continued to be authorized and embodied in written police policy but where the particular manifestation of a checkpoint had ceased.

The Court requested plaintiffs cite a case, if they could, where a preliminary injunction was issued and then upheld where a Court was faced with a situation factually similar to this where a program existed but the checkpoint was no longer being implemented and where an injunction nevertheless issued. Tr. 7/9/08 Hrg. at 17:19 – 18:1.

Plaintiffs respectfully direct the Court to the <u>Edmond v. City of Indianapolis</u> case, which establishes the authority and appropriateness for such to issue under these circumstances.[2] Before

---

[1] The Court was clear that it did not seek a rehashing of the arguments already submitted. Plaintiffs submit this supplementation to provide additional detail or respond only to selected issues that appeared to be of focus in the hearing. This filing is not intended as a reply filing to arguments presented in the District's opposition to the motion for preliminary injunction. By endeavoring to make a brief and selective supplementation plaintiffs are not suggesting a concession to any arguments that may have been made by the District but that are not specifically addressed herein.

1

the U.S. District Court, the Edmond plaintiffs sought a preliminary injunction to enjoin a checkpoint program where checkpoints had been established only intermittently and then only a total of six times at various locations throughout Indianapolis. See Edmond v. Goldsmith, 38 F. Supp.2d 1016, 1018 (S.D.Ind. 1998) (between August 1998 and the November District Court ruling, checkpoints had been deployed on six occasions); Edmond v. Goldsmith, 183 F.3d 659, 661 (7th Cir. 1999) (same, resulting in 1,161 vehicle stops); Edmond v. City of Indianapolis, 531 U.S. 32, 34 – 35 (2000) (acknowledging same); see also Kirkeby v. Furness, 52 F.3d 772 (8th Cir. 1995) (plaintiffs entitled to preliminary injunction enjoining the enforcement of an ordinance where the ordinance provided for the establishment of temporary zones in which picketing was prohibited); see also Kirkeby v. Furness, 52 F.3d 772 (8th Cir. 1995) (distinguishing program from its manifestations, evaluating and addressing separately the constitutionality of the program established by ordinance providing for temporary no-picketing zones, and distinct manifestations of such zones).

In Edmond, with this factual predicate only, the Seventh Circuit reversed the denial of the preliminary injunction and the U.S. Supreme Court affirmed the issuance of the preliminary injunction.

In the Edmond case, the parties and court assumed that the checkpoints would be redeployed again at an uncertain time and place. A comparable predicate exists in the instant case. The District of Columbia represents it "reserves the right to redeploy the safety zone" as it deems appropriate. Tr. 7/9/08 Hrg. at 43:15. The District concedes that the program was

---

[2] Plaintiffs did not file their lawsuit until after Police Chief Cathy Lanier and Acting Attorney General Peter Nickles testified on June 16, 2008 before the D.C. Council and insisted that the checkpoints would be deployed again as the police department determined appropriate and expressly declined to indicate that the program would be terminated or even modified. Even had the District voluntarily ceased the checkpoints, which they have expressly disclaimed doing, the case would not be moot. See City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 n10 (1982) ("Mere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave '[t]he defendant . . . free to return to his old ways.'"), quoting, United States v. W.T. Grant Co., 345 U.S. 629, 632 (1953).

authorized and promulgated in anticipation of recurring circumstances justifying and causing recurring use. Id. at 47:9 – 15. It concedes that it has already been used in the Trinidad instance and admits it may be needed (in the MPD's evaluation) at other times. Id. at 47:16.

## II.    The Class Certification Decision Should Issue Contemporaneous With the Preliminary Injunction Ruling

The Court stated at the motions hearing that "a preliminary injunction is not based on a class" and that the class certification decision is unlikely to occur before a ruling on the preliminary injunction motion. Id. at 11:5 – 9.

Plaintiffs respectfully urge the Court to rule on the class certification motion, which will be fully briefed within a matter of days, at the same time or prior to the ruling on the motion for a preliminary injunction. See Fed.R.Civ.P. 23(c) (ruling on certification to issue "[a]t an early practicable time after a person sues . . . as a class representative").

Particularly where the Court's inquiry at the hearing focused in part on whether or not the plaintiffs in this litigation will be affected in the future by any checkpoint, it is necessary and reasonably practicable at this time for the ruling on class certification to issue that will define the scope of the plaintiff group. In Edmond, the U.S. District Court adjudicated the issue of class certification simultaneous with its ruling on the motion for a preliminary injunction. Edmond v. Goldsmith, 38 F. Supp.2d 1016 (S.D.Ind. 1998).

Injunctive relief does not, of course, require a class. In the Sitz case the Michigan Courts and ultimately the U.S. Supreme Court entertained a complaint seeking injunctive relief enjoining the future use of sobriety checkpoints. That complaint was filed on behalf of a number of individual "licensed drivers of the State of Michigan who regularly travel throughout the state in their automobiles." The complaint was filed the day prior to the singular instance of one sobriety checkpoint, in which a checkpoint was deployed for seventy-five (75) minutes. See Sitz

3

v. State Police, 170 Mich. App. 433, 436 (Mich. 1988). During the course of initial proceedings, the State of Michigan agreed to cease implementation of the sobriety checkpoint program pending resolution of the court case. Id.

Ultimately, the Supreme Court of Michigan enjoined use of the sobriety checkpoints as violating the Michigan State Constitution, although the U.S. Supreme Court ruled that they did not violate the corresponding provisions of the U.S. Constitution. There was no impediment to injunctive relief issuing in Sitz.

**III.   The MPD Checkpoints are for Purposes of General Crime Control**

It is telling that the District, in submitting statistics to support its claim that the checkpoint was "sufficiently productive" directs the Court to evaluate statistics regarding how the checkpoints controlled the rate of *general crime*, to include both occurrence of violent *and* non-violent crime. See Def's Opp at 36 – 37; Ex. 6 to Def's Opp (NSZ After Action Report) at 9 – 10.

The District presents as "proof" of the effectiveness of the checkpoints statistics showing that "[t]he average total number of crimes [including both violent and non-violent crimes] during the nine (9) previous five (5) day time ranges was 4.66 crimes. The four crimes reported during the NSZ active days constitute a 13% reduction off average." Def's Opp at 37.

Using the MPD's own statistical presentation,[3] but viewing it in terms of *violent* crimes - - which is what purportedly justifies the creation of the zone, see Def's Opp at 3 - - the MPD's own statistics demonstrate that the total average number of *violent* crimes during the nine (9) previous five (5) day time ranges was 1.88 violent crimes. The two violent crimes reported

---

[3] The look back period of the MPD's self-selected nine week period is decidedly self-serving and intended to include in the general average the extraordinary occurrence of crime during the period of 4/12/08 through 4/17/08, in which period six (6) violent crimes were committed - - more than 300% greater than what is typical. Even including this week, the MPD's own statistics demonstrate, as described above, a 10% increase in violent crime during the period of the checkpoints.

during the NSZ active days **constitute a 10% increase in violent crime** that arose during the checkpoint period. See Ex. 6 to Def's Opp (NSZ After Action Report) at 9.

Also using the MPD's own statistical presentation, comparing the checkpoint period to period from the immediately preceding week, there is a **100% increase, a doubling, in violent crimes and a 100% increase, a doubling, in non-violent crimes during the checkpoint period.** See Ex. 6 to Def's Opp (NSZ After Action Report) at 9. There are two (2) violent crimes during the week of the checkpoints as compared to one (1) violent crime in the preceding period. There are two (2) non-violent crimes in the week of the checkpoints as compared to one (1) in the preceding period.

The MPD lauds the fact that no crimes occurred during the few hours each day of the checkpoints. Apparently, the spectacular presence and concentration of police at the checkpoints not only physically pushed crime to outside the NSZ, see Allison Klein and Clarence Williams, "Trinidad Driver Checks Halted, 9 People Shot Across District," *Washington Post*, June 13, 2008 (Trinidad checkpoints truncated after a night in which eight people were shot at six locations throughout the District), it also pushed crime temporally within the NSZ area to occur at a doubled rate during the days of the checkpoint at times when the checkpoint was not in place. Violent crime was not reduced.

There was discussion at the motions hearing about how the District might distinguish checkpoints that are set up to respond to a "specific type of crime" as distinguished from those for general crime control. Plaintiffs will not reiterate herein arguments presented previously, but do draw the Court's attention to the fact that that was precisely what was considered and rejected in the Edmond case, where checkpoints were implemented in response to specific findings regarding violent crime activity facilitated by vehicular use. See Edmond 531, U.S. at 41.

Plaintiffs further observe that, although defendant contends that the NSZ's are implemented strictly in response to documented incidents of violent crime, the authorizing order does not contain such restricting criteria, explicitly encompasses *any* crimes deemed appropriate by the Chief and allows the implementation of NSZ's in the unrestricted discretion of the Chief. Ex. 1 to Pls' Motion (MPD Special Order SO-08-06) at 2.

At the motions hearing, the District contended that the scope of general crime control was not encompassed by suspicionless seizures of persons traveling lawfully upon the roadways where the police were not conducting the seizure with the intent to compel self-incriminating information. The privacy interests and protections against government intrusions protected by the Fourth Amendment, however, are broader than and not strictly co-extensive to those advanced by the Fifth Amendment's protections against self-incrimination.

For example, while simultaneously recognizing the authority of law enforcement to seize contraband transported in cars and to combat the specific threat then recognized by the illegal possession and transport of alcohol contraband, the Supreme Court ruled that the Fourth Amendment protections rooted in privacy and the right to be free from police intrusion precluded blanket suspicionless seizures and searches of people travelling in cars.

> "It would be intolerable and unreasonable if a prohibition agent were authorized to stop every vehicle on the chance of finding liquor and thus subject all persons lawfully using the highways to the inconvenience and indignity of such a search. Travelers may be so stopped in crossing an international boundary because of nation self protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings and effects which may be lawfully brought in. But those lawfully within the country, entitled to use the public highways, have a right to free passage without interruption or search unless there is known to a competent official authorized to search, probable cause for believing that their vehicles are carrying contraband or illegal merchandise."

Carroll v. United States, 267 U.S. 132, 153 - 154 (1925)

**IV.     Plaintiffs Do Not Believe that September 11, 2001 Has Caused <u>Edmond</u> to No Longer Have Binding Precedential Effect or to be Subject to Modification**

The Court suggested that "how a Supreme Court of the United States would deal with this problem [of neighborhood violent crime] post 9/11 might be very different" than it did in the pre-9/11 <u>Edmond</u> case.

This case has nothing to do with 9/11 or threat of terrorism. It pertains to suspicionless police seizures justified by reference to the problem of local violent crime. The District argues that these suspicionless checkpoints are no different than checkpoints at airports or the entrance to federal buildings to counter terrorism. This case is not about terrorism and, as discussed at the hearing, the <u>Edmond</u> case specifically allows checkpoints in such exigent circumstances such as to stop a fleeing felon or to stop an imminent terrorist threat.

Doctrines that allow checkpoints at specific locations of acute concern or risk from threat of terrorism have been self-limiting in scope. They are allowed at federal buildings, or at the entry point to common carriers. Never has there been a doctrine that has allowed for suspicionless searches of law abiding citizens at any location based on the omnipresent threat of crime or violent crime. No urban area is unaffected by crime. The doctrine advanced by the MPD is precisely the exception that would swallow the rule and render the Fourth Amendment to be an empty measure against regimes of suspicionless seizures by police of law-abiding citizens.

**V.     Regarding Expungement of Collected Data**

The District has proposed entry of an order providing for the expungement or sealing of information and records collected at the Trinidad checkpoint on persons who were seized there. At the motions hearing, District counsel represented that, based on recent communications with Chief Lanier, the District would not have objections to refraining from putting such data into police databases when collected at future implementations of the checkpoints. Tr. 7/9/08 Hrg. at

7

61:3 – 11. The District also indicated the desire or need to retain some categories of information on persons stopped as is routinely done for Terry stops, including in the event of a complaint. Id. at 57 – 58.

Plaintiffs concur with the District that there is a need to retain information documenting when police involuntarily deprive a person of their liberty. Lawsuits challenging police racial profiling in the selection of persons for Terry stops have been determined on the basis of such retained data. Plaintiffs' view is that none of this data may be used for law enforcement purposes or entered into law enforcement databases.

The District and the plaintiffs, thus, appear to have some agreement that certain data may be appropriate for recording and that such recorded data should or may be segregated from placement into police databases. Plaintiffs' counsel will endeavor to communicate with the District's counsel to determine if agreement can be reached on the terms of an appropriate order, as proposed by the District or also encompassing future checkpoint implementations.

July 18, 2008               Respectfully submitted,

                            __/s/_____
                            Carl Messineo [450033]
                            Mara Verheyden-Hilliard [450031]
                            PARTNERSHIP FOR CIVIL JUSTICE
                            617 Florida Avenue, NW
                            Washington, D.C. 20001
                            (202) 232-1180
                            (202) 350-9557 fax