UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
CANEISHA MILLS, ET AL.                  )
                                        )
        Plaintiffs,                     )
v.                                      )   Civil Action No. 08-1061 (RJL)
                                        )
DISTRICT OF COLUMBIA                    )
441 4th Street, N.W.                    )
Washington DC 20001                     )
                                        )
        Defendant                       )
_____)
```

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION
FOR CLASS CERTIFICATION**

**I.      The Proposed Certification Is Not Improper Under Fed.R.Civ.P. 1**

The District argues first that class certification is improper because "Class certification does not provide any advantages in the resolution of Plaintiffs' claim." Def's Opp at 4.

Simultaneously, the District contends that Plaintiffs' claim for a preliminary injunction should be denied on the District's claim that the plaintiff group (when comprised of the four individual plaintiffs, one each from each of the District's quadrants) is of insufficient breadth to establish standing because according to the District it is wholly conjectural that the police will ever utilize its ongoing suspicionless checkpoint program and also that any of these particular individuals will again encounter a checkpoint. See e.g., Supplemental Filing of Defendant District of Columbia to Plaintiffs' Motion for Preliminary Injunction (docket entry no. 11) at 1 (arguing that plaintiffs cannot "support[] their contention that the existence of the NSZ program, even in the absence of a planned future implementation of checkpoints, constitutes irreparable harm"). The District can be anticipated to apply this same argument in attempts to avoid permanent injunctive relief.

1

To buttress this argument factually, at the hearing of July 9, 2008 the District represented to the Court that "It is too speculative. While the District maintains, reserves the right to redeploy the safety zone. . . whether it ever in fact will be, whether there will be circumstances which would justify its utilization again is unclear to any of us." Tr. 7/9/2008 Hrg at 43:42:14 – 20.

On July 18, 2008 the District represented in its Supplemental Filing that it was only "conjecture" that despite the existence of the NSZ program there would be future implementation of checkpoints. Docket Entry No. 11.

The very next day, July 19, 2008, the District then filed a notice with the Court that such checkpoints were again being deployed, approximately 45 minutes before such deployment. Docket Entry No. 14 (checkpoints to be established for at least a five day period, by police order dated July 19, 2008). On July 24, 2008 the District filed another notice with the Court that such checkpoints were again being deployed for five more days, hours after the deployment was initiated. Docket Entry No. 16 (checkpoints to be extended, by police order dated July 24, 2008).

According to the District, no individual plaintiff is capable of showing that they will be affected by the ongoing harm of the NSZ program and future checkpoints, and further, that the moment that any plaintiff is in fact harmed by the operation of the program, then the harm is complete, throwing the person harmed back into the position of being unable to prove they will be harmed again. There is never standing, according to the District, except the time during which a person is involuntarily seized by the Metropolitan Police Department at a checkpoint, a duration which is obviously of too short a duration within which to secure judicial relief and during which a person is involuntarily under police seizure. By the District's own terms, this is plainly a violation in which the harm is capable of repetition yet evading review. See Weinstein v. Bradford, 423 U.S. 147, 149 (1975) (per curiam); See Also First National Bank of Boston v.

Bellotti, 435 U.S. 765, 774 (1978); Southern Co. Services v. F.E.R.C., 416 F.3d 39, 43 (D.C. Cir. 2005); Beethoven.com LLP v. Librarian of Congress, 394 F.3d 939, 950-951 (D.C. Cir. 2005); Burlington N.R. Co. v. STB, 75 F.3d 685, 690 (D.C. Cir. 1996); Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 514-516 (1911). It is also not an accurate statement of standing requirements. [1]

The District then argues that no class of persons can be certified because, the District asserts, not every single member of the class will in fact be stopped at a checkpoint. This misconstrues the nature of the harm in order to minimize it. The harm is not circumscribed to the very moment of seizure. The harm includes the deprivation of the right to travel lawfully upon the roadways unmolested and unrestricted by unconstitutional seizure and questioning. The harm includes the ongoing effect that each member of the class is restricted or barred from driving into the surrounded neighborhood unless one submits to the suspicionless seizure, subjects oneself to questioning and intelligence gathering and establishes to the police's satisfaction that one has a "legitimate" purpose to drive on that roadway in that neighborhood.

---

[1]  The District of Columbia repeatedly relies upon the case of Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) to support its argument that plaintiffs lack standing.  The District's references are inapplicable to the case at bar, where plaintiffs challenge government seizures to which they have themselves been subjected.

In Lujan, plaintiffs sought to challenge an Environmental Protection Agency rule that did not directly regulate plaintiffs conduct, but regulated that of someone else, specifically federal agencies engaged in conduct in foreign nations that might affect or endanger protected species of wildlife. Plaintiffs claim was that the rule, as interpreted, would harm endangered species in foreign nations and consequently injure their interest in viewing endangered animals for aesthetic purposes. One activist attested that she had traveled to Egypt in 1986 to see endangered crocodiles and another attested that she had traveled to Sri Lanka to observe the Asian elephant and the leopard. Each said that they hoped in the future to do so again. The Court found each of these two prior trips was insufficient to establish standing where the standing sought was to challenge conduct that acted not upon plaintiffs, but upon someone else.

> "When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depend considerably upon **whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.** When, however, as in this case, a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed."

Lujan, 504 U.S. at 561 – 562 (italics in original, boldface added).

3

The District insists that class certification will offer no advantage to plaintiffs.

Yet, so long as the District contends, as it does, that the plaintiff group is of insufficient breadth to make the necessary showing of standing for preliminary or permanent injunctive relief, such insistence is clearly self-serving and baseless.

The District of Columbia is correct that class certification does not alter the legal analysis as to whether the NSZ program is unconstitutional. It overlooks, however, that class certification does relate to the remedy, specifically whether preliminary or permanent injunctive relief may issue.

Should the District withdraw its objections to the issuance of preliminary or permanent injunctive relief based on allegations of deficiencies of standing to recover such remedy, then plaintiffs will reevaluate the need for the motion for class certification. In the Sitz case, the State of Michigan "agreed to delay implementation of the sobriety checkpoint program pending resolution of the case." Sitz v. State Police, 170 Mich. App. 433, 437 (Mich. App. 1988). Likewise, in Edmond v. Goldsmith, 38 F. Supp.2d 1016 (S.D.Ind. 1998), the City of Indianapolis accepted that the constitutional issues should be determined on motion for preliminary injunction. Edmond v. Goldsmith, 38 F. Supp.2d 1016 (S.D.Ind. 1998). It is in this case only where the defendant has refused to do so, with its Police Chief recently boasting to the media that she will continue the checkpoints "until a judge orders me to stop," "D.C. Police Checkpoints Prompt Lawsuit," *CBS News.com*, July 20, 2008, while simultaneously arguing to the court that the future deployment of checkpoints is only "conjectural." Supplemental Filing of Defendant District of Columbia to Plaintiffs' Motion for Preliminary Injunction (docket entry no. 11) at 1; Tr. 7/9/2008 Hrg at 43:42:14 – 20.

## II.     Defendants Concede the Numerosity Requirement is Satisfied

While again presenting the meritless contention that "class certification only serves to complicate an otherwise straight-forward facial challenge to the constitutionality of the program," the District concedes that "Plaintiffs' proposed class does appear to be of such a size as to render joinder of all members impracticable." Def's Opp at 5.

## III.    Defendants Offer No Substantial Argument of a Lack of Commonality

This Court has previously observed that "The commonality test is met where there is at least one issue, the resolution of which will affect all or a significant number of the putative class members." Keepseagle v. Veneman, Civ. A. No. 99-3119, mem. op. at 19 (D.D.C. Dec. 12, 2001); See Chang v. U.S., 217 F.R.D. 262, 269-270 (D.D.C. 2003).

The District makes two arguments opposing recognition of commonality, each of which is unpersuasive.

The District argues that there is no common question of whether the checkpoint seizures are constitutional and specifically whether the NSZ programmatic purpose is crime control as that term is applied in City of Indianapolis v. Edmond. City of Indianapolis v. Edmond, 531 U.S. 32 (2000). This is plainly a common question of law - - indeed, the fundamental and primary inquiry.

The District contends this not be a common issue on the basis that it claims to have already proven or "demonstrated during the July 9, 2008 hearing in this matter" that Edmond is inapplicable or that the Edmond case really stands for the proposition that police cannot use checkpoints in violation of the Fifth Amendment protection against self-incrimination, even though nowhere is the Fifth Amendment referenced in that case and the ruling is expressly based

5

on the Fourth Amendment. That is an argument on the merits, not an argument precluding class consideration on the merits.

The District asserts that commonality is destroyed because the District intimates that two class representatives had their First Amendment rights violated as well as their Fourth or that the District speculates each or either may claim that to be the case. Even were this the case, it would not alter the existence of the basic and common question of whether the blanket warrantless and suspicionless seizures constitute violations of the Fourth Amendment. This establishes the requisite commonality.

## IV.   Defendants Offer No Persuasive Argument that Typicality is Absent

The plaintiffs' challenge is to the warrantless and suspicionless seizure program whereby the MPD claims that, based on the existence of prior criminal activity, they have the authority to surround entire neighborhoods, subject all drivers to questioning about purpose in lawful travel upon public roadways, and prohibit persons from such lawful travel if a purpose is not deemed "legitimate" by police standards.

The geographic limitations of this police authority are coextensive with the area of the District of Columbia. There are no restrictions and such may be implemented at any location without restriction within the District of Columbia. Just as it may be implemented in the neighborhood of Trinidad, it may also be implemented in the neighborhood surrounding Foxhall Road were, for example, the police to seek to bar "outsiders" from entering or driving through that neighborhood ostensibly to prevent crime.

The interest that is implicated is the interest in movement upon the public roadways of the District of Columbia free of unconstitutional seizures.

As such, it is an interest possessed by all putative class members. The proposed class definition is an extrapolation from the individual interests deemed sufficient for injunctive relief to be entertained and to ultimately issue on remand in <u>Michigan Dept. of State Police v. Sitz</u>, 496 U.S. 444, 448 (1990), that of licensed drivers who travel regularly throughout the State of Michigan.

The interest in roadway travel free of unconstitutional interruption is typical of and between the proposed class and the proposed class representatives.

It is not substantially dissimilar to the class certified in the <u>Edmond</u> case, which was "any and all persons driving vehicles who have been stopped or [are] subject to being stopped in the future" at challenged roadblocks. <u>See</u>, <u>Edmond v. Goldsmith</u>, 38 F. Supp.2d at 1020. That class definition was good enough for the U.S. Supreme Court, ultimately. The class proposed in the instant case, as discussed further below, is more specific and less ambiguous.

Although plaintiffs contend that the District's objections to the class definition are unpersuasive, it would be appropriate for the Court to reform the class definition and certify the class identically as certified in the <u>Edmond</u> case, rather than deny class certification. Plaintiffs propose the <u>Edmond</u> class definition, as modified as follows, as an alternative: "Any and all persons driving vehicles who have been stopped or are subject to being stopped in the future at the roadblocks or checkpoints maintained by the District of Columbia pursuant to its Neighborhood Safety Zone program."

Contrary to the District's assertions, in the class as originally proposed, each of the putative class members has standing to challenge this unconstitutional roadblock system *based on their interest in roadway travel unmolested by unconstitutional police seizure - -* just as did the individual plaintiffs in the <u>Sitz</u> case. Consequently, their aggregation into a class is perfectly

7

appropriate. They need not - - as the District contends - - be one of 951 persons stopped during the initial Trinidad checkpoint manifestation of the NSZ program. See Sitz, 496 U.S. 444; See also Edmond v. Goldsmith, 38 F. Supp.2d 1016.

The proposed class is approximately 300,000 - - if one uses the number of drivers licensed by the District of Columbia as a rough gauge of the number of D.C. residents who are also licensed drivers.

The District contends that of these approximately 300,000 persons there are at least 78 who have signed a statement compiled by a local political candidate indicating that they politically agree with deploying the NSZ checkpoints regardless of the constitutionality or unconstitutionality of the tactics.[2] This constitutes a tiny fraction of the proposed class, less than .0003 percent, presuming that all persons who signed are drivers and residents of the District of Columbia. Complete unanimity is not required in large classes, nor is it likely to be achieved particularly in matters that have become public political issues as well as constitutional challenges. See Rosado v. Wyman, 322 F. Supp. 1173, 1193-94 (E.D.N.Y.), aff'd, 437 F.2d 619 (2d Cir. 1970), aff'd mem., 402 U.S. 991, 91 S.Ct. 2169, 29 L.Ed.2d 157 (1971); See also, Waters v. Barry, 711 F. Supp. 1125, 1131-1132 (D.D.C. 1989).

Presuming the District's representations about the signers' qualifications to be true and accurate, one cannot know by an informal statement whether all the persons who signed the statement had anything in their mind other than that they want the police to "do something" to respond to the problems of crime.

---

[2] The statement submitted by the District is accompanied by an affidavit swearing that the persons signing it are residents of the Trinidad area. The District refers in its filing to the signers being "Trinidad residents," and as "actually living in the Trinidad neighborhood." This is not an accurate statement. The political candidate, Kathy Henderson, who signed and swore to the affidavit and who drafted, circulated and also *signed* the statement, does not, however, herself live in Trinidad. The statement itself has all addresses blacked out. It also has what purports to be 73 signatures, not 78.

Indeed, a survey taken at an open community meeting held as a "healing" opportunity on June 13, 2008, directly after the initial checkpoint deployment in Trinidad, found that "Residents of D.C.'s Trinidad neighborhood overwhelmingly oppose the use of police checkpoints in their community." Michael Neibauer, "Trinidad Survey Finds Rejection of Checkpoints," *The Examiner*, June 17 2008.

In any case, however, constitutional rights may not be petitioned away, regardless of efforts by the Mayor, the police, and a local political candidate to create and organize the appearance of opposition to a constitutional challenge to the NSZ program. Constitutional rights are inalienable. The interest of all citizens is that their constitutional rights be respected and upheld by the court system.

The District cites only one Federal Circuit case, Horton v. Goose Creek Indep. School Dist., 690 F.2d 470 (5th Cir. 1982), in support of its proposition that the class should not be certified because there are some people who have signed a statement in support of checkpoints. Yet that case went forward to certify a class of persons challenging the constitutionality of a drug search program in a school district despite there being parents and students who supported the challenged program. The court noted that while some members of the class may disagree with the named plaintiffs, they may rely on the defendant to present to the court the arguments that the program is not unconstitutional. Horton, 690 F.2d at 487-488.

The District then points to Waters v. Barry, where this Court certified a class of potentially "hundreds of thousands" of persons challenging the constitutionality of DC's juvenile curfew program. Waters v. Barry, 711 F.Supp. 1125, 1131 (D.D.C. 1989). That case is instructive. The Waters Court recognized class action status while finding that many potential class members responding to the scourge of crime would politically favor a youth curfew:

9

"[T]he District offers the eminently plausible suggestion that, of the thousands of class members, more than a few favor imposition of a curfew. From this fact, the District argues that the named plaintiffs' claims are not typical of those of the class members, and that the named plaintiffs will not fairly and adequately protect the interests of the class.

"The Court agrees that the proposed class will inevitably include individuals who favor the curfew. In matters of this type, involving a class of this size, differences of opinion are unavoidable. Nevertheless, diversity of opinion within a class does not defeat class certification. See Lanner v. Wimmer, 662 F.2d 1349, 1357 (10th Cir. 1981) ("The fact that the class may have included persons who support the [challenged] program does not offend the principles set down in Hansberry v. Lee, 311 U.S. 32, 61 S. Ct. 115, 85 L.Ed. 22 (1940). It is not 'fatal if some members of the class might prefer to not have violations of their rights remedied.'") (quoting United States Fidelity & Guaranty Corp. v. Lord, 585 F.2d 860, 873 (8th Cir. 1978)); Wilder v. Bernstein, 499 F.Supp. 980, 993 (S.D.N.Y. 1980) ('The fact that some members of the class may be satisfied with the existing system and may prefer to leave the violation of their rights unremedied is simply not dispositive of a determination under Rule 23(a).')."

Waters v. Barry, 711 F.Supp. at 1131 - 1132 (footnote omitted).

As in Waters, a successful class suit in the instant case would not "alter the rights or obligations of the dissenting class members." Id. at 1132. No restriction of rights would be affected by a successful suit which would simply preserve existing constitutional rights.

## V.     The Class Definition is Not Vague and Is Adequate to Achieve Relief

The proposed definition of the class is not vague and is in fact straightforward.[3] The proposed class definition is, "All residents of the District of Columbia who possess a motor vehicle operator or "drivers' license". As discussed, above, the class definition in Edmond, was "any and all persons driving vehicles who have been stopped or [are] subject to being stopped in the future at the drug interdiction roadblocks maintained by the City of Indianapolis in an

---

[3] The Court in *Waters* certified the class defined as "all minors in the District of Columbia, all parents of minor children in the District of Columbia, all stepparents, grandparents, uncles, aunts, adult friends and other adults who will be prevented from acting *in loco parentis* to minors in the District of Columbia during curfew hours, all young adults in the District of Columbia who might appear to a police officer to be minors, all for-profit corporations that will suffer harm because of the discrimination against them in the curfew law, and all persons and organizations whose exercise of political, cultural, religious or associational activities will be impaired because of the application of the curfew law to them, their co-religionists or associational companions." Waters v. Barry, 711 F.Supp. at 1130.

attempt to interdict and curtail unlawful drugs and unlawful drug use", Edmond v. Goldsmith, 38 F. Supp.2d at 1020, and was satisfactory. Plaintiffs' references in their filings to holders of District licenses have been to provide a rough estimate of the number of persons likely to be residents of the District who also hold drivers licenses. It is likely that there are residents of the District who drive with drivers' licenses from other states, and it is likely that there are holders of District licenses who are currently residents of other states. Thus the proposed class is persons who are currently residing in the District and who hold drivers licenses: people who reside in DC and possess licenses. This is neither amorphous nor vague. Additionally, this is not a class that would be certified for damage purposes, such that there is an issue as to later identification and determination of individual class members' damages and qualifications to receive relief. The relief sought is injunctive.

The District asserts that there is no risk of inconsistent rulings in the absence of class certification. In Berlin Democratic Club v. Rumsfeld, 410 F. Supp. 144 (D.D.C. 1976), plaintiffs there conceded that in light of the unique circumstances of the alleged violation (targeted unlawful surveillance by the U.S. military against political organizations active in West Berlin), there existed no other persons who could mount the sort of challenge that they had. Berlin Democratic Club, 410 F. Supp. at 163.

The risk of inconsistent rulings does, in fact, exist. There already have been additional implementations of checkpoints at different sites than the first implementation. The District speculates that any future claims for relief arising from the steadily increasing number of checkpoint implementations under a variety of factual circumstances would necessarily be certified as "related cases" and be transferred to this presiding Judge. That is wholly conjectural.

In any case, given the District's professed concerns about complication, class litigation would be far less complicated than multiple related cases.

Furthermore, it is clear that the District through its policy of implementing checkpoints has acted on grounds that apply generally to the class. Fed.R.Civ.P. 23(b)(2).

The District's argument that the proposed class definition undercuts Plaintiffs' objectives strains credibility. The District appears to argue that upon a finding of unconstitutionality of its NSZ program, it could find a way to set up unconstitutional checkpoints in D.C. and apply them in such fashion that that they only make suspicionless seizures of drivers outside the class definition, i.e., those who are residents outside of the District (although they cannot know a drivers' residence until after they have stopped him or her), therefore rendering the class definition inadequate to stop the unconstitutional conduct. (Def's Opp. at 13). Plaintiffs do not believe that an injunction issued against the District which barred use of its unconstitutional NSZ program, would allow for such an outcome.

## VI.     Regarding Expungement Relief

The District represents that it has been 44 days with no objection from plaintiffs to their proposal that an order mandating expungement relief on certain terms be entered. The District's willingness to be so fast and loose with facts and intentions to serve its argument is disturbing. The District's proposal was put forward 18 days before their filing asserting that 44 days had elapsed (docket entry no. 6 entered on June 27, 2008 and docket entry no. 10 entered on July 15, 2008). Indeed, twelve days after the original proposal was put forward, the Court directed or suggested at the July 9, 2008 hearing that the District have an additional opportunity to discuss the specifics of what data was to be collected and what was to be expunged, and to make any

representation they want as to that particular issue. Only as of July 18, 2008, has the District provided that detail in a supplemental filing.

Based on the District's representations and proposed order with respect to the sealing of the records of the approximately 950 persons seized at the initial Trinidad checkpoint implementation, plaintiffs do not oppose the entry of the order as submitted by the District for the expungement or sealing of those affected individuals' records.[4]

With that relief achieved, plaintiffs concur that there is no further need for the expungement class for the approximately 950 persons seized at the initial Trinidad checkpoint.

July 25, 2008                                          Respectfully submitted,

__/s/_____
Carl Messineo [450033]
Mara Verheyden-Hilliard [450031]
PARTNERSHIP FOR CIVIL JUSTICE
617 Florida Avenue, NW
Washington, D.C. 20001
(202) 232-1180
(202) 350-9557 fax

---

[4] It is plaintiffs' understanding that this proposal is to be a permanent order, subject to further considerations of the Court as necessitated by this litigation, rather than a preliminary order that would allow the defendant to reenter the information into criminal databases at the conclusion of the litigation.