# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ | |
| CANEISHA MILLS, *et al.* ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | Civil Action No. 08-1061 (RJL) |
| ) | |
| DISTRICT OF COLUMBIA ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## PLAINTIFFS' NOTICE OF FILING OF
## SUPPLEMENTAL PLEADING

Pursuant to the July 30, 2008 Status Hearing, Plaintiffs herein respectfully submit to the

Court Plaintiffs' Supplemental Pleading (Attachment 1).


August 14, 2008                              Respectfully submitted,


                                             _/s/_____
                                             Carl Messineo [450033]
                                             Mara Verheyden-Hilliard [450031]
                                             PARTNERSHIP FOR CIVIL JUSTICE
                                             617 Florida Avenue, NW
                                             Washington, D.C. 20001
                                             (202) 232-1180
                                             (202) 350-9557 fax

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CANEISHA MILLS, *et al.*          )
                                  )
            Plaintiffs,           )
                                  )
v.                                )        Civil Action No. 08-1061 (RJL)
                                  )
DISTRICT OF COLUMBIA              )
                                  )
            Defendant.            )
                                  )

## PLAINTIFFS' SUPPLEMENTAL PLEADING

1.  During the period after the filing of plaintiffs' Complaint on June 20, 2008 and continuing to date, the District of Columbia has maintained Special Order SO-08-06, "Neighborhood Safety Zones."

2.  During the period after the filing of plaintiffs' Complaint and continuing to date, the District of Columbia has declined to rescind SO-08-06, although that option has been available.

3.  On July 18, 2008, the District of Columbia made a Court filing in which it continued to argue, notwithstanding the continued authorization of the Neighborhood Safety Zone Special Order, that any claim that the checkpoints would be deployed pursuant to its program was pure "conjecture." (docket entry no. 11).

4.  On July 19, 2008, the MPD executed a new implementation of checkpoints, again in the Trinidad neighborhood.

5.  On that same day, MPD Police Chief Cathy Lanier and other officials held a press conference and Lanier stated that the District of Columbia will continue to implement the challenged checkpoints at will "until a judge orders me to stop."

1

6. In the five day checkpoint implementation starting on July 19, 2008, the Neighborhood Safety Zone was defined as follows: "The neighborhood known as Trinidad: specifically from the intersection of Mt. Olivet Road, NE and Bladensburg Road, NE southbound to the intersection of Florida Avenue, NE then proceeding westward on Florida Ave, NE to the intersection of Trinidad Avenue, NE and then north on Trinidad Avenue, NE to the intersection of Mt. Olivet Road NE, then east to Bladensburg Road, NE." (docket entry no. 13-3). The area of this NSZ, therefore, was approximately fifty blocks and approximately fifty times the area of the initial NSZ implemented on June 7, 2008.

7. On July 24, 2008, Chief Lanier extended the operation of that checkpoint. (docket entry no. 16-2).

8. On or about July 28, 2008, at another press conference, the District of Columbia reaffirmed its intention to continue to implement checkpoints at will.

9. At the July 28, 2008 press conference Mayor Adrian Fenty conceded the extremity of the checkpoint program, but justified it by referencing the gravity of the problem of violent crime.

10. Mayor Fenty said, referring to the checkpoints, "While this is obviously an extreme measure, we are of the belief that extreme circumstances require extreme responses."

11. To date the District of Columbia has authorized and continued to authorize systems of suspicionless roadway seizure checkpoints for the purpose of general crime control.

12. To date the District of Columbia has maintained and implemented a policy or practice of establishing suspicionless roadway seizure checkpoints for the purpose of general crime control.

13. To date, including all amendments, Special Order SO-08-06 has defined and continues to define a "Neighborhood Safety Zone" to be an area "designated by the Chief of Police in response to documented crimes of violence the purpose of which is to provide high police visibility, prevent and deter crime, safeguard officers and community members, and create safer District of Columbia neighborhoods."

14. To date, including all amendments, Special Order SO-08-06 has directed and continues to direct officers to stop all vehicles at designated checkpoints without regard to the presence of individualized suspicion of crime.

15. To date, including all amendments, Special Order SO-08-06, has implemented a definition of a "NSZ checkpoint" as encompassing a checkpoint location at or along the perimeter of "the NSZ where vehicles are stopped for the purpose of determining whether the operator has a legitimate reason for entering the NSZ."

16. By effect of a July 24, 2008 amendment, SO-08-06 was expanded so that checkpoints were not restricted to be perimeter entry checkpoints but could be placed anywhere within the targeted neighborhood. (docket entry no. 16-3).

17. As amended, SO-08-06, now defines a NSZ checkpoint to be "A location at any point along the perimeter of *or within* the NSZ where vehicles are stopped. . ." (emphasis added).

18. Now, not only at the perimeter, but at any time and any place within the targeted neighborhood, a checkpoint may be effected to engage in suspicionless roadway seizures with the stated general crime control purpose being (and continuing to be) "to provide high police visibility, prevent and deter crime, safeguard officers and community members, and create safer District of Columbia neighborhoods."

19. The July 24, 2008 amendment also effected a new authority to use a roving cruiser or officer to stop any vehicle apparently without individualized suspicion. The authority provides that "traffic stops based on reasonable suspicion, probable cause, *or in response to lookouts* are authorized." (docket entry no. 16-3).

20. The categoric reference to stops "in response to lookouts" appears to broach a new lesser threshold for stops and seizures that is distinctive from stops based on probable cause or reasonable suspicion.

21. The July 24, 2008 amendment also effected a new authority to stop pedestrians "based on reasonable suspicion, probable cause, *or in response to lookouts*." (docket entry no. 16-3).

22. From the date of the initial issuance of SO-08-06, through and beyond the filing of the original Complaint, and to date, the Special Order-08-06 directs officers to prominently distribute and post large posters that warn that noncompliance may result in arrest, and that specifically state "**NOTICE This area has been declared a NEIGHBORHOOD SAFETY ZONE BY ORDER OF THE CHIEF OF POLICE, VEHICLES ENTERING THIS AREA ARE SUBJECT TO STOP. OPERATORS MUST PROVIDE IDENTIFICATION.** Vehicles entering this area will be stopped to determine whether the vehicle's operator has a legitimate reason for entering the Neighborhood Safety Zone. Identification will be requested of the driver of the vehicle. Failure to comply with such a request may result in arrest for 'Failure to Obey' per Title 18 DCMR §2000.2" (NSZ Poster distributed by MPD).

23. The July 24, 2008 amendment has added two elements related to the arrest function of the checkpoints. First, the MPD added a statement of disclaimer that "The primary purpose

of an NSZ is not to make arrests or to detect evidence of ordinary criminal wrongdoing. .
." Second, the MPD added an element in contemplation of arrests. The Special Order
now requires "[d]eployment of an arrest processing vehicle in close proximity to each
NSZ Entry Checkpoint." (see docket entry no. 16-3).

24. In plaintiffs' original Complaint, they averred that "The primary purpose of the
    Neighborhood Safety Zone program is to control and deter crime, including violent
    crime." From the date of the initial issuance of SO-08-06, through and beyond the filing
    of the original Complaint, and to date, it remains unchanged that the primary purpose of
    the Neighborhood Safety Zone program is to control and deter crime, including violent
    crime.

25. In all versions, the Special Order provides that "The establishment of Neighborhood
    Safety Zones is an effective law enforcement tool **for addressing violent crime.**"
    (docket entry no. 4-2; docket entry no. 11-2; docket entry no. 16-3).

26. In all versions, the Special Order represents that "the purpose [of the NSZ checkpoint
    program] is to provide high police visibility, prevent and deter crime, safeguard officers
    and community members, and create safer District of Columbia neighborhoods." (docket
    entry no. 4-2; docket entry no. 11-2; docket entry no. 16-3).

27. In all versions of the Special Order, the NSZ checkpoints may be "established solely in
    response to documented crimes of violence occurring" within the targeted neighborhood.
    (docket entry no. 4-2; docket entry no. 11-2; docket entry no. 16-3).

28. In all versions of the Special Order, the threshold or "trigger" for the implementation of
    the checkpoints is the presence of crime.

29. In all versions of the Special Order, there is no limitation on what offense may constitute the threshold or "trigger" the authorization of checkpoints.

30. In all versions, the Special Order provides a non-comprehensive list of offenses and states that the Chief of Police, without restriction, may designate any others as sufficient to trigger checkpoints.

31. In all versions, the Special Order provides that the trigger or threshold offense(s) is "e.g., recently reported criminal incident(s) including homicides, shootings, robberies, and other offenses as approved by the Chief of Police."

32. The threshold, being the presence of crime, is no threshold at all.

33. On August 8, 2008, the MPD made available on its web site crime statistics for the preceding one calendar year, from August 7, 2007 through August 7, 2008. During that period, according to the MPD, there were 34,507 crimes of which 7,814 were categorized as "violent crimes."

34. In all versions, the Special Order provides that an ancillary stated purpose of the checkpoints is to stop every vehicle and to exclude from entry any vehicle except those where the operator is able to provide to an officer's satisfaction "a legitimate reason" for entry into the neighborhood.

35. In all versions of the Special Order, the price of vehicular entry into the neighborhood is that the operator suffer a violation of informational and personal privacy and must disclose details about their identity, the identity of associates, his or her intended activity and/or destination within the neighborhood.

36. In all versions, Special Order SO-08-06 requires officers assigned to an NSZ to "[i]nquire whether the operator of the stopped vehicle has a <u>legitimate</u> reason for entering the NSZ . . ." (emphasis in original).

37. In all versions, the Special Order requires that the checkpoint officer not accept the stated reason at face value, but is to "[r]equire proof of the reason."

38. In all versions, the officer is to question the individual to elicit information sufficient for the officer "to verify the accuracy of the reason."

39. By effect of the July 24, 2008 amendments, officers are directed that they may be intrusive but not "unreasonably" intrusive.

40. In all versions, a driver seeking to visit friends or family is required to disclose, for example, the identity of their friend(s) or family along with telephone number, contact information and address. The police may then, out of the blue, call the driver's friend(s) or family for verification.

41. In all versions of the Special Order, "visiting a friend" or "visiting a family member" is not one of the six so-called "legitimate" reasons for entering the neighborhood.

42. In all versions of the Special Order, "going to pick up groceries" is not one of the six "legitimate" reasons for entry.

43. In all versions of the Special Order, "driving a van into the neighborhood to help a friend move" is not one of the six "legitimate" reasons for entry.

44. In all versions of the Special Order, driving a vehicle into the neighborhood to engage in a broad array of lawful activities is prohibited.

45. In all versions of the Special Order, a driver will be denied entry unless he or she both possesses a reason deemed "legitimate" to police <u>and</u> is willing to forego and lose

informational and personal privacy and disclose the details of such purpose in order to secure entry.

46. In all versions, under Special Order SO-08-06, officers must "[d]eny a stopped vehicle access to the NSZ when it is determined that the motor vehicle operator does not have a legitimate reason for entering the NSZ."

47. Checkpoint officers are directed in all versions of the Special Order that the only time entry is allowed outside the six enumerated circumstances is if there is present "exigent circumstances" and where "an official the rank of Sergeant or above assigned to the NSZ approves the entry."

48. In its updates to the Special Order, the District of Columbia has stated that it will maintain as confidential and will not place into District of Columbia databases data from the PD Form 76s, completed for every seizure. In other words, the PD Form 76s strictly speaking will not be the point-of-entry for data gathered through seizure into law enforcement intelligence databases.

49. Instead, other data points-of-entry will be established to collect data on law abiding citizens and move that data into law enforcement databases and for intelligence and other law enforcement use. In the July 18, 2008 update to SO-08-06, the District authorized the "deployment of [license plate] tag reader(s)" that would collect data throughout the neighborhood. The District also authorized that "District members assigned to the NSZ, but not to an NSZ Entry Checkpoint, document for each vehicle observed in the NSZ, the vehicle's tag number and vehicle description" and produce such data for recording and law enforcement use. (see docket entry no. 11-2)

50. The July 18, 2008 amendments to the Special Order add another new intelligence gathering component, requiring that "Whenever a NSZ is declared, a member of the . . . Intelligence Fusion Division shall be present within the NSZ." (see docket entry no. 11-2). The Fusion Centers function as intelligence data-entry-points whereby local police agencies such as the D.C. MPD can feed information about persons to federal and law enforcement agencies, including the Federal Bureau of Investigation and Department of Homeland Security.

51. At some or all iterations of the checkpoint subsequent to the filing of the original complaint, the District has passed out fliers to drivers who are stopped. However, at all such iterations, the checkpoints are not mere informational checkpoints. At all such checkpoints, the function of the checkpoints continues to be the inquiry to drivers of their purpose in seeking to use the roadway and the exclusion of selected drivers from such use.

52. Since the filing of the original complaint, the plaintiffs in this matter continue to experience ongoing injury from the continued implementation of the checkpoints.

53. The two subsequent implementations of the checkpoints were, again, in the Trinidad neighborhood. Plaintiffs reasonably expect subsequent implementations in that neighborhood in particular.

54. Plaintiff Linda Leaks continues to be harmed and is threatened to future and ongoing injury by the ongoing checkpoint implementations in Trinidad. During the five to ten day implementations of the checkpoints with the targeted neighborhood being Trinidad, her ability to lawfully use the roadways within Trinidad is impaired and restricted while checkpoints are in effect.

9

55. Ms. Leaks, a District resident and community activist, is committed to and works in support of the preservation of affordable housing in the District of Columbia, including the Trinidad neighborhood specifically. Leaks works with District residents subject to potential displacement to exercise the right of first refusal when the property in which they have been renting is marked for sale. This brings local residents into first time ownership, preserves existing properties as affordable housing, and enhances the quality of life for the affected individuals and communities.

56. Leaks is a board member of the "God Is In Control at 1256" board of directors for the cooperative building at 1256 Owen Place. The cooperative is so named because the lower-income residents felt truly blessed to be able to own their own residence in Trinidad.

57. In furtherance of her fiduciary duties to the "God Is In Control at 1256" Co-op, Leaks regularly enters Trinidad to speak with and work with the tenants who are currently in a transition phase, temporarily vacating the property so it may be rehabilitated and renovated. She regularly enters Trinidad for the purpose of meeting with architects and others involved in the renovation. Leaks oversees this process. Leaks has concrete intentions to continue to enter Trinidad by vehicle in furtherance of her duties. She has concrete intentions to enter into Trinidad by vehicle for the purpose of clearing out and hauling away items located in the vacated units, in preparation for rehabilitation and renovation. Leaks needs to drive a vehicle into Trinidad and load that vehicle with items of substantial size or quantity for this purpose. In connection with her responsibilities as a board member, Leaks also has concrete intentions to bring supplies and items by vehicle to the property. Although a specific date is not known, Leaks has the intention to conduct

10

trainings at the Trinidad property for the new property owners in how to responsibly manage the property. In connection with such trainings, Leaks will use her vehicle to carry supplies, including water and food and refreshments, literature and books, as well as a large easel for presentation.

58. Although committed to its preservation as a community, and a member of the Trinidad community, Leaks is not a resident of Trinidad. Her activities, as described above, do not fall within the scope of the six "legitimate" purposes for entering the neighborhood. Accordingly, under the Special Order she is not allowed to drive into Trinidad when checkpoints are in effect. Her work to support and help the Trinidad neighborhood is ongoing and she has established the intention to continue that work as an ongoing matter, with concrete intentions to do as described above.

59. Since the filing of the original complaint, and to date, Ms. Leaks continues to suffer an ongoing frustration of purpose with respect to her work in trying to bring working class District residents into homeownership, specifically in Trinidad. The police checkpoint program has caused a stigma to attach to the Trinidad neighborhood generally and has brought adversity to Leaks' interest and work as a director in the "God Is In Control at 1256" Co-op.

60. The presence of checkpoints have stigmatized Trinidad and, since the filing of the original complaint, Leaks has had to expend more and more efforts, time and resources to overcome (where at all possible) a newly-manifest unwillingness to associate with or move into Trinidad caused by the checkpoints. This results in an ongoing diversion/consumption of resources and frustration of purpose, her goal as a community activist being to strengthen communities by preserving affordable housing and to match

potential first-time-homeowners with affordable housing, including specifically at the

"God Is In Control at 1256" Co-op. People are willing to invest their lives in a

neighborhood such as Trinidad and work to combat crime through community based and

empowering programs, but the imposition of ominous and civil-rights-depriving

checkpoints is very different and is not something that people are interested in having as

a characteristic of their potential new neighborhood.

61. The stigma is uniquely associated with the imposition of the checkpoints. Owen Place

NE, on which is located "The God Is In Control at 1256" Co-Op, abuts the June 7, 2008

initial Trinidad checkpoint implementation. Yet, the triple murder which preceded the

checkpoint, occurred blocks away and well outside the residential block that was targeted

by the checkpoint. The site of the homicides was directly abutting the newly developing

H Street corridor. Mayor Fenty and the District of Columbia have designated that area for

development and have directly invested resources and funding into that area by the

millions of dollars. The District Government, while unwilling to harm and stigmatize

and/or disrupt access to or otherwise impair the clubs, restaurants and bars on the

commercially developing H Street corridor, which abuts the Florida Ave NE and

Holbrook St. NE murder site, was willing to impose such a cost on the persons in the

neighborhood of the checkpoint. Since the filing of the initial complaint in this matter, the

adverse and ongoing impact of this stigma has become a manifest obstacle to Leaks'

work and fiduciary interests and duties.

62. On August 2, 2008, Chief of Police Cathy Lanier announced the arrest of William

McCorckle in connection with the May triple-homicide near the H Street corridor that

formed the basis for the establishment of the NSZ.

63. Shortly after the establishment of the NSZ program in June of 2008, Interim Attorney
General Peter Nickles justified the checkpoint program by saying that his and Mayor
Fenty's intentions were: "How can we keep people out of a neighborhood who don't
belong?"

64. McCorckle resided *within* Trinidad. As a resident of Trinidad, according to the operating
rules of the NSZ checkpoints, those checkpoints were to yield to allow McCorckle to
drive into Trinidad whenever he wished since residing in the neighborhood is categorized
as one of six limited "legitimate" purposes for entry. This is not effective. McCorkle - - to
whom police attribute the May, 2008 triple homicide - - was allowed to use the roadways
in Trinidad for free passage, but Linda Leaks was not.

65. Ms. Leaks' work as a community activist brings her into neighborhoods throughout the
District of Columbia. The communities she works in are troubled by crime, the presence
of which is claimed by the police to justify or cause their implementation of checkpoints.
Just in the past weeks, for example, she has travelled throughout the District of Columbia
including to communities including Barry Farm, Kelly Miller, Temple Court and
Potomac Gardens. She has in recent weeks travelled repeatedly to the area of Ivy City,
which requires her to travel through and upon the roadways of Trinidad to reach. She has
the concrete intention to continue to drive throughout the District of Columbia, as a
resident and activist within the District of Columbia. Even as the checkpoints are
implemented elsewhere, she is likely to be affected both in terms of her mobility and
access to relevant affordable properties and also because more working class
neighborhoods will be stigmatized by the checkpoints which will, in turn, cause her to

13

expend additional time and effort to overcome resistance to moving into neighborhoods that are perceived to be in a state of police siege.

66. For William Robinson, a fifty year resident of Trinidad, the continued implementation of the checkpoints has created an ongoing and future personal injury to his enjoyment and use of his home neighborhood for residential, recreational and aesthetic purposes.

67. Robinson cares for his elderly mother, who resides with him in his Trinidad home. Robinson's mother, who is 98 years old, requires oxygen as well as ongoing personal and medical care and attention. Robinson fears that when the checkpoints are in place, he will be delayed in his ability to reach her when, for example, she is in need of oxygen or immediate attention and where even a few minutes of delay may be critical.

68. During the implementation of the more recent checkpoints in Trinidad, Robinson encountered the checkpoint perimeters and was caused the inconvenience of having to divert his travels around the checkpoints in order to travel to or from his home. He has been forced to hunt for an overlooked alley just so that he could simply get into or around his own neighborhood. With future checkpoints reasonably expected in Trinidad, he is reasonably expected to have his travels interrupted or disrupted and/or be subject to suspicionless seizures in order to reach his Trinidad home or other destination by vehicle. His home is within and "in the path" of likely harm from the future iterations of checkpoints in Trinidad.

69. In the weeks since the original complaint, particularly with the repetition of the checkpoints in his neighborhood of Trinidad, Robinson has experienced and continues to experience an environmental impairment of the aesthetic and functional qualities of his home neighborhood. The sense of living "in a police state" with his neighborhood

characterized by roadblocks and checkpoints, disrupted travel and police intrusion, persists as does the District's continued intent and sudden implementation of the Trinidad checkpoints. Just as the stigma of a criminalized neighborhood persists even beyond the hours or days of checkpoint execution, so does this impaired enjoyment and sense of Robinson's home neighborhood. This is an objective harm and is not a mere idiosyncratic preference. See, e.g., editorial board, "Editorial: A D.C. Police State, *The Washington Times*, August 8, 2008.

70. During the more recent implementations of the checkpoints his friends and associates have avoided coming to visit him at his home because of the checkpoints. As a former D.C. school teacher and as a current coach, his former students, fellow coaches and friends often seek to visit him at his home in Trinidad. This adversely affects Robinson's ability to visit with friends and associates and increasingly burdens Robinson, as due to the checkpoints, he must travel outside his neighborhood should he wish to see friends and associates. During the recent highly publicized implementation of the checkpoints, people were deterred from visiting with him and he was deprived their company in his home. They tell him that they do not want an encounter with the police at the checkpoints, that they do not want the inconvenience of being stopped, and they do not want to have to tell the police who they are visiting or why they may be driving through. Since the checkpoints, and not before, despite the existence of crime, associates of Mr. Robinson now express to him that they do not want to come into Trinidad. Mr. Robinson is advised by his friends and associates that with the police checkpoints, Trinidad resembles Iraq.

71. Robinson continues to hold concrete intentions to continue to reside in the Trinidad neighborhood and use the roadways throughout Trinidad and throughout the District of Columbia, as he has for the past fifty years. He has concrete intentions of continuing to have guests and friends visit him in his home, as they have for decades. Where the Neighborhood Safety Zone specifically encompasses his residence, as is much more likely now that the expanse of the neighborhood zone has been increased to almost 50 blocks in its most recent implementation, Robinson will have to suffer constitutional injury and submit to a suspicionless seizure and related questioning and disclosures to the police or else be barred from driving to his home. Short of leaving Trinidad, his home of fifty years, and moving outside of the District, Robinson cannot avoid future exposure to the challenged course of conduct which is likely to repeat itself specifically within Trinidad, as evidenced by prior repeated implementations there.

72. Sarah Sloan is a community organizer who, among other things, actively opposes the checkpoints. Sloan was out of town during the period of the more recent implementation of the Trinidad checkpoints and, therefore, neither encountered the checkpoints nor sought to enter the affected neighborhood. Barring such exceptional circumstances, with the continued implementation of the checkpoints, Sloan concretely and definitely intends to drive into and enter the targeted neighborhood during the period of checkpoint implementation. She is drawn to the situs of the checkpoints in order to carry in and distribute literature, speak with community residents, to assemble and meet for political purposes. She does not intend, nor does she desire, when driving to a meeting or gathering in a resident's home, for example, to have to disclose to the police who she will be meeting with. She is adversely affected by having to be subject to the suspicionless

16

search and questioning at the checkpoints the avoidance of which become more burdensome if not impossible depending on circumstances and needs as the scope of the targeted neighborhood expands.

73. When plaintiffs came before the Court after the first implementation of the checkpoints, the designated neighborhood was one block. In subsequent implementations it has expanded geographically to encompass up to fifty blocks, and there is no reason to expect it to not expand further.

74. Lack of or availability of human resources do not substantially impair the expansion of the targeted neighborhood zone. The police merely place unstaffed jersey barriers or bike racks or other obstructions to blockade entry streets into the targeted neighborhood and funnel traffic to the entry checkpoints. The versions of the Special Order, as amended since the filing of the original complaint, have specifically added a provision that directs that officers use tactics to funnel traffic to the NSZ Checkpoints, and require that the NSZ plan requesting the establishment of an NSZ include "[p]rocedures for disrupting routine traffic access so that the traffic is funneled to the NSZ Entry Checkpoint(s)." (docket entry no. 16-3).

75. Sarah Sloan, as a District resident and community/political activist, routinely drives throughout the District into all District of Columbia neighborhoods including those more disproportionally affected by violent crime and has the concrete intention to continue to do so throughout the District. With these continued implementations of the checkpoints, even if they expand to different neighborhoods, she is likely to encounter them in the ordinary course of driving.

76. Plaintiff Caneisha Mills, like each other plaintiff, continues to drive throughout the District of Columbia and has concrete plans to continue to do so.

August 14, 2008                                    Respectfully submitted,


                                   _/s/_____
                                   Carl Messineo [450033]
                                   Mara Verheyden-Hilliard [450031]
                                   PARTNERSHIP FOR CIVIL JUSTICE
                                   617 Florida Avenue, NW
                                   Washington, D.C. 20001
                                   (202) 232-1180
                                   (202) 350-9557 fax

I hereby verify under penalty of perjury that plaintiffs' Class Action Complaint and the foregoing supplemental pleading is true and correct.

Executed on August 14, 2008.

_Linda Leaks_
Linda Leaks

I hereby verify under penalty of perjury that plaintiffs' Class Action Complaint and the foregoing supplemental pleading is true and correct.

Executed on August 14, 2008.

William Robinson

I hereby verify under penalty of perjury that the foregoing supplemental pleading is true and correct.

Executed on August 14, 2008.

Sarah Sloan

I hereby verify under penalty of perjury that plaintiffs' Class Action Complaint and the foregoing supplemental pleading is true and correct.

Executed on August 14, 2008.

Caneisha Mills