**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CANEISHA MILLS, *et al.*,

Plaintiff,

v.

DISTRICT OF COLUMBIA,

Defendants.

Civil Action No. 08-1061 (RJL)

**DEFENDANT DISTRICT OF COLUMBIA'S NOTICE OF FILING OF ITS RESPONSE TO PLAINTIFFS' SUPPLEMENTAL PLEADING**

Defendant District of Columbia, by and through its undersigned counsel,

Defendant District Of Columbia's Response To Plaintiffs' Supplemental Pleading.

Respectfully submitted,

PETER J. NICKLES
Acting Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

ELLEN EFROS [250746]
Assistant Deputy Attorney General
Chief, Equity Section I

_/s/_Thomas L. Koger________________
THOMAS L. KOGER [427921]
Senior Assistant Attorney General

_/s/ Chad Copeland___________________
CHAD COPELAND[1]
Assistant Attorney General

[1] DC Bar Application pending. Member of Texas Bar in good standing. Authorized by the Office of the Attorney General for the District of Columbia to provide legal services pursuant to Rules of the United States District Court for the District of Columbia Local Rules 83.2(d) and 83.2(e).

Equity I Section
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Telephone: (202) 724-6610
Facsimile: (202) 727-3625
thomas.koger@dc.gov

Counsel for Defendant District of Columbia

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **CANEISHA MILLS, *et al.*,** | : | |
| **Plaintiff,** | : | |
| **v.** | : | **Civ. Action No. 08-1061 (RJL)** |
| **DISTRICT OF COLUMBIA,** | : | |
| **Defendant.** | : | |

**DEFENDANT DISTRICT OF COLUMBIA'S RESPONSE**
**TO PLAINTIFFS' SUPPLEMENTAL PLEADING**

Defendant, District of Columbia ("District"), by and through undersigned counsel, respectfully submits this memorandum of points and authorities in response to Plaintiffs' Supplemental Pleading ("PSP").

The PSP contains a number of verified admissions by Plaintiffs that provide the Court additional bases on which to deny Plaintiffs' Motion for Preliminary Injunction ("PI Mot.").

As Plaintiffs assert in the PSP, the Metropolitan Police Department implemented a Neighborhood Safety Zone ("NSZ"), including checkpoints, on July 19, 2008. PSP ¶ 4. This NSZ, with its checkpoints, was initially implemented for a five-day period in the Trinidad neighborhood of Washington, D.C. PSP ¶¶ 4, 6. On July 24, 2008, MPD Chief Cathy Lanier extended the operation of this NSZ. PSP ¶ 7.

Plaintiffs moved for a preliminary injunction on June 20, 2008, based on their alleged encounters with NSZ checkpoints conducted by the MPD in Trinidad from June 7-12, 2008. That NSZ and its component checkpoints were conducted in accordance with MPD Special Order-08-06, Neighborhood Safety Zones, effective June 4, 2008 ("SPO.I"). After the parties

had submitted their filings in support of and in opposition to the preliminary injunction motion, on July 9, 2008, this Court heard oral argument on the motion. During that argument, the Court repeatedly called on Plaintiffs to identify irreparable harm that they were suffering when no NSZ was in operation. The Court asked whether, when no NSZ was in operation of planned, harm to Plaintiffs was not "conjectural." Transcript of July 9, 2008 hearing herein ("Tr."), relevant pages of which are annexed as Exh. A, at 10:1-18; *see also* Tr. 13:21-14:11. When Plaintiffs conceded that they did not, in fact, know whether or when a subsequent NSZ might be established, the Court reminded Plaintiffs that they could pursue a temporary restraining order at such point as the MPD established another NSZ. Tr. at 14:12-13; *see also* Tr. at 66:3-24.

**I. Plaintiffs' Failure To Act Reflects An Absence Of Irreparable Harm**

Thus, on July 9, 2008, Plaintiffs were fully apprised of their opportunity, if another NSZ checkpoint were established, to move for a TRO and of this Court's preparedness, even on a weekend, to hear such a motion in the context of a controversy that would be "live" for interim injunction purposes. Plaintiffs had represented that they could bring a TRO by Saturday morning if an NSZ were announced on a Friday evening. Tr. 66:3-22. In the late afternoon of July 19, 2008, the District conducted a press conference to announce that it would establish an NSZ in Trinidad that evening. PSP ¶¶ 4, 5. That evening, Plaintiffs were electronically served copies of the July 19, 2008 Commander's Request for Implementation Of A Neighborhood Safety Zone (Dkt. 14-2) and of Chief Lanier's Declaration Establishing A Neighborhood Safety Zone (Dkt. 14-3) ("Auth. Decl."). The Auth. Decl. specified that the resultant NSZ was to be

"enforced beginning at 1900 hours on July 19 and concluding at 1900 hours on July 24, 2008." Auth. Decl. at 3. Plaintiffs did not seek a TRO.[1]

On July 24, 2008, Chief Lanier decided to extend the NSZ. PSP ¶ 7 (citing Dkt. 16-2). Plaintiffs were electronically served a copy of Chief Lanier's Declaration Continuing a Neighborhood Safety Zone that night. (Dkt. 16-2). Plaintiffs did not seek a TRO. Plaintiffs' repeated failures to seek a TRO under these circumstances demonstrate that Plaintiffs have not been subjected to irreparable harm by the Special Order or the NSZ program. *See Qualls v. Rumsfeld*, 357 F. Supp.2d 274, 286 (D.D.C. 2007) (delay in acting upon claim militates against finding of irreparable harm) (citing *Mylan Pharmaceuticals v. Shalala*, 81 F. Supp. 2d 30, (D.D.C. 2000) (same)). Accordingly, Plaintiffs' Motion For Preliminary Injunction should be denied.

## II. Plaintiffs' Averments Regarding the Effects of the July NSZ Demonstrate An Absence Of Irreparable Harm

That Plaintiffs have not been subjected to irreparable harm by the NSZ program is further demonstrated by Plaintiffs' Supplemental Pleading. The PSP contains allegations regarding the supposed effects of the NSZ program on each of the Plaintiffs. Not one of the Plaintiffs alleges that she or he was actually stopped at a checkpoint during the operation of the recent NSZ, which began on July 19 and ended on July 28, 2008. (*See* PSP ¶¶ 54-76). This demonstrates that

---

[1] By waiting to move for a preliminary injunction until after the June NSZ had ceased to operate, Plaintiffs failed to present a motion supported by the ongoing or imminent threat of irreparable harm necessary to establish standing to pursue a preliminary injunction. Plaintiffs' election not to pursue a TRO in response to the implementation of the July 19, 2008 NSZ or its July 24, 2008 is consistent with their choice not to file an amended complaint. Whether Plaintiffs' failures in this regard present an issue of mottness or ripeness, Plaintiffs lack standing on the current record to obtain a preliminary injunction. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 563-64 (1992) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects.'" The District will not be submitting a separate filing regarding the ripeness/mootness issue.

Plaintiffs are unable to establish that they will suffer irreparable in the absence of a preliminary injunction. *See, e.g., Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (stating standard for determining existence of irreparable harm). Accordingly, the PI Mot. should be denied. *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317–18 (D.C. Cir. 1998); *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).

Nevertheless, Ms. Leaks asserts that she has been injured because "[t]he presence of checkpoints have stigmatized Trinidad." PSP ¶ 59. This, she asserts, has made her work, as a director in the "God Is In Control at 1256" Co-op in Trinidad, of attracting potential first-time-homeowners, more difficult. Assuming that the implementation of NSZ checkpoints in the area, as opposed to violent crime in the area or a slumping housing market, were accountable for Ms. Leaks' difficulties, she may be made whole through an award of damages, if she prevails on her claims. Her alleged injuries are not irreparable harm. *Wisconsin Gas*, 758 F.2d at 674.

In addition, Mr. Robinson alleges two injuries that he relates to the NSZ program. He claims to fear that when checkpoints are in place, he may be delayed in reaching his home to care for his elderly mother when she may be in need of oxygen or immediate attention. PSP ¶ 67. That such a need may arise when he has driven away from his home and that a checkpoint may cause him delay to his mother's detriment is conjectural, not irreparable harm. *See, e.g., Wisconsin Gas Co.*, 758 F.2d at 674 (irreparable harm exists only where (1) the injury is both certain and great, not something merely feared as likely to occur at some indefinite time; and (2) of such imminence that there is a "clear and present" need for relief to prevent it). That Mr. Robinson did not seek a TRO in light of such averred concerns about his mother underscores that they are conjectural rather than certain, great, and imminent, as they would have to be to support a preliminary injunction. *Id.*

Mr. Robinson also complains that the checkpoints have caused associates of his to stop visiting him at his home, thereby requiring him to travel outside his neighborhood to see them. PSP ¶¶ 69-70. Assuming that this inconvenience is attributable to the NSZ checkpoints, it is not an irreparable injury. *Wisconsin Gas Co.*, 758 F.2d at 674. In fact, it was not sufficient to spur a TRO.

Ms. Sloan was not injured by the July checkpoints because she was not even in town while they were in place. PSP ¶ 72. Ms. Mills simply avers that she drives throughout the District and has concrete plans to continue doing so. PSP ¶ 76. She does not allege that the July NSZ impeded her driving throughout the District in any way. *Id.*

## III. Conclusion

Plaintiffs' Supplemental Pleading underscores that Plaintiffs are not subjected to irreparable harm by the Special Order, the NSZ program, or the implementation of NSZ checkpoints. Accordingly, the PI Mot. should be denied.

Respectfully submitted,

PETER J. NICKLES
Interim Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation Division

/s/ Ellen A. Efros
ELLEN A. EFROS, D.C. Bar No. 250746
Chief, Equity Section I
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Telephone: (202) 442-9886
Facsimile: (202) 727-0431

/s/ Thomas L. Koger
THOMAS L. KOGER, D.C. Bar No. 427921
Senior Assistant Attorney General

_/s/ Chad Copeland___________________
CHAD COPELAND[2]
Assistant Attorney General
Equity I Section
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Telephone: (202) 724-6610
Facsimile: (202) 727-3625
thomas.koger@dc.gov

Counsel for Defendant District of Columbia

[2] DC Bar Application pending. Member of Texas Bar in good standing. Authorized by the Office of the Attorney General for the District of Columbia to provide legal services pursuant to Rules of the United States District Court for the District of Columbia Local Rules 83.2(d) and 83.2(e).

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA



| | | |
|---|---|---|
| CANEISHA MILLS, ET AL., | : | Docket No. CV08-1061 |
| | : | (RJL) |
| Plaintiffs, | : | |
| | : | July 9, 2008 |
| | : | |
| v. | : | 2:00 p.m. |
| | : | |
| DISTRICT OF COLUMBIA, | : | |
| | : | |
| Defendant. | : | |

. . . . . . . . . . . . . . . .

TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs: MARA VERHEYDEN-HILLIARD
Partnership For Civil Justice, Inc.
617 Florida Avenue, NW
Washington, DC 20001

For the Defendant: THOMAS KOGER, ESQ.
Office of the Attorney General For the District of Columbia
441 4th Street, NW
Washington, DC 20001

Court Reporter: PATTY ARTRIP GELS, RMR
Official Court Reporter
Room 4700-A, U.S. Courthouse
Washington, D.C. 20001
(202) 962-0200

THE COURT: Okay. Now, what is the basis to believe that they may be stopped again?

MS. VERHEYDEN-HILLIARD: Well, I would note, your Honor, in the Edmond case --

THE COURT: They live in this particular neighborhood, the Trinidad section?

MS. VERHEYDEN-HILLIARD: No. The basis is not whether or not the checkpoints are going to be deployed specifically in Trinidad. Each of these persons happens to have been already stopped in Trinidad, and one of the elements of relief that we were seeking as you know is expungement of the data that was collected during these stops, but I am not addressing that point here because the District appears to be conceding that it will expunge the data, but the issue is that the Plaintiffs themselves are drivers in the District of Columbia. These checkpoints may go up at any point in District of Columbia at any time.

THE COURT: That's conjectural at this point, isn't it?

MS. VERHEYDEN-HILLIARD: Well, indeed, your Honor, it is not only the individual Plaintiffs, but there is a proposed Plaintiff class. The Plaintiff class represents all drivers in the District of Columbia. With certainty that Plaintiff class would be affected by the establishment of these checkpoints, but I note on that issue in Sitz, in Michigan Department of State Police v Sitz, a Supreme Court case on sobriety checkpoints in

papers that we have filed.

THE COURT: Right. So if I am correct, the program is not being executed right now anywhere in the city at least to my knowledge? Do you have reason to believe otherwise?

MS. VERHEYDEN-HILLIARD: The program remains in force and as the Chief of Police has testified before the District of Columbia council, may be deployed at any moment. Indeed in the Trinidad circumstances, the checkpoint program was announced on June 4th and was in place on June 7th which also raises the issue of capable of repetition but evading review where you have the situation where the police will announce a checkpoint, put it up within 48 hours or so, and then take it down which will create this problem where were one to follow the District's arguments as to the ability to challenge a checkpoint would make it virtually impossible to challenge a checkpoint.

THE COURT: Right. So the injunction you seek isn't to stop an existing checkpoint, but to prohibit one from being reinstituted under this program?

MS. VERHEYDEN-HILLIARD: It is an injunction against the special order and the program itself.

THE COURT: Okay. So going back to where we started, where is the irreparable harm to these Plaintiffs if we don't know today when this program if at all may be reinstituted in the future during the period of time that precedes the ultimate resolution of the merits?

Ultimately you want a declaration of unconstitutionality of this program. That's why you filed the suit. What we are focusing on is the time period from today until the Court can actually issue that decision. You want the Court to issue this extraordinary relief to cover that period of time, but we don't know, as we sit here, as I sit here today and you stand here today, we don't really know whether the city during that period of time will reinstitute this program.

MS. VERHEYDEN-HILLIARD: We don't know that they will not at any moment. We don't know that tonight they won't issue an order putting something in place for two days from now.

THE COURT: True, but you could, at that point, you could seek a TRO.

MS. VERHEYDEN-HILLIARD: Well, your Honor, they were specifically asked at the hearings before the District of Columbia council whether or not they were suspending the program, whether or not they were going to look at it and rethink it, reevaluate it. They said, no, that they felt legally fine with the program and that they would deploy it at any point that they wished to deploy it. I think the fact that as in Sitz you have licensed drivers, persons who drive in the District of Columbia --

THE COURT: Right.

MS. VERHEYDEN-HILLIARD: -- there is the constant threat that so long as the program remains in force. It is not

THE COURT: What's the basis to say there is a likelihood?

MS. VERHEYDEN-HILLIARD: Because the District of Columbia has been asked and had the opportunity to say that they will not use this program again and they have said and Chief Lanier has testified before the D.C. council she intends to use it again which is saying factually that this program will be rolled out, that people are going to be stopped, and then as they did last time, they did it on 48 hours, approximately 48 hours' notice which gives us a very limited time period within which anyone can seek review and seek to stop this checkpoint particularly if they announce it on a Friday night and put it into effect on a Saturday unless somebody is coming to the emergency Judge.

THE COURT: You could always seek a TRO under those circumstances.

MS. VERHEYDEN-HILLIARD: Right, if they put it into effect on a Friday night and people --

THE COURT: You would be right back here with me, not some emergency Judge.

MS. VERHEYDEN-HILLIARD: Or we will call you Saturday morning, your Honor.

THE COURT: Believe me, I am always accessible, but you would be able to bring any TRO action before this Court.

MS. VERHEYDEN-HILLIARD: Well, our belief is that