UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CANEISHA MILLS, *et al.*,          )
                                   )
          Plaintiffs,              )
                                   )
     v.                            )     Civil Case No.  08-1061 (RJL)
                                   )
DISTRICT OF COLUMBIA,              )
                                   )
          Defendant.               )
                                   )

MEMORANDUM OPINION
(October 30, 2008)

Four citizens of the District of Columbia ("plaintiffs") have filed a motion for a preliminary injunction to enjoin further implementation of the Metropolitan Police Department's ("MPD's") "Neighborhood Safety Zones" ("NSZ") checkpoint program and to expunge certain information collected by the officers at the first of these checkpoints.  Plaintiffs allege that MPD's stopping and questioning of motorists and passengers at the various NSZ checkpoints constituted unconstitutional seizures of each in violation of the Fourth Amendment.  Plaintiffs further allege that absent a preliminary injunction they will suffer the irreparable harm of a similar constitutional violation the next time a NSZ checkpoint is instituted.  Because plaintiffs have neither demonstrated a substantial likelihood that this checkpoint program is unconstitutional, nor the necessary irreparable harm, the extraordinary relief of a preliminary injunction is DENIED.

1

## BACKGROUND

### A.    *MPD Special Order 08-06 & June 7-12 NSZ Checkpoints*

On June 7, 2008, MPD concluded that violence plaguing the city's Trinidad neighborhood had reached grave proportions.  During the preceding year, the neighborhood had been subject to twenty-five assaults involving a firearm, five of which resulted in homicides and six of which involved the use of vehicles.  (Decl. of Lamar Greene ¶ 5, June 27, 2008 ("Greene Decl."); Def.'s Opp'n Br., Ex. 5, Request for Establishment of NSZ at 2-3.)  In response, and following a particularly tragic triple homicide on May 31, 2008, MPD designated a portion of Trinidad a "Neighborhood Safety Zone" and erected eleven vehicle checkpoints over the course of five days at locations around the zone's perimeter.  (Decl. of Cathy L. Lanier ¶ 4, June 27, 2008 ("Lanier Decl. I"); Greene Decl. ¶¶ 4-6, 11.)  According to MPD's Chief, Cathy Lanier, the checkpoints "served as a 'fence' to keep violent criminals out of Trinidad," rather than "'nets' to capture evidence of ordinary criminal wrongdoing."  (Lanier Decl. I ¶ 10.)  MPD implemented the checkpoints pursuant to its NSZ checkpoints program, which was established by MPD Special Order 08-06, issued just three days earlier on June 4, 2008.  (Pls.' Mot. for Prelim. Inj., Ex. 1 ("SO-08-06 #1" or "Special Order").)

MPD officers staffing the checkpoints stopped 951 vehicles, of which they allowed 903 to proceed into the neighborhood and denied entry to 48 on account of either the operator's failure, or the operator's refusal, to provide a verifiable "legitimate reason" for entry.  (Def.'s Opp'n Br., Ex. 6, NSZ After Action Report

at 2.)  The Special Order, which governed the officers' conduct, listed the

following "legitimate" reasons for entry:

> 1) The person resides in the NSZ;
> 2) The person is employed in the NSZ or is on a commercial delivery;
> 3) The person attends school or a day-care facility, or is taking a child to, or picking up a child from, a school or day-care facility in the NSZ;
> 4) The person is a relative of a person who resides in the NSZ;
> 5) The person is seeking medical attention, is elderly, or is disabled; and/or
> 6) The person is attempting to attend a verified organized civic, community or religious event within the NSZ; . . . .

(SO-08-06 #1 ¶ V.F.3.)[1]  Officers were authorized to request identification and

proof of the reason for entry sufficient to "verify the accuracy of the reason."  (*Id.*

¶¶ V.F.4-5.)  Officers were instructed not to compel an operator to provide a

reason for entry or verifying information; failure or refusal to provide a reason or

verifying information, however, was sufficient to deny entry.  (*Id.* ¶ V.F.5; Greene

Decl. ¶ 8.)  Operators that were denied entry, or that chose not to provide any

information, were informed that they could park their vehicle outside the NSZ and

enter the NSZ on foot.  (Greene Decl. ¶ 8; Decl. of Burley Anthony Sanders ¶ 9,

June 26, 2008 ("Sanders Decl.").)  Failure to provide a "legitimate reason" was not

a criminal offense and the lone arrest made at a Trinidad NSZ checkpoint was for

driving while in possession of an open container of alcohol.  (Sanders Decl. ¶ 12.)

---

[1]     Entry could also be granted in "exigent circumstances," but only by an official the rank of Sergeant or above.  (Lanier Decl. I ¶ 8; SO-08-06 #1 ¶ V.F.3.g.)

Officers staffing the checkpoints also recorded identifying information on a Stop or Contact Report ("PD Form 76") for each vehicle stopped. (Greene Decl. ¶ 10; SO-08-06 #1 V.G.7.) For vehicles denied entry, officers were instructed to record the "operator information, vehicle description, vehicle tag number, and reason for denial."[2] (SO-08-06 #1 ¶ V.G.7.a.) For vehicles either granted entry or whose operators elected to leave the checkpoint without providing information, officers were instructed to record the "vehicle tag number, and where appropriate, the reason for entry." (*Id.*) Plaintiffs allege that the information recorded on these forms was entered into police record keeping systems and/or databases. (V. Compl. ¶ 31.) At the oral argument on this motion, the District's counsel confirmed that data for up to 68 individuals stopped at NSZ checkpoints had been entered into a law enforcement electronic database. (Prelim. Inj. Hr'g Tr. at 57:19-25, July 9, 2008.)

Plaintiffs Caneisha Mills, William Robinson, Linda Leaks, and Sarah Sloan each allege that he or she was stopped at a NSZ checkpoint during the June 7-12 Trinidad NSZ. (V. Compl. ¶¶ 1-4.) All except Mr. Robinson, who resides in the Trinidad neighborhood, were denied entry in their vehicles on account of their refusal to provide certain information. (*Id.*) Specifically, Ms. Mills was denied entry in her vehicle when she did not provide personal information regarding her

---

[2]     The PD Form 76's "Operator/Pedestrian Information" section contains standard fields for recordation of name, home address, phone number, driver's license number, gender, race/ethnicity, date of birth, height and weight, eye color, hair color, complexion, and miscellaneous other identifying features. (SO-08-06 #1, Attach. B.)

identity and activities, Ms. Leaks was denied entry in her vehicle when she did not

provide details about her political activity and intended community organizing,

and Ms Sloan was denied entry in her vehicle when she refused to provide

information about a political meeting she sought to attend. (*Id.* ¶¶ 1, 3-4.) Mr.

Robinson further alleges that he was told by an officer at a checkpoint that he

could not proceed to his house in his vehicle without providing identity

information, which he refused to do. (*Id.* ¶ 2.) It is unclear, however, whether Mr.

Robinson was in fact ultimately denied entry to the NSZ on that occasion.

Plaintiffs filed their class action complaint seeking declaratory, injunctive, and

compensatory relief on June 20, 2008 and filed the present motion for a

preliminary injunction later that same day.

### B.    *Revised Special Orders & July 19-28 Trinidad Checkpoints*

On July 18, 2008, nine days after oral argument on this motion, MPD

issued a revised Special Order 08-06. (Decl. of Cathy L. Lanier ¶ 6, July 18, 2008

("Lanier Decl. II"), Ex. 1 ("SO-08-06 #2).) The revised Special Order included

additional language further clarifying the NSZ checkpoint program's purpose and

slightly changed the procedures governing the NSZ checkpoints, but did not alter

its core aspects as outlined above, except in one respect. Consistent with Chief

Lanier's decision after the first NSZ to preserve but not use the information

gathered at the checkpoints (Lanier Decl. I ¶ 12.), the revised Special Order

expressly provided that no data gathered at NSZ checkpoints and recorded on PD

Form 76s was to be entered into any District of Columbia electronic database.

(Lanier Decl. II ¶ 6; SO-08-06 #2 ¶ V.O.13.)  Instead, MPD's General Counsel

was required to hold all PD Form 76s in a confidential file, absent a court order

requiring otherwise.  (Lanier Decl. II ¶ 6; SO-08-06 #2 ¶¶ V.O.9.b.5, V.T.3.)

The following day, July 19, 2008, Chief Lanier authorized a second NSZ in

the Trinidad neighborhood in response to multiple shootings early that morning by

individuals using a vehicle to enter and quickly exit the Trinidad neighborhood.

(Def.'s Notice of Filing, July 19, 2008, Attach. 1, Request for Establishment of

NSZ at 1-2; *Id.*, Attach. 2, Decl. Establishing a NSZ at 1-2.)  On that occasion,

more than a half-dozen people had been shot, including a thirteen-year old boy,

who later died.  (*Id.*, Attach. 3, MPD Information Flyer.)  On July 24, Chief Lanier

authorized a five-day extension for the second NSZ in response to information

received indicating that "the threat of additional and future acts of violence by

persons entering Trinidad in motor vehicles to commit such acts remains high."

(Def.'s Notice of Filing, July 24, 2008, Attach. A, Decl. Continuing a NSZ.)  MPD

also issued a second revised Special Order 08-06 to govern the extended NSZ's

implementation.  (*Id.*, Attach. B ("SO-08-06 #3").)  The second revised Special

Order contained additional slight changes to the procedures governing the NSZ

checkpoints, but did not further alter its core aspects.

C.   *Court Hearings Following Revisions to Special Order*

On July 30, 2008, the Court held a follow-up hearing to assess the impact

of MPD's revisions to the Special Order on the justiciability of plaintiffs' claims.

(July 30, 2008 Minute Entry.)  The Court directed plaintiffs to inform the Court

and the District by August 4, 2008 whether they intended to amend their existing

complaint and motion for a preliminary injunction to encompass the later

roadblock and two revisions to the Special Order, or file a new complaint. If

neither, the Court directed plaintiffs to brief the issue of whether the revisions to

the Special Order mooted their initial complaint and motion. (*Id.*)

On August 4th, plaintiffs filed notice with the Court that, despite their

belief that the revisions to the Special Order did not moot their claims, they would

file a supplemental pleading and any supplement to their motion for a preliminary

injunction by August 14th. (Pls.' Praecipe Pursuant to July 30, 2008 Status Hr'g.)

Plaintiffs thereafter filed a "Supplement Pleading," which recounted in numbered

paragraphs plaintiffs' version of the events that they alleged had occurred since

their complaint. (Pls.' Suppl. Pleading.) Plaintiffs did not supplement their

motion for a preliminary injunction.

On August 20, 2008, the Court held a hearing to determine the impact of

plaintiffs' "Supplemental Pleading" on the matter. Due to a continuing concern as

to whether the second and third iterations of the Special Order were properly

before me, I directed plaintiffs to provide the Court with legal support by August

25, 2008 for plaintiffs' contention that they were. (August 20, 2008 Minute

Entry.) In addition, I ordered the District to respond to plaintiffs' initial complaint

by August 25, 2008. (*Id.*) Both plaintiffs and the District duly complied, and

upon consideration of plaintiffs' legal memorandum, (Pls.' Filing Regarding

Suppl. Pleading.), I concluded that I could treat plaintiffs' supplemental pleading

as a supplement to plaintiffs' complaint pursuant to Federal Rule of Civil

Procedure 15(d).  (Order, Sept. 3, 2008.)  I consequently ordered the District to

file its response to the supplemental pleading by September 15, 2008, which, of

course, it did.  (*Id.*)

## DISCUSSION

"A preliminary injunction is an extraordinary remedy that should be

granted only when the party seeking the relief, by a clear showing, carries the

burden of persuasion." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)

(citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).  To prevail on their

motion for a preliminary injunction, plaintiffs must demonstrate: (1) a substantial

likelihood of success on the merits; (2) that they will suffer irreparable injury if the

injunction is not granted; (3) that an injunction will not substantially injure other

interested parties; and (4) that the public interest will be furthered by the

injunction. *Katz v. Georgetown Univ.*, 246 F.3d 685, 687 (D.C. Cir. 2001).  These

factors interrelate on a sliding scale and a court must balance the strengths of

plaintiffs' arguments on each of the factors.  *CityFed Fin. Corp. v. Office of Thrift

Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995); *St. Croix Chippewa Indians of

Wis. v. Kempthorne*, 535 F. Supp. 2d 33, 36 (D.D.C. 2008).  If plaintiffs "make[] a

particularly weak showing on one factor . . ., the other factors may not be enough

to compensate." *Dodd v. Fleming*, 223 F. Supp. 2d 15, 20 (D.D.C. 2002).  For the

following reasons, plaintiffs have failed to establish either a substantial likelihood

of success on the merits or the necessary irreparable harm.  As a result, they have

failed to meet their considerable burden.

I.      **Substantial Likelihood of Success on the Merits**

        To succeed on the merits, plaintiffs would ultimately have to demonstrate

that the suspicionless vehicle seizures conducted by the MPD pursuant to the NSZ

checkpoint program are unconstitutional.[3]  To do so they would need, in essence,

to either demonstrate that (1) the primary purpose of the NSZ checkpoint program

is to serve the District's "general interest in crime control," or (2) that, if the

primary purpose is not to serve the District's "general interest in crime control,"

the checkpoints are nevertheless constitutionally unreasonable.  To date, they have

done neither.  How so?

*A.*      ***Constitutional Framework***

        A Fourth Amendment seizure occurs whenever law enforcement officials

stop a vehicle at a roadside checkpoint (or "roadblock").  *Mich. Dep't of State*

---

[3]      Given the District's filing on the record of the second and third versions of the
Special Order and plaintiffs' ample opportunity to assert additional argument concerning
the effect of the revised Special Order on their motion, I treat as properly before me all
facets of the NSZ checkpoint program as it has been revised by MPD to date.  *See State
Farm Mut. Auto. Ins. Co. v. Dole*, 802 F.2d 474, 479 (D.C. Cir. 1986) ("The ripeness
doctrine['s] . . . roots are found in both the Article III requirement of 'case or
controversy' and prudential considerations favoring the orderly conduct of the
administrative and judicial processes.").  However, because I determine, as discussed
*infra*, that plaintiffs have failed to establish any irreparable harm in connection with those
facets of the NSZ checkpoint program permitted under the first version of the Special
Order but subsequently prohibited (e.g., the entry of operator information into law
enforcement databases), I will consider for purposes of this review of plaintiffs'
likelihood of success on the merits only those facets of the NSZ checkpoint program
extant at the time of this decision.  Hence, the data storage that occurred during the first
NSZ is not evaluated under this portion of the analysis.

*Police v. Sitz*, 496 U.S. 444, 450 (1990); *Delaware v. Prouse*, 440 U.S. 648, 653

(1979).  Indeed, the Supreme Court has noted that roadside checkpoints, however,

brief, intrude on motorists' "right of 'free passage without interruption'" and

"arguably on their right to personal security."  *United States v. Martinez-Fuerte*,

428 U.S. 543, 557-58 (1976) (quoting *Carroll v. United States*, 267 U.S. 132, 154

(1925)).  Because seizures "[are] ordinarily unreasonable in the absence of

individualized suspicion of wrongdoing," *City of Indianapolis v. Edmond*, 531

U.S. 32, 37 (2000), the Supreme Court has fashioned a two-step analysis to

determine the constitutionality of checkpoints that subject motorists and

passengers to suspicionless stops.

First, a court must determine the "primary purpose" of the checkpoint

program to determine if it is presumptively unconstitutional. *Illinois v. Lidster*,

540 U.S. 419, 423-24 (2004); *United States v. Davis*, 270 F.3d 977, 979 (D.C. Cir.

2001).  In that regard, the Supreme Court has held unconstitutional vehicle

checkpoint programs whose primary purpose is merely to "serve the general

interest in crime control" (e.g., drug interdiction checkpoints). *Edmond*, 531 U.S.

at 41-42, 44.  And although the Supreme Court has not, to date, set a bright line

rule for what constitutes serving the "general interest in crime control," it has, by

contrast, upheld only a limited number of suspicionless vehicle checkpoint

programs.

For example, the Supreme Court has upheld vehicle checkpoints designed

to intercept illegal aliens, *Martinez-Fuerte*, 428 U.S. at 543, and designed to

remove drunk drivers from the road, *Sitz*, 496 U.S. at 444, because both serve

"special law enforcement concerns." *Lidster*, 540 U.S. at 424.  The Supreme

Court has also upheld checkpoints designed to collect information about a specific,

highway-related crime, where "the concept of individualized suspicion has little

role to play." *Id.*  Finally, the Supreme Court has indicated that license and

registration checkpoints aimed at serving the state's interest in highway safety are

also permissible. *Edmond*, 531 U.S. at 37-38, 39 (citing *Prouse*, 440 U.S. at 663);

*see also United States v. Bowman*, 496 F.3d 685, 691-92 (D.C. Cir. 2007).

　　　If the court determines that the primary purpose of the checkpoint program

does not render the program presumptively unconstitutional, it must then asses the

"reasonableness" of the checkpoints. *Lidster*, 540 U.S. at 426-27.  In doing so, the

court must assess: (1) the gravity of the public concern served by the checkpoints;

(2) the degree to which the checkpoints advance the public interest; and (3) the

severity of the checkpoints' interference with individual liberty. *Brown v. Texas*,

443 U.S. 47, 50-51 (1979); *see also, e.g.*, *Lidster*, 540 U.S. at 427-28 (applying

*Brown* test); *Sitz*, 496 U.S. at 449-55 (applying *Brown* test).

　　　Plaintiffs here contend, not surprisingly, that the primary purpose of the

NSZ checkpoint program is to serve the District's "general interest in crime

control" and, even if it were not, that the program is administered in an

unconstitutionally unreasonable manner.  (Pls.' Mem. in Supp. Mot. for Prelim.

Inj. at 17-19, 24-25.)  The District strongly disagrees.  It contends that the primary

purpose is *not* to serve its general interest in crime control, but to serve the "non-

general law enforcement" purpose of deterring a particular type of violent crime that is facilitated, in part, by the use of automobiles to avoid detection and apprehension. (Def.'s Opp'n Br. at 18, 33-35.) In addition, the District contends that the NSZ program is conducted in a constitutionally reasonable manner: properly balancing the intrusion of the roadblock seizure with the public's strong interest in deterring this type of violent criminal behavior. (*Id.* at 37-42.) For the following reasons, plaintiffs have not demonstrated a substantial likelihood of success on the merits as to either prong of this constitutional analysis.

## B.     *The Primary Purpose*

A vehicle checkpoint program's "primary purpose" is a question of fact that a court must assess at the programmatic level. *Edmond*, 531 U.S. at 44, 48; *Bowman*, 496 F.3d at 693-94; *Davis*, 270 F.3d at 981. Indeed, the D.C. Circuit has cautioned that "finding the primary or predominant purpose will often prove difficult," and the district court must take into account all available evidence. *Davis*, 270 F.3d at 982. Further, in a suit to enjoin future roadblocks, a court should not "probe the minds of individual officers acting at the scene," but should look beyond the specific circumstances of any one roadblock in determining the "programmatic purpose." *Edmond*, 531 U.S. at 48; *see also Davis*, 270 F.3d at 981-82. Here, notwithstanding plaintiffs' arguments to the contrary, the primary purpose is, as a matter of fact, quite clearly set out in a variety of sources, including the Special Order, the NSZ training documents, the Trinidad NSZ

authorizing documents, and declarations from Chief Lanier, as well as by the
factual circumstances of the Trinidad roadblocks themselves. How so?

First, the Special Order's "purpose" statement offers persuasive *prima facie*
evidence of the NSZ checkpoint program's primary purpose. The Special Order's
Background section explains that "[v]ehicles are common instrumentalities of
crime, particularly armed violent crime" and that "[i]t is in the interest of law
enforcement to prohibit vehicles with no legitimate purpose to enter
neighborhoods that have been victimized by spikes in violent crime." (SO-08-06
#3 ¶ I.) And while the first Special Order includes only some generalized
sentiments regarding the NSZ program's purpose (e.g., to provide "high police
visibility, prevent and deter crime, safeguard officers and community members,
and create safer District of Columbia neighborhoods") (SO-08-06 #1 ¶¶ I, II,
III.2), the second and third versions of the Special Order include a more precise
purpose statement. The "primary purpose" of an NSZ

> is *not* to make arrests or to detect evidence of ordinary criminal
> wrongdoing, but to increase protection from violent acts, and
> promote the safety and security of persons within the NSZ *by*
> *discouraging – thereby deterring – persons in motor vehicles from*
> *entering the NSZ intending to commit acts of violence.*

(SO-08-6 #2 ¶ I; SO-08-06 #3 ¶ I (emphasis added).)

Indeed, the rules governing the NSZ checkpoints corroborate this stated
primary purpose. The Special Order requires that a NSZ be established "solely in
response to documented crimes of violence occurring within the designated

neighborhood."[4]  (SO-08-06 #3 ¶ IV.A.)  It requires that all vehicles seeking to

enter a NSZ at a checkpoint be stopped, but prohibits officers from stopping

vehicles exiting the checkpoint, absent individualized suspicion.  (*Id.* ¶¶ IV.F,

V.M.5.)  It also prohibits officers from stopping pedestrians entering or exiting the

NSZ, absent individualized suspicion.[5]  (*Id.* ¶ IV.G.)  For vehicles stopped at a

checkpoint, it provides that officers shall not search the vehicle unless the officer

develops individualized suspicion that a crime is being committed.  (*Id.* ¶ IV.H.)

Importantly, it limits officers' inquiries to whether the operator has a legitimate

reason for entry and can provide proof reasonably sufficient for the officer to

verify the accuracy of the reason.  (*Id.* ¶ V.L.)  On this point, the NSZ Lesson Plan

used to train MPD officers is particularly instructive and emphatic: "refusal to

answer any or all questions should not be viewed as a basis for suspicion, and such

drivers should be allowed to depart without being further detained."  (Pls.' Mot.

for Prelim. Inj., Ex. 2, NSZ Lesson Plan at 10.)  The Special Order also requires

MPD to notify local residences and businesses about the NSZ in advance and to

---

[4]      The Special Order states that the following types of evidence may support the
existence of a neighborhood violent crime problem sufficient to establish a NSZ:
pertinent violent crime data, information contained in citizen and community reports and
complaints relevant to documented violent crimes, and information gathered from
criminal intelligence sources relevant to documented violent crimes.  (SO-08-06 #3 ¶¶
V.A.1-3.)  Notably, the NSZ Lesson Plan used to train MPD officers states that NSZs
should be "[e]stablished for a specific law enforcement purpose – not for general law
enforcement or fishing expeditions."  (Pls.' Mot. for Prelim. Inj., Ex. 2, NSZ Lesson Plan
at 5.)
[5]      Reinforcing the program's disinterest in pedestrians, the NSZ Lesson Plan
emphasizes "Focus in on vehicles" and "Do not stop pedestrians." (Pls.' Mot. for Prelim.
Inj., Ex. 2, NSZ Lesson Plan at 3, 6.)

post notices warning oncoming traffic that a NSZ has been established.[6]  (SO-08-06 #3 ¶ V.O.4.)  Each of these facets of the NSZ checkpoint program provide corroborating evidence that the programmatic purpose of the program is *not* to uncover evidence of ordinary criminal wrongdoing, but to deter violent crime facilitated specifically by the use of vehicles in neighborhoods recently victimized by spikes in violent crime.[7]

Thus, the novel question presented in this case is whether this primary purpose to deter violent crime of a specific type is a purpose sufficiently distinct from the District's general interest in crime control to pass muster under the Supreme Court's analysis in *Edmond*.  In my judgment, it is!  Indeed, because the NSZ checkpoint program *explicitly* does not seek to detect ordinary criminal wrongdoing, or apprehend those committing criminal acts, the program's primary

---

[6]     The brochure MPD provides to the public is further evidence that the NSZ checkpoint program's primary purpose is to deter violent crime associated specifically with motor vehicles.  The NSZ Brochure states that "[o]ne of the most challenging issues facing law enforcement – particularly in violent crimes – is the fact that many crimes occur using a motorized vehicle." (Pls.' Mot. for Prelim. Inj., Ex. 3, NSZ Brochure.)  The brochure goes on to state that the purpose of a NSZ "is to provide high police visibility, prevent and deter crime, and create safer District of Columbia neighborhoods – by prohibiting vehicles with no legitimate purpose to enter the area." (*Id.*)

[7]     Chief Lanier's authorization for the second Trinidad NSZ similarly evidences this purpose. "The primary purpose of the NSZ program, with its checkpoints, its brochure, its signage, and its attendant publicity is to discourage persons inclined toward committing acts of violence involving a motor vehicle from attempting to enter Trinidad, by alerting them to the existence of the program and increased police presence within the community and also by 'fencing them out' physically . . . ." (Def.'s Notice of Filing, July 19, 2008, Attach. 2, Decl. Establishing a NSZ at 1.)  Also, I find no evidence, and plaintiffs do not allege, that either the circumstances surrounding the implementation of the first and second Trinidad NSZs or the conduct of the officers implementing the checkpoints indicate that the program's stated purpose is a "subterfuge" and the program is meant to advance a different (potentially impermissible) purpose. *Cf. United States v. McFayden*, 865 F.2d 1306, 1312 (D.C. Cir. 1989) (finding no evidence that traffic regulation checkpoint was a subterfuge for capturing drug dealers).

purpose is *clearly* distinct from the District's "general interest in crime control," as that phrase was employed in *Edmond*.

While both the District of Columbia and the City of Indianapolis in *Edmond* employed checkpoints to address increased illegal activity, the methods the checkpoints' employed – and in turn the checkpoints' purposes – are materially different. In *Edmond*, the City of Indianapolis conducted six vehicle checkpoints in August 1998 in an effort to interdict the transportation of illegal drugs. 531 U.S. at 34-35. Officers at the checkpoints asked the operator of each vehicle stopped for license and registration, performed an open-view examination of the vehicle, looked for signs of operator impairment, and walked a narcotics-detection dog around the outside of the vehicle. *Id.* Indianapolis justified the checkpoint program on account of a severe and intractable drug problem and conceded that "its proximate goal [was] to catch drug offenders." *Id.* at 41-42 (quoting *Edmond v. Goldsmith*, 183 F.3d 659, 665 (7th Cir. 1999) (noting a related goal of using incapacitation of those caught to deter others)).

The Supreme Court found Indianapolis' drug interdiction checkpoints dissimilar to the sobriety checkpoints previously upheld in *Sitz*, where the checkpoints addressed an "immediate, vehicle-bound threat to life and limb," and the unique border context crucial to the Court's decision in *Martinez-Fuerte* upholding border patrol checkpoints. *Id.* at 43. Instead, because the drug interdiction checkpoints' primary purpose "[was] to uncover evidence of ordinary criminal wrongdoing, the program contravene[d] the Fourth Amendment." *Id.* at

42. The Court emphasized that "[w]e cannot sanction stops justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime." *Id.* at 44.

Such justification is not present here. Unlike the program in *Edmond*, the NSZ checkpoint program's primary purpose is *not*, in whole or in part, to uncover evidence of ordinary criminal wrongdoing. Officers are instructed to inquire only into the operator's reason for seeking entry to the NSZ. Officers are further instructed that vehicle searches shall not occur absent individualized suspicion generated during the pendency of a stop. Failure or refusal to provide information to the officer is not grounds for suspicion and the officer must allow any operator that does not wish to provide information to turn around and exit the checkpoint (or to enter the NSZ on foot without further inquiry). And whereas the Indianapolis' checkpoints had catching drug offenders as its goal and succeeded in arresting 55 motorists (out of 1,161 vehicles stopped) on that basis, *Edmond*, 531 U.S. at 34-35, the NSZ program was preventative in nature and resulted in only one arrest during the first Trinidad NSZ.[8] Indeed, the NSZ checkpoint program's primary purpose could not be more distinct from the impermissible purpose found in *Edmond*. *See also Lidster*, 540 U.S. at 423 (upholding information-gathering checkpoint after distinguishing *Edmond* on basis that information-gathering checkpoint's purpose "was *not* to determine whether a vehicle's occupants were

---

[8]    The record does not reflect whether any arrests were made during the second Trinidad NSZ.

committing a crime" (emphasis in original)); *Prouse*, 440 U.S. at 659 n.18
(indicating that government's interest in controlling automobile thefts through the
apprehension of stolen cars is not distinguishable from the government's general
interest in crime control).

Finally, plaintiffs argue that even if the NSZ checkpoint program does not
have as its primary purpose the detection of ordinary criminal wrongdoing, a
primary purpose of deterring violent crime facilitated by motor vehicles
nevertheless is indistinguishable from the District's "general interest in crime
control." (Pls.' Mem. in Supp. Mot. for Prelim. Inj. at 19.) I disagree. The
Supreme Court made clear that "the phrase 'general interest in crime control' does
not refer to every 'law enforcement' objective." *Lidster*, 540 U.S. at 424 (citing
*Edmond*, 531 U.S. at 44 n.1). Indeed, in *Lidster* the Supreme Court upheld the
constitutionality of information-gathering highway checkpoints after determining,
first, that the checkpoint program's purpose "was not to determine whether a
vehicle's occupants were committing a crime" and, second, that individualized
suspicion, or lack thereof, had little role to play in that type of checkpoint
program. *Id.* at 424-25 ("Like certain other forms of police activity, say, crowd
control or public safety, an information-seeking stop is not the kind of event that
involves suspicion, or lack of suspicion, of the relevant individual."). Here,
"fencing out" vehicles that lack a legitimate reason to enter a neighborhood
victimized by a spike in violent crime is a public safety objective for which
individualized suspicion has little role to play. The NSZ checkpoint program does

not have as its primary purpose the apprehension of individuals committing
wrongdoing, nor does it operate in a manner that would likely induce self-
incriminating statements.  For these reasons, I find that plaintiffs have failed to
establish a substantial likelihood that the NSZ checkpoint program has an
impermissible primary purpose rendering the program presumptively
unconstitutional.

**B.**     ***The Reasonableness of the Roadblock Program***

Plaintiffs further contend that even if the primary purpose of the NSZ
checkpoint program does not render the program presumptively unconstitutional,
the program as implemented does not strike a reasonable balance between the
intrusion the checkpoints cause to individual liberty with the public's interest in
deterring this type of violent crime. (Pls.' Mem. in Supp. Mot. for Prelim. Inj. at
24-26.) I disagree!

The reasonableness of seizures at vehicle checkpoints is assessed by
weighing: 1) the gravity of the public concern served by the checkpoints; 2) the
degree to which the checkpoints advance the public interest; and 3) the severity of
the checkpoints' interference with individual liberty. *Brown*, 443 U.S. at 50-51;
*United States v. McFayden*, 865 F.2d 1306, 1310 (D.C. Cir. 1989). While the
gravity of the public concern may reduce an individual's liberty interest, see *Sitz*,
496 U.S. at 451-52, "the gravity of the threat alone [is not] dispositive of questions
concerning what means law enforcement officers may employ to pursue a given

purpose." *Edmond*, 531 U.S. at 42.  Here, the balance on these three factors tips

clearly in the District's favor.

### i.    *Gravity & Effectiveness*

As to the first factor, plaintiffs concede that "[a] grave situation does . . .

exist today in the District of Columbia when it comes to street crime and personal

security." (Pls.' Mot. for Prelim. Inj. at 3.)  Indeed, the events preceding the

District's implementation of the NSZs bespeak the violence that can result when

individuals use vehicles to accomplish violent objectives.  Combating extremely

violent acts that are facilitated by the use of vehicles to enter, and quickly exit, our

neighborhoods is undeniably a grave public concern.  *Cf. Maxwell v. City of New

York*, 102 F.3d 664, 667 (2d Cir. 1996) (checkpoints "attempting to deter drive-by

shootings" perceived to be connected with drive-up drug purchases "served an

important public concern"); *Sitz*, 496 U.S. at 451 ("No can seriously dispute the

magnitude of the drunken driving problem or the States' interest in eradicating

it.").

The closely related second factor – effectiveness – also weighs in the

District's favor.  On this factor the District need only establish that the method

chosen is a reasonable law enforcement technique that furthers the public's

interest in deterring this type of violent crime in a "sufficiently productive"

fashion.  *See Sitz*, 496 U.S. at 453-54; *Davis*, 270 F.3d at 982.  It is not for this

Court to decide whether the NSZ checkpoints are the *best* means to advance the

public interest identified.  *Sitz*, 496 U.S. at 453-54.  Indeed, considerable deference

must be accorded "the government officials who have a unique understanding of, and a responsibility for, limited public resources." *Id.* at 454.  And while statistical evidence can often be instructive, it is not required to establish a checkpoint's effectiveness and in some contexts is inapposite. *Bowman*, 496 F.3d at 693 ("'[T]he effectiveness' or expected effectiveness 'of the checkpoint . . . may be demonstrated' in a variety of ways . . . ." (quoting *Davis*, 270 F.3d at 982)); *Davis*, 270 F.3d at 982 ("[S]tatistical evidence is not . . . essential."); *see also Lidster*, 540 U.S. at 427 (information-gathering checkpoints effective where tailored to collect information on same route and at approximately same time of night as hit-and-run accident); *Prouse*, 440 U.S. at 659-60 ("common sense" suggests that random, discretionary spot-checks are not a productive means to catch unlicensed drivers).  In fact, no single type of evidence is a touchstone for determining whether a checkpoint is "effective."

Here, the NSZ checkpoints are narrowly tailored to serve their stated deterrent purpose.  They are high-profile, publicized both in the neighborhood and the media prior to and during their operation.  (Lanier Decl. I ¶ 11.)  They are required to be well-marked so that motorists are given advance notice that they are approaching a NSZ checkpoint and can decide whether to seek entry.  (*Id.*; SO-08-06 #3 ¶ V.O.4.)  And for those motorists who choose to seek entry, the inquiry made at the checkpoints is tailored only to determine whether the operator has a verifiable "legitimate" reason to enter the neighborhood. *Cf. Maxwell*, 102 F.3d at 667 (checkpoints designed to deter drive-by shootings by admitting only vehicles

with a connection to the neighborhood "were reasonably viewed as an effective mechanism to deter criminal behavior in the barricaded area"). The NSZ checkpoints, accordingly, are a reasonable means to advance the program's deterrent purpose.

Moreover, the limited statistical evidence available to date indicates that the checkpoints are also productive. During the first Trinidad NSZ, four crimes were committed. The District notes that this represents a 13% decrease off the average over the nine previous five-day periods. (Def.'s Opp'n Br. at 37.) Plaintiffs counter that two of the four crimes committed during the Trindad NSZ were violent crimes, which represents a 10% *increase* in violent crime over the nine previous five-day periods. (Pl.'s Supp. Br. at 4-5.) The primary purpose of the checkpoints, however, is not to deter crime *generally*, but to deter violent crime facilitated by the use of a vehicle. And here, no violent crimes involving the use of a vehicle occurred while the NSZ was in effect. (Greene Decl. ¶ 12; Def.'s Opp'n Br., Ex. 6, NSZ After Action Report at 9-10.) The checkpoints, therefore, duly advanced the program's purpose.[9]

---

[9]    On this factor plaintiffs draw attention to *Galberth v. United States*, 590 A.2d 990 (D.C. 1991), in which the D.C. Court of Appeals found unconstitutional a MPD checkpoint also in Trinidad aimed at combating "violence, drugs, and guns" and disrupting an open air drug market. In *Galberth*, however, the District offered no empirical evidence whatsoever to support the checkpoint's effectiveness. *Id.* at 999. Such is not the case here. Also, the court in *Galberth* took it upon itself to determine whether other law enforcement techniques would have been similarly effective. As noted above, *Sitz* commands a different approach.

## ii.    *Intrusiveness*

The final factor in the *Brown* reasonableness test requires an analysis of the intrusiveness of the roadblock stops. Here again, the analysis weighs in the District's favor. An individual's expectation of privacy in an automobile and the freedom to operate it wherever one wishes are significantly different from one's expectation of privacy and freedom in one's own home. *Martinez-Fuerte*, 428 U.S. at 561. In short, the level of intrusion must be weighed in the context of the public interest. Thus, a particularly strong public interest will reduce the weight accorded the intrusion on the motorists stopped at the checkpoints. To determine the severity of the checkpoints' intrusiveness on motorists the court must examine both the "objective" and the "subjective" intrusiveness of the checkpoints, as well as the level of discretion afforded officers' conducting the checkpoints. *Sitz*, 496 U.S. at 452; *Brown*, 443 U.S. at 51. Here, plaintiffs have not established a substantial likelihood that the NSZ checkpoints' intrusion on individual liberty is so great that it outweighs the interests the NSZ checkpoints advance. How so?

A checkpoint's "objective" intrusion is "measured by the duration of the seizure and the intensity of the investigation." *Sitz*, 496 U.S. at 452. Here, as the parties themselves agree, the stops were brief. Indeed, the District contends (and plaintiffs do not disagree) that motorists denied entry are turned away from the checkpoint in a minute or less and those who pass through do so in a matter of seconds. (Sanders Decl. ¶¶ 7-8.); *cf. Lidster*, 540 U.S. at 427 (upholding stops requiring a brief wait in line and contact with police lasting a few seconds); *Sitz*,

23

496 U.S. at 448, 451 (upholding stops lasting 25 seconds); *Martinez-Fuerte*, 428 U.S. at 547 (upholding stops lasting up to five minutes).

The scope of the officers' inquiry for each motorist is also minimal. Officers request identification and proof of the motorist's stated reason for entry sufficient to "verify the accuracy of the reason." (SO-08-06 #3 ¶ V.L.4.) While that proof could include a telephone number at the address to which the operator seeks entry (which the officer can use to verify the operator's stated reason for entry) or an invitation to a "verified organized civic, community, or religious event" within the NSZ, (*Id.*), posing such questions is not *per se* impermissible conduct at a vehicle checkpoint. *See Martinez-Fuerte*, 428 U.S. at 558 (upholding border patrol stops where motorists were required to "respon[d] to a brief question or two and possibly . . . produc[e] a document evidencing a right to be in the United States"). Nor is it unprecedented. Indeed, the Second Circuit in *Maxwell v. City of New York* faced an almost identical situation and found that a "request for evidence of a legitimate reason to enter [a] barricaded area [is] not significantly intrusive." 102 F.3d at 667 (upholding checkpoint program designed to deter drive-by shootings by only allowing individuals with a legitimate reason to enter the neighborhood).

More importantly, no motorist stopped at a NSZ checkpoint is *required* to respond to the officer's inquiry. The Special Order specifically prohibits officers from compelling motorists to provide information. (SO-08-06 #3 ¶ V.L.4.) Failure to provide a "legitimate reason" is *not* a criminal offense and officers are

instructed to allow a motorist to turn away from the checkpoint if the motorist does not wish to submit to the officer's inquiry.  (Greene Decl. ¶ 8; Prelim. Inj. Hr'g Tr. at 52:23-25, 53:1, July 9, 2008.)  Moreover, motorists are free to park their car outside the NSZ and enter the NSZ on foot without being subject to any law enforcement inquiry.  (SO-08-06 #3 ¶ IV.G.)  Indeed, officers are instructed to proactively inform operators denied entry that they have this option.  (Greene Decl. ¶ 8; Sanders Decl. ¶ 9.)  These facets of the inquiry temper to a significant degree its intrusiveness.

The checkpoints' "subjective intrusiveness" is also minimal.  The checkpoints are publicized, posters warn motorists approaching the checkpoint that a stop is imminent, and all motorists who choose to proceed to the checkpoint are stopped.  These steps are the very type that the Supreme Court has held minimize anxiety, alarm, and fear.  *Sitz*, 496 U.S. at 452 (finding potential for "fear and surprise" minimal where uniformed police officers stopped every approaching car); *see also McFayden*, 865 F.2d at 1313 (finding minimal subjective intrusion where roadblock was announced at news conference several days earlier and roadblock was well marked).

Finally, the NSZ checkpoint program is drafted to minimize the discretion vested with the officers implementing the program.  *See Brown*, 443 U.S. at 51 (reasonableness under the Fourth Amendment requires that "the seizure . . . be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers"); *Prouse*, 440 U.S. at 661 (finding system of

vehicle spot checks unconstitutional on account of "standardless and unconstrained discretion" afforded police officers). The Special Order provides a highly-detailed set of rules governing the preconditions for every NSZ and the conduct of everyone from the Chief of Police to the individual officers staffing the checkpoints. *Cf. McFayden*, 865 F.2d at 1313 (traffic roadblock minimized discretion where field officers were given specific instructions and stopped vehicles in a "systematic and preplanned fashion"). Moreover, officers are required to complete a training session on the program before they are allowed to staff a checkpoint. (SO-08-06 #3 ¶ IV.D; Lanier Decl. I ¶ 7.) In fact, the only instance where officers retain any significant discretion in executing this program is when an operator's stated reason falls within an ambiguity in the list of "legitimate reasons" for entry. But, because the list is drafted with specificity and is disseminated to the public, the discretion that is necessarily inherent in such a list is quite restricted. *Cf. Maxwell*, 102 F.3d at 668 (finding instructions that were "detailed as reasonably possible" constitutionally adequate).

Accordingly, for all of these reasons, I conclude that plaintiffs have not established a substantial likelihood that the NSZ checkpoint program subjects motorists to unreasonable seizures in violation of the Fourth Amendment. Having also found that the NSZ checkpoint program does not have as its primary purpose the District's "general interest in crime control," I find that plaintiffs have not established the likelihood of success on the merits necessary to warrant the extraordinary relief of a preliminary injunction.

## II.    Irreparable Harm

Plaintiffs next contend that a preliminary injunction is necessary because they otherwise will suffer the irreparable harm of having their constitutional rights violated when, and if, they are stopped during a future invocation of the NSZ checkpoint program. (Pls.' Mot. for Prelim. Inj. at 3.) The District, not surprisingly, disagrees, arguing that it is pure speculation as to when, if ever, the next roadblock may occur, and, in any event, because plaintiffs fail to demonstrate a substantial likelihood of success on the merits, there is no constitutional violation to enjoin. (Def.'s Opp'n Br. at 11-16.) I agree.

Our Circuit has provided that in cases involving plaintiffs seeking injunctive relief for alleged constitutional violations the plaintiffs' claim for irreparable harm is directly contingent on their showing a substantial likelihood of success on the merits. *See Delaware & Hudson Ry. Co. v. United Transp. Union*, 450 F.2d 603, 619-20 (D.C. Cir. 1971) ("[I]n cases involving a claim by movant of interference with protected freedoms . . ., the finding of irreparable injury . . . depends on an appraisal of the validity, or at least the probable validity, of the legal premise underlying the claim of right in jeopardy of impairment."); *see also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006) (requiring more than a mere allegation of a First Amendment violation) (construing *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). Having failed to establish a substantial likelihood of success on the merits, plaintiffs' showing of irreparable harm is therefore similarly lacking. Moreover, even if

plaintiffs' showing on the merits were not so deficient, the Court finds that the risk that a NSZ will be instituted again during the pendency of this litigation is so speculative that for the following reasons the "imminence" requirement for a preliminary injunction is also lacking.

Our Circuit has set a high standard for irreparable harm. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. Indeed, injunctive relief "will not be granted against something merely feared as liable to occur at some indefinite time." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (quoting *Connecticut v. Massachusetts*, 282 U.S. 660, 674 (1931)). In short, plaintiffs must demonstrate that the injury is of such "imminence" that there is a clear and present need for equitable relief to prevent irreparable harm. *Id.* Past constitutional violations, therefore, are not sufficient *alone* to satisfy the irreparable harm requirement; the violation must be either ongoing or threatened. *Wagner v. Taylor*, 836 F.2d 566, 576 n.76 (D.C. Cir. 1987); *see also Chaplaincy of Full Gospel Churches*, 454 F.3d at 301; *Veitch v. Danzig*, 135 F. Supp. 2d 32, 37 (D.D.C. 2001); *Hamlyn v. Rock Island County Metro. Mass Transit Dist.*, 960 F. Supp. 160, 163 (C.D. Ill. 1997) ("[T]hose cases which have held that a constitutional wrong constitutes an irreparable injury involve some continuing or future injury . . . .") (citing cases). They have not done so here.

Simply stated, this court is in no position to predict when the factual preconditions for a NSZ roadblock, which are considerable, will again exist, if

ever.[10]  Accordingly, I am not convinced that the risk that MPD will implement

additional NSZ roadblocks during the pendency of this litigation would be great

enough to satisfy plaintiffs' required showing on irreparable harm for a

preliminary injunction even if they had made a sufficient showing – which they

did not – on their likelihood of success on the merits.[11]

---

[10]     Plaintiffs argue that they will suffer irreparable harm because, as licensed drivers
residing in the District, they retain a substantial risk of being stopped at a NSZ
checkpoint again as long as the NSZ checkpoint program remains in effect, particularly
given that the District "reserves the right to redeploy" the NSZ checkpoint program at
will. (Prelim. Inj. Hr'g Tr. at 8:18-24, 43:14-16, July 9, 2008; V. Compl. ¶ 52.)  Indeed,
plaintiffs note in a separate filing that MPD established the July 19, 2008 NSZ just one
day after the District represented in its July 18, 2008 Supplemental Filing on this motion
that it was only "conjecture" that there would be future invocations of the NSZ
checkpoint program. (Pls.' Reply Br. in Supp. Mot. for Class Cert. at 2 (citing Def.'s
Supp. Filing).)  Nevertheless, whether (and when) MPD will again implement a NSZ
remains speculation.  NSZ checkpoints are not implemented at the whim of any given
officer.  Rather, a NSZ can only be established in limited circumstances ("solely in
response to documented crimes of violence"), upon a specific showing of proof, and at
the sole discretion of the Chief of Police or the Chief's designee. (SO-08-06 #3 ¶¶ IV.A,
IV.C, V.A, V.U.)  Further, MPD's General Counsel is required to advise the Chief of
Police in writing whether a request for a NSZ meets the legal requirements prior to any
such authorization. (*Id.* ¶ V.T.2.)  These requirements materially curtail MPD's ability to
implement a NSZ for any purpose at any time.

[11]     Plaintiffs also argue that a similar factual predicate exists here as did before the
district court in *Edmond v. Goldsmith*, 38 F. Supp. 2d 1016 (S.D. Ind. 1998), under which
the Supreme Court eventually held the City of Indianapolis' drug interdiction checkpoints
unconstitutional. *Edmond*, 531 U.S. at 32.  In *Edmond v. Goldsmith*, however, the district
court did not discuss nor reach the issue of irreparable harm.  Rather, the district court
denied plaintiffs' motion for a preliminary injunction solely on the basis of the district
court's finding that the plaintiffs failed to establish a likelihood of success on the merits.
*Goldsmith*, 38 F. Supp. 2d at 1021, 1027 (treating the moving party's likelihood of
success on the merits as the "threshold issue"); *see also Edmond v. Goldsmith*, 183 F.3d
659, 666 (7th Cir. 1999) (noting, in reversing the district court, that the lawfulness of the
checkpoint program "was the only ground on which [the district court] denied the
preliminary injunction" and that "[w]hether there may be other grounds for denying the
preliminary injunction . . . are issues for the district court to decide in the first instance").
The *Edmond* line of cases, therefore, is inapplicable to the issue of irreparable harm in
this case.

Finally, with respect to the data gathering and storage practices permitted in the first Special Order but prohibited thereafter, plaintiffs have not established a substantial risk that MPD will re-institute those practices if a future NSZ roadblock is established. While the District's prohibition of this practice does not *per se* moot plaintiffs' challenge to the District's data collection practices on the merits, *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982) ("It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."), plaintiffs have not established a credible threat that the District will, during the pendency of this litigation, reverse course and engage in practices it presently prohibits. For this reason, to the extent plaintiffs have not already withdrawn their request for a preliminary injunction requiring the District to expunge all data collected to date, such request is also denied.[12] *See Washington Free Cmty., Inc. v. Wilson*, 484 F.2d 1078, 1084 (D.C. Cir. 1973) ("[A] policy revision instituted after and designed to eliminate offending governmental conduct can obviate the necessity for enjoining such conduct, there being no reason to believe the revision would not be fully implemented."); *Dodd*, 223 F. Supp. 2d at 20 ("[I]f a party

---

[12]     The District filed a proposed order with its opposition brief that permits counsel for the District to retain copies of the Form PD-76s completed for any of the named plaintiffs but requires that all other Form PD-76s generated through the Trinidad NSZ checkpoint operations be filed under seal with the Court. (Def.'s Opp'n Br. at 3 n.1; *Id.*, Ex. 15.) Plaintiffs indicated their consent to this proposed order in their reply brief in support of their pending motion for class certification. (Pls.' Reply Br. in Supp. Mot. for Class Cert. at 13.) There being agreement among the parties on this issue, the Court enters the District's proposed order with this Memorandum Opinion.

makes no showing of irreparable injury, the court may deny the motion for injunctive relief without considering the other factors.").

## III.   Public Interest and Public Injury

Finally, having failed to establish either a substantial likelihood of success on the merits or irreparable harm, the Court finds no need to engage in an analysis of the remaining factors. Suffice it to say that the public's interest in deterring violent crime of this type through a checkpoint program this carefully crafted is overwhelming. Simply put, to take this arrow out of MPD's quiver on such a weak showing as to its unconstitutionality would be injurious not only to MPD's ability to protect our citizens, but to the public's overwhelming need to be protected from these mobile merchants of violence.

### CONCLUSION

Thus, for all of the above reasons, the Court DENIES plaintiffs' Motion for a Preliminary Injunction. An appropriate Order will issue with this Memorandum Opinion.

RICHARD J. LEON
United States District Judge

31